ORIGINAL

FILED
MAY - 2 2006
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| GISELE C. FISHER,<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant. | No. 06-351 T<br>COMPLAINT |

Gisele C. Fisher, plaintiff, alleges as follows:

## I. PARTIES

1. Plaintiff, an individual residing in Des Moines, Washington, is the taxpayer.

2. Plaintiff's social security number is 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.

3. Defendant is the United States.

## II. JURISDICTION AND VENUE

4. This Court has original subject matter jurisdiction by reason of 28 U.S.C. 1491(a)(1) because this is an action for recovery of federal gift tax and interest erroneously or illegally assessed and collected.

5. Venue is proper in this Court.



MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET, SEATTLE, WASHINGTON 98101-2352

## III. FACTS/STATEMENT OF CLAIM

6. On or before April 15, 2001, plaintiff timely filed a federal gift tax return, Form 709, with the Internal Revenue Service at Ogden, Utah. The name and address of the taxpayer appearing on Form 709 were Gisele C. Fisher, Post Office Box 98510, Des Moines, Washington 98198. The identification number shown on the return was 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. Plaintiff timely paid gift taxes in the amount of $2,198,731.20 on account of this return.

7. Plaintiff reported on Form 709 the value of 946 shares of D. R. Fisher Company, a closely-held Washington corporation, at $8,430 per share pursuant to an appraisal.

8. On audit of this return, the Commissioner of the Internal Revenue Service (the "Commissioner") erroneously valued the 946 shares of stock at $12,338 per share. As a result of the audit, the Commissioner assessed a deficiency of $1,208,592.

9. On or about February 3, 2005, the defendant mailed plaintiff a notice of deficiency in which it determined that plaintiff owed an additional tax of $1,208,592. On or about April 13, 2005, plaintiff paid to the Internal Revenue Service on account of this assessment the sum of $1,208,592.

10. On or about May 26, 2005, plaintiff filed a Form 843 claim with the Internal Revenue Service Center at Cincinnati, Ohio, for a refund of federal gift tax paid in the amount of $1,208,592, together with interest as allowed by law. A copy of this claim is attached hereto as Exhibit A.

11. More than six months have passed since Plaintiff filed the Form 843 refund claim. No action on the claim for refund (Exhibit A) has been taken by Congress or any agency of the United States or in any judicial proceeding, including any action in the Tax Court of the United States.



MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE (206) 622-8484
4400 TWO UNION SQUARE
601 UNION STREET, SEATTLE, WASHINGTON 98101-2352

12. Plaintiff is the sole owner of the claim depicted in Exhibit A and asserted herein, and has made no assignment thereof.

13. Recovery is sought of federal gift tax paid on April 13, 2005, in the amount of $1,208,592 and interest of $300,528.28 paid July 20, 2005 by checks payable to the U.S. Treasury and mailed to the Internal Revenue Service, Ogden Service Center, Ogden, Utah 84201.

## IV. PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment against the United States in the amount of $1,208,592 plus interest paid of $300,528.28, interest and costs allowed by law, and such other relief as the court may deem just, including the award of attorney fees under 26 U.S.C. § 7430.

DATED this 1st day of May, 2006.

MILLER NASH LLP

Paul W. Oden

Paul W. Oden
4400 Two Union Square
601 Union St.
Seattle, WA 98010
Tel: (206) 622-8484
Fax: (206) 622-7485
Attorneys for Plaintiff

# EXHIBIT A

Claim for Refund and Request for Abatement

Form **843** (Rev. November 2002)
Department of the Treasury Internal Revenue Service

# Claim for Refund and Request for Abatement

▶ See separate instructions.

OMB No. 1545-0024

*Use Form 843 only if your claim involves **(a)** one of the taxes shown on line 3a or **(b)** a refund or abatement of interest, penalties, or additions to tax on line 4a.*
***Do not** use Form 843 if your claim is for—*
- *An overpayment of income taxes;*
- *A refund for nontaxable use (or sales) of fuel; or*
- *An overpayment of excise taxes reported on Form(s) 11-C, 720, 730, or 2290.*

Type or print

| | |
|---|---|
| Name of claimant<br>**Gisele C. Fisher** | Your SSN or ITIN<br>**537 : 44 : 7838** |
| Address (number, street, and room or suite no.)<br>**PO Box 98510** | Spouse's SSN or ITIN<br>: : |
| City or town, state, and ZIP code<br>**Des Moines, WA 98198** | Employer identification number (EIN)<br>: |
| Name and address shown on return if different from above | Daytime telephone number<br>( ) |

1 Period. Prepare a separate Form 843 for each tax period
From **01 / 01 / 2000** to **12 / 31 / 2000**

2 Amount to be refunded or abated $ **1,208,592**

3a Type of tax, penalty, or addition to tax:
☐ Employment ☐ Estate ☑ Gift ☐ Excise (see instructions)
☐ Penalty—IRC section ▶ ____________

b Type of return filed (see instructions):
☐ 706 ☑ 709 ☐ 940 ☐ 941 ☐ 943 ☐ 945 ☐ 990-PF ☐ 4720 ☐ Other (specify)

4a Request for abatement or refund of:
☐ Interest as a result of IRS errors or delays.
☐ A penalty or addition to tax as a result of erroneous advice from the IRS.

b Dates of payment ▶

5 **Explanation and additional claims.** Explain why you believe this claim should be allowed, and show computation of tax refund or abatement of interest, penalty, or addition to tax. If you need more space, attach additional sheets.

**Taxpayer paid the deficiency asserted in the Service's Notice of Deficiency, dated February 3, 2005, copy enclosed. The Notice of Deficiency was issued based on the Service's July 15, 2004 Examination Report, copy enclosed. For the reasons stated in the taxpayer's letter of August 10, 2004 to Carolyn Tucker, copy attached, the claim should be allowed. The value of the taxpayer's gifts was supported by the Valuation Report of Mr. T. S. Leung dated February 15, 2001, copy enclosed. The valuation of the stock stated its fair market value for federal gift tax purposes. A copy of the taxpayer's check is enclosed. A copy of the government's valuation report prepared by Lewis Olds is enclosed.**

**Signature.** If you are filing Form 843 to request a refund or abatement relating to a joint return, both you and your spouse must sign the claim. Claims filed by corporations must be signed by a corporate officer authorized to sign, and the signature must be accompanied by the officer's title.

Under penalties of perjury, I declare that I have examined this claim, including accompanying schedules and statements, and, to the best of my knowledge and belief, it is true, correct, and complete.

Gisele Corwan Fisher — May 24, 2005
Signature (Title, if applicable. Claims by corporations must be signed by an officer.) Date

Signature Date

For Privacy Act and Paperwork Reduction Act Notice, see separate instructions. Cat. No. 10180R Form **843** (Rev. 11-2002)

**Duplicate Original**

**Department of the Treasury**
**Internal Revenue Service**
Appeals Office
1220 SW Third Avenue
Suite 1117, MS O680
Portland, OR 97204

Date: FEB 0 3 2005

GISELE C. FISHER, DONOR
C/O PAUL W. ODEN
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WA 98101

**Letter Number:** 901(cg)-c

**Person to Contact:**
Mr. Gary Hiraki
Employee ID Number: 9-94919
Tel: (503) 326-3366
Fax: (503) 326-4951
**Refer Reply to:**
AP:FO-West:8:POR:GTH
**Form Number:**
709
**Taxpayer Identification Number:**
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
**Tax Type:**
Income
**Last Day to File a Petition with the United States Tax Court:**
May 4, 2005

**Certified Mail** 7003 1010 0004 5302 7722

**Notice of Deficiency**

| Tax Year Ended | Tax |
|---|---|
| December 31, 2000 | $1,208,592.00 |

Dear Mr. Oden:

We've determined that you have a deficiency in your tax account(s). This means you owe additional tax, other amounts such as penalties or additions to tax, or both, as shown above. This letter is your **NOTICE OF DEFICIENCY** that the law requires. The enclosed statement shows how we figured your deficiency.

**If you disagree** with this notice of deficiency, you may petition the United States Tax Court for a redetermination of your deficiency. You have 90 days from the date of this letter (150 days if this letter is addressed to you outside of the United States) to file your petition. Send your completed petition form, a copy of this letter, and copies of all statements and/or schedules you received with this letter, to the United States Tax Court. You may get a petition form and a copy of the rules for filing a petition by writing to the following address:

United States Tax Court
400 Second Street, NW
Washington, DC 20217

The Tax Court has a simplified procedure for small tax cases when the amount in dispute for **each** tax year is $50,000 or less. If you intend to file a petition for multiple tax years and the amount in dispute for any one or more of the tax years exceeds $50,000, this simplified procedure is not available to you. If you use this simplified procedure, you cannot appeal the Tax Court's decision. You can get information pertaining to the simplified procedure for small cases from the Tax Court by writing to the court at the above address or from the court's internet site at www.ustaxcourt.gov.

If you intend to file a petition with the Tax Court, you should do so promptly. The court cannot consider your case if you file the petition late. The law considers your petition as filed on time if the postmarked date falls within the 90 or 150 day period allowed, and the envelope containing the petition is properly addressed with the correct postage.

The time allowed to file a petition with the Tax Court cannot be extended or suspended because the time is set by law. Requesting more information, or receiving other correspondence from the Internal Revenue Service (IRS) will not change the time allowed by law to file your petition.

**If you agree** with this notice of deficiency and do not intend to petition the Tax Court for a redetermination, please sign the enclosed waiver form and return it to us at the IRS address at the top of the first page of this letter. This will permit us to assess the deficiency quickly, and may limit the accumulation of interest you may owe. We've enclosed an envelope for your convenience.

If you decide not to send the IRS your signed waiver, and also not to file a petition with the Tax Court within the time limit, the law requires us to assess the deficiency and bill you after 90 days (150 days if this letter is addressed to you outside of the United States) from the date of this letter. This bill may include interest. If you are a C corporation, under Internal Revenue Code Section 6621(c), large corporate underpayments may be subject to a higher rate of interest than the normal rate of interest for underpayments.

If you have questions about this letter, you may call or write to the contact person whose name appears on the first page of this letter. If you write to us, please include: (1) a copy of this letter to help us to identify your account; and (2) your telephone number, including the area code, and the best time for us to call you. If you send a copy of this letter to us, we recommend you keep the original for your records. If you call us and our telephone number is outside your local calling area, please remember there will be a long distance charge from your telephone company.

The contact person listed on the front of this letter can access your tax information and help you get answers. In addition to help from this contact person, you may ask for help from the Taxpayer Advocate by calling 1-877-777-4778, or contacting the Taxpayer Advocate for the IRS office that issued this notice of deficiency by calling 503-326-2333 or writing to 1220 SW Third Avenue, MS O405, Portland, , OR 97204. Taxpayer Advocate assistance is not a substitute for established IRS procedures. The Taxpayer

Advocate can help you to understand your tax situation, provide account information, and make sure that your problem is handled promptly and properly. However, the Taxpayer Advocate cannot reverse legally correct tax determinations, or extend the time the law allows you to file a petition with the United States Tax Court.

Thank you for your cooperation.

Sincerely,
Mark W. Everson
Commissioner
By

Les Lucas
Appeals Team Manager

Enclosures:
Waiver
Form 4089A Notice of Deficiency Statement
Envelope
Statement
Copy of this Letter

| Form 4089-A (Rev. 04/1982) | Department of the Treasury - Internal Revenue Service **Notice of Deficiency - Statement** | Symbols: AP:FO-West:8:POR:GTH |
|---|---|---|

GISELE C. FISHER
PO BOX 98510
DES MOINES, WA 98198-0510

AND

GISELE C. FISHER, DONOR
C/O PAUL W. ODEN
4400 TWO UNION SQUARE
601 UNION STREET
SEATTLE, WA 98101

DUPLICATE ORIGINALS OF THIS NOTICE HAVE BEEN SENT TO THE ADDRESSES SHOWN ABOVE

SSN\EIN: 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

Interest, as provided by law, will be charged on the unpaid liability until it is paid in full.

Kind of Tax:
Income

| Tax Year(s) Ended | Deficiency (Increase in Tax and Penalties) |
|---|---|
| | Deficiency |
| December 31, 2000 | $1,208,592.00 |

___ Copy to Authorized Representative:

A-5

**Internal Revenue Service** **Department of the Treasury**

Date: July 15, 2004

Paul W. Oden
Miller Nash LLP
4400 Two Union Squ.,
601 Union St.
Seattle, WA 98101

Taxpayer Identification Number:
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
Person to Contact/ID Number:
Denise H. Larson
Contact Telephone Number:
425-898-8708

RECEIVED
JUL 16 2004
MILLER NASH LLP

Dear Mr. Oden,

We are sending you the enclosed material under the provisions of your power of attorney or other authorization on file with us. For your convenience, we have listed the name of the taxpayer to whom this material relates.

If you have any questions, please call the contact person at the telephone number shown in the heading of this letter.

Thank you for your cooperation.

Sincerely,

for Frank Nixon

Area Director, Area 14

Enclosures:
☒ Letter(s)
☒ Report(s)
☒ Other

Taxpayer's Name

Gisele C. Fisher



Letter 937 (Rev. 8-2000)
Cat. No. 30760X

**Internal Revenue Service**

**Department of the Treasury**

**Date:** July 15, 2004

**Taxpayer Identification Number:**
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
**Form:**
709
**Tax Period(s) Ended and Deficiency Amount(s):**
2000
$1,208,592

Gisele C. Fisher
P.O. Box 98510
Des Moines, WA 98198

**Person to Contact:**
Denise H. Larson

**Contact Telephone Number:**
425-898-8708
**Employee Identification Number:**
91-03623
**Last Date to Respond to this Letter:**
August 18, 2004

Dear Ms. Fisher,

We have enclosed an examination report showing proposed changes to your tax for the period(s) shown above. Please read the report, and tell us whether you agree or disagree with the changes by the date shown above. (This report may not reflect the results of later examinations of partnerships, "S" Corporations, trusts, etc., in which you may have an interest. Changes to those accounts could also affect your tax.)

**If you agree with the proposed changes...**

1. Sign and date the enclosed agreement form. If you filed a joint return, both taxpayers must sign the form.

2. Return the signed agreement form to us.

3. Enclose payment for tax, interest and any penalties due. Make your check or money order payable to the **United States Treasury.** You can call the person identified above to determine the total amount due as of the date you intend to make payment.

4. After we receive your signed agreement form, we will close your case.

If you pay the full amount due now, you will limit the amount of interest and penalties charged to your account. If you agree with our findings, but can only pay part of the bill, please call the person identified above to discuss different payment options. We may ask you to complete a collection information statement to determine your payment options, such as paying in installments. You can also write to us or visit your nearest IRS office to explain your circumstances. If you don't enclose payment for the additional tax, interest, and any penalties, we will bill you for the unpaid amounts.

**Letter 950 (DO) (Rev. 9-2000)**
Catalog Number 40390D

If you are a "C" Corporation, Section 6621 (c) of the Internal Revenue Code provides that an interest rate 2% higher than the standard rate of interest will be charged on deficiencies of $100,000 or more.

**If you don't agree with the proposed changes...**

1. You may request a meeting or telephone conference with the supervisor of the person identified in the heading of this letter. If you still don't agree after the meeting or telephone conference, you can:

2. Request a conference with our Appeals Office. If the total proposed change to your tax is:

   - $25,000 or less for *each* referenced tax period, send us a letter requesting consideration by Appeals. Indicate the issues you don't agree with and the reasons why you don't agree. If you don't want to write a separate letter, you can complete the Statement of Disputed Issues at the end of this letter and return it to us.

   - More than $25,000 for *any* referenced tax period; you must submit a formal protest.

The requirements for filing a formal protest are explained in the enclosed Publication 3498, *The Examination Process*. Publication 3498 also includes information on your *Rights as a Taxpayer* and the *IRS Collection Process*.

If you request a conference with our Appeals Office, an Appeals Officer will call you (if necessary) for an appointment to take a fresh look at your case. The Appeals Office is an independent office and most disputes considered by the Appeals Office are resolved informally and promptly. By requesting a conference with our Appeals Office you may avoid court costs (such as the Tax Court $60 filing fee), resolve the matter sooner, and/or prevent interest and any penalties from increasing on your account.

If you decide to bypass the Appeals Office and petition the Tax Court directly, your case will usually be sent to an Appeals Office first to try to resolve the issue. Certain procedures and rights in court (for example, the burden of proof and potential recovery of litigation costs) depend on you fully participating in the administrative consideration of your case, including consideration by the IRS Appeals Office.

If you don't reach an agreement with our Appeals Office or if you don't respond to this letter, we will send you another letter that will tell you how to obtain Tax Court Review of your case.

You must mail your signed agreement form, completed Statement of Disputed Issues, or a formal protest to us by the response date shown in the heading of this letter. If you decide to request a conference with the examiner's supervisor, your request should also be made by the response date indicated.

MAIL RESPONSES TO:

**Internal Revenue Service**
Attn: Carolyn Tucker
915 Second Ave., MS W103
Seattle, WA 98174

If you have any questions, please contact the person identified in the heading of this letter. We will be glad to discuss your options with you.

Sincerely yours,

For Frank Nixon
Area Director, Area 14

Enclosures:
Copy of this letter
Examination Report
Agreement Form
Publication 3498
Envelope

## STATEMENT OF DISPUTED ISSUES

☐ THE PROPOSED CHANGE IS $25,000 or less for each of the REFERENCED TAX PERIOD(S).

| Issue(s) I Disagree With: | Reasons for Disagreement: |
| --- | --- |
| | |

(if more space is needed, attach a separate sheet)

Signature  Date



Letter 950 (DO) (Rev. 9-2000)
Catalog Number 40390D

@

Form 3233
(Rev. ) (CG)

Department of the Treasury - Internal Revenue Service
# REPORT OF GIFT TAX EXAMINATION

| Name of Donor | Social Security Number | Date of Gift |
|---|---|---|
| Gisele C. Fisher | 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 | 2000 |

| | Shown on Return | As Corrected |
|---|---|---|
| . Total value of gifts of donor | | |
| Less amount attributable to spouse | 4,926,784.00 | 7,124,224.00 |
| . Balance (line 1 less line 2) | 0.00 | 0.00 |
| . Gifts of spouse to be included | 4,926,784.00 | 7,124,224.00 |
| . Total Gifts (line 3 plus line 4) | 0.00 | 0.00 |
| . Less total annual exclusions | 4,926,784.00 | 7,124,224.00 |
| . Total included amount of gifts (line 5 less line 6) | 120,000.00 | 120,000.00 |
| . Gifts to Spouse for which a MD will be claimed | 4,806,784.00 | 7,004,224.00 |
| . Exclusions attributable to gifts on line 8 | 0.00 | 0.00 |
| ]. Marital deduction (line 8 less line 9) | 0.00 | 0.00 |
| Charitable deduction (Net of Exclusions) | 0.00 | 0.00 |
| . Total Deductions (line 10 plus line 11) | 0.00 | 0.00 |
| . Tentative taxable (line 7 less line 12) | 0.00 | 0.00 |
| . Generation-skipping transfer taxes payable | 4,806,784.00 | 7,004,224.00 |
| . Total taxable gifts for this period (line 13 plus line 14) | 0.00 | 0.00 |
| Total taxable gifts for prior periods | 4,806,784.00 | 7,004,224.00 |
| . Total taxable gifts (line 15 plus line 16) | 245,000.00 | 245,000.00 |
| . Tax computed on amount in line 17 | 5,051,784.00 | 7,249,224.00 |
| . Tax computed on amount in line 16 | 2,419,281.20 | 3,627,873.20 |
| . Total tax payable on taxable gifts (line 18 less line 19) | 69,200.00 | 69,200.00 |
| Unified Credit from Table B | 2,350,081.20 | 3,558,673.20 |
| Unified credit against gift tax allowable for prior periods | 220,550.00 | 220,550.00 |
| Balance (line 21 less line 22) | 69,200.00 | 69,200.00 |
| 20% of amount allowed as specific exemption after Sept. 8, 1976 | 151,350.00 | 151,350.00 |
| Balance (line 23 less line 24) | 0.00 | 0.00 |
| Unified Credit (lesser of line 20 and line 25) | 151,350.00 | 151,350.00 |
| Credit for foreign gift taxes | 151,350.00 | 151,350.00 |
| Total credits (line 26 plus line 27) | 0.00 | 0.00 |
| Balance (line 20 less line 28) | 151,350.00 | 151,350.00 |
| Generation-skipping transfer taxes | 2,198,731.20 | 3,407,323.20 |
| Total tax (line 29 plus line 30) | 0.00 | 0.00 |
| Tax previously assessed (from line 31) | 2,198,731.20 | 3,407,323.20 |
| Total Tax - Increase <decrease> (line 31 less line 32) | | 2,198,731.20 |
| Penalties previously assessed | | 1,208,592.00 |
| Penalties as corrected | | 0.00 |
| Net Penalties - Increase <decrease> (line 35 less line 34) | | 0.00 |
| Increase <decrease> in tax & penalties (line 31 plus line 34) | | 0.00 |
| | | 1,208,592.00 |

Form 3233(Rev. )(CG)

Form 886-A
Rev. April 1968)(CG)

EXPLANATION OF ITEMS

SCHEDULE NO. OR EXHIBIT

NAME OF TAXPAYER
Gift of Gisele C. Fisher

YEAR/PERIOD ENDED
2000

| | Returned | Corrected |
|---|---|---|
| Sch. A1, Gifts of Donor w/out GST | | |
| Total gift in Grits | 4,926,784.00 | 7,124,224.00 |
| Total of these items | 4,926,784.00 | 7,124,224.00 |
| | | 4,926,784.00 |
| Increase to schedule | | 2,197,440.00 |

See attached schedule.

| | |
|---|---|
| Total adjusted taxable gift per RAR | $7,124,224 |
| Total gifts reported on Form 709 | ($4,926,784) |
| Total additional taxable gifts | $2,197,440 |

| Form 886A | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Schedule No. or Exhibit |
|---|---|---|
| Name of Taxpayer<br>Gisele C. Fisher | | Year/Period Ended<br>2000 |

Calculation using value of $12,338 per share:

Gisele C. Fisher – 3 Year GRIT

| | |
|---|---|
| 1. Value of the transferred property (400 x 8430) | $4,935,200 |
| 2. Present Value of the Income to Grantor Factor | .19673 |
| 3. Present Value of the Reversion Factor | .12297 |
| 4. Present Value of the Income to Grantor (1 x 2) | $970,902 |
| 5. Present Value of the Reversion (1 x 3) | $606,882 |
| 6. Combined Present Value of Income and Reversion | $1,577,784 |
| 7. Value of the Gift (1 – 6) | $3,357,416 |

| | |
|---|---|
| Fair Market Value of Gift – 3 year GRIT | $3,357,416 |
| Value of GRIT on Form 709 | 2,293,972 |
| | ---------------- |
| Additional amount of gift | $1,063,444 |
| | ========= |

---

Gisele C. Fisher – 4 Year GRIT

| | |
|---|---|
| 1. Value of the transferred property (200 x 8430) | $2,467,600 |
| 2. Present Value of the Income to Grantor Factor | .24681 |
| 3. Present Value of the Reversion Factor | .16044 |
| 4. Present Value of the Income to Grantor (1 x 2) | $609,028 |
| 5. Present Value of the Reversion (1 x 3) | $395,902 |
| 6. Combined Present Value of Income and Reversion | $1,004,930 |
| 7. Value of the Gift (1 – 6) | $1,462,670 |

| | |
|---|---|
| Fair Market Value of Gift – 4 year GRIT | $1,462,670 |
| Value of GRIT on Form 709 | 999.377 |
| | ---------------- |
| Additional amount of gift | $ 463,293 |
| | ========= |

---

Gisele C. Fisher – 5 Year GRIT

| | |
|---|---|
| 1. Value of the transferred property (200 x 8430) | $2,467,600 |
| 2. Present Value of the Income to Grantor Factor | .29033 |

| Form 886A | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Schedule No. or Exhibit |
|---|---|---|
| **Name of Taxpayer**<br>**Gisele C. Fisher** | | **Year/Period Ended**<br>2000 |

| | |
|---|---|
| 3. Present Value of the Reversion Factor | .19622 |
| 4. Present Value of the Income to Grantor (1 x 2) | $716,418 |
| 5. Present Value of the Reversion (1 x 3) | $484,192 |
| 6. Combined Present Value of Income and Reversion | $1,200.610 |
| 7. Value of the Gift (1 – 6) | $1,266,990 |

| | |
|---|---|
| Fair Market Value of Gift – 5 year GRIT | $1,266,990 |
| Value of GRIT on Form 709 | 865.677 |
| Additional amount of gift | $ 401,313 |

Gisele C. Fisher – 6 Year GRIT

| | |
|---|---|
| 1. Value of the transferred property (156 x 8430) | $1,924,728 |
| 2. Present Value of the Income to Grantor Factor | .32790 |
| 3. Present Value of the Reversion Factor | .23023 |
| 4. Present Value of the Income to Grantor(1 x 2) | $631,118 |
| 5. Present Value of the Reversion (1 x 3) | $443,130 |
| 6. Combined Present Value of Income and Reversion | $1,074,248 |
| 7. Value of the Gift (1 – 6) | $850,484 |

| | |
|---|---|
| Fair Market Value of Gift – 6 year GRIT | $ 850,485 |
| Value of GRIT on Form 709 | 581,094 |
| Additional amount of gift | $ 269,390 |

Total amount of Additional gifts:

| | |
|---|---|
| 3 Year GRIT | $1,063,444 |
| 4 Year GRIT | 463,293 |
| 5 Year GRIT | 401,313 |
| 6 Year GRIT | 269,390 |
| **Total Add'l Gifts** | **$2,197,440** |

| (Rev. April 1968) | EXPLANATION OF ITEMS | SCHEDULE NO. OR EXHIBIT 5 |
|---|---|---|
| NAME OF TAXPAYER Gisele C. Fisher | | YEAR/PERIOD ENDED 2000 |

What was the fair market value, on the date of the gift, of the shares of D. R. Fisher Company that were used to fund the Grantor Retained Income Trusts created by the donor?

## Facts

Gisele Fisher made taxable gifts for the calendar year 2000. These gifts were reflected on a timely filed Form 709 for 2000. The total amount of adjusted taxable gifts as shown on this return was $4,806,784. There were gift taxes paid with the return in the amount of $2,198,731.

Gisele C. Fisher is a widow. The primary beneficiaries of the gifts, which were given in 2000, were her two nephews, Ian Metzker (Metzker) and Enrique Braun-Ortega (Braun-Ortega) and her niece, Brigitte Ruth (Ruth). In addition, there were cash gifts to their spouses, her sisters and to grandnieces and grandnephews. All of the cash gifts were given in the names of the above listed people into the Gisele C. Fisher Irrevocable Trust. The total amount of cash gifts was $186,667.

Listed on the Form 709, were a series of Grantor Retained Income Trusts (GRITs) whereby the Grantor transferred stock in the D. R. Fisher Company to Metzker, Braun-Ortega and Ruth as remainder beneficiaries. These trusts were set up as term trusts which provided all net income to the grantor during the term. At the termination of the term of each trust, the underlying trust assets will pass to the remainder beneficiaries as discussed below. If the donor were to die during the term of the trust, then the underlying assets of the trust would be included in her estate under IRC Section 2036. The trusts were for differing lengths of time (terms) as follows:

1) Gisele C. Fisher 03 DRF Co. Trust Agreement:

   On March 10, 2000 the taxpayer transferred four hundred shares of D.R. Fisher Company, a closely held Washington Corporation to Paul W. Oden as Trustee of the Gisele C. Fisher 03 DRF Co. Trust under an irrevocable trust agreement dated March 10, 2000. Gisele Fisher retained the right to all trust income for a period of three years, and also retained a reversionary interest in the shares. Metzker, Braun-Ortega and Ruth held the remainder interests in the Trust.

2) Gisele C. Fisher 04 DRF Co. Trust Agreement:

   On March 10, 2000 the taxpayer transferred two hundred shares of D.R. Fisher Company, a closely held Washington Corporation to Paul W. Oden as Trustee of the Gisele C. Fisher 04 DRF Co. Trust under an irrevocable trust agreement dated March 10, 2000. Gisele Fisher retained the right to all trust income for a period of four years and also retained a reversionary interest in the stock. Metzker, Braun-Ortega and Ruth held the remainder interests in the Trust.

3) Gisele C. Fisher 05 DRF Co. Trust Agreement:

| (Rev. April 1968) | EXPLANATION OF ITEMS | SCHEDULE NO. OR EXHIBIT 6 |
|---|---|---|
| NAME OF TAXPAYER Gisele C. Fisher | | YEAR/PERIOD ENDED 2000 |

On March 10, 2000 the taxpayer transferred two hundred shares of D.R. Fisher Company, a closely held Washington Corporation to Paul W. Oden as Trustee of the Gisele C. Fisher 05 DRF Co. Trust under an irrevocable trust agreement dated March 10, 2000. Gisele Fisher retained the right to all trust income for a period of five years and also retained a reversionary interest in the stock. Metzker, Braun-Ortega and Ruth held the remainder interests in the Trust.

4) Gisele C. Fisher 06 Co. Trust Agreement::

On March 10, 2000 the taxpayer transferred one hundred fifty six shares of D.R. Fisher Company, a closely held Washington Corporation to Paul W. Oden as Trustee of the Gisele C. Fisher 06 DRF Co. Trust under an irrevocable trust agreement dated March 10, 2000. Gisele Fisher retained the right to all trust income for a period of six years and also retained a reversionary interest in the stock. Metzker, Braun-Ortega and Ruth held the remainder interests in the Trust.

Except for the differing term lengths, the four trusts have substantially the same provisions in the trust agreements. As noted above, the terms are for three, four, five and six years respectively. However, in all other respects the trusts are virtually identical.

<u>GRANTOR TRUST PROVISIONS</u>:

Article II – The trusts are intended to be Grantor Trusts. Gisele C. Fisher in each trust is given the power to reacquire the Trust Corpus by substituting other property of equivalent value. This power is exercisable by the Trustor in a non-fiduciary capacity and does not require the approval or consent of any person in a fiduciary capacity.

Gisele Fisher is the income beneficiary or each trust and the remainder beneficiaries are 1/3 each to Metzker, Braun-Ortega and Ruth.

Article V – All net income to Gisele Fisher at least annually. If the donor dies prior to the expiration of the term of the trust, then the shares of D.R. Fisher will go to her estate. However, if the donor survives the term of the trust, then the remainder passes to Metzker, Braun-Ortega and Ruth per Article VI.

Article VI –

To Enrique Braun-Ortega – all net income is to be paid to him for life at least annually. He may also by intervivos and testamentary instrument (i.e. trust or will) appoint his share of the trust income and principal to his lineal descendents or trusts for their benefit.

To Ian Metzker – all net income is to be paid to him for life at least annually. The Trustee also has the discretion to pay to or apply for his benefit so much of the principal of the trust as the Trustee in his sole and absolute discretion determines is necessary for his uninsured medical expenses that are not covered by government assistance. At his death, the property is to pass via limited power of appointment to his lineal descendents.

| (Rev. April 1968) | EXPLANATION OF ITEMS | SCHEDULE NO. OR EXHIBIT 8 |
|---|---|---|
| NAME OF TAXPAYER Gisele C. Fisher | | YEAR/PERIOD ENDED 2000 |

In order to calculate the value of the gifts via the GRITs, first the value of the property that was placed into the GRIT should be calculated. The property placed into each GRIT consisted solely of stock in the D.R. Fisher Company.

An appraisal was attached to the gift tax return that was authored by Tony S. Leung of Corporate Advisory Associates Incorporated. It was written in February of 2001 and appraised the stock in D.R. Fisher Company as of March 10, 2000. Mr. Leung opined that the value of the stock as of March 10, 2000 was $8,430 per share. This per share value was used to calculate the value of the property placed into the GRITS. There was a calculation for the value of the remainder interest in each of the trusts for Metzker, Braun-Ortega and Ruth. The values used in reporting the gifts were as follows:

Gisele C. Fisher – 3 Year GRIT

| | |
|---|---|
| 1. Value of the transferred property (400 x 8430) | $3,372,000 |
| 2. Present Value of the Income to Grantor Factor | .19673 |
| 3. Present Value of the Reversion Factor | .12297 |
| 4. Present Value of the Income to Grantor (1 x 2) | $663,374 |
| 5. Present Value of the Reversion (1 x 3) | $414,655 |
| 6. Combined Present Value of Income and Reversion | $1,078,029 |
| 7. Value of the Gift (1 – 6) | $2,293,972 |

The total value of the gift was $2,293,972 for the three year GRIT. This was split equally by three beneficiaries and therefore was equal to a gift of $764,657 each.

Gisele C. Fisher – 4 Year GRIT

| | |
|---|---|
| 1. Value of the transferred property (200 x 8430) | $1,686,000 |
| 2. Present Value of the Income to Grantor Factor | .24681 |
| 3. Present Value of the Reversion Factor | .16044 |
| 4. Present Value of the Income to Grantor (1 x 2) | $416,122 |
| 5. Present Value of the Reversion (1 x 3) | $270.502 |
| 6. Combined Present Value of Income and Reversion | $686,624 |
| 7. Value of the Gift (1 – 6) | $999,377 |

The total value of the gift was $999,377 for the four year GRIT. This was split equally by three beneficiaries and therefore was equal to a gift of $333,125 each.

Gisele C. Fisher – 5 Year GRIT

| | |
|---|---|
| 1. Value of the transferred property (200 x 8430) | $1,686,000 |
| 2. Present Value of the Income to Grantor Factor | .29033 |
| 3. Present Value of the Reversion Factor | .19622 |
| 4. Present Value of the Income to Grantor (1 x 2) | $489,496 |
| 5. Present Value of the Reversion (1 x 3) | $330,827 |
| 6. Combined Present Value of Income and Reversion | $820,323 |
| 7. Value of the Gift (1 – 6) | $865,677 |

| (Rev. April 1968) | EXPLANATION OF ITEMS | SCHEDULE NO. OR EXHIBIT 7 |
|---|---|---|
| NAME OF TAXPAYER Gisele C. Fisher | | YEAR/PERIOD ENDED 2000 |

To Brigitte Ruth - all net income is to be paid to her for life at least annually. The Trustee also has the discretion to pay to or apply for his benefit so much of the principal of the trust as the Trustee in his sole and absolute discretion determines is necessary for her uninsured medical expenses that are not covered by government assistance. At her death, the property is to pass via limited power of appointment to her lineal descendents.

**GRANTOR RETAINED INCOME TRUSTS:**

Special rules are applied to determine whether a transfer of an interest in trust to a member of the transferor's family is a gift and to value the amount of the gift. IRC Section 2702(a)

Generally, the amount of the gift is the value of the transferred property less the value of any interests retained by the transferor or an applicable family member. Treasury Regulation Section 25.2702-1(b)

The retention of a term interest in property is treated as the retention of an interest in trust. IRC Section 2702(c) (1)

The value of an interest retained by the transferor or an applicable family member is zero unless that interest is a qualified interest. IRC Section 2702(a)(2)(A).

Section 2702 which applies to transfers made after October 8, 1990 generally applies to an interest transferred in trust that benefits a family member when the transferor, the spouse, parents or certain other senior family members (an applicable member of the transferor's family) retains an interest in the property subject to the transfer. If the statute applies to a transfer, the transferor's retained interest will be valued at zero for gift tax purposes unless the interest meets certain criteria or the transaction is specifically exempted from the statute.

Section 2702 only governs transfers in trust for the benefit of members of the transferor's family as defined in IRC Section 2704 (c)(2). IRC Sections 2702(e) Even if the transferor retains an interest in the trust, Section 2702 will not apply if the other beneficiaries are unrelated third-parties, aunts, uncles, nieces, nephews or cousins. In this circumstance, the value of the gift would be only the value of the interest in the property transferred to the other beneficiaries as determined under the traditional valuation methods under IRC Section 7520.

The GRITs formed by the donor, if transferred to a member of the transferor's family, would be governed by IRC Section 2702. However, the gifts were made to persons which are not "members of the transferor's family". The trusts were set up to benefit two nephews and a niece. Therefore, the gifts were valued using the traditional valuation methods under IRC Section 7520. These methods employ the use of the term interest tables for the income interest with a remainder interest passing as a gift. The value of the reversion retained by the donor for the term of each individual trust was also subtracted from the value of the gift.

| (Rev. April 1968) | EXPLANATION OF ITEMS | SCHEDULE NO. OR EXHIBIT 9 |
|---|---|---|
| NAME OF TAXPAYER Gisele C. Fisher | | YEAR/PERIOD ENDED 2000 |

The total value of the gift was $865,677 for the five year GRIT. This was split equally by three beneficiaries and therefore was equal to a gift of $288,559 each.

Gisele C. Fisher – 6 Year GRIT

| | |
|---|---|
| 1. Value of the transferred property (156 x 8430) | $1,315.080 |
| 2. Present Value of the Income to Grantor Factor | .32790 |
| 3. Present Value of the Reversion Factor | .23023 |
| 4. Present Value of the Income to Grantor(1 x 2) | $431,215 |
| 5. Present Value of the Reversion (1 x 3) | $303,771 |
| 6. Combined Present Value of Income and Reversion | $733.986 |
| 7. Value of the Gift (1 – 6) | $581,094 |

The total value of the gift was $581,094 for the 6 year GRIT. This was split equally by three beneficiaries and therefore was equal to a gift of $193,698 each.

All parties are in agreement with the methods by which the gifts were calculated. At issue here is the fair market value of the D.R. Fisher Company (DRF) stock that was placed in the GRITs on the date of the gifts.

**Fair Market Value of D.R Fisher Company shares:**

DRF is a family controlled Washington Corporation formed in 1923 to acquire and own real and personal properties. Its purposes are to acquire, own, sell, lease, convey and mortgage real property, personal property and other investments as a personal holding company. The company for many years has owned a portfolio of investment securities and some real properties. On the date of the gift, the asset holdings consisted of 13 publicly traded stocks, cash balances in two bank checking accounts, shares in a money market fund, and two real properties.

There is no shareholder agreement among the shareholders or with the Company. There is a right of first refusal among the shareholders for persons wishing to sell their shares. Dividends from the stock portfolio have been the main source of income for DRF. The primary source of income has been the dividend from Safeco Corporation. There are few on-going expenses. DRF has been taxed as a personal holding company .

The Company was founded by O.D. Fisher and O.W. Fisher. Prior to January 6,1987 the Company had been owned 50/50 by Bennett I. Fisher and his brother George O. Fisher. They each held 1,000 common shares. Bennett died on January 6, 1987 leaving his shares to his wife and widow, Gisele C. Fisher. She subsequently made gifts of 22 shares of stock each to her sons George D. Fisher and William O. Fisher.

Before the transfers on the valuation date, the shareholdings were as follows:

| (Rev. April 1968) | EXPLANATION OF ITEMS | SCHEDULE NO. OR EXHIBIT 10 |
|---|---|---|
| NAME OF TAXPAYER Gisele C. Fisher | | YEAR/PERIOD ENDED 2000 |

| Name | # of Shares | %Interest |
|---|---|---|
| Allie Fisher | 1,000 | 50 |
| Gisele C. Fisher | 956 | 47.8 |
| George D. Fisher | 22 | 1.1 |
| William O. Fisher | 22 | 1.1 |
| Total | 2,000 | 100.00 |

After the funding of the GRITs with the stock in DRF, the donor had given away all of her interest in the company. So, her entire 47.8% interest in DRF passed on the 2000 gift tax return.

Valuation

The parties agree that, on the valuation date, DRF's net asset value (NAV) was $ 47,080,571, broken down by asset class as follows:

ASSETS

| Asset Type | Value |
|---|---|
| Bank Accounts | 318,178 |
| Equities portfolio | $44,632,371 |
| Money Market Funds | 765,880 |
| Real estate | 1,127500 |
| **LIABILITIES** | |
| Accounts Payable | 494 |
| Notes Payable | 46,000 |
| Reserve for FIT | (283,136) |
| TOTAL: | $47,080,571 |

Of the $44,632,371 in the equities portfolio, $37,530,401 or 84% was held in stock in Safeco Corporation and Fisher Companies Inc. Specifically, the company held 85,523 shares of Fisher Companies, a family controlled corporation valued at $13,968,401. The company held 40,392 shares of Safeco Corporation valued at $23,562,000.

The year 2000 gift tax return was filed using the value of $8,430 per share for the DRF stock. This is the value per share that was calculated by Mr. Leung/Corporate Advisory Associates in the appraisal attached to the gift tax return. The gift tax return was selected for examination by the Internal Revenue Service. Lewis D. Olds of Lewis Olds and Associates reviewed Mr.

Leung's appraisal. Mr. Olds did not agree with the value placed on the shares of stock in DRF for funding the GRITs.

GENERAL PROVISIONS:

Section 2501(a) imposes a tax on the transfer of property by gift. Section 2512(a) provides that, if a gift is made in property, the value of the property on the date of the gift is considered the amount of the gift.

25.2512-1, Gift Tax Regulations, provides that the value of property for gift tax purposes is "the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell, and both having reasonable knowledge of relevant facts." The willing buyer and willing seller are hypothetical persons, rather than specific individuals or entities, and their characteristics are not necessarily the same as those of the donor and the donee. McCord v. Commissioner 120 T.C. 358 (T.C. 2003), Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990) (citing Estate of Bright v. United States, 658 F.2d 999, 1006 (5th Cir. 1981).The hypothetical willing buyer and willing seller are presumed to be dedicated to achieving the maximum economic advantage.

In deciding valuation cases, courts often look to the opinions of expert witnesses. Nonetheless, we are not bound by the opinion of any expert witness, and we may accept or reject expert testimony in the exercise of our sound judgment. Helvering v. Natl. Grocery Co., 304 U.S. 282, 295, 82 L. Ed. 1346, 58 S. Ct. 932 (1938); Estate of Newhouse v. Commissioner, supra at 217. Although we may largely accept the opinion of one party's expert over that of the other party's expert, see Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 452 (1980), we may be selective in determining what portions of each expert's opinion, if any, to accept, Parker v. Commissioner, 86 T.C. 547, 562 (1986). Finally, because valuation necessarily involves an approximation, the figure at which we arrive need not be directly traceable to specific testimony if it is within the range of values that may be properly derived from consideration of all the evidence. Estate of True v. Commissioner, T.C. Memo. 2001-167 (citing Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285). [**31] McCord v. Comm'r, 120 T.C. 358, 374 (T.C., 2003)

The primary issue in this case is the value of the shares of DRF on the date of the gift. At issue are the reduction of value for the built-in capital gains taxes, discount for lack of control and discount for marketability.

The court in Peracchio v. Commissioner, T.C. Memo 2003-280 (U.S. Tax Court Memos, 2003) addressed similar issues. There were shares of stock in a holding company which were the subject of a gift. This court found it appropriate to look at the underlying assets inside of investment companies to determine the appropriate amount of these discounts.

Expert Opinions in that case were presented by a Mr. Dankoff and a Mr. Burns. The court stated "Both Mr. Dankoff and Mr. Burns determine a minority interest discount factor for each type of investment held by the partnership, based (to the extent possible) on discounts observed in shares of closed end funds holding similar assets. They then determine their respective

| (Rev. April 1968) | EXPLANATION OF ITEMS | SCHEDULE NO. OR EXHIBIT 12 |
|---|---|---|
| NAME OF TAXPAYER Gisele C. Fisher | | YEAR/PERIOD ENDED 2000 |

minority interest discounts for the transferred interests by calculating the weighted average of such factors, based on the partnership's relative holdings of each asset type. That is an approach we have previously followed in the context of investment partnerships, see McCord v. Commissioner, similar assets, 120 T.C. 358, 395-396, 2003 U.S. Tax Ct. LEXIS 16, 120 T.C. No. 13 (2003), and we shall do so again here." Peracchio v. Comm'r, T.C. Memo 2003-280 (U.S. Tax Court Memos, 2003)

"The parties agree that, because the partnership's assets on the valuation date consisted entirely of cash and marketable securities, the partnership's net asset value (NAV) on that date is the appropriate starting point for determining the fair market value of the transferred interests. The parties further agree that, in valuing the transferred interests, it is appropriate to discount each interest's pro rata share of the partnership's NAV to reflect the lack of control and lack of marketability inherent in the transferred interests. The parties disagree on the magnitude of those discounts. " Peracchio v. Comm'r, T.C. Memo 2003-280 (U.S. Tax Court Memos, 2003)

The court went on to find the appropriate discounts to be applied to the underlying asset value of the company. They found that the weighted lack of control discount should be 6% and the lack of marketability should be 25%.

The taxpayer has asserted that it is appropriate to subtract the full dollar for dollar value of the capital gains from the NAV. She cites Estate of Dunn v. Commissioner, 301 F.3d 300 (5th Cir.) and Estate of Eisenberg v. Commissioner, 115 F.3d 50 (2d Cir. 1998) as authority for this assertion. In addition, she has stated that the Ninth Circuit acknowledged the propriety of the application by both the government experts of a 40% discount from the net asset value for built-in corporate taxes. The Ninth Circuit opinion does not make any reference to the appropriateness of taking the full capital gains from the valuation of the company. Thus, any representation that this is the law in this Circuit is unjustifiable. The Ninth Circuit has not addressed this issue. Furthermore, the Tax Court in those cases found that there should not be a dollar for dollar reduction in the tax. The Tax Court in Estate of Davis v. Commissioner, 110 T.C. 530 (1998), Estate of Jameson v. Commissioner, T.C. Memo 1993-43, 1999, appealed to 267 F.3d 366 (5th Cir. 2001), vac. and rem'd, by the Fifth Circuit, both agreed that the value of a closely held company should be reduced by the unrealized capital gains. However, the appropriate amount by which to discount the stock is a matter of fact which must be decided on a case by case basis.

In Borgatello v. Commissioner, TC Memo 2000-264, the court stated that applying the full amount of the capital gains as a discount "to net asset value is unrealistic because it does not account for any holding period for the assets. The estate's expert concedes that there would be some period of tax deferral although he did not articulate how long the period of deferral would be. Mr. Wilde assumes a 10 year holding period for the assets". Borgatello, 264, 280 As seen below, in the instant case, there was an assumption of a five year holding period.

The Sixth Circuit has addressed the issue of built-in capital gains and decided that the gains should be a factor in deciding the value of the stock that is at issue. In Estate of Pauline Welch V. Commissioner, 200 U.S. App. LEXIS, 3315, 2000-1 U.S. Tax Cases (CCH) (6th Cir. 2000), the court stated that "the proper approach in cases of this nature is not to deduct the built-in capital gains tax from the value of the appreciated real estate – as petitioners sought to do in the

present case – because the question is not what is the value of the real estate, but what is the value of the stock with regard to all the circumstances, including the built-in potential capital gains liability if and when the real estate is sold" Welch, 3315, 3323. (Here the company being valued held real estate with potential built-in capital gains taxes)

NET ASSET VALUE;

Mr. Leung/Corporate Advisory Associates (CAA) based their appraisal on one valuation approach – the adjusted net asset value method (NAV). Asset holding companies are generally valued based on the assets that they are holding. Mr. Olds concurred in their choice of appraisal method.

However, in calculating the NAV, CAA subtracted the full value of the built in capital gains held inside of the company. DRF has a large built-in capital gain tax due to the nature of the family held business. The company's purpose has been to hold stock that is related to the family for investment. CAA took the fair market value of the assets, subtracted the book value and multiplied the remaining amount by 34%. This created a deferred capital gain amount of $15,859,390. This amount was subtracted in full from the fair market value of the company. The remaining amount was subject to further valuation discounts.

A hypothetical willing buyer of the shares of DRF would be purchasing a minority interest in the company. The shares discussed herein do not have the voting power to effect liquidation or effect distributions. They would not be able to control the company or its investment objectives and thus would require that the interest be discounted to reflect that lack of control.

DRF is classified as a personal holding company. This classification does affect the distributions available to a shareholder. The company is expected to distribute all of its dividend and interest income because of its personal holding company status. So, a buyer of these shares would know that they would be receiving distributions from the company, in contrast to most non-distributing minority interests. DRF has a dividend yield of 5.4% which is much higher than the industry standard for companies holding listed securities.

**VALUATION OF STOCK BY CAA:**

CAA compared the stock in DRF to closed-end investment companies (CICs). CICs own stocks for investments. CAA selected two groups of CICs to compare with DRF: one that holds diversified stock portfolios and on that has concentration in the financial sector. No CICs were found that hold the same securities portfolio as DRF or that had a similar concentration of shares in Safeco Corporation. The price/net asset value (P/NAV) ratios and distribution yields were reviewed by CAA. Per the report, the average P/NAV ratios for both groups of CICs were les than 1.0 indicating that the shares were traded at discounts from net asset value. The report states that this phenomenon is historically consistent. "The observed discounts on stock CICs can be explained by several factors: the market supply and demand for the shares; the inherent minority nature of the shares; and the built-in capital gain tax to the owners if the underlying securities were sold. Furthermore, the market data suggests there is no correlation between expected yield from the stock portfolio and the P/NAV". CAA Report, page 4

| (Rev. April 1968) | EXPLANATION OF ITEMS | SCHEDULE NO. OR EXHIBIT 14 |
|---|---|---|
| NAME OF TAXPAYER Gisele C. Fisher | | YEAR/PERIOD ENDED 2000 |

Per the report, DRF's dividend yield is higher than all of the comparables within the CICs without incurring capital gains.

"Using these market data, the appropriate P/NAV ratio for DRF can be determined by considering their comparative differences:

1. The diversified stock CICs have much larger and more diversified holdings than DRf. The Company's portfolio consists of only 13 stocks with concentration in one stock. As shown in Exhibit 5, the CICs each hold 40 to over 300 stocks in their portfolios. The CICs that have concentration in financial stocks also do not have the degree of concentration as DRF. In terms of diversification, DRF is a less desirable investment vehicle.
2. The CICs in Exhibits 5 and 6 have professional investment managers and performance targets. With tradings, they have generated capital gains that augment the distributions to their shareholders. On the other hand, DRF is discouraged from trading because of the high built-in gain. The lack of trading increases the risk of the portfolio, and reduces the potential return.
3. Comparing the cost basis for the Company's portfolio to its market value indicates a built-in gain of about 97 of the net asset value. This is significantly higher than the average of around 30 percent for the CICs. High built-in gain makes DRF less desirable for an investor intending on building a similar portfolio.
4. In contrast with the publicly-traded shares of the CICs, the shares of DRF are closely held and have no ready marketability. All else being equal, the lack of marketability increases the risk of ownership and diminishes value. This market phenomenon is evidenced by transactions wherein restricted securities of public firms were sold in private placements. Restricted securities are typically sold at lower prices than their registered and publicly-traded counterparts. A number of studies on these restricted stock transactions have been conducted since the 1960's." (A table was provided to summarize the transactions) CAA report, pages 4 and 5.

"Since discount for lack of marketability is not a constant amount for all situation, the appropriate consideration for DRF should reflect its specific situations, the appropriate considerations for DRF should reflect its specific circumstances. Based on the data described above, we conclude that the value discount for the lack of marketability with DRF, relative to the CICs should be in the 30 o 40 percent range." CAA report page 6.

The report then states that using these factors and the market date, they determined that a P/NAV of 0.54 should be used to value the shares. This produces an aggregate fair market value of $16,859,438 ( $47,080,571 less $15,859,390 capital gain X .54). This produces a per share value of $8,430.

**REVIEW APPRAISAL – LEWIS D. OLDS:**

Mr. Olds reviewed the net asset value calculations for DRF. He agreed with the values used except for the deduction of $15,859,390 for the built in capital gains. Mr. Olds stated that CAA did not describe the discount taken as being partially for a lack of control and partially for a lack of marketability. "Normally in an appraisal of a closely held business or investment holding

| (Rev. April 1968) | EXPLANATION OF ITEMS | SCHEDULE NO. OR EXHIBIT 15 |
|---|---|---|
| NAME OF TAXPAYER Gisele C. Fisher | | YEAR/PERIOD ENDED 2000 |

company, one sees a discount for lack of control and a second discount for lack of marketability." Olds report, page 8.

"Assuming Mr. Leung selected a Price/Net Asset Value ratio of approximately 85 percent, his implied minority discount was 15 percent and his implied marketability discount was approximately 36.5 percent. This is consistent with the data he presented on Price/Net Asset Value ratios from Closed End Mutual Funds." Olds report page 8. Mr. Olds agreed that a 15 percent discount would be reasonable for the valuation of a minority interest in DRF, using this data. However, he disagreed with the use of 36.5 as an appropriate lack of marketability discount.

Mr. Olds noted that DRF had a very high dividend yield, indeed higher than any of the comparable Closed End Mutual Funds. "Normally, a high dividend yield would lend itself to a higher value" Olds report, page 9 The report written by CAA stated that this company was at a higher risk due to its lack of diversification with the large investment in a single stock. Mr. Olds stated that the major stocks within the portfolio had all performed with stable profitability for many years prior to the valuation date. Thus, he concluded that the lack of diversification was offset by the stability and lack of volatility in the three major stocks of the portfolio: Weyerhauser, Safeco, and Fisher Companies, Inc.

The lack of trading in DRF, per Mr. Olds report, appeared to related to the high built in gains in the company's portfolio. Thus, it appeared that the reduction of the price to value ratio from .85, indicated by Mr. Leung's sample of Closed End Funds, to .54 appears to be supported by lack of marketability only.

"Since Mr. Leung deducted a provision for the built-in gains taxes, he has dealt with that portfolio risk. It is double-counting to use the built-in gain liability as a justification for a high marketability discount. If a buyer is compensated for the future income tax liability associated with the built-in gains, it does not seem reasonable to increase the marketability discount for the future tax liability as well. That risk or cost has already been accounted for". Olds report, page 10.

Mr. Olds stated that the studies used by CAA included studies which supported a lower marketability discount that the one taken in the CAA report. Additionally, Mr. Olds disagreed with the use of Pre-IPO studies in valuing the common stock of DRF. He cited several articles which state that there is a built-in bias inherent in the Pre-IPO transaction data. This is due to the fact that "many of the transactions in the studies either take place too far from the initial public offering date or are not arm's-length transactions". Olds Report, page 12,

Based on his own review of the data available and the risks of ownership of the stock in DRF, Mr. Olds concluded that a discount for lack of control of 15% was reasonable. Also, he opined that a lack of marketability discount of 20 –25% would be reasonable.

In addition, there is no indication that the company is currently planning to sell the underlying assets and incur an immediate capital gain on the assets. In fact, it is fairly clear that this company has no intentions of immediately selling its assets due to nature of the business. This company has held the assets of the company for decades with almost no change or trading.

| (Rev. April 1968) | EXPLANATION OF ITEMS | SCHEDULE NO. OR EXHIBIT 16 |
|---|---|---|
| NAME OF TAXPAYER Gisele C. Fisher | | YEAR/PERIOD ENDED 2000 |

The company is held by members of the family with long term ties to the company whose assets are held by DRF.

Therefore, Mr. Olds stated that the built-in gains inside the company should not be taken as a dollar for dollar reduction of value. Instead, it would be reasonable to assume that the capital gains will be incurred over a five year period to reflect the possibility that some of the gains will be recognized in the near term.

> "The reserve for deferred taxes has been calculated at a 35 percent federal tax rate, the same as was used by CAA. But I discounted the calculated tax liability of $15,859,390, using a discount rate of 8 percent, over an assumed holding period of five years. This discount, which amounts to approximately 32 percent, provides for what I consider this liability to be: non-current and contingent on future events which might or might not occur. The discount rate of 8 percent is based on rates of return generated by closed end funds and Investment Companies, as tracked by Ibbotson Associates in their Cost of Capital Yearbook, 2001 edition. The holding period is arbitrary, but reflects the fact that between 1987 and 2000, a span of 13 years, the composition of the portfolio held by DRF had changed very little, particularly with respect to the blocks of stock in Safeco Corporation, Weyerhaeuser Company and Fisher Companies Inc., which showed no change."
>
> Olds Report, page 15

Thus, Mr. Olds stated that a value per share based on a present valued built-in gain tax, a 15% lack of control discount and a 20% discount for lack of marketability would result in a value per share for DRF of $12,337.56 per share or $12,338 rounded.

**Conclusion**

The fair market value of the shares of DRF which were placed in GRITs on March 10,2000 should have been valued at $12,338 per share.

See CAA report and Olds reports for additional and supplemental information.4

@

Form 890
(Rev. Oct. 1988)

Department of the Treasury - Internal Revenue Service

# Waiver of Restrictions on Assessment and Collection of Deficiency and Acceptance of Overassessment -- Estate, Gift, and Generation-Skipping Transfer Tax

(Please see the instructions on the second page of this form)

Date Received by Internal Revenue Service

## Part 1. Consent to Assessment and Acceptance of Overassessment

I consent to the immediate assessment and collection of any deficiencies (increase in tax and penalties) and accept any overassessment (decrease in tax and penalties) shown below, plus any interest provided by law. I understand that by my signing this waiver, a petition to the United States Tax Court may not be made, unless additional deficiencies are determined.

Date of Death or Period Ending 2000

| Item | Increase | Decrease |
|---|---|---|
| Tax | 1,208,592.00 | |
| Penalty | | |
| Total | 1,208,592.00 | |

If the estate is required to file with the Area Director of Internal Revenue evidence of payment of estate, inheritance, legacy, succession or generation-skipping transfer taxes to any State or the District of Columbia, I understand that such evidence must be filed by , or the credits for these taxes will not be allowed. I also agree to the assessment and collection of the increase in estate tax and penalties of based on the disallowed credits, plus interest figured to the 30th day after or until this increase is assessed, whichever is earlier.

Estate of

Executor or Administrator — Sign Here — Date — Address

Executor or Administrator — Sign Here — Date — Address

Donor — Name: Gisele C. Fisher — Address: Washington

Donor's Signature — Sign Here — Date

Form 890 (Rev. 10-88)(CG)

MILLER | NASH LLP
ATTORNEYS AT LAW

Miller Nash LLP
www.millernash.com
4400 Two Union Square
601 Union Street
Seattle, WA 98101-1367
(206) 622-8484
(206) 622-7485 fax

3400 U.S. Bancorp Tower
111 S.W. Fifth Avenue
Portland, OR 97204-3699
(503) 224-5858
(503) 224-0155 fax

500 E. Broadway, Suite 400
Post Office Box 694
Vancouver, WA 98666-0694
(360) 699-4771
(360) 694-6413 fax

Paul W. Oden
paul.oden@millernash.com

August 10, 2004

Certified Article Number
7160 3901 9844 4961 1069
SENDERS RECORD

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Internal Revenue Service
Attn: Carolyn Tucker
915 Second Avenue, MS W103
Seattle, WA 98174

Subject: Gisele C. Fisher
SSN: 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
Form 709, Year 2000

Dear Ms. Tucker:

I am in receipt of a letter dated July 15, 2004, and the attached report of the examining agent. I represent Gisele C. Fisher, and the taxpayer is filing a formal protest in duplicate to the examination report showing proposed changes to the taxpayer's gift tax for tax year 2000.

1. Conference. A conference relating to this appeal from the findings of the examining revenue agent is requested in the Appeals Office.

2. Name and address of the taxpayer.
Gisele C. Fisher
P.O. Box 98510
Des Moines, Washington 98198

3. Date and symbol of letter of transmittal.
July 15, 2004
Letter 937 (Rev. 8-2000)

4. Tax year involved. Taxable year 2000.

5. Protested Adjustments. The determination appealed from is based on the following errors:

The taxpayer does not agree with the finding by the revenue agent that the

fair market value of the shares of D.R. Fisher Company on March 10, 2000 was $12,338 per share, not the $8,480 per share value reported by the taxpayer on her Form 709 for year 2000.

6. Statement of the facts. On March 9, 2000, taxpayer established four grantor retained income trusts with terms of three, four, five and six years. The beneficiaries of the trusts were her two nephews, Ian Metzker and Enrique Braun-Ortega and her niece, Brigitte Ruth. Mrs. Fisher transferred all of her shares of D.R. Fisher Company, a closely-held Washington corporation, to the four trusts in amounts of 400, 200, 200 and 156 shares. In each trust, Mrs. Fisher retained an income interest and a reversion interest under which the trust assets would revert to her estate if she did not survive the term of the trusts. In addition, Mrs. Fisher made cash gifts in trust to the trustee of an Irrevocable Trust dated June 15, 1997.

On her Form 709, the taxpayer valued her gifts of the remainder future interests under the traditional valuation methods of IRC Section 7520 by reducing the fair market value of the shares transferred by the present values of her retained income interests and reversion interests. There is no dispute between the parties on this reporting standard (Form 886-A, page 9). The taxpayer's calculation of the fair market value of the stock of D.R. Fisher Company was supported by the report of T. S. Tony Leung of Corporate Advisory Associates, Inc. who valued each share of stock at $8,430. Enclosed is a copy of Mr. Leung's report.

D.R. Fisher Company was formed in 1923 to acquire, own and hold real and personal property. In large part, the company's investments have been in Safeco Corporation and Fisher communications, Inc. stock that together represent eighty-four percent of the fair market value of the Company's assets. The parties agree on the fair market value of the Company's assets: $47,080,571 (Form 886-A, page 10).

The Company was founded by O.D. Fisher and O.W. Fisher, the grandfather and great uncle of the taxpayer's husband, Bennett I. Fisher who died January 6, 1987. Bennett I. Fisher gifted taxpayer 800 shares of his Company stock by will; the other 200 shares he left to his son, Bennett I. Fisher II who left his shares to the taxpayer at his death in August 1987. The taxpayer sold 44 of her shares to her brother-in-law, George O. Fisher, in 1987 to pay the deficiency asserted by the IRS on her husband's estate based on another revenue agent's opinion of the fair market value of the Company's stock.

On March 10, 2000, the company had 2,000 shares of common stock issued and outstanding, of which the taxpayer owned 956 shares. The other shares were held by the taxpayer's sister-in-law, Allie Fisher (1,000 shares) and her two sons, taxpayer's nephews, George D. Fisher (22 shares) and William O. Fisher (22 shares). Taxpayer's nephews acquired their shares from their parents by gift, sale or other transfer and not from the taxpayer as asserted

MILLER | NASH LLP
ATTORNEYS AT LAW



by the revenue agent. See the enclosed Declaration of Gisele C. Fisher and Form 886-A, page 10.

The Service retained Lewis D. Olds to review the taxpayer's valuation report. Mr. Olds did not agree with the report's conclusion with respect to the fair market value of the Company' stock of $8,840 per share and found that a value per share between a low of $11,566.46 and a high of $12,337.56 represented a reasonable range of values for the stock. The agent's proposed adjustment uses the highest range figure of $12,337.56 per share. Enclosed is a copy of Mr. Olds' review report.

7. Statement of the law. A gift is valued by its fair market value on the date of the gift. Section 2501(a); 2512(a). Stated another way in the regulations, the value of property for gift tax purposes is "the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell, and both having reasonable knowledge of relevant facts." The willing buyer and willing seller are hypothetical persons, rather than specific individuals or entities, and their characteristics are not necessarily the same as those of the donor and the donee. McCord v. Commissioner, 120 T.C. 358 (T.C. 2003); Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990) (citing Estate of Bright v. United States, 658 F.2d 999,1006 (5th Cir. 1981). As noted on page 11 of Form 886-A, the hypothetical willing buyer and willing seller are presumed to be dedicated to achieving the maximum economic advantage.

Where a gift is made of closely-held stock, Rev. Rul 59-60 describes the general approach, methods, and factors which must be considered in valuing the securities under consideration. All available financial data are to be considered, including the nature of the business and the history of the enterprise from its inception; the book value of the stock and the financial condition of the business. The Ruling provides that certain factors may carry more weight than others because of the nature of the company's business. For example, the value of the stock of a closely held investment company such as D.R. Fisher Company, while the value is closely related to the value of the assets underlying the stock, the cost of liquidating the company merits consideration when appraising the relative values of the stock and the underlying assets. Rev. Rul. 59-60, Section 5 (b).

Since the repeal of General Utilities, 296 U.S. 200 (1935) by the Tax Reform Act of 1986, it has not been possible to liquidate a C corporation without the recognition of gain by the corporation. While the old rule under General Utilities permitted a shareholder to obtain corporate assets with only one level of gain (the taxpayer's/shareholder's), the repeal meant that two levels of tax would apply to a liquidation distribution: a corporate level of tax, and a second, shareholder level of tax.

MILLER | NASH LLP
ATTORNEYS AT LAW



Taxpayer's valuation expert took the capital gains into account in his reduction of the fair market value of the Company's assets; the Service's expert discounted the presumed capital gains tax by assuming a five-year recognition of the tax by the hypothetical buyer. This is anomalous: First, the hypothetical, bona fide purchaser of a minority stock interest would have no control to trigger and time the recognition of the capital gains tax. Secondly, the developing law supports a full and immediate reduction in a company's net asset value for the built-in gains tax.

Built-In Gains Tax Deduction. Prior to the statutory repeal of General Utilities in 1986, there was authority for the propriety of discounts for the hypothetical costs of liquidating a corporation. See, for example, Revenue Ruling 59-60's pronouncement that "the cost of liquidating" a holding company is among the factors that "merit consideration" in determining the fair market value of its stock. The taxpayer believes that there is greater reason to apply liquidation costs in the calculation of a corporation's net asset values today.

Since 1986, the Tax Court has accepted an adjustment for built-in gains tax in the calculation of a holding company's net asset value. In this regard, See Estate of Davis v. Commissioner, 110 T.C. 530 (1998); Borgatello v. Commissioner, TC Memo 2000-264; Estate of Simplot, 112 T.C. 130, 159, 166 & n. 22( 1999) rev'd on other grounds 249 F.3d 1191 (9th Cir. 2001) (Tax Court recognized that built-in gains taxes attributable to appreciation on a corporation's assets should depress the value of the stock of the corporation as valued using an asset-based approach; IRS experts found 40% discounts). The adjustment for built-in gains tax, then, is settled: the Tax Court allows some deduction for built-in gains tax. Taxpayer's expert took into account the full, 35% built-in gains tax in his calculation of the net asset value of the Company's assets. In contrast, the government's expert discounted the effect of the tax to present value, assuming a five-year recognition of the gains inherent in the securities. (Olds at Page 15)

The Second Circuit and the Fifth Circuit recognize that the built-in-capital gains tax must be considered in the valuation of the stock of a closely-held company, see Estate of Eisenberg v. Commissioner, 155 F.3d 50 (2d Cir. 1998) (valuation of the assets of a company's commercial building leased to a third party) remanded to the Tax Court for determination of the amount of the discount; and Estate of Dunn v. Commissioner, 301 F.3d 399 (5th Cir. 2002) (the built-in gains tax liability must be considered as a dollar-for-dollar reduction from the fair market value of a company's assets as a matter of law) (My emphasis). The Service acquiesced in the Eisenberg decision to the extent it holds that there is no legal prohibition against such a discount for built in capital gains tax. AOD 1999-001.

339

Dunn in the Fifth Circuit and Eisenberg in the Second Circuit, then, support Mr. Leung's reduction for the full amount of built-in gains tax. Moreover, the Ninth Circuit in Simplot, supra, acknowledged in passing the propriety of the application by both of the

MILLER | NASH LLP
ATTORNEYS AT LAW



government experts of a 40% discount from net asset value for built-in corporate taxes. Thus and to the extent that Simplot is the law of the Ninth Circuit on this issue, Mr. Leung's 35 percent reduction in net asset value for built-in capital gains tax is clearly warranted. See Golsen v. Commissioner, 54 T.C. 742 (1970), aff'd on another issue, 445 F.2d 985 (10th Cir.), cert denied, 404 U.S. 940 (1971). (the Tax Court follows the rule adopted by the court of appeals to which the taxpayer would appeal an adverse decision). In fact, Mr. Leung's reduction of built-in gains tax is 5% less than the government's experts in Simplot, supra.

In this regard, incorporating both the unrealized gain of marketable securities and any corporate income taxes that would be payable on such gain is consistent with statements of Financial Accounting Standard 115 and 109. It is the practice of public companies to use current value accounting that reflects the deferred tax liability resulting from unrealized appreciation of portfolio assets. The use of current asset accounting as a supplement to historical cost accounting merely recognizes that portfolio assets appreciate in value, and as those assets appreciate, the tax liabilities owed on realization of such values also increases. That is, current asset accounting considers all tax liabilities on the theory that if asset values are to be stated at their current fair market values that a similar statement must be made of all liabilities to realize those fair market values. Consequently, the taxpayer's reporting is based on sound economic principles.

The taxpayer is convinced that the Tax Court would recognize that the full 35% capital gains tax in this case is an appropriate and necessary deduction from current asset values in the calculation of the Company's net asset value. Moreover, should this issue be presented in a refund action taxpayer believes that either the Court of Appeals for the Federal Circuit or the Ninth Circuit would allow a full, dollar-for-dollar reduction for the built-in tax, as determined by Mr. Leung in his report.

The examining agent relies on Borgatello v. Commissioner, TC Memo 2000-264 for the proposition that a full reduction for the built-in gains tax is not warranted where doing so does not account for the holding period of the assets. (Form 886-A at page 12) Taxpayer submits that this authority is distinguishable from this case: First, the assets under review were unique properties, two California shopping centers, not publicly-traded securities such as those held by the Company. Secondly, the interest valued in Borgatello was a 82.76% controlling interest that could time the recognition of gains upon a sale of one or both of the shopping centers. A hypothetical buyer of the stock of D.R. Fisher Company could not control the company to time the disposition of the company's stock. That same hypothetical buyer, however, could opt to replicate the Company's portfolio of securities by buying Safeco or Fisher Communications stock on the open market without being locked into a minority position indefinitely.

MILLER | NASH LLP
ATTORNEYS AT LAW



Further, taxpayer believes strongly that the government's position with respect to the allowance of a deduction for built-in gains tax should be consistent. That is, the position the government took in Simplot, supra in the 9th Circuit that a full and immediate deduction of all relevant taxes attributable to a sale of the valued company's appreciated publicly-traded assets should be followed. Inconsistency from the government does nothing to rationalize tax law or tax planning.

Phase-in of Liability for Built-In Gains Tax. Fair market value to a hypothetical third party buyer is the standard by which such stock is valued and has been since the Service issued Revenue Ruling 59-60 forty-five years ago. That seminal ruling says, among other things, that "the cost of liquidating" a holding company is among the factors that "merit consideration" in determining the fair market value of its stock. For this reason, we question Mr. Olds' assumption that the recognition of built-in gains could be staged over a five-year or longer time period. See Olds Review at page 15. We are not alone in this regard. The Fifth Circuit in Estate of Jameson v. Commissioner, 267 F.3d 366 (5th Cir. 2001) expressly overruled the Tax Court's holding that a reduction for capital gain taxes should be allowed "only in an amount reflecting the rate at which [capital gains] will be recognized, measured as the net present value of the built-in capital gains tax liability that will be incurred over time as timber is cut." Such assumptions about future operations, the appellate court reasoned, were unwarranted.

Taxpayer submits that there is no authority for a present value calculation of the built-in-gains tax liability under the net asset value methodology. First, valuation is to be determined on a date certain, not on a sliding time line. The valuation on the taxpayer's gift tax return was as of March 10, 2000. A hypothetical third party buyer without control of the company could not time the recognition by the Company of the built-in-gains on which the tax liability would be payable. A controlling shareholder might time tax recognition; a minority shareholder has no control with which he or she can time the recognition of taxes.

The Jameson court, in reversing the Tax Court, rejected the Tax Court's analysis that the hypothetical buyer of stock would engage in long-range timber production and not in immediate liquidation. The Jameson court concluded that the Tax Court's approach was fatally flawed in its discounting of the future flow of capital gains taxes on timber property. The Court of Appeals concluded that the Tax Court's own valuation methodology must be tied to the record as well as to sound and consistent economic principles. The Tax Court misplaced emphasis on a specific, as opposed to a hypothetical third party buyer, engaged in long-run timber reduction that led to the Tax Court's denial of a full discount for the accrued capital gains liability. "The hypothetical willing buyer/willing seller test substitutes evidence of the actual owner's or purchaser's intent with the most economically rational analysis of a sale. It is these sound economic principles of valuation that the taxpayer submits, support the taxpayers gift tax reporting.

MILLER | NASH LLP
ATTORNEYS AT LAW



Relationship of Built-in Gains tax to Marketability Discount. Mr. Olds' report related the marketability discount to the reduction in net asset value attributable to the built-in gains tax liability. Taxpayer's position is that a separate and discrete discount must be accorded closely-held stock for its lack of marketability irrespective of the Company's built in gains tax liability. Conceptually and as a matter of sound valuation methodology, all elements relevant to closely-held stock, including for this purpose built-in-gains liability and a minority holding relate in one or more ways to the marketability of the stock. Stated another way, a minority interest in a closely-held corporation and a built-in capital gains tax cause the stock of the corporation to be less marketable or less valuable to a third party. For this reason, a minority interest discount is accorded a non-controlling stock interest. Similarly, the lack of a ready market for the closely-held stock relates to fair market value but also relates directly to the marketability issue.

Where the parties use the income capitalization method to value closely-held stock, the element of a built-in gains tax is not considered to be relevant, although other taxes may affect value. One would think that the courts would accept lower marketability discounts in such cases; however, precedent does not support this reasoning. The Tax Court, for example, recognizes a marketability discount in valuation cases where an income capitalization methodology is employed as large as the discount for lack of marketability in net-asset value methodology cases. In this regard, see Estate of Green v. Commissioner, TC Memo 2003-348 (2002). (Court held that a lack of marketability discount of 35% was appropriate for estate tax purposes of a decedent's minority interest in closely-held stock. 35% was within the 24- to 45-percent range indicated by restricted stock studies).

The taxpayer's position is that the marketability discount range allowed in Tax Court precedent should apply irrespective of the valuation methodology employed-the capitalization of income methodology or the net asset value methodology. The failure to apply a separate deduction for built-in gains tax under a net asset, liquidation analysis, finding that the deduction is part of the marketability discount, as disclosed in the Olds' report is not supportable. If an expert's analysis begins with a calculation of a company's net asset value, tax liabilities need to be an integral part of the "netting" of asset values.

Minority Interest Discount to Net Fair Market Value. The parties agree that a 15% minority interest discount may be accorded the fair market value of the stock. Mr. Leung's implied minority interest discount was 15 percent, as his valuation selected a Prince/Net Asset Value ratio of approximately 85 percent. Mr. Olds considered a 15 percent minority interest discount to be reasonable. (Olds at Page 8)

Marketability Discount. The only real issue between the parties, then, is the amount of the marketability discount. Taxpayer submits that Mr. Leung relied on comparable closed-end investment companies ("CICs") invested either in diversified stock portfolios or

investments concentrated in the financial sector. Mr. Leung then contrasted D.R. Fisher Company with his comparable CICs, taking into account the relative specifics of the subject company with the selected, comparable CICs, making a final adjustment within the scope of his expertise to conclude with the reported value for the D.R. Fisher Company stock. I note that Mr. Leung's approximate 32% marketability discount is less than the discount found by both of the government's experts in Okerlund v. United States, 53 Fed. Cl. 341(2002), aff'd., 365 F.3d 10440 (2004). (both experts found a 40% marketability discount.

Mr. Olds, on the other hand, citing reports published after the valuation date, concluded that a smaller, marketability discount should apply. Mr. Olds relied in large part on a treatise by Mukesh Bajaj, et al. "Fair Value and Marketability Discounts". Taxpayer questions the relevance of academic studies printed after the valuation date, Olds' Review at page 15, especially where, as here, Mr. Bajaj's report has been subject to criticism by the valuation peer community. See, e.g., the article by Lance S. Hall, ASA, in the March/April 2004 issue of Valuation Strategies, copy enclosed. In essence, Mr. Hall's response to the Bajaj study identifies two fatal flaws: the first: all registered shares are liquid; and the second: all restricted stock is equally illiquid. While the debate among the experts may continue, it is sufficient to note for our purposes that Mr. Olds relied on data and authority published after March 10, 2000-the valuation date. Further, Mr. Olds's reliance on restricted stock comparables is not supportable. Restricted stock will become marketable at a future date; the stock of D.R. Fisher Company has no prospect of becoming marketable at any time in the future. Oranges should not be compared to apples.

The judicial response to the Bajaj study has been mixed. Where the Tax Court has addressed the study, it has looked to the raw data from the Bajaj study, rather than to the study's conclusions, in according a discount for lack of marketability to closely-held stock. In this regard, See McCord, 120 TC 358 (2003) and Clarissa W. Lappo, TC Memo 2003-258. In McCord, the court pointed out that Dr. Bajaj had isolated the liquidity portion of the marketability discount and concluded that it was unable to accept that liquidity alone equated to marketability. In Lappo, the Tax Court disregarded Bajaj's conclusion that the portion of private placement discounts attributable solely to impaired marketability was 7.2 percent in favor of an examination of the study's raw data. Having undertaken a study of the underlying data, the Tax Court concluded at a 21-percent marketability discount to have been appropriate before adjustments to incorporate characteristics specific to the partnership under review. (My Emphasis). Cf. with the following lack of marketability discounts observed in recent Tax Court decisions:30 percent-Estate of Thompson v. Commissioner, T.C. Memo. 2004-174; 30 percent – Estate of Desmond v. Commissioner, T.C. Memo. 1999-76; 40 percent and 45 percent-Barnes v. Commissioner, T.C. Memo. 1995-255; 30 percent-Mandelbaum v. Commissioner, T.C. Memo. 1995-255, affd. Without published opinion 91 F.3d 124 (3dCir. 1996); 30 percent-Estate of Gallo v. Commissioner, T.C. Memo. 1985-363.

MILLER | NASH LLP
ATTORNEYS AT LAW



The taxpayer believes Mr. Leung's conclusion to be fully supported and supportable, as it does adjust for the characteristics specific to the stock of D.R. Fisher Company. Mr. Olds' range of marketability discounts of 20-25% suggests that there are no characteristics of the D.R. Fisher Company stock that would make it more or less marketable than unregistered (restricted) securities. Common sense suggests that marketability discount accorded unregistered shares that will be marketable at some time in the future should be less than the marketability discount for restricted shares, such as D.R. Fisher Company shares, that have no prospect of ever becoming marketable. Common sense must prevail here.

Conclusion. The government and the taxpayer agree one very significant point: The appropriate valuation methodology to value the stock of D. R. Fisher Company on March 10, 2000 is the net asset value methodology. Based on the foregoing analysis of the case law with respect to built-in gains tax deduction from net asset value and the lack of marketability discount, taxpayer submits that the proposed adjustments to her gift tax return for year 2000 are not warranted and that the examination should be closed without adjustments.

I have submitted the protest and the accompanying documents and, I believe the facts stated in the protest and the accompanying documents are true and correct.

The taxpayer requests a hearing before the appeals office. Please contact me to schedule the hearing.

Yours very truly,

Paul W. Oden

cc: Mrs. Gisele C. Fisher
ODEN:mdd
Enc.: 4
File No.: 503662-6001
503662-6001.10
Doc ID: SEADOCS:183298.2

Corporate Advisory Associates, Inc.
1001 Fourth Avenue, Suite 4730
Seattle, WA 98154

Tel 206-382-9898
Fax 206-382-0355

# D.R. FISHER COMPANY

## AS OF MARCH 10, 2000

BUSINESS VALUATION AND FINANCIAL ADVISORS

Client #: F275-5

CORPORATE
ADVISORY
ASSOCIATES
INCORPORATED

February 15, 2001

Paul Oden, Esq.
Miller Nash

In accordance with your request, we have made an appraisal of D.R. Fisher Company (hereinafter referred to as "DRF" or "the Company"). This report presents our findings.

The purpose of this appraisal is to express an opinion of the fair market value of the common shares of the Company as of March 10, 2000. The term "fair market value" as used herein is defined as the amount at which the common shares would be exchanged between a willing buyer and a willing seller, each having reasonable knowledge of all relevant facts, neither being under any compulsion to act. This valuation is made for those common shares less than 50 percent of the total, and is intended for gift tax reporting purposes.

Determining the fair market value of a business ownership interest requires consideration of all pertinent factors bearing upon its investment quality. As stated in Revenue Ruling 59-60, these factors include:

> The nature of the business and the history of the enterprise from its inception.
>
> The economic outlook in general and the condition and outlook of the specific industry in particular.
>
> The book value of the stock and the financial condition of the business.
>
> The earnings capacity of the company.
>
> The dividend-paying capacity.
>
> Whether or not the enterprise has goodwill or other intangible value.
>
> Sales of the stock and the size of the block of stock to be valued.
>
> The market price of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter.

1001 FOURTH AVENUE
SUITE 4730
SEATTLE, WA 98154
TEL 206-382-9898
FAX 206-382-0355

The common shares of DRF are closely held and have no active market to indicate their value. Therefore, we have analyzed the appropriate factors to determine their fair market value.

Based upon the investigation and the analyses outlined in the following pages, it is our opinion that as of March 9, 2000 the fair market value for the common shares in DRF that are less than 50 percent of the total is:

**EIGHT THOUSAND FOUR HUNDRED & THIRTY DOLLARS PER SHARE**
**($8,430/share)**

based on 2,000 common shares issued and outstanding.

In accordance with recognized professional ethics, the fee for this service is not contingent upon our conclusion of value. Neither Corporate Advisory Associates, Inc. nor any of its employees currently or prospectively has an ownership interest in the Company. Corporate Advisory Associates, Inc. and its employees are independent of the management and shareholders of the Company.

The accompanying report and exhibits document the premises, analyses, and logic upon which our conclusions are founded. The statements of fact contained in this report are true and correct. The opinion expressed above is advisory in nature, and represents my unbiased professional analyses and conclusion.

This appraisal has been prepared in accordance with the Uniform Standards of Professional Appraisal Practice of the American Society of Appraisers. Furthermore, the American Society of Appraisers has a mandatory recertification program for all of its Accredited Senior Appraisers (ASA). The ASA signing this report is in compliance with the requirements of this program. No one provided significant professional assistance to the ASA signing this report.

Neither all nor any part of the contents of this letter and the accompanying pages should be conveyed to the public through advertising, public relations, news, sales, mail, direct transmittal, or other media, without the prior written consent and approval of Corporate Advisory Associates, Inc.

Future services required of Corporate Advisory Associates, Inc. regarding the subject matter of this report, including but not limited to testimony or attendance in court, shall be arranged as separate engagements based on terms to be mutually agreed upon in the future.

Respectfully submitted,

CORPORATE ADVISORY ASSOCIATES, INC.

T.S. TONY LEUNG
CPA, CFA, ASA

TSL/kt
F275-5

**D.R. FISHER COMPANY**

**TABLE OF CONTENTS**

SUMMARY OF ANALYSIS .......... 1

EXHIBITS

1. List of Securities Held .......... 7
2. Comparative Summary Statement of Income .......... 8
3. Comparative Summary Balance Sheet .......... 9
4. Net Asset Value Analysis .......... 10
5. Valuation Ratios for Selected Closed-End Investment Companies -- Diversified Stocks .......... 11
6. Valuation Ratios for Selected Closed-End Investment Companies -- Financial Stocks .......... 13
7. Closed-end Investments Companies' Quarterly Discounts to Net Asset Values (3/90-2/00) .......... 14
8. Valuation Analysis .......... 15
9. Qualifications of Valuation Consultant .......... 16

## SUMMARY OF VALUATION

### Description of the Company

DRF is a Washington corporation formed in 1923 to acquire and own real and personal properties. The Company has owned a very stable portfolio of investment securities and some real properties. Its asset holdings on the valuation date comprised shares in 13 publicly-traded stocks, cash balances in two bank checking accounts, shares in a money market fund, and two real properties. Exhibit 1 shows the list of the publicly-traded stocks held by the Company, and their market values based on their average high-low prices on the valuation date. As shown, two stocks (Safeco Corporation and Fisher Companies, Inc.) accounted for 84 percent of the portfolio value. The stocks in the portfolio were acquired many years ago and have substantial appreciation since. The Company also owns these two real properties:

1. A 2.133 acre lot in the Gardner-Simmental Plaza on the north side of Bozeman, Montana. The property is zoned for light manufacturing and is currently vacant.

2. A 1.48 acre parcel with 151 feet of waterfront at 23435 Marine View Drive in Des Moines, Washington. The property is improved with two homes and other structures.

Before certain transfers effective on the valuation date, the shareholdings were:

| | Number of Shares | Ownership Percentage |
|---|---|---|
| Allie Fisher | 1,000 | 50.0 |
| Gisele C. Fisher | 956 | 47.8 |
| George D. Fisher | 22 | 1.1 |
| William O. Fisher | 22 | 1.1 |
| Total | 2,000 | 100.0 |

There is no shareholder agreement among the shareholders or with the Company. DRF's corporate bylaws, as amended, states that a shareholder shall not sell his or her shares to a non-shareholder without first offering the shares to the other shareholders.

To review the Company's recent operating results, we have summarized the Company's internal financial statements since 1997 in Exhibits 2 and 3. Exhibit 2 shows that dividends from the stock portfolio have been the main source of income for DRF. In

particular, a lion's share of the dividends has come from shares in the Safeco Corporation. Total dividend income has gradually grown. The Company's real estate holdings have generated minimal income in comparison. Prior to 1999, DRF owned a vacant lot on Aurora Avenue in Seattle. It was sold in 1999 and accounted for the $167,000 gain. The Company has little on-going expenses. As shown, a high proportion of its pretax income has been distributed as dividends. DRF has been taxed as a personal holding company for federal income tax purposes.

Exhibit 3 shows the Company's year-end balance sheet since 1997. The most current balance sheet relative to the date of valuation is as of the end of March. It is shown in the exhibit as well. The cost bases for the assets were very low compared to their market values.

**Valuation Analysis**

Generally, asset holding companies are appraised based on their underlying asset value. Exhibit 4 shows the determination of the Company's net asset value based on its balance sheet at the end of March. The bank account balances were as of the end of the month. The market values for the securities were based on their average high-low prices on the valuation date. We have not independently appraised the two real properties owned by DRF. We have relied upon two appraisals, as described in the footnotes to Exhibit 4. As a personal holding company, DRF will incur income tax on the capital gain from sale of assets. Therefore, we have calculated the built-in-gain tax on the unrealized gain as a deferred liability. The net asset value on the valuation date is therefore determined at $31,221,181.

If the assets are producing adequate income, the income approach is also a relevant consideration. As shown in Exhibit 4, almost all of the assets in DRF were in stocks. Exhibit 1 shows that the divided yield for this stock portfolio is 5.36 percent. DRF has paid out dividend and interest income as dividends to its shareholders because of its personal holding company status. But most of the dividend yield from this portfolio is derived from the share holdings of Safeco Corporation, which had a yield of almost 8 percent around the valuation date. Relative to its average high-low price for 1999, Safeco's current dividends still indicate a yield of 4.4 percent, significantly higher than the market average. It is among one of the highest dividend yielding stocks available in the market. We have not found another insurance company with comparably high dividend yield. As will be shown later, it is not feasible to apply the dividend income valuation approach on DRF with market benchmarks based on more normal dividend yields. Therefore, only the asset valuation approach will be applied to value the shares of DRF.

In the valuation analysis, we have examined the primary source of value for the non-majority shares of DRF: their ability to access the underlying asset value. In concept,

this can be effected by liquidating the assets and distributing the proceeds. However, the shares being valued do not have the voting power to effect liquidation, to make decisions on distributions, or to change the investment objectives of the Company. In other words, they lack the power of control. The shares also lack ready marketability. The following discusses in more detail these effects on the value of the shares due to the rights and restrictions stated in the limited liability company agreement:

Distributions. Although DRF is managed by majority vote, it is expected to distribute all of its dividend and interest income because of its personal holding company status. A non-majority shareholder is reasonably assured of these distributions. Given the relatively high yield of the portfolio, this is a favorable feature and affects value positively for the non-majority shares.

Liability. Because corporations shield shareholders from corporate liabilities, the shareholders of DRF are not personally liable for the obligations or expenses of DRF except to the extent of the value of their stock. Limited liability protection is a favorable feature and it affects value positively for the shareholders.

Management and Control. A non-majority shareholder cannot dictate the business decisions for DRF, such as changing the portfolio or investment strategy. Because of the high built-in gain in the portfolio, tradings would be discouraged anyway. Given this constraint, the lack of control over operations has limited effects on receiving the dividend stream.

Liquidity and Right to Transfer. A shareholder has no right to require DRF to redeem his or her shares, which do not have a market. The transfers of a shareholder's interest are subject to the restrictions stated in the bylaws. The risk in an investment is significantly higher when there is no mechanism for the investor to terminate or sell his or her interest at will. These restrictions further limit the universe of potential buyers, and affects the value of the shares negatively.

It is relevant to consider how market pricing reflects a non-majority owner's limited ability to access the asset value. Buy-sell transactions involving a large number of buyers and sellers are useful guidelines for fair market valuation. They are typically found with public firms whose ownership shares are traded in the stock markets or the national quotation systems. The concept is that the market prices on a well-selected group of public firms reflect a large number of investors' assessments of risk and return for similar investment opportunities. These buy/sell transactions therefore approximate fair market value transactions. Valuation ratios gleaned from these transactions, when properly adjusted for DRF's characteristics, can be applied to value its shares.

Ninety-five percent of the Company's assets are in publicly-traded stocks. Therefore, it is similar to a closed-end investment company ("CIC") that owns stocks for investments. CICs are similar to mutual funds but have a fixed number of shares that trade like stocks

on the stock exchanges. There are many publicly-traded CICs, some with investments targeted at equities or fixed income, some at a specific economic sector or a foreign economy, and some have diversified holdings. Most of the CICs are organized as corporations. If they meet certain distribution and diversification requirements, they are tax pass-through entities similar to a partnership. Although the tax aspect of a CIC is not similar to DRF, CICs can be useful guidelines for our valuation. Our research, however, did not identify any CICs that hold the same securities portfolio as the Company's or with similar concentration in the shares of Safeco Corporation. Instead, we have selected two groups of CICs to compare with DRF: one that holds diversified stock portfolios and one that has concentration in the financial sector. Exhibits 5 and 6 show their price/net asset value (P/NAV) ratios and distribution yields. Other descriptive information on the CICs is shown on the exhibits as well.

As shown, the average P/NAV ratios for both groups of CICs are less than 1.0, indicating that their shares are traded at discounts from net asset value. We used three average measures to represent each group. The CICs that have concentration in the financial sector have similar P/NAV ratios as the other group. In fact, this discount phenomenon is historically consistent; stock CICs typically are traded below their net asset value. Exhibit 7 presents a graphical depiction of the relationship between share price and net asset value since 1990 for the Herzfeld Closed-End Average. The observed discounts on stock CICs can be explained by several factors: the market supply and demand for the shares; the inherent minority nature of the shares; and the built-in capital gain tax to the owners if the underlying securities were sold. Furthermore, the market data suggests there is no correlation between the expected yield from the stock portfolio and the P/NAV ratio.

These CICs also have varying yields based on dividends to their shareholders. In Exhibit 5, five of the ten CICs have dividend yields at or above 10 percent, and similarly with one of the three CICs in Exhibit 6. However, these high dividend yields generally involve distribution of capital gains. Our review of the dividend yields of the underlying portfolios of these CICs indicates a range of 1 to 2 percent for the diversified stock CICs and 2 to 4 percent for those concentrated in the financial sector. None has a dividend yield approaching the 5.4 percent of DRF's portfolio.

Using these market data, the appropriate P/NAV ratio for DRF can be determined by considering their comparative differences:

1. The diversified stock CICs have much larger and more diversified holdings than DRF. The Company's portfolio consists of only 13 stocks with concentration in one stock. As shown in Exhibit 5, the CICs each hold 40 to over 300 stocks in their portfolios. The CICs that have concentration in financial stocks also do not have the degree of concentration as DRF. In terms of diversification, DRF is a less desirable investment vehicle.

2. The CICs in Exhibits 5 and 6 have professional investment managers and performance targets. With tradings, they have generated capital gains that augment the distributions to their shareholders. On the other hand, DRF is discouraged from trading because of the high built-in gain. The lack of trading increases the risk of the portfolio, and reduces the potential return.

3. Comparing the cost basis for the Company's portfolio to its market value indicates a built-in gain of about 97 percent of the net asset value. This is significantly higher than the average of around 30 percent for the CICs. High built-in gain makes DRF less desirable for an investor intending on building a similar portfolio.

4. In contrast with the publicly-traded shares of the CICs, the shares of DRF are closely held and have no ready marketability. All else being equal, the lack of marketability increases the risk of ownership and diminishes value. This market phenomenon is evidenced by transactions wherein restricted securities of public firms were sold in private placements. Restricted securities are typically sold at lower prices than their registered and publicly-traded counterparts. A number of studies on these restricted stock transactions have been conducted since the 1960's. The table below summarizes the results of these studies:

| Years Studied | Name/Author of Study | Average Percentage Discount | Number of Transactions |
|---|---|---|---|
| 1966-69 | SEC Institutional Investor | 25.8% | 398 |
| 1968-70 | Milton Gelman | 33.0% | 89 |
| 1969-72 | Robert E. Moroney | 35.6% | 146 |
| 1969-73 | J. Michael Maher | 35.4% | N/A |
| 1968-72 | Robert Trout | 35.5% | 60 |
| 1978-82 | Standard Research Consultants | 45.0%[a] | 28 |
| 1981-84 | Willamette Management Associates | 31.2%[a] | 33 |
| 1981-88 | William L. Silber | 33.8% | 69 |
| 1979-92 | FMV Opinions, Inc. | 23.0% | 100 |
| 1991-95 | Bruce A. Johnson | 20.0% | 72 |
| 1996-97 | Kathryn F. Aschwald | 21.0% | 23 |

[a] Median instead of average.

The average discounts found in these studies appear to be relatively consistent over time until the 1990's. Average discounts have been lower in the 1990's. Many analysts attributed this to the more active market for restricted securities due to the enactment of the Securities and Exchange Commission Rule 144A. The data support the notion that the relative prospect for liquidity affects the value discounts on privately-held stocks. The shares of DRF being valued have no definite prospect of becoming liquid, and a liquidity event is unlikely in the next two years, the holding period required for restricted stocks before 1997. Also, the ranges of the discounts from these studies vary significantly, reaching as high as 60 percent. It is therefore important to understand those factors that may influence the discount for lack of marketability. The data from these studies tend to show that the discount increases when the size of the firm declines. Firms that are more profitable tend to have smaller discounts.

Another group of studies analyze initial public offerings to determine the relationship between the prices at which the securities were initially offered to the public and the prices at which private sales were transacted within five months prior to initial public offerings[a]. The results of these studies were that the private transactions on average carried prices 40 to 45 percent less than the prices at which the securities subsequently came to market.

Since discount for lack of marketability is not a constant amount for all situations, the appropriate considerations for DRF should reflect its specific circumstances. Based on the data described above, we conclude that the value discount for the lack of marketability with DRF, relative to the CICs should be in the 30 to 40 percent range.

By considering these factors and using the market data shown in Exhibits 5 and 6, we have determined a P/NAV ratio of 0.54 to value the shares. Exhibit 8 shows the valuation result. The aggregate fair market value of $16,859,438 is for all the shares on the non-control basis. For the 2,000 shares outstanding, the fair market value per share is therefore $8,430.

---

[a] John D. Emory, "The Value of Marketability as Illustrated in Initial Public Offerings of Common Stock," *Business Valuation News*, various issues since 9/85.

**EXHIBIT 1**

**D.R. FISHER COMPANY**

**SCHEDULE OF SECURITIES HELD**

| QUANTITY | EQUITY | 03/10/2000 PRICE | 03/10/2000 MKT VALUE | INDICATED DIVIDEND [a] | INDICATED YIELD% |
|---|---|---|---|---|---|
| 25,888 | THE CHUBB CORPORATION | 45.375 | 1,174,668.00 | 1.28 | 2.82 |
| 4,000 | CONSOLIDATED EDISON INC | 27.469 | 109,875.00 | 2.18 | 7.94 |
| 232,928 | FISHER COMPANIES INC | 59.969 | 13,968,401.00 | 1.26 [b] | 2.10 |
| 3,200 | FORTUNE BRANDS INC | 22.281 | 71,300.00 | 0.92 | 4.13 |
| 3,200 | GALLAHER GROUP | 16.469 | 52,700.00 | 1.34 | 8.14 |
| 3,516 | GENERAL PUBLIC UTIL INC | 24.031 | 84,493.88 | 2.12 [b] | 8.82 |
| 1,600 | THE MONTANA POWER CO | 38.094 | 60,950.00 | 0.80 | 2.10 |
| 1,381 | PECO ENERGY COMPANY | 38.157 | 52,694.13 | 1.00 | 2.62 |
| 800 | PUGET SOUND ENERGY INC | 19.906 | 15,925.00 | 1.84 | 9.24 |
| 1,000 | RYERSON TULL INC | 12.781 | 12,781.25 | 0.20 | 1.56 |
| 1,267,200 | SAFECO CORPORATION | 18.594 | 23,562,000.00 | 1.48 | 7.96 |
| 101,424 | WEYERHAEUSER | 53.875 | 5,464,218.00 | 1.60 | 2.97 |
| 11 | LA CEN NET PROFIT UNITS | 215.000 | 2,365.00 | 0.00 | 0.00 |
| | | TOTAL | 44,632,371.25 | WTD AVG | 5.36 |

[a] Source: Standard and Poors Stock Report (March 2000), unless otherwise noted

[b] Source: Form 10-K March 2000

FILE: Fisher01spreadB
DOV: 3/10/00
**EXHIBIT 2**

## D. R. FISHER COMPANY
## COMPARATIVE SUMMARY STATEMENT OF INCOME

| STATEMENT TYPE | (3 months) IN-HOUSE | | IN-HOUSE | | IN-HOUSE | | IN-HOUSE | |
|---|---|---|---|---|---|---|---|---|
| STATEMENT DATE | 03/31/2000 | | 12/31/1999 | | 12/31/1998 | | 12/31/1997 | |
| | ($000) | % | ($000) | % | ($000) | % | ($000) | % |
| **DIVIDENDS:** | | | | | | | | |
| THE CHUBB CORPORATION | 8 | 1.38 | 33 | 1.31 | 32 | 1.42 | 30 | 1.43 |
| CONSOLIDATED EDISON INC | 2 | 0.36 | 9 | 0.34 | 8 | 0.38 | 8 | 0.41 |
| FISHER COMPANIES INC | 61 | 10.10 | 242 | 9.60 | 233 | 10.46 | 228 | 11.03 |
| FORTUNE (AMERICAN) BRANDS INC | 1 | 0.12 | 3 | 0.11 | 3 | 0.12 | 5 | 0.22 |
| GALLAHER GROUP | 0 | 0.00 | 5 | 0.19 | 4 | 0.19 | 3 | 0.12 |
| GPU INC | 2 | 0.31 | 7 | 0.29 | 7 | 0.32 | 7 | 0.34 |
| INLAND STEEL INDUSTRIES INC | 0 | 0.00 | 0 | 0.00 | 0 | 0.01 | 0 | 0.01 |
| THE MONTANA POWER COMPANY | 0 | 0.05 | 1 | 0.05 | 1 | 0.06 | 1 | 0.06 |
| NATIONS TREASURY RESERVES DAILY | 4 | 0.66 | 35 | 1.39 | 0 | 0.00 | 0 | 0.00 |
| PACIFIC HORIZON TREASURY FUND | 0 | 0.00 | 6 | 0.23 | 0 | 0.00 | 0 | 0.00 |
| PECO ENERGY COMPANY | 0 | 0.00 | 1 | 0.05 | 1 | 0.06 | 2 | 0.12 |
| PUGET SOUND ENERGY INC | 0 | 0.06 | 1 | 0.06 | 1 | 0.07 | 1 | 0.07 |
| RYERSON TULL INC | 0 | 0.01 | 0 | 0.01 | 0 | 0.00 | 0 | 0.00 |
| SAFECO CORPORATION | 469 | 78.20 | 1,825 | 72.33 | 1,698 | 76.29 | 1,546 | 74.72 |
| WEYERHAEUSER COMPANY | 41 | 6.77 | 162 | 6.43 | 162 | 7.29 | 162 | 7.84 |
| **TOTAL DIVIDENDS** | 588 | 98.03 | 2,331 | 92.40 | 2,152 | 96.68 | 1,994 | 96.37 |
| **INTEREST:** | | | | | | | | |
| WASHINGTON FEDERAL SAVINGS | 1 | 0.08 | 2 | 0.08 | 2 | 0.10 | 2 | 0.11 |
| FISHER COMPANIES INC | 0 | 0.00 | 0 | 0.00 | 49 | 2.21 | 50 | 2.42 |
| **TOTAL INTEREST** | 1 | 0.08 | 2 | 0.08 | 51 | 2.31 | 52 | 2.53 |
| **OTHER INCOME:** | | | | | | | | |
| ROYALTY | 0 | 0.05 | 0 | 0.01 | 0 | 0.02 | 1 | 0.04 |
| MISCELLANEOUS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| RENTAL INCOME - FARM | 11 | 1.83 | 22 | 0.87 | 22 | 0.99 | 22 | 1.06 |
| SALE OF AURORA PROPERTY | 0 | 0.00 | 167 | 6.64 | 0 | 0.00 | 0 | 0.00 |
| **TOTAL OTHER INCOME** | 11 | 1.89 | 190 | 7.53 | 22 | 1.01 | 23 | 1.10 |
| **TOTAL INCOME** | 600 | 100.00 | 2,523 | 100.00 | 2,226 | 100.00 | 2,069 | 100.00 |
| **EXPENSES:** | | | | | | | | |
| SERVICE CHARGES | 2 | 0.33 | 8 | 0.31 | 8 | 0.36 | 8 | 0.38 |
| ROYALTY EXPENSE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| DIRECTORS' FEES | 0 | 0.05 | 1 | 0.05 | 1 | 0.05 | 1 | 0.06 |
| INTEREST EXPENSE | 0 | 0.00 | 2 | 0.10 | 2 | 0.11 | 3 | 0.12 |
| CORPORATION LICENSE | 0 | 0.01 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| REAL ESTATE TAXES | 12 | 1.99 | 14 | 0.57 | 14 | 0.62 | 15 | 0.71 |
| INSURANCE | 4 | 0.74 | 4 | 0.17 | 4 | 0.19 | 4 | 0.19 |
| GENERAL | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| FOREIGN INCOME TAXES PAID & W/H | 0 | 0.00 | 0 | 0.02 | 1 | 0.03 | 0 | 0.02 |
| DEPRECIATION | 0 | 0.05 | 1 | 0.05 | 1 | 0.05 | 2 | 0.11 |
| **TOTAL EXPENSES** | 19 | 3.17 | 32 | 1.27 | 31 | 1.41 | 33 | 1.60 |
| **PRETAX INCOME:** | 581 | 96.83 | 2,491 | 98.73 | 2,194 | 98.59 | 2,036 | 98.40 |
| LESS DIVIDENDS PAID | -44 | -7.34 | -2,266 | -89.82 | -2,146 | -96.41 | -1,698 | -82.07 |
| LESS RESERVE FOR INCOME TAX | 0 | 0.00 | -69 | -2.75 | -52 | -2.36 | -338 | -16.32 |
| **TOTAL EARNED SURPLUS** | 537 | 89.49 | 155 | 6.15 | -4 | -0.19 | 0 | 0.01 |

FILE: Fisher01spreadB
DOV: 3/10/00
EXHIBIT 3

D. R. FISHER COMPANY
COMPARATIVE SUMMARY BALANCE SHEET

| STATEMENT TYPE | IN-HOUSE | | IN-HOUSE | | IN-HOUSE | | IN-HOUSE | |
|---|---|---|---|---|---|---|---|---|
| STATEMENT DATE | 03/31/2000 | | 12/31/1999 | | 12/31/1998 | | 12/31/1997 | |
| | ($000) | % | ($000) | % | ($000) | % | ($000) | % |
| **CASH & EQUIVALENTS:** | | | | | | | | |
| BANK OF AMERICA | 250 | 16.32 | 468 | 47.00 | 254 | 32.92 | 566 | 52.34 |
| MONEY MARKET FUNDS | 766 | 50.01 | 12 | 1.20 | 0 | 0.00 | 0 | 0.00 |
| WASHINGTON FEDERAL SAVINGS | 68 | 4.45 | 68 | 6.80 | 66 | 8.53 | 63 | 5.86 |
| **TOTAL CASH & EQUIVALENTS** | 1,084 | 70.79 | 547 | 55.01 | 319 | 41.45 | 630 | 58.21 |
| **INVESTMENTS - REAL ESTATE:** | | | | | | | | |
| AURORA AVE - VACANT LAND | 0 | 0.00 | 0 | 0.00 | 11 | 1.37 | 11 | 0.98 |
| BOZEMAN - VACANT LAND | 19 | 1.24 | 19 | 1.90 | 11 | 1.36 | 11 | 0.97 |
| **TOTAL REAL ESTATE INVESTMENTS** | 19 | 1.24 | 19 | 1.90 | 21 | 2.74 | 21 | 1.95 |
| **INVESTMENTS - STOCKS:** | | | | | | | | |
| THE CHUBB CORP | 4 | 0.26 | 4 | 0.41 | 4 | 0.52 | 4 | 0.37 |
| CONSOLIDATED EDISON INC | 22 | 1.46 | 22 | 2.25 | 22 | 2.91 | 22 | 2.07 |
| FISHER COMPANIES INC | 86 | 5.58 | 86 | 8.60 | 86 | 11.10 | 86 | 7.91 |
| FORTUNE BRANDS INC | 9 | 0.58 | 9 | 0.89 | 9 | 1.15 | 9 | 0.82 |
| GALLAHER GROUP | 5 | 0.34 | 5 | 0.52 | 5 | 0.67 | 5 | 0.48 |
| GENERAL PUBLIC UTIL INC | 31 | 2.00 | 31 | 3.08 | 31 | 3.98 | 31 | 2.84 |
| INLAND STEEL INDUSTRIES | 0 | 0.00 | 0 | 0.00 | 31 | 4.01 | 31 | 2.85 |
| THE MONTANA POWER CO | 12 | 0.79 | 12 | 1.21 | 12 | 1.56 | 12 | 1.11 |
| PECO ENERGY COMPANY | 14 | 0.89 | 14 | 1.37 | 14 | 1.77 | 14 | 1.26 |
| PUGET SOUND ENERGY INC | 7 | 0.48 | 7 | 0.74 | 7 | 0.96 | 7 | 0.68 |
| RYERSON TULL INC | 31 | 2.02 | 31 | 3.10 | 0 | 0.00 | 0 | 0.00 |
| SAFECO CORPORATION | 40 | 2.64 | 40 | 4.06 | 40 | 5.24 | 40 | 3.73 |
| WEYERHAEUSER COMPANY | 62 | 4.08 | 62 | 6.28 | 62 | 8.11 | 62 | 5.78 |
| LA CENT NET PROFIT UNITS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| **TOTAL STOCK INVESTMENTS** | 323 | 21.12 | 323 | 32.52 | 323 | 42.00 | 323 | 29.90 |
| **INVESTMENTS - FARM:** | | | | | | | | |
| REAL ESTATE & BUILDINGS | 48 | 3.17 | 48 | 4.87 | 48 | 6.30 | 48 | 4.48 |
| FARM IMPROVEMENTS & OTHER | 56 | 3.68 | 57 | 5.70 | 58 | 7.52 | 59 | 5.46 |
| **TOTAL FARM INVESTMENTS** | 105 | 6.85 | 105 | 10.57 | 106 | 13.81 | 108 | 9.95 |
| **TOTAL ASSETS** | 1,531 | 100.00 | 995 | 100.00 | 770 | 100.00 | 1,082 | 100.00 |
| **LIABILITIES** | | | | | | | | |
| ACCOUNT PAYABLE - TRUSTEES OF M.B.F. | 0 | 0.03 | 0 | 0.05 | 0 | 0.06 | 0 | 0.05 |
| NOTE PAYABLE - TRUSTEES OF M.B.F. | 46 | 3.00 | 46 | 4.62 | 46 | 5.97 | 46 | 4.25 |
| RESERVE FOR INCOME TAX | -283 | -18.49 | -283 | -35.44 | -353 | -5.85 | -45 | -2.10 |
| **TOTAL LIABILITIES** | -237 | -15.45 | -237 | -23.79 | -306 | -39.74 | 1 | 0.13 |
| **CAPITAL & SURPLUS:** | | | | | | | | |
| CAPITAL STOCK | 200 | 13.06 | 200 | 20.10 | 200 | 0.00 | 200 | 18.49 |
| CAPITAL SURPLUS | 57 | 3.69 | 57 | 5.68 | 57 | 25.97 | 57 | 5.22 |
| EARNED SURPLUS AS OF 1/1 | 975 | 63.67 | 820 | 82.41 | 824 | 106.98 | 824 | 76.13 |
| EARNED SURPLUS 1/1 THRU 12/31 | 537 | 35.04 | 155 | 15.60 | -4 | -0.54 | 0 | 0.03 |
| **TOTAL CAPITAL & SURPLUS** | 1,768 | 115.45 | 1,231 | 123.79 | 1,076 | 139.74 | 1,080 | 99.87 |
| **TOTAL LIABILITIES & CAPITAL** | 1,531 | 100.00 | 995 | 100.00 | 770 | 100.00 | 1,082 | 100.00 |

FILE: Fisher01nava.xls
DOV: 3/10/00

**EXHIBIT 4**

**D. R. FISHER COMPANY**
**NET ASSET VALUE ANALYSIS**

| STATEMENT TYPE | BOOK VALUE | MARKET VALUE |
|---|---|---|
| STATEMENT DATE | 3/31/00 | 3/10/00 |
| | $ | $ |
| ASSETS: | | |
| BANK OF AMERICA | 249,987 | 249,987 |
| WASHINGTON FEDERAL SAVINGS | 68,191 | 68,191 |
| MONEY MARKET FUNDS | 765,880 | 765,880 |
| THE CHUBB CORPORATION | 4,041 | 1,174,668 |
| CONSOLIDATED EDISON INC | 22,390 | 109,875 |
| FISHER COMPANIES INC | 85,523 | 13,968,401 |
| FORTUNE BRANDS INC | 8,842 | 71,300 |
| GALLAHER GROUP | 5,153 | 52,700 |
| GENERAL PUBLIC UTIL INC | 30,679 | 84,494 |
| THE MONTANA POWER CO | 12,046 | 60,950 |
| PECO ENERGY COMPANY | 13,665 | 52,694 |
| PUGET SOUND ENERGY INC | 7,405 | 15,925 |
| RYERSON TULL INC | 30,858 | 12,781 |
| SAFECO CORPORATION | 40,392 | 23,562,000 |
| WEYERHAEUSER | 62,482 | 5,464,218 |
| LA CEN NET PROFIT UNITS | 1 | 2,365 |
| BOZEMAN - VACANT LAND | 18,950 | 252,500 [a] |
| 23435 MARINE DRIVE | 104,900 | 875,000 [b] |
| TOTAL ASSETS | 1,531,387 | 46,843,929 |
| LIABILITIES | | |
| ACCOUNTS PAYABLE - TRUSTEES OF M.B.F. | 494 | 494 |
| NOTES PAYABLE - TRUSTEES OF M.B.F. | 46,000 | 46,000 |
| RESERVE FOR FEDERAL INCOME TAX | -283,136 | -283,136 |
| DEFERRED TAX ON GAIN | 0 | 15,859,390 [c] |
| TOTAL LIABILITIES | -236,642 | 15,622,748 |
| NET ASSETS | **1,768,029** | **31,221,181** |

[a] Based on appraisal as of May 25, 2000 by ERA Landmark Real Estate
[b] Based on appraisal as of March 10, 2000 by Coldwell Banker
[c] ($46,843,929-$1,531,387)(35%)

01/30/2001
Fisher01cediv
DOV: 3/10/00

**EXHIBIT 5**

## D.R. FISHER COMPANY
## VALUATION RATIOS FOR SELECTED CLOSED-END INVESTMENT COMPANIES: DIVERSIFIED STOCKS

| FUND NAME | TOTAL ASSET VALUE (MILLIONS) [a] | (3/3/00) PRICE / SHARE [b] | (3/3/00) NET ASSET VALUE [b] | PRICE / NAV | LATEST 4 WEEK STRAIGHT AVG PRICE/NAV [b] | DIVIDEND YIELD [c] | BUILT-IN GAINS AS % OF ASSET VALUE [d] |
|---|---|---|---|---|---|---|---|
| ADAMS EXPRESS | 1752.2 | $ 34.25 | $ 42.28 | 0.81 | 0.83 | 1.0% | 48.0% |
| BLUE CHIP VALUE FUND | 161.0 | $ 7.94 | $ 8.59 | 0.92 | 0.95 | 11.0% | 29.0% |
| GABELLI EQUITY TRUST | 1370.5 | $ 11.31 | $ 12.62 | 0.90 | 0.92 | 11.0% | 41.0% |
| GENERAL AMERICAN INVESTORS | 1035.6 | $ 38.25 | $ 42.42 | 0.90 | 0.90 | 1.3% | 42.0% |
| LIBERTY ALL-STAR EQUITY FUND | 1326.0 | $ 10.06 | $ 13.30 | 0.76 | 0.63 ** | 12.6% | 27.0% |
| MORGAN GRENFELL SMALLCAP | 107.4 | $ 16.75 | $ 19.90 | 0.84 | 0.86 | 0.0% * | 26.0% |
| ROYCE VALUE TRUST | 665.9 | $ 13.88 | $ 16.64 | 0.83 | 0.84 | 10.0% | 20.0% |
| SALOMON BROTHERS FUND | 1819.9 | $ 18.31 | $ 19.37 | 0.95 | 0.97 | 0.8% | 30.0% |
| TRI-CONTINENTAL CORPORATION | 3952.8 | $ 23.06 | $ 30.09 | 0.77 | 0.79 | 1.5% | 32.0% |
| ZWEIG FUND | 727.7 | $ 9.19 | $ 11.74 | 0.78 | 0.82 | 12.6% | 10.0% |
| | | HARMONIC AVERAGE | | **0.84** | **0.84** | **2.2%** | **25.4%** |
| | | MEAN | | **0.85** | **0.85** | **6.2%** | **30.5%** |
| | | MEDIAN | | **0.84** | **0.85** | **5.7%** | **29.5%** |

[a] Morningstar
[b] Barron's Market Week
[c] Standard & Poor's Stock Guide, April 2000 (uses March 2000 data)
[d] SEC filings, 1999
* Excluded from harmonic average
** Excluding the week 3/3
Criteria for selection:
Common stock funds (at least 65% equities)
Primarily US-based companies in portfolio
Excludes non-diversified funds

01/30/2001
Fisher01cediv
DOV: 3/10/00

**EXHIBIT 5 CONTINUED**

## D.R. FISHER COMPANY

## DESCRIPTION OF SELECTED CLOSED-END INVESTMENT COMPANIES

| | ASSET ALLOCATION [a] | | | | | |
|---|---|---|---|---|---|---|
| FUND NAME | STOCKS | BONDS | CASH | OTHER | NUMBER OF STOCKS [b] | PRIMARY HOLDINGS |
| ADAMS EXPRESS | 91.9% | 1.3% | 1.9% | 4.9% | 108 | Financials 20%, services 20%, technology 7% |
| BLUE CHIP VALUE FUND | 100.0% | 0.0% | 0.0% | 0.0% | 47 | Services 25%, technology 19%, industrial 13% |
| GABELLI EQUITY TRUST | 94.0% | 0.0% | 5.6% | 0.4% | 390 | Services 48%, industrial 18%, financials 9% |
| GENERAL AMERICAN INVESTORS | 72.0% | 0.0% | 26.6% | 1.4% | 56 | Financials 26%, retail 21%, services 17% |
| LIBERTY ALL-STAR EQUITY FUND | 97.8% | 0.0% | 1.9% | 0.2% | 207 | Financials 20%, technology 16%, services 17% |
| MORGAN GRENFELL SMALLCAP | 100.0% | 0.0% | 0.0% | 0.0% | 81 | Services 23%, technology 23%, financials 10% |
| ROYCE VALUE TRUST | 73.4% | 24.0% | 1.4% | 1.2% | 342 | Industrial 26%, technology 18%, services 18% |
| SALOMON BROTHERS FUND | 91.0% | 2.0% | 6.0% | 1.0% | 94 | Financials 19%, technology 18%, services 18% |
| TRI-CONTINENTAL CORPORATION | 92.5% | 5.9% | 1.7% | 0.0% | 67 | Technology 18%, financials 16%, health 13% |
| ZWEIG FUND | 81.2% | 4.4% | 14.5% | 0.0% | 103 | Services 18%, industrial 17%, financials 16% |

[a] Morningstar

[b] SEC filings, 1999

File: Fisher01cefin.xls
DOV: 3/10/00

EXHIBIT 6

## D.R. FISHER COMPANY
## VALUATION RATIOS FOR SELECTED CLOSED-END INVESTMENT COMPANIES: FINANCIAL STOCKS

| NAME | TOTAL ASSET VALUE (MILLIONS)[a] | 3/10/00 PRICE / SHARE[b] | 3/10/00 NET ASSET VALUE[b] | PRICE / NAV | PREVIOUS 4 WEEK STRAIGHT AVG PRICE / NAV[b] | DIVIDEND YIELD[c] | PRIMARY HOLDINGS[a] |
|---|---|---|---|---|---|---|---|
| FIRST FINANCIAL FUND | 245.9 | 7.06 | 8.12 | 0.87 | 0.89 | 1.13% | 96.2% Financial stocks, 2% Energy, 1.5% Retail |
| JOHN HANCOCK BANK & THRIFT | 1009.5 | 6.25 | 7.15 | 0.87 | 0.86 | 2.40% | 100% Financial stocks |
| SOUTHEASTERN THRIFT | 100.2 | 12.38 | 15.12 | 0.82 | 0.82 | 18.75% | 100% Financial stocks |
| HARMONIC AVERAGE | | | | 0.85 | 0.86 | 2.22% | |
| MEAN | | | | 0.85 | 0.86 | 7.43% | |
| MEDIAN | | | | 0.87 | 0.86 | 2.40% | |

[a] Morningstar
[b] The Wall Street Journal
[c] Standard & Poor's Stock Guide, April 2000 (pricing for March 2000), Form N-30D
[d] SEC filings, 2Q 1999
[e] Standard & Poor's Stock Reports
* Excluded from averages
Criteria for selection:
Common stock funds (at least 70% equities)
Primarily US-based companies in portfolio

2/15/01
File: Fisher01pnavch.xls
DOV: 3/10/00

**EXHIBIT 7**

## D.R. FISHER COMPANY
## CLOSED-END INVESTMENT COMPANIES' QUARTERLY DISCOUNTS TO NET ASSET VALUES (3/90 - 2/00)




Source: Barron's Weekly
Discounts are from the Herzfeld Closed-End Average (HCEA), which measures 19 equally-weighted closed-end funds that invest primarily in American equities.
HCEA originated on 12/31/87 and was initially set to 1938.83, equal to the Dow Jones Industrial Average.

**Exhibit 8**

**D.R. FISHER COMPANY**
**Valuation Analysis**

**I. Multiple of Net Asset Value (NAV)**

| | 3/10/01 |
|---|---|
| NAV | $31,221,181 |
| × Selected Ratio | 0.54 |
| = Indicated Value | $16,859,438 |

| | |
|---|---|
| **II. Concluded Aggregate Non-Control Interest Value** | **$16,859,438** |
| Total Shares Outstanding | 2,000 |
| Fair Market Value Per Share | **$8,430** |

**Exhibit 9**

# D.R. FISHER COMPANY

## Qualifications of Valuation Consultant

## T.S. Tony Leung

Since 1978, Mr. Leung has provided business valuation service to clients in a variety of industries for various purposes. A majority of the companies appraised are closely held businesses. Mr. Leung has made appraisals and provided valuation advice for merger/acquisition transactions; strategic planning as related to ownership transition and corporate reorganization; estate and gift tax reportings; and business litigations. Mr. Leung has testified as an expert witness in Washington, Oregon, Alaska and California state and federal courts.

**Education**

1977 M.B.A. in Finance from University of Washington

1975 B.A. in English Literature from University of Washington

**Professional Designations**

1979 Certified Public Accountant (C.P.A.)

1982 Chartered Financial Analyst (C.F.A.)

1983 Accredited Senior Appraiser (A.S.A.)

**Publications**

"Useful Business Valuation Concepts for the Planner." *Personal Financial Planning,* May/June 1993.

"Value of a Design Firm: Some Useful Concepts." *FMG Journal,* March 1992

"Financing Techniques for Small Business Buy Outs." *The Practical Accountant,* February 1990.

"Examining the Economic Dynamics in a Leveraged ESOT." *Business Valuation Review,* September 1989.

"Tax Reform Act of 1986; Considerations for Business Valuations." *Business Valuation Review,* June 1987.

"Myths about Capitalization Rate and Risk Premium." *Business Valuation News,* March 1986.

"Affordable Financing & Tax Free Rollover May Stimulate Business Owners to Try ESOPs." *Valuation Bulletin,* Winter 1985.

"Business Valuation Considerations for Emerging High Growth Companies." *Business Valuation Review,* March 1985.

"Pricing a Practice." *Financial Planning,* October 1984.

"Revenue Rulings 83-119 and 83-120: Impact of Preferred Stock Recapitalizations." *Valuation Bulletin,* Winter 1984.

**Publications (continued)**

"Valuing Emerging High-Growth Companies: A New Approach." *Valuation Bulletin*, Summer 1984.

"Professional Goodwill Value." *Washington State Bar News*, June 1984.

"Recapitalization Planning." *Financial Planning*, June 1984.

"Evaluating Professional Goodwill." *Seattle-King County Bar Bulletin*, October 1983.

"Capitalization Rate Selection: In Defense of the Public Companies Comparison Approach." *Valuation Bulletin*, Summer 1983.

"Valuation of Professional Goodwill." *Valuation Bulletin*, Spring 1983.

"Valuing Non-Marketable Professional Goodwill: A Dilemma for Professional Appraisers." *Valuation Bulletin*, Fall 1982.

"Understanding Fair Market Value." *Valuation Bulletin*, Summer 1982.

"Valuing Preferred Stock Issued in a Recapitalization." *Estate Planning*, September 1980.

**Speaking Engagements**

Mr. Leung has made numerous presentations on the subject of business valuations to professional and business groups, including:

Canadian Institute of Chartered Business Valuators

Washington State Bar Association

Washington Society of CPAs

American Society of Appraisers

Estate Planning Councils

International Association for Financial Planning

National Center for Employee Ownership

Securities & Exchange Commission Government-Business Forum

Seattle King County Economic Development Council

The Executive Committee

**Professional Affiliations and Community Service**

Past President, Seattle Chapter of the American Society of Appraisers (1983-1985)

Member of Editorial Board, Business Valuation Review, American Society of Appraisers (since 1990)

Member of Business Valuation Committee, American Society of Appraisers (1985-1987)

Seattle Society of Financial Analysts

Association for Investment Management & Research

Washington State Society of Certified Public Accountants

Pratt Fine Arts Center, Seattle
Trustee (1988-1995)
President, Board of Trustees (1988-1991)

| | | | |
|---|---|---|---|
| Amount: | $1,208,592.00 | Sequence Number: | 0650536124 |
| Account: | 92713031 | Capture Date: | 04/20/2005 |
| Bank Number: | 12500002 | Check Number: | 134 |

Mrs. Bennett I. Fisher
P.O. Box 98510 824-1981
Des Moines, WA 98198

10134

Date 4/13/05

19-2/1250 WA
16303

Pay to the order of U.S. Treasury $1,208,592.00

One million two hundred and eight thousand five hundred ninety two and 00/100 Dollars

Bank of America

Relationship Account
Valued Client Since 1950

Des Moines 016303
Washington

For 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
2000 Gift Tax Deficiency

Mrs. Bennett I. Fisher

⑆125000024⑆ 92713 031⑈ 0134 ⑈0120859200⑈

00469765001
041705

FISH2951710900000564051537447836
200012 04172005

0650536124

# APPRAISAL REVIEW REPORT

**Taxpayer: Gisele C. Fisher**

**REVIEW OF CORPORATE ADVISORY SERVICES' APPRAISAL OF A MINORITY COMMON STOCK INTEREST IN**

# D.R. FISHER COMPANY

**As Of March 10, 2000**

**Prepared For:**

**Internal Revenue Service**
**Order #TIRWR-03-D-00002 Call No. 2**

November 5, 2003

**LEWIS OLDS**
& ASSOCIATES

**LEWIS OLDS & ASSOCIATES**
Business Appraisers • Financial Consultants

November 5, 2003

Mr. David Dalton
Appraisal Program Manager
Internal Revenue Service
1220 SW Third Avenue, Room 661
Portland, OR 97204

**Re: IRS Order No. TIRWR-03-D-00002 Call No. 2**
**Gisele C. Fisher - Re: D.R. Fisher Company**
**Appraisal Review Comments - Corporate Advisory Associates**
**Minority Common Stock Interest As of March 10, 2000**

Dear Mr. Dalton:

You have asked me to perform a review of an appraisal report prepared by Mr. Tony Leung of Corporate Advisory Associates, Inc. (CAA). Mr. Leung prepared a report on the *fair market value*, as of March 10, 2000, of a minority common stock interest in D.R. Fisher Company ("DRF" or "the Company"). The report was intended for gift tax reporting purposes.

The purpose of my review is to advise you of the reasonableness and appropriateness of CAA's appraisal report and the underlying support for their opinions. I understand that my comments may be used in determining additional gift taxes payable, if any, by Gisele C. Fisher, who made gifts of stock in DRF to various family members on March 10, 2000.

*Fair market value* is defined as the price at which property would change hands between a willing seller and a willing buyer, neither under compulsion to buy or sell, and both having knowledge of relevant facts. This standard assumes a cash or cash equivalent sale.

I have prepared this appraisal review report using standard valuation techniques and practices. The analysis, opinions and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practice*, promulgated by the Appraisal Foundation and endorsed by the American Society of Appraisers (ASA).

22922 N.E. 14th Street Sammamish, Washington 98074
Oregon Phone: (503) 646-3667 Oregon Fax: (503) 646-3228
Washington Phone: (425) 898-9863 Washington Fax: (425) 898-9624
E-Mail: lolds@lewisolds.com

The ASA has a mandatory reaccreditation program for all of its *Accredited Senior Appraisers*. I am in compliance with the requirements of that program. I was accredited in 1989 and I am reaccredited until 2009. I have no present or contemplated future interest in the subject property, or any other interest which might tend to prevent making a fair and unbiased appraisal opinion.

Based on my review procedures, which are described below, it is my opinion that:

- The appraisal report prepared by CAA has a deficiency in that it does not disclose the documents and information relied upon, contrary to the requirements of the Uniform Standards of Professional Appraisal Practice (USPAP). Also, no discussion was made regarding the general economic outlook, or the outlook for investments similar to those held by DRF.
- The appraisal method and technique used was limited to the Adjusted Net Asset Value Method. Little explanation was given by CAA about why they rejected other valuation methods, or whether their Net Asset Value Method was based on liquidation values or on some other standard of value.
- CAA reviewed a sample of Closed End Funds' Price/Net Asset Value ratios as part of their analysis in arriving at a discount for lack of control and lack of marketability. They offered reasonably clear empirical data to support their selected discount. However, CAA did not articulate a specific discount for lack of control and a separate discount for lack of marketability, arriving instead at a single Price/Net Asset Value ratio inclusive of provision for lack of marketability as well as lack of control.
- CAA offered no specific information for their selection of a discount for lack of marketability, other than reference to a standard set of empirical studies. The valuation report offered little explanation to relate the empirical study data to specific features of minority common stock interest in DRF.
- No discussion or consideration in the report was presented regarding past transactions or appraisals involving DRF stock, even though several previous transfers had been made, and Mr. Leung had prepared an appraisal report as of January 6, 1987, the date of Bennett Fisher's death.
- The valuation opinion reached by CAA with respect to their Price/Net Asset Value discount is not well supported, in my opinion, and it is an opinion with which I cannot concur.
- After applying what I consider to be more supportable discounts to the pro-rata value, I have calculated the *fair market value* of a minority common stock interest to be within a range of **$11,566 and $12,338 per share.**

**REVIEW PROCEDURES UNDERTAKEN**

In conducting this assignment, I have performed the following review procedures:

- Verified the Adjusted Net Asset Value of DRF as of March 10, 2000. I made a detailed review and analysis of the listing of marketable securities as presented in CAA's appraisal report, dated February 15, 2001, including testing the accuracy of the market prices described in the report;
- Reviewed CAA's appraisal report and verified the accuracy of their calculation of the net asset value of the 100 percent interest in DRF as of March 10, 2000.
- Reviewed Mr. Leung's previous appraisal report, dated August 14, 1987, wherein he appraised a 50 percent capital stock interest in DRF as of January 6, 1987, prepared for estate tax purposes, pertaining to the death of Bennett I. Fisher, Gisele Fisher's husband.
- Reviewed the calculations and discussion by CAA as to the fair market value of a minority common stock interest in DRF as of March 10, 2000;
- Reviewed the basis for valuation of a minority common stock interest in DRF as of March 10, 2000;
- Reviewed the reasonableness of CAA's selection of the Adjusted Net Asset Value method as the only method for valuation of interests in DRF;
- Reviewed the professional preparation of the CAA report, including adherence to Uniform Standards of Professional Appraisal Practice, the appraiser's supporting documentation and credibility of the factual information and documentation contained in the report;
- Reviewed the Price/Net Asset Value and marketability discount analyses, value of securities owned by DRF and other factual and opinion data in the report, with reference to supporting documentation and final conclusions. In the process of this review I performed my own analysis and I have provided a recommended percentage discount for lack of control and for lack of marketability. I have also commented on the reliability of the empirical studies cited in the context of recent Tax Court decisions.
- Reviewed the DRF Federal Income Tax Returns For 1997 through 2001;
- Reviewed the listing of marketable securities owned by DRF as of March 31, 2000, as presented in CAA's appraisal report, including spot-checking the securities' market prices as of the valuation date;
- Reviewed authoritative support for minority and marketability discounts cited by CAA in their report, including the following sources:

  - SEC Institutional Investor Study Report of the Securities and Exchange Commission, H.R. Doc. No. 64, Part 5, 92nd Cong., 1st Session. 2444-2456 (1971);
  - Gelman, Milton, "An Economist-Financial Analyst's Approach to Valuing Stock of a Closely Held Company", *Journal of Taxation*, June 1972, pp. 353-4.
  - Moroney, Robert E., "Most Courts Overvalue Closely-Held Stocks," *Taxes*, March 1973, pp. 144-56, and "Why 25 Percent Discount for Nonmarketability in One Valuation, 100 Percent in Another?" *Taxes*, May 1977, p.320.
  - Maher, J. Michael, "Discounts for Lack of Marketability for Closely-Held

Business Interests," *Taxes*, September 1976, pp. 562-71;

- Trout, Robert R., "Estimation of Discount Associated with the Transfer of Restricted Securities," *Taxes*, June 1977, pp. 381-85;
- "Discounts on Restricted Stock: The Impact of Illiquidity on Stock Prices", W.L. Silber, *Financial Analysts Journal*, July-August, 1991.
- Standard Research Consultants, "Revenue Ruling 77-287 Revisited," *SRC Quarterly Reports*, Spring 1983, pp. 1-3;
- Bruce A. Johnson and James R. Park, "Limited Partnership Discounts - Observations from the Secondary Market," *Business Valuation Review*, June 1997, pp. 59-64;
- Kathryn F. Aschwald, "Restricted Stock Discounts Decline as Result of 1-year Holding Period", *Business Valuation Update*, May 2000, pp. 1-5;
- Robert W. Baird & Company Studies, conducted under the direction of John D. Emory, published in *Business Valuation News* and *Business Valuation Review* during the period September 1985 through March 1997; and
- Willamette Management Associates Studies, conducted under the direction of Shannon P. Pratt, described in *Valuing A Business*, 2nd Edition 1989, pp. 250-255.

I reviewed additional minority interest and marketability discount information, including the following:

Houlihan, Lokey, Howard & Zukin's 1999 Annual Control Premium Study;
Bogdanski, John A., "Discounts and Premiums", Chapter 4, *Federal Tax Valuation*, Warren, Gorham & Lamont 1996, pp. 4-71 to 4-88;
Eric W. Nath, "A Tale of Two Markets," *Business Valuation Review*, September 1994, pp. 107-112;
Mergerstat Review, 1999 Edition, published by Mergerstat, a division of Houlihan, Lokey, Howard & Zukin;
Realty Stock Review, a bi-monthly publication of Charter Financial Publishing Corp.;
"Partnership Re-Sale Discounts Holding Their Own", *Partnership Spectrum*, pp 1-9, (May/June 1999); and
"Liquidations Put Pressure on Re-Sale Discounts", *The Partnership Spectrum*, pp 1-10, May/June 2000 issue.

## Summary Description Of The Company

DRF is a family controlled Washington corporation, incorporated in 1923. Its purposes are to acquire, own, sell, lease, convey and mortgage real property, personal property and other investments as a personal holding company.

The Company was founded by O.D. Fisher and O.W. Fisher. Prior to January 6, 1987 the

Company had been owned 50/50 by Bennett I. Fisher and his brother George O. Fisher. They each held 1,000 common shares. Bennett died on January 6, 1987, leaving his shares to his wife and widow, Gisele C. Fisher. She subsequently made gifts of 22 shares of stock each to her two sons: George D. Fisher and William O. Fisher. As of March 10, 2000, the Company's ownership was as follows:

| Name | # of Shares | % Interest |
|---|---|---|
| Allie Fisher | 1,000 | 50 |
| Gisele C. Fisher | 956 | 47.8 |
| George D. Fisher | 22 | 1.1 |
| William O. Fisher | 22 | 1.1 |
| Total | 2,000 | 100.0 |

## REVIEW OF CAA APPRAISAL OF DRF

Mr. Tony Leung of CAA prepared a report on February 15, 2001 of a minority common stock interest as of March 10, 2000, for gift tax reporting purposes. Based on his valuation, Mrs. Fisher made gifts of DRF stock on that day to various family members.

CAA stated in their Certification that their report was prepared in conformity with the Uniform Standards of Professional Appraisal Practice. These standards require, among others, that an appraiser must include in the analysis, when relevant, data regarding:

- the nature and history of the business;
- financial and economic conditions affecting the business enterprise, its industry, and the general economy;
- past results, current operations, and future prospects of the business enterprise;
- past sales of the capital stock or other ownership interests in the business enterprise being appraised;
- sales of similar business or capital stock of publicly held similar businesses;
- prices, terms and conditions affecting past sales of similar business equity; and
- economic benefit of intangible assets.

CAA did little to conform with these requirements. They did not include an economic analysis section, nor did they consider past transactions involving stock in the Company being gifted by Mrs. Fisher to her children. Also, no mention was made of a search by CAA for comparable sales or comparable publicly traded companies. The only search for public company information

had to do with finding a basis for a minority discount among publicly traded Closed End Investment Funds. In addition, no mention was made of the 1987 appraisal which Mr. Leung prepared when he was a principal of Management Advisory Services, Inc.

Standards Rule 10-2 requires that each written business valuation report must be prepared in accordance with one of the following options and prominently state which option it used: Appraisal Report or Restricted Use Appraisal Report. CAA did not do this.

Standards Rule 10-2 also requires the Appraisal Report to state the identity of the client and intended users, by name or type. This was not done.

Generally, CAA followed the broad requirements of USPAP, but I found that the report did not provide enough detail to provide the reader with adequate information about the analysis performed, as well as about the context in which the valuation was being made. At a minimum, CAA should have listed the documents and information which they reviewed and relied upon in arriving at their opinion.

**DISCUSSION OF CAA VALUATION METHOD**

CAA based their appraisal opinion upon one valuation approach: the adjusted net asset (NAV) method.

Under the NAV method, they applied a single discount to the pro-rata fair market value of stockholders' equity, using a discount derived from Price/Net Asset Value ratios among Closed End Investment Companies. They derived their data from *Morningstar Closed-End Funds* as well as *Barrons Weekly* and Standard & Poor's *Stock Guide* - March 2000.

I concur with CAA's choice of appraisal method. It is consistent with the nature of the assets owned by DRF. I also concur with CAA's estimate of DRF's overall Net Asset Value. I spot-checked the accuracy of the pricing and valuation of each security in the portfolio and found them to be accurate.

My major points of disagreement are with their calculation of deferred capital gains taxes without discounting for their non-current, contingent status, and their selection of an overall Price/Net Asset Value ratio of 0.54 times in valuation of a minority common stock interest.

## NET ASSET VALUE DISCUSSION

CAA presented a detailed statement of Adjusted Net Asset Value as of March 10, 2000. Mr. Leung, the report author, also presented a schedule of the market value of each security, and he presented a narrative description of assets as of the valuation date. The total value of assets, which consisted of a portfolio of marketable stocks, cash, money market funds and two parcels of real property, was $46,843,929 as of March 10, 2000. Liabilities listed were accounts payable of $494 and a $46,000 note payable to the Trustees of M.B.F., the identity of which was not disclosed. In addition there was an amount of $283,136 in income tax refunds receivable, which Mr. Leung listed among liabilities, although it was actually an asset.

Mr. Leung deducted $15,859,390 from the Adjusted Book Value of the Company to allow for deferred income taxes on the unrealized holding gain on the Company's assets, calculated at a federal tax rate of 35 percent on a gain of $45,312,542 ($46,843,929-$1,531,387 book value). After making this deduction the Adjusted Net Asset Value was $31,221,181.

I have no disagreement with Mr. Leung's calculation of Adjusted Net Asset Value, although I disagree with deducting the deferred taxes on the gain with no discounting for their contingent and non-current nature.

CAA applied a Price/Net Asset Value discount of 54 percent to the Adjusted Net Asset Value as of March 10, 2000, leaving an indicated aggregate minority interest fair market value of $16,859,438. This discount was a combination of a minority discount based on publicly traded closed end funds, and a marketability discount based on various empirical studies. [1]

I reviewed Mr. Leung's calculations as well as the sources of his data for the Price/Net Asset Value ratio derived from Closed End Funds.

I consider his ratios based on Closed End Funds to be reasonably well supported, although his sample is quite small. In the high technology area he presented only two comparable funds. Among Capital Appreciation and Income and Capital Appreciation Funds, he used a sample which contains at least 65 percent equities, primarily US based companies and which ostensibly

[1] Study made by FMV Opinions, Inc., as reported in "Strategies for Obtaining the Largest Valuation Discounts", Hall and Polacek, *Estate Planning*, Jan-Feb. 1994;
"The value of marketability as Illustrated in Initial Public Offerings of Common Stock", John D. Emory, *Business Valuation Review*, various issues since September 1985. In his December 1999 report as of October 13, 1999, Mr. Leung added reference to two more studies: "Discounts of Stocks of Closely Held Corporations", by Steven E. Bolten, in *Trusts & Estates*, December, 1990, and "Discounts on Restricted Stock: The Impact of Illiquidity on Stock Prices," by W.L. Silber, in *Financial Analysts' Journal*, July-August 1991.

excludes non-diversified funds. Mr. Leung did not describe his Price/Net Asset ratios to be a minority discount. Instead, he used these ratios in conjunction with reference to studies on marketability discounts to justify his overall Price/Net Asset Value Ratio of 54 percent.

Normally in an appraisal of a closely held business or investment holding company, one sees a discount for lack of control and a second discount for lack of marketability. Mr. Leung did not do this. He did not make reference to any of the studies which appraisers normally use for identifying discounts for lack of control. Nor did he describe the discount derived from the Closed End Mutual Funds as being a minority discount or discount for lack of control. He simply cited the information.

Assuming Mr. Leung selected a Price/Net Asset Value ratio of approximately 85 percent, his implied minority discount was 15 percent and his implied marketability discount was approximately 36.5 percent. This is consistent with the data he presented on Price/Net Asset Value ratios from Closed End Mutual Funds. The calculation is as follows:

| | |
|---|---|
| Pro-Rata Value | 100.00 % |
| Minority Discount (15.0%) | -15.00 |
| Marketable Minority Interest Value | 85.00 |
| Marketability Discount (36.47%) | -31.00 |
| Fair Market Value | 54.00% |

The implied marketability discount has been calculated in series with the minority discount. In other words, the marketability discount has been applied to the net marketable minority interest value. Thus the discount does not add up in simple summation. The overall Price/Net Asset Value ratio of 54 percent must be calculated serially.

I consider 15 percent to be reasonable for valuation of a minority interest in the Company as of March 10, 2000, given the data from Closed End Funds.

I do not consider a marketability discount of 36.47 percent to be appropriate, however.

The assets held by DRF are for the most part marketable securities. Their historical dividend yield trend in market value supports the hypothesis that DRF was indeed like a Closed End Fund. But for the fact that its shares did not trade on an exchange, it was similar in most other respects to a closed end fund. In his report, Mr. Leung acknowledges that DRF's dividend yield, which averaged 5.36 percent in March 2000, was higher than all of the Closed End Funds which he used as comparables. In fact, the dividend yield of his chosen Closed End Funds ranged from

1 to 2 percent for the diversified stock funds and 2 to 4 percent for those concentrated in the financial sector. Normally a high dividend yield would lend itself to a higher value. It is not clear from Mr. Leung's report that he had drawn that or some other conclusion.

Mr. Leung highlighted the portfolio of DRF as being less diversified and smaller in dollar size than that of his chosen Closed End Funds. While it is true that the portfolio was considerably smaller than the sample of Closed End Funds used by Mr. Leung, the major stocks within the portfolio had all performed with stable profitability for many years prior to the valuation date. In my analysis of the companies in DRF's portfolio, I have concluded that the lack of diversification was offset by the stability and lack of volatility in the three major stocks of the portfolio: Weyerhaeuser, Safeco and Fisher Companies, Inc. The charts below show that all three stocks had experienced a declining trend in their price during 1999, but in March, 2000, the picture was more optimistic. Compared to many companies at that time, these three showed reasonable stability.




**Figure 1** - Safeco Stock Price Trends: Jan-Dec 2000




**Figure 2** - Fisher Communications Stock Price Trends: Jan-Dec 2000




**Figure 3** - Weyerhaeuser Company Stock Price Trends: Jan-Dec 2000

Mr. Leung also highlighted DRF's lack of trading, the high built-in gain of its portfolio and its lack of ready marketability. From his discussion, it appears that the lack of trading is due to the high built-in gains issue, so there are really only two substantive reasons for Mr. Leung's choice of a 0.54 times price-to-value ratio rather than the 0.85 times ratio indicated by his sample of Closed End Funds.

Since Mr. Leung deducted a provision for the built-in gains taxes, he has dealt with that portfolio risk. It is double-counting to use the built-in gain liability as a justification for a high marketability discount. If a buyer is compensated for the future income tax liability associated with the built-in gains, it does not seem reasonable to increase the marketability discount for the future tax liability as well. That risk or cost has already been accounted for.

This leaves only the issue of non-marketability to support Mr. Leung's high discount.

Mr. Leung's sources of authority for his marketability discount include Mr. Lance Hall and Timothy Polacek of FMV Opinions, Inc. The authors of this article, entitled "Strategies for Obtaining the Largest Valuation Discounts", emphasized that discounts must be based on specific facts and circumstances. Among other points made in the article, they concluded that a marketability discount for a closely held entity, based on empirical studies, should take size as well as other factors into consideration. The following paragraphs are taken from that article.

> "**Lack of marketability discounts.** The data that is frequently referred to in determining the discount for lack of marketability begins with the 1971 Institutional Investor Study Report, published by the Securities and Exchange Commission ("SEC Study"). This study

reviewed discounts in connection with transactions involving securities that were restricted from trading on the public exchanges under Rule 144 of the Securities and Exchange Act of 1934. Based on more than 300 transactions, the SEC Study found that restricted stock transactions occurred at prices that were, on average, **24% less** than the prices for similar blocks of unrestricted stock."

According to the SEC Study, three variables influence the size of the discount for lack of marketability: (1) the annual sales of the corporation, (2) the level of earnings, and (3) the stock exchange on which the corporation's stock was bought and sold. The SEC Study indicates that the lack of marketability discount was highest (30%-40%) for companies with less than $5 million in sales, but decreased (10%-20%) for companies with more than $5 million in sales. For companies ranked by earnings, lack of marketability discounts were highest (20%-30%) for companies having less than $1 million in earnings and lowest (10%-20%) for companies with earnings over $1 million. Similarly, lack of marketability discounts were greatest (30%-40%) among corporations whose stock was traded over the counter, but that did not report their financial information on a regular basis. Lower discounts applied to stock traded on the American (20%-30%) and New York (10%-20%) Stock Exchanges. The SEC Study clearly demonstrates that the three variables listed above influence the magnitude of lack of marketability discounts.

In an update to the SEC Study, FMV Opinions, Inc., a business valuation firm in Irvine, California, examined more than 100 restricted stock transactions from1979 through April 1992 ("FMV Study"). The FMV Study corroborates the conclusions of the SEC Study that the size of the discount is often a function of the size of the subject company's revenues, earnings, and the exchange on which the unrestricted stock was traded. Moreover, the mean discount of the SEC Study (24%) was very similar to the overall mean discount of the FMV Study (23%). The FMV Study also reported that for the period May 1991 through April 1992, restricted stock transactions occurred at prices that were 21% less than those for similar blocks of unrestricted stock.

In addition to the three variables examined in the SEC Study, the FMV Study identified three other variables as influencing the size of the discount for lack of marketability: (1) the dollar value of the block of stock, (2) the percentage size of the block of stock being sold, and (3) the market value or capitalization of the corporation whose stock was being bought and sold. According to the FMV Study, the lack of marketability discount was highest (20%-30%) for blocks of stock valued at less than $10 million, but decreased (10%-20%) as the size of the block exceeded $10 million. For blocks of stocks that exceeded 10% ownership, discounts were higher (20%-30%) than for blocks representing

less than 10% ownership. Lack of marketability discounts appear to increase as the capitalization of the corporation decreases below $50 million (30%-40%) compared to corporations with capitalization's in excess of $100 million (10%-20%).

The latest 12-month data (May 1991 to April 1992 and involving 17 restricted stock transactions) of the FMV Study suggests that discounts are shrinking for restricted stock transactions. The reason for the drop in discounts for the latest period may be that more transactions now occur under Rule 144(a), which relaxes some of the restrictions on such transactions, thus making the restricted securities more marketable.

The SEC Study and FMV Study's 13-year and latest 12-month results conclude that the average discount from the publicly traded price was approximately **20% to 25%**. These figures coincide with the mean discounts allowed by the Tax Court during the same period, suggesting that the court may be well informed regarding the empirical data that is available to support its decisions."

In short, at least one study cited by Mr. Leung would appear to support a discount of much less than the 30 to 40 percent range he concluded to in his report.

A more recent article and study by FMV Opinions corroborated their initial findings. [2] A discount of 20 to 25 percent appears to be more in line with the SEC data as well as FMV Opinion's data on investment firms and financial institutions.

Another authoritative source of data cited by Mr. Leung was the series of studies done by John Emory on prices paid for stock in companies before and after an Initial Public Offering (IPO). Mr. Emory has found sizeable discounts in the companies he has tracked - over 46 percent.

According to Messrs. Hall and Robak, and also in my own review of Mr. Emory's data, there is a built-in bias inherent in the Pre-IPO transaction data. This is the fact that "to put it as briefly as possible, many of the transactions in the studies either take place too far from the initial public offering date or are not arm's-length transactions. The problem with transactions taking place too far prior to the IPO is that the typical pre-IPO firm goes through a radical transformation, in terms of products and services offered, customers served, depth and breadth of management, and

[2] "Bringing Sanity to Marketability Discounts: A New Data Source", by Esben Robak and Lance Hall, in *Valuation Strategies*, July/August 2001.

other factors. Furthermore, the pre-IPO studies have a successful IPO bias that drives the presumed average discount up for unregistered shares. The Rule requires a holding period of 1 year currently (under the original version of Rule 144 the holding period was 2 years). After the initial holding period, unregistered securities can be sold only by complying with certain "dribble out," or volume limit, provisions of the Rule. According to these provisions, the total amount of securities sold in any three-month period, to qualify for the exemption, cannot exceed the greater of one percent of the total number of the company's outstanding shares or the average weekly reported trading volume during the four weeks preceding such sale. Furthermore, the issuer has to have filed all reports (financial and other) required by the SEC and the seller of the restricted stock has to comply with the manner of sale and notice requirements of the Rule." [3]

These significant shortcomings cast doubt on the relevance of the pre-IPO studies for determining lack of marketability discounts for private equity.

Finally, there exists a study published annually by Partnership Profiles, Inc. in their magazine, *Partnership Spectrum*, which documents transactions involving minority interests in limited partnerships which trade on an informal market set up by a group of brokers. This study, details of which are highlighted on Table II attached to this report, shows that for equity interests in 27 debt-free partnerships which make regular distributions, the discount from the appraised value of the assets was 25 percent in 1999. Mr. Leung did not make any reference to this study, in spite of it being used by many appraisers.

Regarding the **marketability discount**, I have concerns about the Pre-IPO studies cited by CAA. Mr. Leung suggest that a marketability discount of **30 to 40 percent** was reasonable for DRF, based on a 34.2 percent average of seven restricted stock studies and the Pre-IPO studies of John Emory and Willamette Management Associates, which averaged approximately 45 percent.

As I stated above, there is a built-in bias to the Pre-IPO studies which should be considered before relying too heavily on them. And within the seven restricted stock studies, there is also a bias and a problem, as pointed out by Mr. Robak and Mr. Hall:

> The studies listed above [the same studies cited by CAA] were mostly performed on small samples of restricted stock transactions. Also, most of the studies listed in the table provide little or no detail about how the discount varies around the average. However, the

[3] Robak and Hall , *op. cit.*

most comprehensive of these studies, the Institutional Investor Study, does provide some detail: the discounts in this study tended to be higher for transactions involving companies with lower revenues and net income, and for companies traded in the over-the-counter market. Common for all the restricted stock studies, however, is the fact that since the underlying data has never been made public, it is impossible to verify any of their conclusions. Moreover, the average discounts in most of the older studies are contradicted by studies published in academic journals. [4] Furthermore, even if these studies were not contradicted by more rigorous academic studies, the use of an average provides little insight into what an appropriate discount should be for a specific interest. In other words, it begs the question, "Is the subject asset better or worse than the average?" Without the underlying data, it is literally impossible to know. [5]

Mr. Leung's choice of empirical studies did not apply particularly well to the subject common stock interest, and the studies they cited have been shown to be biased.

Moreover, the marketability discount which Mr. Leung selected in his previous appraisal of DRF in 1987 was only 20 percent. There was no discussion in the current report or comparison to that valuation to justify a higher discount in 2000.

### ALTERNATE VALUE

CAA has suggested that a willing buyer and a willing seller would agree on a price per unit of DRF which is equal to 54 percent of the underlying after-tax net asset value. I consider this to be an excessive discount, given the liquidity of its assets and the recent findings on marketability discounts as described by FMV as well as more recently by Dr. Mukesh Bajaj et al. [6]

In my opinion, based on the factors I reviewed and discussed above, I consider the following values to reasonably represent the range within which *fair market value* of Mrs. Fisher's interests in DRF fell as of March 10, 2000, the valuation date:

---

[4] See, for example, *Equity Ownership Concentration And Firm Value: Evidence From Private Equity Financings*, Wruck, K. H., Journal of Financial Economics 23, 3-28, 1989; and *Market Discounts And Shareholder Gains For Placing Equity Privately*, Hertzel, M. and R. L. Smith, Journal of Finance 48, 459-485, 1993.

[5] Robak and Hall , *op. cit.*

[6] "Firm Value and Marketability Discounts" by Mukesh Bajaj, David J. Denis, Stephen P. Ferris & Atulya Sarin, Journal of Corporation Law, 27 (Fall, 2001): 89-115.

| Description | | Low | | High |
|---|---|---|---|---|
| Net Asset Value | | $47,080,571 | | $47,080,571 |
| Reserve For Deferred Taxes | | (10,793,634) | | (10,793,634) |
| Adjusted Net Asset Value | | 36,286,937 | | 36,286,937 |
| Discount for lack of Control | 15% | (5,443,041) | 15% | (5,443,041) |
| Marketable Minority Interest Value | | 30,843,896 | | 30,843,896 |
| Discount For Lack of Marketability | 25% | (7,710,974) | 20% | (6,168,779) |
| Aggregate Fair Market Value | | $ 23,132,922 | | $ 24,675,117 |
| Value Per Share (2,000 Total Shares) | | **$ 11,566.46** | | **$ 12,337.56** |

CAA's value, by comparison, was $8,430, reflecting a Price/NAV ratio of 0.54

The reserve for deferred taxes has been calculated at a 35 percent federal tax rate, the same as was used by CAA. But I discounted the calculated tax liability of $15,859,390, using a discount rate of 8 percent, over an assumed holding period of five years. This discount, which amounts to approximately 32 percent, provides for what I consider this liability to be: non-current and contingent on future events which might or might not occur. The discount rate of 8 percent is based on rates of return generated by closed end funds and Investment Companies, as tracked by Ibbotson Associates in their Cost of Capital Yearbook, 2001 edition. The holding period is arbitrary, but it reflects the fact that between 1987 and 2000, a span of 13 years, the composition of the portfolio held by DRF had changed very little, particularly with respect to the blocks of stock in Safeco Corporation, Weyerhaeuser Company and Fisher Companies Inc., which showed no change.

My value for a minority common stock interest is derived from applying a **15 percent minority interest discount** and a **20 to 25 percent marketability discount** to the pro-rata net asset value of DRF as of March 10, 2000. In my opinion, this value is one which reflects the reality of DRF as a family controlled holding company in early 2000, and the nature and liquidity of the assets held by DRF. Together the two discounts reflect a Price/NAV ratio range of 0.64 to 0.68.

My calculations are presented on Table I attached to this report, with data for the Closed End Funds on Table II.

Please contact me if you require additional information or assistance.

Very truly yours,

**LEWIS OLDS & ASSOCIATES**

Lewis D. Olds, CPA, ASA

enclosures

# APPENDIX A

# FINANCIAL & VALUATION TABLES

LEWIS OLDS
& ASSOCIATES

# Table I

## D.R. Fisher Company

### Comparison of Stock Valuations - March 10, 2000

| | Per CAS | | Per LO&A | | | |
|---|---|---|---|---|---|---|
| | Discount | Value | Discount | Value | Discount | Value |
| **Net Asset Value Method** | | | | | | |
| Market Value of Assets | | 47,127,065 | | 47,127,065 | | 47,127,065 |
| Less: Book Value of Liabilities | | 46,494 | | 46,494 | | 46,494 |
| Net Asset Value | | 47,080,571 | | 47,080,571 | | 47,080,571 |
| Less Reserve For Deferred Taxes on Gain | | (15,859,390) | | (10,793,634) | | (10,793,634) |
| Adjusted Net Asset Value | | 31,221,181 | | 36,286,937 | | 36,286,937 |
| Discount For Lack of Control | 15.00% | (4,683,177) | 15.00% | (5,443,041) | 15.00% | (5,443,041) |
| Marketable Minority Interest Value | | 26,538,004 | | 30,843,896 | | 30,843,896 |
| Discount For Lack of Marketability | 36.47% | (9,678,567) | 25.00% | (7,710,974) | 20.00% | (6,168,779) |
| Aggregate Non-Marketable Minority Interest Value | | 16,859,437 | | 23,132,922 | | 24,675,117 |
| Fair Market Value Per Share (2,000 Shares O/S) | | 8,430 | | 11,566 | | 12,338 |

# Table II

## D.R. Fisher Company

### Valution Ratios For Selected Closed-End Investment Companies

As of March 24, 2000

### CIC's Selected By Corporate Advisory Associates

| | Ticker Symbol | Common Shares (000) | Type | Total Asset Value (Millions) | 3/3/00 Price/ Share Per Stock Guide | Price/NAV Per Stock Guide | Dividend Yield | Built-In Gain As % Of Asset Value | Comments |
|---|---|---|---|---|---|---|---|---|---|
| Adams Express | ADX | 53,204 | ICA | 2,823.8 | $ 37.38 | 0.84 | 1.0% | 49% | Diversified |
| Blue Chip Value Fund | BLU | 16,740 | ICA | 175.8 | $ 8.25 | 0.89 | 10.7% | 10% | Diversified |
| Gabelli Equity Trust | GAB | 106,479 | CA | 1,503.6 | $ 12.13 | 0.95 | 0.0% | 47% | Non-diversified |
| General American Investors | GAM | 26,219 | CA | 1,318.4 | $ 39.38 | 0.88 | 1.2% | 45% | Diversified |
| Liberty All-Star Equity Fund | USA | 94,998 | CA | 1,441.8 | $ 11.19 | 0.77 | 0.0% | 27% | Diversified |
| Morgan Grenfell SmallCap | MGC | 9,802 | CA | 155.9 | $ 16.38 | 0.84 | 0.0% | 30% | Diversified |
| Royce Value Trust | RVT | 35,071 | CA | 552.9 | $ 13.81 | 0.84 | 9.9% | 20% | Diversified |
| Salomon Brothers Fund | SBF | 94,608 | CA | 1,820.0 | $ 19.75 | 0.94 | 8.0% | 32% | Diversified |
| Tri-Continental Corporation | TY | 125,234 | ICA | 3,193.5 | $ 25.50 | 0.77 | 1.4% | 28% | Diversified |
| Zweig Fund | ZF | 60,136 | CA | 733.5 | $ 10.00 | 0.82 | 0.0% | | |
| D.R. Fisher Company | | 2 | | 47.0 | | | 5.4% | 96% | |
| | | | | **Average** | | **0.85** | 3.2% | 32% | |
| | | | | **Median** | | **0.84** | 1.2% | 30% | |

### Other CICs

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ACM Managed Dollar Income | ADF | 22,003 | ICA | 198.0 | $ 9.00 | 0.98 | 13.3% |
| ACM Managed Income Fund | AMF | 22,818 | ICA | 141.2 | $ 6.19 | 1.11 | 13.6% |
| Alliance All-Mkt Adv Fund | AMO | 2,508 | CA | 104.7 | $ 41.75 | 0.74 | 11.1% |
| Bergstrom Capital | BEM | 1,000 | ICA | 269.3 | $ 269.25 | 0.91 | 0.0% |
| Bexil Corp | BXL | 762 | ICA | 7.0 | $ 9.25 | 0.72 | 10.8% |
| Blackrock High Yield Trust | BHY | 6,307 | CA | 78.4 | $ 12.44 | 0.96 | 13.0% |
| Central Securities | CET | 16,851 | CA | 571.9 | $ 33.94 | 0.79 | 0.8% |
| Chartwell Div & Inc. Fund | CWF | 15,537 | CA | 166.1 | $ 10.69 | 0.82 | 11.6% |
| Conseco Strategic Income Fund | CFD | 6,735 | CA | 66.5 | $ 9.88 | 0.81 | 13.2% |
| Debt Strategies Fund | DBS | 31,425 | ICA | 184.6 | $ 5.88 | 0.83 | 13.4% |
| Debt Strategies Fund II | DSU | 62,610 | ICA | 442.2 | $ 7.06 | 0.83 | 13.6% |
| Debt Strategies Fund III | DBU | 11,010 | CA | 95.0 | $ 8.63 | 0.94 | 13.2% |
| DLJ High Yield Bond Fund | DHY | 44,007 | ICA | 349.3 | $ 7.94 | 1.03 | 12.5% |
| Duff/Phelps Util Income Fund | DNP | 205,714 | ICA | 1,812.9 | $ 8.81 | 1.00 | 8.9% |
| Engex Inc | EGX | 977 | CA | 34.2 | $ 35.00 | 1.09 | 0.0% |
| Equus II Inc | EQS | 4,954 | CA | 50.5 | $ 10.19 | 0.63 | 0.4% |
| Global Income Fund | GIF | 4,939 | ICA | 22.2 | $ 4.50 | 0.78 | 13.3% |
| Mass. Mutual Part'n Inv. | MPV | 9,333 | ICA | 91.0 | $ 9.75 | 0.85 | 9.8% |
| MFS Special Value Trust | MFV | 6,354 | ICA | 88.6 | $ 13.94 | 1.00 | 11.8% |
| Pacific American Inc. Shrs | PAI | 9,389 | ICA | 112.1 | $ 11.94 | 0.80 | 8.7% |
| PIMCO Comml Mtg Sec Tr | PCM | 11,010 | ICA | 136.2 | $ 12.38 | 0.96 | 9.6% |
| Petroleum & Resources | PEO | 13,841 | ICA | 445.5 | $ 32.19 | 0.88 | 2.6% |
| TCW Conv Sec Fund | CVT | 41,990 | ICA | 433.0 | $ 10.31 | 0.84 | 8.1% |
| Van Kampen Cv Sec | VXS | 3,242 | | 101.5 | $ 31.31 | 0.81 | 2.7% |
| Zweig Total Return | ZTR | 89,771 | | 555.5 | $ 6.19 | 0.81 | 0.0% |
| | | | | **Average** | | **0.88** | 9.6% |
| | | | | **Median** | | **0.84** | 12.5% |

# APPENDIX B

# REVIEWER'S CERTIFICATION

LEWIS OLDS
& ASSOCIATES

## CERTIFICATION STATEMENT

I certify that, to the best of my knowledge and belief:

- the facts and data reported by the reviewer and used in review process are true and correct.
- the analyses, opinions, and conclusions in this review report are limited only by the assumptions and limiting conditions stated in this review report, and are my personal, impartial and unbiased professional analyses, opinions, and conclusions.
- I have no present or prospective interest in the property interest that is the subject of this report, and I have no personal interest or bias with respect to the parties involved.
- my engagement in this assignment was not contingent upon developing or reporting predetermined results.
- my compensation is not contingent on an action or event resulting from the analyses, opinions, or conclusions, or the use of, this report.
- my analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.
- no one provided significant professional assistance to the person signing this report.

Lewis D. Olds, CPA, ASA
Valuation Consultant

**LEWIS OLDS**
**& ASSOCIATES**

# APPENDIX C

## CONTINGENT & LIMITING CONDITIONS

LEWIS OLDS
& ASSOCIATES

# CONTINGENT & LIMITING CONDITIONS

This valuation review opinion is subject to the following conditions:

1 Information, estimates, and opinions contained in this report are obtained from sources considered reliable; however, no liability for such sources is assumed by the appraiser.

2 The company and its representatives have confirmed to the appraiser that the information supplied to the appraiser was complete and accurate to the best of the company's employees' knowledge. Information supplied by management has been accepted without further verification as correctly reflecting the company's past results and current condition in accordance with generally accepted accounting principles, unless otherwise noted.

3 Possession of this report, or a copy thereof, does not carry with it the right of publication of all or part of it, nor may it be used for any purpose by anyone but the client without the previous written consent of the appraiser or the client and, in any event, only with proper attribution.

4 The assets, properties and business interests appraised are assumed to be free and clear of any or all liens or encumbrances unless otherwise indicated. Lewis Olds & Associates (LO&A) assumes that there is full compliance of all applicable federal, state, and local regulations and laws unless such non-compliance is stated herein.

5 Appraiser is not required to give testimony in court, or be in attendance during any hearings or depositions, with reference to the company being appraised, unless previous arrangements have been made.

6 This opinion of value may not be used by any other person or for any other purpose other than to whom it is addressed or named in the body of the report and only for the stated purpose of the appraisal, unless prior written consent by LO&A is given.

7 The various estimates of value and opinions presented in this report apply to this appraisal only and may not be used out of the context presented herein. This appraisal is valid only for the appraisal date or dates specified herein and only for the appraisal purpose(s) specified herein.

8 Environmental problems may exist in association with the company being appraised. LO&A's analysis does not give consideration to such problems, except as is disclosed in the appraisal.

**LEWIS OLDS**
**& ASSOCIATES**

# APPENDIX D

## REVIEWER'S QUALIFICATIONS

LEWIS OLDS
& ASSOCIATES

**LEWIS OLDS & ASSOCIATES**
Business Appraisers • Financial Consultants

# LEWIS D. OLDS, CPA, ASA

**Academic and Professional Credentials**

Bachelor of Science, Business Administration, Accounting, University of Minnesota, Minneapolis, 1976
MBA, Finance & Management Information Systems, University of British Columbia, Vancouver, 1978
Canadian Institute of Chartered Accountants, Chartered Accountant, British Columbia, 1979
Canadian Institute of Chartered Business Valuators, Chartered Business Valuator, 1984
American Society of Appraisers, Accredited Senior Appraiser, Business Valuation (Accredited since 1989) Reaccredited 2003
Oregon State Board Of Accountancy, Certified Public Accountant, 1996
Washington State Board Of Accountancy, Certified Public Accountant, 2001

**Position & Experience**

Valuation Consultant & Owner, Lewis Olds & Associates
Valuation Consultant & Member, Arnold & Olds, LLC, 1994-2000
Director, Business Valuation Dept., Lyon Skelte & Speirs, Inc., Lake Oswego, OR, 1992-1994
Director, Business Valuation Dept., Soberman Isenbaum & Colomby, Toronto, Ontario, 1987-1992
Senior Valuation Analyst, Thorne Ernst & Whinney, Toronto, Ontario, 1986-1987
Valuation Consultant, Lewis Olds & Associates, Vancouver, B.C., 1984-1986
Senior Valuation Analyst, Coopers & Lybrand, Vancouver, B.C., 1981-1984

Qualified as an expert witness on financial and valuation issues in District Courts of Oregon and Washington; U.S. District Court; and in Supreme Courts of Ontario and British Columbia; accepted as a business valuation expert by the Internal Revenue Service.

**Professional Affiliations**

American Society of Appraisers (Past President, Portland Chapter)
Washington Society of Certified Public Accountants
Oregon Society of Certified Public Accountants
American Institute of Certified Public Accountants
Canadian Institute of Chartered Business Valuators

**Seminars, Speeches, and Instruction**

Speaker, Oregon State Bar Association, May 1998 Continuing Legal Education Program, Business Law Section, on draftimg buy-sell agreements.
Speaker, Oregon State Bar Association, May 1996 Continuing Legal Education Program, Family and Juvenile Law Section, on the valuation of law practices in divorce litigation.
Speaker, Oregon State Bar Association, November 1993 Continuing Legal Education Program, Family and Juvenile Law Section, on the role of business appraisers in divorce litigation.
Seminar Instructor, November, 1988, Education Consortium of Chartered Accountants, Toronto, Ontario, on The Accountant's Role in Litigation
Seminar Instructor, March, 1983, Provincial Court Registrars' Training Program, Valuation of Business Assets

**Publications**

"Who Took The Market Out Of Fair Market Value?" December 1996, *Family and Juvenile Law Newsletter*, OSBA
"Some Tips For Valuing Small Businesses", April, 1996, *Family and Juvenile Law Newsletter*, OSBA
"IRS Changes Its Mind", August, 1993, *Family and Juvenile Law Newsletter*, OSBA
"Business Valuators - A Valuable Asset for Family Law Attorneys", February, 1993, *Family and Juvenile Law Newsletter*, OSBA
"Should You Buy A Business In A Recession?", *Comments*, December, 1990, Soberman Isenbaum & Colomby, Toronto, Ont.
"No-fault Insurance: Some Things You Should Know", *Comments*, June 1990, Soberman Isenbaum & Colomby, Toronto, Ont.
"Does Your Business Have Goodwill?", *Comments*, March, 1990, Soberman Isenbaum & Colomby, Toronto, Ont.
"Getting The Best Price For Your Practice", November, 1989, *Law Practice Management*, De Boo Publishers, Toronto, Ontario
"Taxes and Support Payments: An Update", May, 1989, *Money & Family Law*, De Boo Publishers, Toronto, Ontario



22922 N.E. 14th Street Sammamish, Washington 98074
Oregon Phone: (503) 646-3667 Oregon Fax: (503) 646-3228
Washington Phone: (425) 898-9863 Washington Fax: (425) 898-9624
E-Mail: lolds@lewisolds.com EIN: 93-1294630