IN THE UNITED STATES COURT OF
FEDERAL CLAIMS

No. 06-351 T
(Judge Emily C. Hewitt)

GISELE C. FISHER,

Plaintiff

v.

THE UNITED STATES,

Defendant.

PLAINTIFF'S MEMORANDUM OF CONTENTIONS
OF FACT AND LAW

PAUL W. ODEN
4400 Two Union Square
601 Union Street
Seattle, Washington 98101-2352
Telephone:(206) 622-8484
Facsimile: (206) 622-7485
Attorney for Plaintiff

# TABLE OF CONTENTS

**Page**

I. STATEMENT OF FACTS PLAINTIFF EXPECTS TO PROVE .................................... 1

II. PLAINTIFF'S POSITION WITH RESPECT TO FACTS ON WHICH DEFENDANT IS EXPECTED TO RELY ........................................................................ 4

III. ISSUES OF FACT AND LAW TO BE RESOLVED BY THE COURT .......................... 5

IV. SUMMARY OF PLAINTIFF'S BASIC FACTUAL CONTENTIONS ............................ 5

V. STATEMENT OF THE CASE ................................................................................... 6

VI. LEGAL ARGUMENT ................................................................................................ 8

1. The fair market value of the taxpayer's stock in D.R. Fisher Company was $8,430 per share on March 10, 2000 ........................................................................ 8

a. A full deduction of The Company's liability for the built-in capital gains tax is appropriate under the net asset valuation methodology ........ 11

b. The proper adjustment to the stock's net asset value to reflect the stock's unique characteristics is 46 percent ............................................ 15

2. The IRS determination of a tax deficiency is not entitled to a presumption of correctness, and plaintiff does not bear the burden to prove the existence of an overpayment of tax ..................................................................... 20

3. The government bears the burden to prove the stock's fair market value ........... 21

VII. CONCLUSION ......................................................................................................... 21

## TABLE OF AUTHORITIES

**Page**

**FEDERAL STATUTES**

26 U.S.C. §§ 331 and 336 .......... 11

26 U.S.C. § 542 .......... 16

26 U.S.C. § 852 .......... 16

26 U.S.C. § 2501 (a)(1) .......... 8

26 U.S.C. § 2512(a) .......... 8

26 U.S.C. § 7491(a) .......... 21

Tax Reform Act of 1986 .......... 11

**REGULATIONS**

Treas. Reg. § 25.2511-2(a) .......... 9

Treas. Reg. § 25.2512-2(f) .......... 8

Treas. Reg. § 25.2512-1 .......... 9

Treas. Reg. § 25.2512-2(f) .......... 9

**RULINGS**

Rev. Rul. 59-60 .......... 9, 11, 13

**FEDERAL CASES**

Bardahl Mfg. Corp. v. Comm'r.,
24 T.C.M. (CCH) 1030 .......... 18

Central Trust Co. v. United States,
158 Ct. Cl. 504, 305 F.2d 393 (1962) .......... 10

Continental Water Co. v. United States,
231 Ct. Cl. 717 .......... 20

**TABLE OF AUTHORITIES**
(continued)

**Page**

Cotchett's Estate v. Comm'r.,
33 T.C.M. 138 (1974) ....... 16

Eisenberg v. Comm'r.,
155 F.3d 50 (2d Cir. 1998)....... 13-15

Eli Lilly & Co. v. United States,
178 Ct. Cl. 666 (1967) ....... 20

Estate of Borgatello v. Comm'r.,
80 T.C.M. (CCH) 260 ....... 19

Estate of Cotchett,
33 T.C.M. (CCH) 138 ....... 19

Estate of Dougherty,
59 T.C.M. (CCH) 772 ....... 17

Estate of Dunn v. Comm'r.,
301 F.3d 339 (5th Cir. 2002) ....... 13

Estate of Gallo,
50 T.C.M. (CCH) 470 ....... 17

Estate of Jameson v. Comm'r.,
267 F.3d 366 (5th Cir. 2001) reversed ....... 14-15

Estate of Jephson,
87 T.C. 297 (1986)....... 17

Estate of Jones v. Comm'r.,
116 T.C. 121 (2001)....... 19

Estate of Lauder,
64 T.C.M. (CCH) 1643 ....... 17

Estate of Mundy,
35 T.C.M. (CCH) 1778 ....... 16

Estate of Piper,
72 T.C. 1062 (1979)....... 18

Estate of Simplot v. Comm'r.,
112 T.C. 130 (1999) rev'd on other grounds, 249 F.3d 1191 (9th Cir. 2001) ....... 14

**TABLE OF AUTHORITIES**
(continued)

**Page**

Estate of Smith v. Comm'r.,
198 F.2d 515 (5th Cir. 1999) ....................................................15

Estate of Welch v. Comm'r.,
208 F.3d 213 (6th Cir. 2000) ....................................................14

Fehrs v. United States,
223 Ct. Cl. 488 ....................................................9

Fisher v. United States,
No. 91-1087 T. ....................................................7

Gallun v. Comm'r.,
33 T.C.M. (CCH) 1316 ....................................................17

Heck v. Comm'r.,
83 T.C.M. (CCH) 1181 ....................................................19

Hermes Consol. Inc. v. United States,
14 Ct Cl. 398 ....................................................9

Lewis v. Reynolds,
284 U.S. 281 (1932) ....................................................20

Mandelbaum v. Comm'r.,
69 T.C.M. (CCH) 2852, aff'd 91 F.3d 124 (3rd Cir. 1996) ....................................................19

Obmer v. United States,
238 F. Supp. 29 (D. Haw. 1964) ....................................................19

Okerlund v. United States,
53 Fed. Cl. 341 (2002) .................................................... 9-10, 17

Union Pacific R.R. v. United States,
208 Ct. Cl. 1 (1975) ....................................................20

United States v. Cartwright,
411 U.S. 546 (1973) ....................................................9

Plaintiff Gisele C. Fisher, the taxpayer, submits the following memorandum of contentions of fact and law.

## I. STATEMENT OF FACTS PLAINTIFF EXPECTS TO PROVE

1. The D.R. Fisher Company was formed in 1923. Through its existence it has not been an operating company but rather has held personal and real property for investment purposes.

2. The total value of the personal and real property assets held by the D.R. Fisher Company ("The Company") as of March 10, 2000 ("Valuation Date"), was $46,843,929.

3. On the Valuation Date, The Company's stock holdings in three companies, SafeCo, Fisher Companies Inc. and Weyerhaeuser accounted for 91.78% of the value of all assets held by The Company.

4. The value of the SafeCo stock held by The Company had appreciated significantly over the period that The Company owned the SafeCo stock. On the Valuation Date, the value of The Company's SafeCo stock was $23,562,000. Of this total value, $23,521,608 or 99.83% was attributable to appreciation of the SafeCo stock from its purchase price.

5. The value of the Weyerhaeuser stock held by The Company had appreciated significantly over the period that The Company owned the Weyerhaeuser stock. On the Valuation Date, the value of The Company's Weyerhaeuser stock was $5,464,218. Of this total value, $5,401,736 or 99.86% was attributable to appreciation of the Weyerhaeuser stock from its purchase price.

6. The value of the Fisher Companies, Inc. stock held by The Company had appreciated significantly over the period that The Company owned the Fisher Companies, Inc. stock. On the Valuation Date, the value of The Company's Fisher Companies, Inc. stock was

$13,968,401. Of this total value, $13,882,878 or 99.39% was attributable to appreciation of the Fisher Companies, Inc. stock from its purchase price.

7. Because the assets held by The Company, including the three stocks accounting for 91.78% of the total asset value, had appreciated in value significantly during The Company's ownership, sale of The Company assets on the Valuation Date would have produced a capital gain of $45,312,542 and thus a capital gains tax liability on the sale of $15,859,390.

8. The stock of each of the three companies that, in total, accounted for 91.78% of the value of all assets held by The Company on the Valuation Date is publicly traded and was readily available for purchase outside of The Company on the Valuation Date.

9. A hypothetical purchaser who purchased 100% of The Company on the Valuation Date based on the market value of the assets held by The Company and then immediately sold the assets would pay $46,843,929 for The Company and, exclusive of transaction costs, would net $31,221,181 after accounting for the capital gains tax on the sale of the assets.

10. For the same $46,843,929, the same hypothetical purchaser could purchase outside of The Company an investment portfolio virtually identical to that held by The Company on the Valuation Date, immediately sell the portfolio, and, exclusive of transactions costs, would net approximately $15,000,000 more than through the purchase of the same assets through The Company because of the absence of capital gains tax on the sale.

11. Dividends from The Company's SafeCo stock comprised from 79% to 91% of The Company's total income during the three years prior to the Valuation Date.

12. The shares of D.R. Fisher Company stock that were transferred, giving rise to the disputed gift tax, did not constitute a controlling interest in The Company. Thus, a

purchaser of this minority interest could not cause The Company to liquidate any or all of the assets it held, sell those assets or merge with another company.

13. Closed-end investment funds are commonly looked to in appraisals of non-controlling or minority interests in closely held holding companies such as The Company as a starting point for assessing the discount from full market value for a minority interest. All closed-end investment funds referred to in the appraisal of the minority interest of The Company were both substantially larger and substantially more diversified than The Company.

14. Numerous studies have found that the inability to sell an asset readily depresses the value of the asset. The longer the period that an asset must be held by a purchaser before it can be sold the greater the reduction in the perceived value of the asset. This reduction in the price that a purchaser is willing to pay for an asset as a result of restrictions on the ability to resell the asset is commonly referred to as a marketability discount.

15. On the Valuation Date, there was no existing or readily available market in which to sell shares of stock in The Company, nor was there any prospect that such a market would ever exist in the future.

16. The transfer of The Company's stock was subject to a Bylaw restriction of a first-right-of purchase in existing shareholders on the Valuation Date.

17. The built-in gains tax liability on The Company's assets was $15,859,390 on the Valuation Date.

18. The fair market per share value of the stock of The Company on the Valuation Date was $8,430.

## II. PLAINTIFF'S POSITION WITH RESPECT TO FACTS ON WHICH DEFENDANT IS EXPECTED TO RELY

1. The adjusted book values of The Company calculated by the Defendant's expert witness under his 5-year and 10-year hypothetical holding periods should be $31,045,000 and $30,895,000 (not $37,282,000 and $41,710,00) respectively to take into account the future appreciation in Company assets during the expert's hypothetical holding periods.

2. The adjusted book value of The Company's assets under the government's expert's hypothetical 5-year and 10-year holding periods discounted to present value under the Defendant's expert's discount rate of 12.7% should be $19,460,000 and $10,810,000 respectively (not $37,282,000 and $41,710,000) as computed by the Defendant's expert.

3. The correct capitalization multiple to be applied to the dividend-income method of valuation under Defendant's expert's methodology is 11.90, not 14.93 as the Defendant's expert contends, once corrections are made for the risk-free rate of return, the equity risk premium, and the forward-looking BETA.

4. Applying a mid-year convention to The Company's dividend income, as Defendant's expert does, to increase the dividend income used to project future income is not appropriate in the absence of evidence of The Company's dividend payments.

5. It is not a valid valuation method to use a capitalization factor of 14.93 to increase projected Company's dividends beyond the dividend growth assumption of 6%, as the Defendant's expert witness does in his analysis.

6. The Avalon Capital and the two Cohen & Steers funds identified by Defendant's expert as part of the peer group of Closed-End funds are not comparable due to either the significantly greater investment return or their sector focus.

7. The Defendant's expert witness failed to adjust his minority discount for The Company's stock at issue to reflect differences in diversification, size, and management between the comparable closed-end funds and The Company.

8. The Defendant's expert witness failed to adjust the lack of marketability discount for the indefinite holding period of The Company's stock.

## III. ISSUES OF FACT AND LAW TO BE RESOLVED BY THE COURT

1. What was the fair market value of the taxpayer's stock in the D.R. Fisher Company for gift tax purposes on March 10, 2000? As part of this ultimate question of fact are the following considerations:

a. Is the federal income tax for built-in capital gains liability deductible in full on the valuation date to compute net asset value, or is the tax deductible at a lesser, present value to be discounted over some hypothetical gain-realization period?

b. Is the proper adjustment to the net asset value of the stock of D.R. Fisher Company to account for its inherent characteristics forty-six percent, as Plaintiff contends, or a lesser percentage to reflect its minority status and lack of marketability, as the Defendant contends.

2. Is the Internal Revenue Service's determination of a tax deficiency entitled to a presumption of correctness?

3. Does the United States have the burden of proof with respect to the fair market value of the taxpayer's stock?

## IV. SUMMARY OF PLAINTIFF'S BASIC FACTUAL CONTENTIONS

Plaintiff expects to prove that the fair market value of her stock in the D.R. Fisher Company on March 10, 2000 was $8,430 per share. Plaintiff disagrees with the government's contention of fact that the fair market value of the stock was higher than $8,430 per share.

## V. STATEMENT OF THE CASE

On March 10, 2000, taxpayer established four grantor retained income trusts with terms of three, four, five and six years. The beneficiaries of the trusts were her two nephews, Ian Metzker and Enrique Braun-Ortega and her niece, Brigitte Ruth. Mrs. Fisher transferred all of her shares of D.R. Fisher Company, a closely-held Washington corporation, to the four trusts in amounts of 400, 200, 200 and 156 shares. In each trust, Mrs. Fisher retained an income interest and a reversion interest under which the trust assets would revert to her estate if she did not survive the term of the trusts.

On her federal gift tax return, Form 709, Mrs. Fisher's calculation of the fair market value of the stock of D.R. Fisher Company (the "Company") was supported by the report of T. S. Tony Leung of Corporate Advisory Associates, Inc. who valued each share of stock at $8,430. Mrs. Fisher paid $2,198,731.20 in federal gift tax with her tax return. The taxpayer will offer Mr. Leung's report into evidence. Mr. Leung based his valuation determination on the net asset value (NAV) methodology, taking into account The Company's substantial built-in capital gains tax liability and allowing for the stock's lack of a market, its lack of diversification, its tax attributes and other factors.

**The Company**. D.R. Fisher Company was formed in 1923 to acquire, own and hold real and personal property. Since that time, The Company's investments have remained largely three publicly-traded stocks: Safeco Corporation (50%); Fisher Companies Inc., now Fisher Communications, Inc. (30%); and Weyerhaeuser Company, Inc.(12%). Together, the three stocks represented ninety-two percent of the fair market value of The Company's assets on March 10, 2000. The parties' expert witnesses are expected to agree that the fair market value of

The Company's assets on the valuation date was $46,843,929.[1] The Company is taxed as a personal holding company for federal income tax purposes due to the number of its shareholders and the dividend income it receives from its portfolio.

The Company founders were D.R. Fisher, O.D. Fisher and O.W. Fisher, the grandfather and great uncles of the taxpayer's husband, Bennett I. Fisher who died January 6, 1987. The Company was capitalized with two thousand shares of $100 par value stock. In 1987, the taxpayer, personal representative of her husband's estate, sold 44 shares to her brother-in-law, George O. Fisher, at $8,580 per share to pay an estate tax deficiency asserted by the IRS on her husband's estate. The sales price was the share value reported by the taxpayer for estate tax purposes, which value was upheld by this Court in 1984 in Fisher v. United States, No. 91-1087 T.

On March 10, 2000, The Company had 2,000 shares of common stock issued and outstanding, of which the taxpayer owned 956 shares, or 47.8%. The other shares were held by the taxpayer's sister-in-law, Allie Fisher (1,000 shares) and her two sons, taxpayer's nephews, George D. Fisher (22 shares) and William O. Fisher (22 shares). Article 17 of The Company's Bylaws provides that no shareholder of The Company can sell her stock to a non-stockholder without first offering the stock for sale to the other shareholders.

The Company is subject to income tax as a C corporation on the amount of its taxable income To avoid the imposition of the personal holding company tax-a tax imposed at the highest marginal corporate rate of tax-the Company distributes most of its taxable income to its shareholders.

The Internal Revenue Service (the "IRS") retained Lewis D. Olds to review the taxpayer's valuation report. Mr. Olds did not agree with the taxpayer's report's conclusion with

[1] Defendant's expert's Schedule 3 value of $46,885,692 appears to use March 31, 2000 values for several of the Company's investments.

respect to the fair market value of The Company' stock of $8,430 per share. While Mr. Leung reduced The Company's asset value by $15,859,390 -the amount of the tax liability inherent in its appreciated portfolio of stocks- the IRS's expert discounted the tax to a present value of $10,793,634, presuming a five-year period for the sale of stocks and the realization of the built-in capital gains, using a discount rate of 8%. The discount rate, Mr. Olds noted, reflected the rate of return generated by closed-end funds and investment companies as tracked by Ibbotson Associates in its 2001 Yearbook. The IRS's expert concluded that a value per share between a low of $11,566.46 and a high of $12,337.56 represented a reasonable range of values for the stock.

The IRS thereafter issued a notice of gift tax deficiency to the taxpayer on the higher, $12,337.56 value. Mrs. Fisher paid $1,208,592, the amount of the asserted gift tax deficiency, plus interest of $300,528.28 and filed an administrative claim for a refund of gift tax and interest. More than six months elapsed from her refund filing without action by the IRS, allowing the taxpayer to file this action for a refund.

## VI. LEGAL ARGUMENT

### 1. The fair market value of the taxpayer's stock in D.R. Fisher Company was $8,430 per share on March 10, 2000.

Federal law imposes an excise tax on a donor of property, measured by the value of the property transferred. 26 U.S.C. § 2501 (a)(1). If a gift is made in property, the value thereof at the date of the gift is the amount of the gift. 26 U.S.C. § 2512(a). For purposes of federal gift taxation, the value of closely-held stock is determined by taking into consideration a company's net worth, prospective earning power, and dividend-paying capacity, as well as other relevant factors. Treas. Reg. § 25.2512-2(f). Among the "other relevant factors" are the following:

> The goodwill of the business: the economic outlook in the particular industry; the company's position in the industry and its

> management; the degree of control of the business represented by the block of stock to be valued; and the values of securities of corporations engaged in the same or similar lines of business which are listed on a stock exchange. . . .

Treas. Reg. § 25.2512-2(f).

Fair market value, for this purpose, is defined as the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts. Treas. Reg. § 25.2512-1. United States v. Cartwright, 411 U.S. 546, 551 (1973); Okerlund v. United States, 53 Fed. Cl. 341, 345 (2002). The relevant buyer is a hypothetical buyer. Okerlund, Id.

The value of the gift is determined by the value of the property passing from the donor, not the property received by the donee. Treas. Reg. § 25.2511-2(a). Valuation of stock must be made as of the relevant date without regard to events occurring subsequent to the crucial date. Hermes Consol. Inc. v. United States, 14 Ct Cl. 398, n. 28 (1988); Fehrs v. United States, 223 Ct. Cl. 488 1980; Okerlund , supra at p. 345.

The Internal Revenue Service has published guidelines to taxpayers and the valuation community on the valuation of closely-held stock. As expressed in Rev. Rul. 59-60, 1959-1 C.B. 237, the relevant criteria in valuing privately held corporate stock for transfer tax purposes are the following:

1. The nature of the business and history of the company.
2. The economic outlook for the nation and particular industry.
3. The book value of the stock and financial condition of the business.
4. The company’s earning capacity and dividend paying capacity.
5. Evidence of goodwill or other intangible value.

6. Past stock sales and the size of the block of stock being valued.

7. Prices of stocks of publicly traded corporation in similar lines of business.

8. All relevant factors affecting fair market value.

The Revenue Ruling is widely accepted as setting forth the appropriate criteria to consider in determining fair market value. Okerlund, Id. In addition, when valuing minority interest stock of a closely-held corporation, the application of certain discounts may be warranted to reflect the stock's lack of marketability and/or lack of voting rights. Central Trust Co. v. United States, 158 Ct. Cl. 504, 524, 305 F.2d 393 (1962) (consideration of a discount when a stock lacks marketability is a recognized appraisal technique for use in arriving at a fair market value for unregistered stock).

The Service's Revenue Ruling advises that a closely held company's balance sheets for two or more years preceding the date of appraisal must be examined, along with preceding five years profit and loss statements. Depending upon the circumstances, certain factors may carry more weight than others because of the nature of the company's business. For example, the earnings may be the more important criterion of value in an operating company; the net asset value of a closely-held investment company, on the other hand, may be the more important factor where, as here, the valuation involves the stock of an investment company. The ruling acknowledges that a sound valuation will be based upon all the relevant facts, but the elements of common sense, informed judgment, and reasonableness must enter into process of weighing those facts and determining their aggregate significance. The valuation of closely held securities is, as the ruling admonishes, a prophecy as to the future and must be based on facts available at the required date of appraisal.

Mr. Leung will testify at trial that he valued the stock of The Company in accordance with the standards enunciated in Rev. Rul. 59-60. Mr. Leung reviewed The Company's balance sheets and income statements for the three-year period prior to the valuation date. He will testify that while he considered the income capitalization methodology that he employed the net asset valuation methodology in his written report. Mr. Leung confirmed The Company's asset values and netted The Company's asset values by the amount of its liabilities, including the liability for federal income taxes on the built-in gains inherent in the stock portfolio. Plaintiff submits this netting was appropriate.

a. A full deduction of The Company's liability for the built-in capital gains tax is appropriate under the net asset valuation methodology.

Mr. Leung confirmed The Company's market values of its assets on the valuation date. To arrive at a net asset value, Mr. Leung took into account The Company's liabilities, including the amount of The Company's built-in capital gains tax liability of $15,859,390. The gains tax was computed at the corporate tax rate of 35% on The Company's appreciation of $45,312.542 ($46,843,925 less the tax basis of $1,531,387). The parties' experts agree on these numbers; however, they do not agree on whether the full amount of the built-in gains tax, or a lesser amount, is to be subtracted from The Company's asset values.

Mr. Leung will testify that the full amount of the tax is to be deducted consistent with the accepted principles of his profession and the dictates of the net asset valuation methodology - which methodology assumes that the hypothetical buyer can gain access to all The Company's assets. Any access to assets triggers the built-in gains tax. While avoidance of this tax was possible prior to 1986, in its enactment of the Tax Reform Act of 1986 Congress eliminated corporate avoidance techniques, such as a sale followed by a liquidation or a dissolution of the company. Current law taxes built-in gains. See 26 U.S.C. §§ 331 and 336.

The parties' respective experts will provide a contrast in their treatment of the effect on a buyer's financial considerations of The Company's built-in gains tax liability. Mr. Leung will explain that a rationale buyer would demand a dollar-for-dollar value reduction for liability. The government's expert, on the other hand, can be expected to contend that a buyer will agree to absorb some but not all of the tax liability's reduction in value of the stock even though that buyer would have no control over the timing of the recognition of the tax.

The taxpayer's position is that a reduction for the built-in gains tax is required under the net asset value methodology – if the valuation marks up the investments to current value, assuming a buyer can access those investments, the built-in taxes need to be deducted as current liabilities. Moreover, the taxpayer's reporting of stock value and is consistent with the economic realities of the two parties to a stock sale that assume both parties act in their economic interests.

Further, Mr. Leung's recognition of the tax effect of the built-in gains obviates the government's expert's "timed" approach to built-in gains tax-an approach the taxpayer submits presumes a hypothetical buyer would not act rationally in her own financial interests. Why would a buyer agree to absorb some of the tax liability by paying more than net asset value when that same buyer can duplicate the investment portfolio in the open market? Further, Mr. Leung's analysis does not involve any consideration of the time period of the recognition of capital gains upon a sale of stock, which is speculation. Finally, by adhering to recognized valuation standards, Mr. Leung's analysis does not involve a consideration of the appreciation of stock values during the presumed recognition time period, as the government's expert must for consistency, since future appreciation cannot be predicted with any reliability. Mr. Leung's analysis, therefore, does not contain a discounting to present value of a future tax liability-which

discounting along with asset appreciation would be necessary under the government's valuation approach. In other words, Mr. Leung's valuation is based on common sense and economic realities, not speculation. However, it is precisely this form of post-valuation date speculation in which the government's witness is engaged in his analysis.

The government's expert witness can be expected to testify consistent with his valuation report that a hypothetical seller would consider the buyer's ability to defer or avoid the recognition of the built-in gains tax. Query, how a reasonable seller could convince a buyer of a minority interest in The Company that such buyer would have any influence over the timing of tax recognition. Assuming for the moment the position is tenable, and the taxpayer stresses that it is not tenable, the circuit courts that have considered the government's position have rejected it. Indeed, the IRS has rejected this approach. Moreover, such an approach is not consistent with the government's directions to the valuation community. In Rev. Rul. 59-60, supra, the government directs the valuation community to consider "the costs of liquidating a company when appraising the relative values of the stock and the underlying assets". One cost of liquidation, certainly, is the substantial, 35% tax on gain. Whether an actual liquidation is contemplated is not relevant for purposes of the valuation of the stock. Eisenberg v. Comm'r., 155 F.3d 50, 59 (2d Cir. 1998).

Mr. Leung's analysis is supported by every appellate court that has considered the issue of the built-in gains tax. The Circuit Courts for the Fifth Circuit and Second Circuit have spoken on this issue: See Estate of Dunn v. Comm'r., 301 F.3d 339 (5th Cir. 2002) (the built-in gains tax liability must be considered as a dollar-for-dollar reduction from the fair market value of the company's assets as a matter of law); and Eisenberg, supra (gains taxes are to be considered a reductions to arrive at a net asset value of the subject company). The IRS has

acquiesced in Eisenberg to the extent that it holds that there is no legal prohibition against a discount for built-in capital gains tax liability. AOD 999-001. The Sixth Circuit in Estate of Welch v. Comm'r., 208 F.3d 213 (6th Cir. 2000) agreed with the Eisenberg Court's approach and concluded that the major issue whether stock value an be discounted to reflect built in gains tax liability has been resolved by the Commissioner's acquiescence in the Eisenberg decision. This new approach after the government's acquiescence, the Sixth Circuit found, required the courts to consider whether a hypothetical willing buyer, having reasonable knowledge of the facts, would take some account of the tax consequences of contingent built-in gains "in making a sound valuation of the property." Estate of Welch, v. Comm'r., 208 F.3d 213 (2000). See also, Estate of Simplot v. Comm'r., 112 T.C. 130, 159 (1999) rev'd on other grounds, 249 F.3d 1191 (9th Cir. 2001) where the Ninth Circuit accepted the parties' agreed-upon 40% discount for built-in gains tax liabilities. Mr. Leung will testify that a buyer would demand a full deduction for the amount of the built-in gains tax.

No Circuit Court has accepted the government's position that tax liabilities are to be discounted to present value, assuming that a buyer can incur the taxes over time in the future. In an analogous case involving the valuation of the stock of a timber company, the Fifth Circuit in Estate of Jameson v. Comm'r., 267 F.3d 366 (5th Cir. 2001) reversed the Tax Court's holding with respect to phased-in tax liability. The Tax Court finding of value assumed that a prospective buyer would operate the subject company in a certain manner to time the timber cutting and attendant tax payments. The court pointed out that this assumption that a hypothetical buyer would operate a company whose expected growth was less than the buyer's required return was "fatally flawed." The Court of Appeals held that valuation standards would not countenance assumptions about future timber cutting operations that would trigger tax

recognition. Yet, it is precisely this form of assumption of future Company actions-the sale of appreciated stocks over time-in which the government's expert suggests a well-informed buyer would engage and would accept even though that same buyer would have no control over Company actions. The courts simply do not accept the positing of transactions which are unlikely and plainly contrary to the economic interests of a hypothetical buyer. Jameson, Id. at p. 372, citing Estate of Smith v. Comm'r., 198 F.2d 515, 529 (5th Cir. 1999) and Eisenberg, supra at p. 57 where the court noted: "The issue is not what a hypothetical willing buyer plans to do with the property, but what considerations affect the fair market value of the property he considers buying." The built-in gains tax affects the fair market value of the taxpayer's stock. Speculating that a minority shareholder would plan to hold his or her stock while income taxes are incurred and paid over time is not the issue.

b. The proper adjustment to the stock's net asset value to reflect the stock's unique characteristics is 46 percent.

After netting of Company assets, Mr. Leung examined publicly-traded companies for his comparable peer group. Mr. Leung compared The Company to the stocks of two groups of closed-end regulated investment companies: one group of eight companies that holds diversified stock portfolios; and a second group of companies that has concentrations in the financial sector. The stocks of the diversified companies were traded in markets considered active at prices which represented 84% of their net asset values, while those of the concentrated portfolios represented 85% of their net asset values.. Mr. Leung noted a number of distinctions between the class of closed-end funds and the subject Company: 1. The comparable closed-end funds have larger and more diversified holdings; 2. The comparable funds had professional investment managers and articulated investment targets; 3. The comparable funds distributed capital gains as well as dividend income and were not subject to federal income taxation; and

4. In contrast to publicly-traded shares of closed end funds, The Company's shares were closely-held and have no ready marketability.

In this respect –the comparison of the subject Company to closed end funds ("CEFS"), Mr. Leung's approach was the same as that approved by the Tax Court in Estate of Mundy, 35 T.C.M. (CCH) 1778. There, the Tax Court approved a taxpayer's valuation report that discounted a closely held company's stock's net asset value 10% based on comparable price to net asset value discounts for regulated investment companies. In addition, the court applied a 16-2/3% discount to the closely held stock to reflect the fact that certain tax benefits accrued to the comparable regulated investment companies and to their shareholders which were not available to the taxpayer's company and its stockholders. Under 26 U.S.C. § 852, regulated investment companies, satisfying statutory diversification requirements, may pass-through capital gains to their shareholders and avoid taxation of their income. In contrast, a closely held investment company such as the D.R. Fisher Company, characterized as a personal holding company for federal income tax purposes under 26 U.S.C. § 542, does not have the capacity to pass-through capital gains to its shareholders. That is, there is a corporate level tax on capital gains paid by the company and a second level of taxation at the shareholder level for company distributions. From the important tax perspective, The Company is a less tax-efficient structure to hold an investment portfolio. See Cotchett's Estate v. Comm'r., 33 T.C.M. 138 (1974) where the Tax Court held that in valuing the stock of a family holding company for estate tax purposes, prices paid for stock of otherwise comparable regulated investment companies must be adjusted to reflect benefits of tax rules for regulated investment companies.

This tax distinction led the Tax Court in Mundy, supra, to apply a 16-2/3% discount in addition to the government's expert witness's discount of 30% from net asset value.

Similarly, the Tax Court in Gallun v. Comm'r., 33 T.C.M. (CCH) 1316, discounted the net asset value of a closely held company by 55% to take into account various factors, including the fact that the comparable publicly traded, closed-end investment companies were readily marketable and were entitled to certain tax benefits as regulated investment companies not available to the closely held company.

Marketability Adjustments.

Mr. Leung will testify that he applied a discount of between 30% and 40% to The Company's net asset value to reflect the stock's lack of a market. Unlike the comparable funds, there was no active and orderly market for the shares of The Company on March 10, 2000. Further, the bylaws of The Company provided that the shareholders could not sell their stock without first offering the shares for sale to the other shareholder. This bylaw provision, Mr. Leung, will explain had a depressant effect on the stock's value.

The lack of marketability discount is based on the fact that stock in a closely held business enterprise is less attractive and more difficult to sell than publicly traded stock. The IRS acknowledges discounts for lack of marketability for closely held business interests. IRM Chp. 4300 (Valuation of Closely Held Businesses), Section 4332. The courts, as well, have recognized that closely-held securities are not as valuable as publicly traded securities. See, e.g., Estate of Gallo, 50 T.C.M. (CCH) 470 (36% lack of marketability discount); Estate of Jephson, 87 T.C. 297, 303-304 (1986); Estate of Dougherty, 59 T.C.M. (CCH) 772. (25% discount for lack of marketability allowed to a 100% interest in a closely held corporation); Estate of Lauder, 64 T.C.M. (CCH) 1643 (40% discount for lack of marketability allowed from appraised value). See also Okerlund, supra at p. 355 where the Court held that a 40% discount for a lack of marketability was sustainable based on the company's dividend payment history, restrictive

stock transfer provisions, among other elements as significant deterrents to investment due to the uncertainties they impose on short or long term returns.

While the rationale for marketability discount is well established, there are various means to quantify the discount. Equating the discount to the costs that would be incurred to make a market for the stock is one means of quantifying the discount. See, e.g., Bardahl Mfg. Corp. v. Comm'r., 24 T.C.M. (CCH) 1030 (20% discount based on the estimated flotation costs using SEC statistics); Estate of Piper, 72 T.C. 1062, 1086 (1979) (35% discount appropriate to account for the costs of a private placement of the stock).

The government's expert witness can be expected to testify that he applied a 25% lack of marketability discount to the shares of The Company. The taxpayer submits that this discount does not consider and weigh fairly all the elements of the subject stock and is at the low end of the spectrum of the published studies of lack of marketability discounts. More specifically, the government' witness did not take into account adjustments for size and lack of diversification of The Company's portfolio.

Other stock Characteristics. Mr. Leung is expected to testify that he considered the other, relevant aspects of the stock of the subject Company, such as its lack of diversification in its investments, its tax status, its relative size compared to comparable closed-end funds and the absence of professional investment managers in deriving the value of the stock for gift tax purposes. Some of these adjustments are not controversial: for example the IRS has conceded that a discount is appropriate to reflect a lack of diversification in a closely-held investment company. Estate of Piper, supra at 1082-84 (for gift tax purpose a 17% "portfolio discount" was allowed). Other adjustments have been embraced by case law. Regarding tax status, courts consider special taxes to which a company is subject such as the personal holding company tax

In Obmer v. United States, 238 F. Supp. 29, 34 (D. Haw. 1964), the federal district court held on facts strikingly similar to the instant case that the value of a family corporation was adversely affected by its status as a personal holding company.

Mr. Leung determined that The Company's Bylaw provision under which a selling shareholder had to first offer his stock to the other shareholders prior to a sale was a relevant factor in the determination of the appropriate marketability discount. Case law supports this conclusion. See, e.g., Estate of Cotchett, 33 T.C.M. (CCH) 138. There, the Tax Court determined that where the bulk of the underlying assets of the shares of a corporation constituted securities subject to the vagaries of the stock market, a first right of refusal constituted a depressant of the value of such shares. A prospective purchaser might lower his offering price to reflect a possible deterioration in the market value of those assets during the specified non-sale period. The existence of a right of first refusal traditionally has been held to support a higher discount from net asset value. In Mandelbaum v. Comm'r., 69 T.C.M. (CCH) 2852, aff'd 91 F.3d 124 (3rd Cir. 1996), the Tax Court suggested there was a "chilling effect" on transfers because of a right of first refusal. See also, Estate of Borgatello v. Comm'r., 80 T.C.M. (CCH) 260 and Estate of Jones v. Comm'r., 116 T.C. 121 (2001) where discounts of 3% and 8% respectively were added to the normal discount for lack of marketability for a right of first refusal. In Heck v. Comm'r., 83 T.C.M. (CCH) 1181, the court allowed a 10% addition to the discount for lack of marketability. Similar reasoning here suggests a further adjustment for the stock's lack of marketability was warranted.

Based on his analysis of the stock's inherent characteristics, including its lack of marketability, as well as The Company's relative size compared to closed-end funds, The

Company's lack of diversification of its investments and its tax status, among other factors, Mr. Leung adjusted the net asset value by forty-six percent.

Mr. Leung's Conclusion.

Mr. Leung' will testify that he derived a fair market value for federal gift tax purposes of $8,430 per share of a minority interest in D.R. Fisher Company as of March 10, 2000.

**2. The IRS determination of a tax deficiency is not entitled to a presumption of correctness, and plaintiff does not bear the burden to prove the existence of an overpayment of tax**.

In general, a taxpayer's gift tax refund action is a *de novo* proceeding in which the taxpayer has the burden of proving the existence of an overpayment of tax. Lewis v. Reynolds, 284 U.S. 281 (1932). The taxpayer must in general prove the correct amount of the tax and the resulting overpayment. Eli Lilly & Co. v. United States, 178 Ct. Cl. 666 (1967). Stated another way, the IRS assessment of an estate tax deficiency is generally presumed to be correct, and the taxpayer must produce sufficient evidence to support a finding contrary to the Commissioner's determination.

However, this general rule is subject to an exception, where the government does not defend its valuation report and produces no evidence in its support. Continental Water Co. v. United States, 231 Ct. Cl. 717 reported in full 49 AFTR 2d 82-1070 {1982). Where each party produces evidence that would support a different valuation, the normal government presumption of correctness is rebutted. Id. at 82-1074; Union Pacific R.R. v. United States, 208 Ct. Cl. 1 (1975).

In Continental, the issue was the fair market value of charitable foundation stock purchased by a disqualified person. The purchase price was $45,560,000. An IRS engineer agent issued a report that asserted the fair market value of the stock on the date of the sale was

$60,212,103. As in the present case, the IRS assessed a tax deficiency based on its report. The taxpayer paid the asserted deficiency, filed a claim for refund and, upon its denial, filed a refund suit in this court.

At trial, the government presented two expert witnesses who valued the stock at $50,000,000. The government abandoned any effort to defend the report upon which the deficiency assessment was made. The court concluded that the government's lack of evidence to support the IRS valuation negated the normal presumption of correctness. The standard of proof, accordingly, is whether plaintiff can demonstrate by a preponderance of the evidence that plaintiff overpaid the federal estate tax. As the government has abandoned its valuation report prepared by Lewis Olds on which the gift tax deficiency was based, the taxpayer here does not bear the burden of proof.

**3. The government bears the burden to prove the stock's fair market value**.

Where the taxpayer introduces credible evidence relevant to ascertaining her liability, as here, the burden of proof shifts so that the government has the burden of proof with respect to factual issues related to gift taxes. Section 7491(a) of the Internal Revenue Code. The burden of proof shifts where the taxpayer (1) has complied with substantiation requirements; (2) has complied with recordkeeping requirements; and (3) has cooperated with IRS information and document requests. The taxpayer submits that she will have met the statutory requirements to shift the burden of proof once she adduces credible evidence through her expert witness of the value of the stock of D.R. Fisher Company. Accordingly, the burden of proof with respect to the value of the stock will fall on the government.

## VII. CONCLUSION

Plaintiff intends to show by way of expert testimony that the fair market value of the taxpayer's stock in the D.R. Fisher Company on March 10, 2000, was $8,430 per share.

Plaintiff has overpaid the federal gift tax in the amount of $1,208,592 and is entitled to a refund in such an amount plus interest.

Respectfully submitted

s/ Paul W. Oden
PAUL W. ODEN
4400 Two Union Square
601 Union Street
Seattle, Washington 98101-2352
Telephone:(206) 622-8484
Facsimile: (206) 622-7485
Attorney for Plaintiff

s/Greg Montgomery
GREG MONTGOMERY
Of Counsel

Date: August 6, 2007.