***No. 06-351 T***
***(Judge Emily C. Hewitt)***

***IN THE UNITED STATES COURT OF FEDERAL CLAIMS***

GISELE C. FISHER,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

UNITED STATES' MEMORANDUM OF
CONTENTIONS OF FACT AND LAW

RICHARD T. MORRISON
Acting Assistant Attorney General

DAVID GUSTAFSON
G. ROBSON STEWART
ROBERT J. HIGGINS

Attorneys
Justice Department (Tax)
Court of Federal Claims Section
P.O. Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-6506

**Page**

**TABLE OF CONTENTS**

United States' Memorandum of Contentions of Fact and Law . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. CONTENTIONS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III. CONTENTIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

A. The Plaintiff Bears the Burden of Proof . . . . . . . . . . . . . . . . . . . . . . . . . . 8

B. The Court May Accept, Reject or Modify Expert Opinions . . . . . . . . . . 10

C. The Gift Tax is Imposed on the Fair Market Value as of the Date of Gift . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

D. The Potential or Built-in Capital Gains Tax Liability for D.R. Fisher Company Should be Discounted Before Reducing the Asset Value of the Company on the Date of Gift . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

E. A 12% discount for lack of control is appropriate . . . . . . . . . . . . . . . . . . 16

F. A 25% discount for lack of marketability is appropriate . . . . . . . . . . . . . 17

IV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Appendix (Separately Bound):

Pub. L No. 99-514, October 22, 1986, § 631, 100 Stat 2085 . . . . . . . . . . . . . . . . . . . . . A1

Internal Revenue Code of 1986 (26 U.S.C.):

§ 541 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A2

§ 2501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A3

**Page**

**Appendix (Continuation):**


§ 2512 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A5

§7491 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A5

Treasury Regulations (26 C.F.R.):

1994 I.R.B. 4, 199-1 C.B. XIX, 1999 WL 33541682 (IRS ACQ) . . . . . . . . . . . . A6

Rev. Rul 59-60, 1959-1 C.B. 237, 1959 Wl 12594 . . . . . . . . . . . . . . . . . . . . . . . A7

Treas. Reg. § 25-2512-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A15


**TABLE OF AUTHORITIES**

**Cases:**


*Abrahamsen v. United States*, 228 F.3d 1360 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . 9

*Alpha Medical, Inc. v. Commissioner*, 172 F.3d 942 (6th Cir. 1999) . . . . . . . . . . . . . . . 10

*Caracci v. Commissioner*, 456 F.3d 444 (5th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . 10

*Continental Water Co. v. United States*, 231 Ct. Cl. 717 (1982) . . . . . . . . . . . . . . . . . . . . 9

*Estate of Davis v. Commissioner*, 110 T.C. 530 (1998) . . . . . . . . . . . . . . . . . . . . . 13, 16

*Estate of Dunn v. Commissioner*, 301 F.3d 339 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . 15

*Esienberg v. Commissioner*, 155 F.3d 50 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . 12, 13, 16

*Gingerich v. United States*, 77 Fed. Cl. 231 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Godley v. Commissioner*, 286 F.3d 210 (4th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 16

**Page**

**Cases (Continuation):**

*Hearst Corp. v. United States*, 28 Fed. Cl. 202 (1993), *vacated*, 36 F.3d 1116 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10

*Helvering v. National Grocery Co.*, 304 U.S. 282 (1938) . . . . . . . . . . . . . . . . . . . . . . . . 10

*Estate of Jameson v. Commissioner*, 267 F.3d 366 (5th Cir. 2001) . . . . . . . . . . . . . . . . 15

*Estate of Jelke v. Commissioner*, T.C. Memo 2005-131 (2005), 2005 WL. 1277407 (U.S. Tax Ct.), *appeal pending*, No. 05-15549-II (11th Cir.) . . . . . 13, 14

*Estate of Newhouse v. Commissioner*, 94 T.C. 193 (1990) . . . . . . . . . . . . . . . . . . . . 16, 17

*Lewis v. Reynolds*, 284 U.S. 281 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Okerlund v. United States*, 365 F.3d 1044 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . 11,16, 17

*Pitcairn v. United States*, 212 Ct. Cl. 168, 547 F.2d 1106 (1976) . . . . . . . . . . . . . . . . . . 10

*Estate of Josephine T. Thompson v. Commissioner*, --- F.3d ----, 2007 WL 2404434 (2nd Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*United States v. Janis*, 428 U.S. 433 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

**Page**

**Statutes:**

Internal Revenue Code of 1986 (26 U.S.C.):

§ 541 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

§ 2501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

§ 2512 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

§ 7491 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**Miscellaneous:**

1999-4 I.R.B. 4, 1999-1 C.B. XIX, 1999 WL 33541682 (IRS ACQ), . . . . . . . . . . . . . . . 12

Tax Reform Act of 1986, Pub. L. No. 99-514, § 631, 100 Stat. 2085 . . . . . . . . . . . . . . . . 12

Revenue Ruling 59-60, 1959-1 C.B. 237 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Treas. Reg. § 25.2512-1, (26 C.F.R.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 15

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-351 T
(Judge Emily C. Hewitt)

GISELE C. FISHER,

Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendant.

UNITED STATES' MEMORANDUM OF
CONTENTIONS OF FACT AND LAW

COMES NOW the defendant, the United States of America, and pursuant to the Court's order of June 21, 2007, and ¶ 14 (a) and (b), Appendix A, RCFC, hereby provides its Memorandum of Contentions of Fact and Law for the above-captioned case.

## I. INTRODUCTION

This is a tax refund suit concerning the amount of federal gift tax owed by the plaintiff, Gisele C. Fisher, with respect to gifts of 956 shares of D.R.Fisher Company (hereinafter, "the Company") to certain relatives on March 10, 2000. There were 2000 shares outstanding on that

date. The Company is a closely held investment company established in 1923 in the State of Washington. The company has historically been a source of income for the Fisher family that founded Fisher Communications. The sources of the income has been corporate dividends, not proceeds from stock or other sales. Historically, there was very little turnover of stock holdings. On the date of gift, the Company primarily owned publicly traded stock and two pieces of real estate. The stock held was concentrated in two companies, SAFECO (55.5%) and Fisher Communciations (31.2%).

The dispute over the amount of the gift tax is due to disagreement over the fair market value of an individual share of the Company on the date of donation. The form of the gifts, *i.e.*, grantor retained interest trusts (GRITs), complicates the gross valuation of the gifts subject to tax but is not an issue in this proceeding. The fair market value of an individual share is the first data entry plugged into a formula for calculating the taxable gifts made through the GRITs. This per share value is the only matter for decision by the Court.

Valuation Methods: Asset Value and Dividend Capitalization

It is the determination of the fair market value of a share of the Company that is in dispute. The United States proposes two methods of valuing the Company as of the date of gift, the plaintiff only one. The first method, asset valuation, is utilized by both parties and there is essential agreement with respect to the gross value of the Company's assets (United States: $46,674,134; Plaintiff: $46,843,929). The second method, capitalization of dividends, is only offered by the United States. Use of this valuation method is rational since the Fisher family used the Company as a source of dividend income from investments. Under this method, the value of the Company is $38,070,000.

<u>Potential or "Built-In" Capital Gains Liability</u>

The parties' first dispute involves the treatment for valuation purposes of the potential or "built-in" capital gains liability," *i.e.*, taxes that are accrued, but as to which there has not yet been a tax-triggering event, such as a liquidating distribution of appreciated assets. This only concerns the asset valuation method, not the capitalization of dividends method of valuation.

The book value of assets on the gift date was $1,531,385 compared to the market value of $46,885,692, yielding a built-in gain of $45,354,307. This is a highly unusual phenomenon for any investment company, explained in part by the longevity of the Company itself, founded 77 years before the gifts at issue (in 1923), and the Company's history of not diversifying its holdings, resulting in long holding periods for its assets. For example, there was not a single sale of stock by the Company during the 10-year period prior to these gifts. Nonetheless, the plaintiff contends that the valuation process for determining the value of a single share of Company stock requires reducing the gross asset value of the Company by an amount equivalent to 100% of the potential capital gains tax on the built-in gain of $45,354,307 as of the date of gift. Calculated at the 35% corporate capital gains tax rate, a 100% reduction would be $15,874,007. Thus plaintiff would reduce the gross asset value of the Company from $46,885,692 to $31,011,685. The plaintiff's alleged per share value, prior to applying discounts for control and marketability, therefore is $15,611.

The United States's position is that the hypothetical capital gains tax should be discounted to reflect the facts and circumstances of the Company, particularly its history of not selling any of its holdings. That is, there was very little, if any, probability that the Company would liquidate after the shares were distributed to the plaintiff's donees. The Company's

financial history, *i.e.*, how it conducted itself over the previous 77 years, and particularly over the most recent five to ten years, strongly suggests that no sale would take place and no capital gains taxes would be due on the valuation date. There was no expectation as of the date of gift that this historical conduct would change. To reflect this history, the United States's expert testimony will describe two scenarios, one contemplating a five-year holding period for the Company's assets and another a 10-year holding period. Rather than reducing the asset value by $15,874,007, these holding periods would result in lesser reductions for capital gains taxes, *i.e.*, approximately $9.8 million (5-year holding period) or $5.4 million (10-year holding period.)

Under the asset valuation method, United States's reduction for built-in capital gains tax decreases the adjusted book value to $37,282,000 (5-year holding period) or $41,710,000 (10-year holding period). Furthermore, the United States's expert reconciled the difference between the asset valuation method and the dividend capitalization method by giving equal weighting to the two methods. The resulting blended values are $37,676,000 for the five-year holding period and $39,890,00 for the 10-year holding period. On a per share basis, these values are $18,838 and $19,945 respectively. These values, in turn, are subject to discounts for lack of control and lack of marketability.

<u>Discounts for Lack of Control and Marketability</u>

Both parties agree that discounts for lack of control and marketability are appropriate for determining the value of a single share of Company stock as of March 10, 2000. Plaintiff advocates a combined discount of 46% for lack of control and lack of marketability, yielding a per share value of $8,430.

The United States' expert advocates a discount for lack of control in the amount of 12%

and a 25% discount for lack of marketability. These discounts yield an effective cumulative discount of 34% and per share values discounted for lack of control and marketability within a range from $12,433 to $13,164.

The Court must decide the appropriate value to assign to a single share of the Company as of March 10, 2000, the date of gift.

II. CONTENTIONS OF FACT

The property at issue here is 956 shares of D.R. Fisher Company ("the Company") gifted on March 10, 2000. These shares constitute a minority interest in the Company as there were 2000 shares outstanding on the gift date. All the shares were held by Fisher family on the date of gift and the gifts were to members of the Fisher family. There were four shareholders as of the date of gift. The Fisher family owned and operated the company without assistance from professional investment managers.

The Company is an investment company, *i.e.*, it did nothing but buy and hold investments, principally publicly traded stock. It did have two minor real estate investments on the gift date. The Company was used as an income vehicle for its shareholders. Dividends were received and paid to its four shareholders. A corporation, the Company's federal income tax status also was as a "personal holding company." As such, it had to distribute its income or otherwise have the amounts of retained income taxed at higher rates. During the three years prior to the gift, the Company paid 97.9% of income to its shareholders. *See* 26 U.S. C. § 541 *et. seq.*

The Company did not diversify its investments. Shares of Safeco, Inc., a financial services company, comprised 55.5% of its assets value. Stock of the family founded

corporation, Fisher Communications, Inc., represented 31.2% of the Company's holdings.

In addition to concentrated holdings, the Company did not ordinarily buy or sell securities. Its turnover on an annual basis was virtually zero. In the ten-year period prior to the valuation date, the Company did not sell any stock investments. One piece of real property was sold during this period and it had been held for almost 50 years.

There is no record of a sale of a share of Company stock and there was no active market for such shares on the gift date. There also were no sales of private companies judged similar to the Company during the relevant time frame. The sale of the Company's assets and an analysis of publicly traded closed-end funds are appropriate methods for arriving at a fair market value of the a Company share of stock.

The Company maintained financial statements that described the "book value" of assets held. This book value represented the cost of acquiring the assets. Book value is not an appropriate method for valuing a share of the Company. Adjusting book value to current fair market value is appropriate for valuing the underlying assets of the Company.

On the valuation date, March 10, 2000, the Company's assets had very low book values in comparison to adjusted book value, *i.e.*, fair market value. If the assets of the Company were sold, the proceeds would be subject to the corporate federal income tax for long-term capital gains at a rate of 35% in 2000. But no hypothetical buyer of Company stock on March 10, 2000, could reasonably expected that the Company would thereafter sell all of its assets, given the Company's history of virtually never selling any assets and holding the assets in order to receive the dividends consistently paid. The Company had been very tax-adverse prior to the valuation date, *i.e.*, avoiding sales of assets to avoid capital gains taxes, and there is nothing to indicate

that such strategy would change with the gift of a minority interest in the Company.

The Company paid the following dividends to its shareholders in the years prior to the valuation date:

| | |
|---|---|
| 1997 | $1,698,000 |
| 1998 | $2,146,000 |
| 1999 | $2,266,000 |

A hypothetical buyer would be concerned, however, that eventually capital gains on the appreciation existing on the date of gift would have to be paid, *i.e.*, represented a bona fide contingent tax liability. The hypothetical seller, on the other hand, would respond that the historic operation of the Company demonstrates that the true value of the contingent tax liability is considerably less than the product of total appreciation on the valuation date multiplied by the corporate capital gain tax rate.

Moreover, the hypothetical buyer could not reasonably expect a discount in share value with respect to possible future appreciation of Company share value after the valuation date. The hypothetical buyer would be in the same position as a buyer of Safeco stock on the open market, subject fully to capital gains, or not, depending on the unknown future of Safeco stock's value, not the fixed historical appreciation existing on the valuation date.

Finally, the built-in gains tax is a contingent liability that would not be booked in financial statements under generally accepted accounting principles.

The fair market value of one share of common stock in D.R. Fisher Company as of March 10, 2000, based on a determination of adjusted book value (including a discounted reduction for the potential or built-in capital gains liability) and the capitalization of dividends,

and after applying a 12% discount for lack of control and a 25% discount for lack of marketability, is in the range of $12,433 to $13,164.

## III. CONTENTIONS OF LAW

### A. The Plaintiff Bears the Burden of Proof

This is a tax refund suit, a *de novo* proceeding in which the plaintiff has the burden of proof, including both the burden of going forward and the burden of persuasion, that she overpaid the gift tax at issue. *Lewis v. Reynolds*, 284 U.S. 281 (1932). The plaintiff also must first rebut the presumption of correctness associated with any determination made by the Commissioner of the Internal Revenue. *United States v. Janis*, 428 U.S. 433, 440-41 (1976). Plaintiff then must prove the exact dollar amount of the alleged overpayment to which it claims a refund. *Id.*; *Gingerich v. United States,* 77 Fed. Cl. 231, 240 (2007). It is well-settled that a tax refund suit is not a quasi appellate review of the administrative action by the Internal Revenue Service. The taxpayer must prove the correct amount of the tax and resulting overpayment. *Hearst Corp. v. United States*, 28 Fed. Cl. 202, 230 (1993), *vacated*, 36 F.3d 1116 (Fed. Cir. 1994).

Plaintiff's reliance on *Continental Water Co. v. United States*, 231 Ct. Cl. 717 (1982), is misplaced. The alleged principle that the IRS presumption of correctness depends on the trial strategy in a *de novo* proceeding, *i.e.*, rely on the IRS expert/engineer's valuation report or forfeit the presumption of correctness, is not supported by decades of jurisprudence that follow the *Continental* decision. The alleged principle appears only in the trial judge's recommended opinion, not in the Court of Claims opinion (the appellate court predecessor of the Court of Appeals for the Federal Circuit). Pltf. Memo.[1] 20-21. The alleged principle in *Continental* is contrary to precedent, has not been cited as precedent since, and is contrary to the same trial judge's opinion in *Hearst*, 28 Fed. Cl. at 230 (IRS valuation engineer report not used at trial). The plaintiff's apparent conclusion that the burden of proof switches to the government for the same reason is not supported even by the *Continental* opinion. Plf. Memo. 21. The burden of proof in a tax refund suit rests with the taxpayer. *Lewis v. Reynolds*; *United States v. Janis; Abrahamsen v. United States*, 228 F.3rd 1360 (Fed. Cir. 2000).

With respect to the application of Internal Revenue Code § 7491(a), the United States' objective at trial is to demonstrate that plaintiff's expert and rebuttal expert will not present "credible" evidence and plaintiff's refund claim will be denied regardless of the burden of proof. Even if the Court rejected the United States' valuation, the Court may undertake its own valuation and is not bound to accept the plaintiff's. *Estate of Josephine T. Thompson v. Commissioner*, --- F.3d ----, 2007 WL 2404434 *3 (2nd Cir.) ("the burden of disproving the taxpayer's valuation can be satisfied by evidence in the record that impeaches, undermines, or

---

1/ References to "Pltf. Memo." are to Plaintiff's Memorandum of Contentions of Fact and Law filed on August 6, 2007.

indicates error in the taxpayer's valuation").

B. The Court May Accept, Reject or Modify Expert Opinions

It is well-settled that in a bench trial, the judge may accept, reject, or modify the opinions of experts offered by either or both parties. *Helvering v. Natl. Grocery Co.*, 304 U.S. 282, 294 (1938); *Pitcairn v. United States*, 212 Ct. Cl. 168, 547 F.2d 1106, 1126 (1976) (Nichols concurring) ("It is normal in valuation proceedings to reject the testimony of retained experts on both sides and to award something in between. The trier of fact is not helpless if the testimony is all unacceptably high or low"); *Estate of Josephine T. Thompson*, slip. op. at 9-10; *Hearst*, 28 Fed. Cl. at 215, 216. *See Caracci v. Commissioner*, 456 F.3d 444 (5th Cir. 2006); *Alpha Medical, Inc. v. Commissioner*, 172 F.3d 942, 948 (6th Cir. 1999).

It is the United States' contention that the Court may reject plaintiff's witnesses' expected testimony that the fair market value of the assets of the Company should be reduced by 100% of the potential or built-in capital gains tax that would be due if the Company was liquidated on the date of gift. Furthermore, the Court may find that discounts for lack of marketability and lack of control are appropriate but reduce the discounts recommended by plaintiffs' witnesses.

The United States further contends that the Court may accept fully, reject fully or partially, or modify the conclusions as to value presented by the United States' expert witness, Dan Hanke.

C. The Gift Tax is Imposed on the Fair Market Value as of the Date of Gift

The tax at issue is the gift tax imposed by § 2501 of the Internal Revenue Code ( 26 U.S.C.). The amount of the gift subject to this tax is determined pursuant to § 2512(a) as follows:

> If the gift is made in property, the value thereof at the date of gift shall be considered the amount of the gift.

The Treasury Regulations, in turn, provide guidance as to the determination of value for the purposes of the gift tax, Treas. Reg. § 25.2512-1:

> Section 2512 provides that if a gift is made in property, its value at the date of the gift shall be considered the amount of the gift. The value of the property is the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts. . .

The regulation also provides that "[A]ll relevant facts and elements of value as of the time of the gift shall be considered." *Id.*

Further administrative guidance for determining fair market value is found in Revenue Ruling 59-60, 1959-1 C.B. 237, *Appendix*. This administrative guidance is accepted by the courts as authoritative. *Okerlund v. United States*, 365 F.3d 1044, 1050 (Fed. Cir. 2004).

It is the United States' position in this case that the expected testimony of plaintiff's expert witnesses Tony Leung and James Rabe does not accurately describe the fair market value of a single share of the Company's stock on the date of gift as the expected testimony will fail to take into account all relevant facts and elements of value as of the March 10, 2000, the date of gift. Specifically, the plaintiff contends that the fair market value of the assets of the Company

should be reduced by 100% of the potential or built-in capital gains tax that would be due if the Company was liquidated on the date of gift. This contention fails to take into account the financial history of the Company that would inform a willing buyer that on March 10, 2000, there existed little likelihood that any of the assets held by the company on that date would be sold in the foreseeable future. Similarly, plaintiff's contentions regarding the magnitude of discounts for lack of control and lack of marketability fail to take into account all relevant facts and elements of value as of the valuation date.

D. The Potential or Built-in Capital Gains Tax Liability for D.R. Fisher Company Should be Discounted Before Reducing the Asset Value of the Company on the Date of Gift

The practice of reducing asset value of a corporation for valuation purposes is a relatively recent phenomenon. *Esienberg v. Commissioner*, 155 F.3d 50 (2d Cir. 1998). Prior to the repeal of the General Utilities Doctrine by the Tax Reform Act of 1986, Pub. L. No. 99-514, § 631, 100 Stat. 2085, 2269, *Appendix*, corporations recognized no gain or loss on distribution of its assets in kind in a partial or complete liquidation, and a corporation could liquidate or dissolve without becoming liable for corporate gains tax, even if the primary motivation was tax avoidance. *Id.* 54-55. Hence, no reduction for potential or built-in gains was allowed for valuation purposes.

The Second Circuit concluded in *Eisenberg* that the capital gains tax liability inherent in the corporation's appreciated property would be incurred in the future and must be taken into account for valuation purposes. Contrary to plaintiff's contention, the Second Circuit did not determine that a reduction equal to 100% of the potential capital gains tax should be taken. Pltf. Mem. 13. Rather, the Second Circuit referenced in its opinion a contemporaneous Tax Court decision that discounted, by 25%, the built-in capital gains liability of a closely held corporation.

*Eisenberg*, *id.* at 58, *citing*, *Estate of Davis v. Commissioner*, 110 T.C. 530, 550-52 (1998). The Internal Revenue Service subsequently acquiesced to *Eisenberg*. 1999-1 C.B. XIX, 1999 WL 33541682 (IRS ACQ). [2]

A recent Tax Court opinion, *Estate of Jelke v. Commissioner*, T.C.Memo. 2005-131 (2005), 2005 WL 1277407 (U.S. Tax Ct.), *appeal pending*, No. 05-15549-II (11th Cir.), follows the principles of *Eisenberg* and *Estate of Davis*. In *Jelke*, the entity to be valued is similar to the Company here, *i.e.*, a closely held corporation (CCC) the only activity of which was the holding and management of investments. CCC's investment objective was long-term capital growth. There was low asset turnover resulting in large unrealized capital gain. The decedent owned 3000 shares, a 6.44 percent interest in CCC. 2005 WL 1277407*2. the Tax Court agreed with the Commissioner's expert's approach "of discounting the built-in capital gain tax liability to reflect that it will be incurred after the valuation date." 2005 WL 1277407 *11. The full built-in gain liability was $51,626,884. The Commissioner's expert proposed discounting this contingent liability by $21,082,226, an amount representing the present value of the future tax liability. 2005 WL 1277407 *9.

A key factor in the Commissioner's expert's analysis was the low turnover rate of the assets held by CCC. The turnover rates ranged from 3.48% to 9.80% during the five years prior to the decedent's death. As noted above, the turnover rate for stock held by the Company was less than low, it was zero, for the five years prior to the date of gift. Based on an average annual

---

2/ In *Estate of Davis*, one of petitioner's experts (Shannon Pratt) agreed with the Commissioner's expert that a reduction of asset value equal to 100% of the built-in gain was not appropriate. 110 T.C. at 553. Mr. Pratt is cited as an authority by plaintiff's rebuttal expert, Mr. Rabe.

turnover rate of 5.95%, the Commissioner's expert assumed in *Jelke* a 16-year period for complete liquidation of security assets held on the date of death. Here, the United States' expert offered more conservative scenarios, a five-year holding period and a ten-year period.

The reasoning of the Tax Court in *Jelke* is very telling and worth reciting here as the facts of this case are strikingly similar, *Jelke*, 2005 WL 1277407 * 9 (emphasis added):

> A hypothetical buyer of CCC is investing in a composite portfolio to profit from income derived from dividends and/or appreciation in value. A hypothetical buyer of CCC is, in most respects, analogous to an investor/buyer of a mutual fund. The buyer is investing in a securities mix and/or performance of the fund and would be unable to liquidate the underlying securities. That is especially true here where we consider a 6.44-percent investor who, inherently, is unable to cause liquidation. In addition, **the record reveals that there was no intention of the trusts or the Jelke family shareholders to liquidate**. A hypothetical buyer of a 6.44-percent interest in CCC is in effect investing in the potential for future earnings from marketable securities. **A hypothetical seller of CCC shares likewise would not accept a price that was reduced for possible tax on all built-in capital gain knowing that CCC sells or turns over only a small percentage of its portfolio annually**. In that regard, the record reflects that CCC had a long-term history of dividends and appreciation, with **no indication or business plan reflecting an intention to liquidate**. In addition, as of the 1999 valuation date, one of the trusts holding CCC shares was designed so as not to terminate before 2019, and none of the CCC shareholders had sold or planned to sell their interests. **These factors belie the use of an assumption of complete liquidation on the valuation date or within a foreseeable period after the valuation date**.

Plaintiff here similarly is mistaken in arguing that a complete liquidation assumption is necessary to value the shares of the Company. Pltf. Mem. 11-15. The facts of this case do not support such an assumption. Not only did the Company have a long history of not selling its securities, the gifted shares constituted a minority interest (956 of 2000) and the recipients could

not force a liquidation, even if one assumed, without any factual basis, that the recipients would act in concert on this matter. The applicable Treasury Regulation also does not require such an assumption. Treas. Reg. § 25.2512-1. The hypothetical willing buyer and hypothetical willing seller both would know all the facts, including the Company's history of not selling any of its securities. The willing buyer might demand a full reduction for the potential capital gains but the willing seller would resist on the grounds that such a demand would be unreasonable given the Company's financial history.

The plaintiff's reliance on *Estate of Dunn v. Commissioner*, 301 F.3d 339 (5th Cir. 2002) is misplaced. Pltf. Mem. 13. That case involved the valuation of a 62.96% interest in a corporation. *Id.* at 346. The interest at issue here is a minority interest. The Fifth Circuit observed in the Estate of Dunn that the "liquidation of all assets assumption" is not required when valuing a minority interest, such as the gifted shares of the Company here. *Id.* at 353 n25.

To the extent that another Fifth Circuit opinion, *Estate of Jameson v. Commissioner*, 267 F.3d 366 (5th Cir. 2001), suggests that a court must always allow a reduction for the full amount of the capital gains tax liability, it is the government's position that the Fifth Circuit's position is incorrect and contrary to the weight of authority. The Fifth Circuit opinion, however, is more fact than principle driven, focusing on a disconnect between the evidence supporting continuation of the timber company rather than liquidation. *Id.* at 372. Contrary to plaintiff's suggestion, the Fifth Circuit did not decide that a discounting the future flow of capital gains taxes was not permitted and remanded the case for further proceedings. *Id.* The Fifth Circuit recognized the *Estate of Davis* decision permitting "some discount for built-in capital gains." *Id.* at 371.

It is clear that a 100% reduction in asset value for potential capital gains taxes is not required when valuing the shares of a corporation. The Second Circuit did not require such a reduction in *Eisenberg*. Plaintiff's expert, Mr. Leung, may testify that a hypothetical willing buyer might demand a complete reduction but such testimony would tell only half the story – the hypothetical willing seller would resist such a demand and be supported by the track record of the Company with regard to virtually never selling stock once purchased during its 77 year existence.

E. A 12% discount for lack of control is appropriate

It is recognized that a discount for lack of control (or minority interest) may be appropriate. *Okerlund*, 365 F.3d at 1050; *Godley v. Commissioner*, 286 F.3d 210, 214 (4th Cir. 2002); *Estate of Newhouse v. Commissioner*, 94 T.C. 193, 249 (1990). Whether a discount is appropriate, and the amount of any such discount are issues of fact. *Godley*, 286 F.3d at 215-216. The parties agree that a discount for lack of control is appropriate here.

The United States' expert will testify that he applied a 12% discount for lack of control to the determine the value of a single share of the Company's stock on the valuation date. He will testify that he identified comparable closed-end mutual funds investing in securities much like the Company. He compared the net asset values of the selected closed-end mutual funds and the trading prices to determine how the subject interests would sell if they were publicly traded. The results of this comparison indicated that the non-controlling interests of the closed-end funds were selling for approximately 12% less than their net asset value. As such, he selected a 12% discount for lack of control to apply to the Company.

Plaintiff's expert's report (Leung) did not breakout any specific discount for lack of

control but rather subsumed this discount in a total discount of 46%. Pltf. Mem. 15-20. Plaintiff's memorandum describes a process that suggests a lack of control discount of approximately 15% but does not clearly state a specific discount for lack of control.

F. A 25% discount for lack of marketability is appropriate

Courts have recognized that the lack of a ready market may tend to diminish the value of shares in a closely held corporation, making it appropriate to discount the fair market value of the stock. *Okerlund*, 365 F.3d at 1050; *Estate of Newhouse,* 94 T.C. at 249. As with the discount for lack of control, the size of any lack of marketability discount is a question of fact to be resolved by the fact-finder. The parties agree that a discount for marketability is appropriate here.

The United States' expert will testify that he applied a 25% discount for lack of marketability to the determine the value of a single share of the Company's stock on the valuation date. The Company has several characteristics that argue for a lower discount, perhaps 20%. The portfolio of the Company lacks diversification but exhibits less risk and volatility than the stock market in general. It has a significant dividend paying capacity. There is a strong tax motivation to continue paying out dividends to shareholders due to its status as a personal holding company. The portfolio has appreciated greatly over time and is very liquid.

A larger lack of marketability discount is suggested by other features of the company. The potential capital gain liability is one but this is counterbalanced by the Company's history of holding its investments for very long periods. The donees hold a minority interest (956 of 2000 shares) and thus cannot force a liquidation or diversification. Transfers of shares are subject to a "right of first refusal" by the other shareholders, but this restriction fails to establish any price or

time limitations.

Given all these facts, the United States' expert will testify that a 25% discount for lack of marketability is appropriate.

Plaintiff's memorandum suggests that its expert, Mr. Leung, is uncertain regarding the reasons for his suggested total discount of 46%. Pltf. Mem. 17-20. Having discussed a possible discount for lack of control of approximately 16%, plaintiff's memorandum states that Mr. Leung will testify that he applied a discount of 30% to 40% for lack of marketability. That does not seem to add up. The facts of this case do not support a discount for lack of marketability of 40%.

Moreover, the plaintiff apparently has not considered the inconsistency between a claim for a 100% reduction for potential built-in capital gains liability and the calculation of the discount for lack of marketability. The assumption of complete liquidation reduces the assets of the Company to cash. If that is so, the analysis to determine the lack of marketability discount must continue that assumption, not convert the holdings back to stock and then contend a larger discount for marketability is appropriate due to the stock holdings. Plaintiff's expert's discount analysis for lack of marketability should be rejected by the Court.

## IV. CONCLUSION

Application of the legal standards for determining fair market value to the facts and circumstances of D.R. Fisher Company as of March 10, 2000, support the United States' view that the value of a single share was within the range of $12,433 to $13,164 on that date. The gift tax owed by the plaintiff should be calculated using these values and the plaintiff's claim for refund should be denied in full.

Respectfully submitted,

s/Robert J. Higgins
ROBERT J. HIGGINS
U.S. Justice Dept., Tax Division
Court of Federal Claims Section
P.O. Box 26, Ben Franklin Station
Washington, D.C. 20044
Tel.: (202) 616-3423
FAX: (202) 514-9440

RICHARD T. MORRISON
Acting Assistant Attorney General

DAVID GUSTAFSON
Chief, Court of Federal Claims Section
G. ROBSON STEWART
Reviewer
Court of Federal Claims Section

Of Counsel

August 27, 2007

s/G. Robson Stewart