# ATTACHMENT B

# APPRAISAL REVIEW REPORT

**Taxpayer: Gisele C. Fisher**

**REVIEW OF CORPORATE ADVISORY SERVICES' APPRAISAL OF A MINORITY COMMON STOCK INTEREST IN**

# D.R. FISHER COMPANY

**As Of March 10, 2000**

**Prepared For:**

**Internal Revenue Service**
**Order #TIRWR-03-D-00002 Call No. 2**

November 5, 2003

**LEWIS OLDS**
& ASSOCIATES

EXHIBIT 24

**LEWIS OLDS & ASSOCIATES**
Business Appraisers • Financial Consultants

November 5, 2003

Mr. David Dalton
Appraisal Program Manager
Internal Revenue Service
1220 SW Third Avenue, Room 661
Portland, OR 97204

**Re: IRS Order No. TIRWR-03-D-00002 Call No. 2**
**Gisele C. Fisher - Re: D.R. Fisher Company**
**Appraisal Review Comments - Corporate Advisory Associates**
**Minority Common Stock Interest As of March 10, 2000**

Dear Mr. Dalton:

You have asked me to perform a review of an appraisal report prepared by Mr. Tony Leung of Corporate Advisory Associates, Inc. (CAA). Mr. Leung prepared a report on the *fair market value*, as of March 10, 2000, of a minority common stock interest in D.R. Fisher Company ("DRF" or "the Company"). The report was intended for gift tax reporting purposes.

The purpose of my review is to advise you of the reasonableness and appropriateness of CAA's appraisal report and the underlying support for their opinions. I understand that my comments may be used in determining additional gift taxes payable, if any, by Gisele C. Fisher, who made gifts of stock in DRF to various family members on March 10, 2000.

*Fair market value* is defined as the price at which property would change hands between a willing seller and a willing buyer, neither under compulsion to buy or sell, and both having knowledge of relevant facts. This standard assumes a cash or cash equivalent sale.

I have prepared this appraisal review report using standard valuation techniques and practices. The analysis, opinions and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practice*, promulgated by the Appraisal Foundation and endorsed by the American Society of Appraisers (ASA).

22922 N.E. 14th Street Sammamish, Washington 98074
Oregon Phone: (503) 646-3667 Oregon Fax: (503) 646-3228
Washington Phone: (425) 898-9863 Washington Fax: (425) 898-9624
E-Mail: lolds@lewisolds.com

The ASA has a mandatory reaccreditation program for all of its *Accredited Senior Appraisers*. I am in compliance with the requirements of that program. I was accredited in 1989 and I am reaccredited until 2009. I have no present or contemplated future interest in the subject property, or any other interest which might tend to prevent making a fair and unbiased appraisal opinion.

Based on my review procedures, which are described below, it is my opinion that:

- The appraisal report prepared by CAA has a deficiency in that it does not disclose the documents and information relied upon, contrary to the requirements of the Uniform Standards of Professional Appraisal Practice (USPAP). Also, no discussion was made regarding the general economic outlook, or the outlook for investments similar to those held by DRF.
- The appraisal method and technique used was limited to the Adjusted Net Asset Value Method. Little explanation was given by CAA about why they rejected other valuation methods, or whether their Net Asset Value Method was based on liquidation values or on some other standard of value.
- CAA reviewed a sample of Closed End Funds' Price/Net Asset Value ratios as part of their analysis in arriving at a discount for lack of control and lack of marketability. They offered reasonably clear empirical data to support their selected discount. However, CAA did not articulate a specific discount for lack of control and a separate discount for lack of marketability, arriving instead at a single Price/Net Asset Value ratio inclusive of provision for lack of marketability as well as lack of control.
- CAA offered no specific information for their selection of a discount for lack of marketability, other than reference to a standard set of empirical studies. The valuation report offered little explanation to relate the empirical study data to specific features of minority common stock interest in DRF.
- No discussion or consideration in the report was presented regarding past transactions or appraisals involving DRF stock, even though several previous transfers had been made, and Mr. Leung had prepared an appraisal report as of January 6, 1987, the date of Bennett Fisher's death.
- The valuation opinion reached by CAA with respect to their Price/Net Asset Value discount is not well supported, in my opinion, and it is an opinion with which I cannot concur.
- After applying what I consider to be more supportable discounts to the pro-rata value, I have calculated the *fair market value* of a minority common stock interest to be within a range of **$11,566 and $12,338 per share.**

**REVIEW PROCEDURES UNDERTAKEN**

In conducting this assignment, I have performed the following review procedures:

- Verified the Adjusted Net Asset Value of DRF as of March 10, 2000. I made a detailed review and analysis of the listing of marketable securities as presented in CAA's appraisal report, dated February 15, 2001, including testing the accuracy of the market prices described in the report;
- Reviewed CAA's appraisal report and verified the accuracy of their calculation of the net asset value of the 100 percent interest in DRF as of March 10, 2000.
- Reviewed Mr. Leung's previous appraisal report, dated August 14, 1987, wherein he appraised a 50 percent capital stock interest in DRF as of January 6, 1987, prepared for estate tax purposes, pertaining to the death of Bennett I. Fisher, Gisele Fisher's husband.
- Reviewed the calculations and discussion by CAA as to the fair market value of a minority common stock interest in DRF as of March 10, 2000;
- Reviewed the basis for valuation of a minority common stock interest in DRF as of March 10, 2000;
- Reviewed the reasonableness of CAA's selection of the Adjusted Net Asset Value method as the only method for valuation of interests in DRF;
- Reviewed the professional preparation of the CAA report, including adherence to Uniform Standards of Professional Appraisal Practice, the appraiser's supporting documentation and credibility of the factual information and documentation contained in the report;
- Reviewed the Price/Net Asset Value and marketability discount analyses, value of securities owned by DRF and other factual and opinion data in the report, with reference to supporting documentation and final conclusions. In the process of this review I performed my own analysis and I have provided a recommended percentage discount for lack of control and for lack of marketability. I have also commented on the reliability of the empirical studies cited in the context of recent Tax Court decisions.
- Reviewed the DRF Federal Income Tax Returns For 1997 through 2001;
- Reviewed the listing of marketable securities owned by DRF as of March 31, 2000, as presented in CAA's appraisal report, including spot-checking the securities' market prices as of the valuation date;
- Reviewed authoritative support for minority and marketability discounts cited by CAA in their report, including the following sources:

    - SEC Institutional Investor Study Report of the Securities and Exchange Commission, H.R. Doc. No. 64, Part 5, 92nd Cong., 1st Session. 2444-2456 (1971);
    - Gelman, Milton, "An Economist-Financial Analyst's Approach to Valuing Stock of a Closely Held Company", *Journal of Taxation*, June 1972, pp. 353-4.
    - Moroney, Robert E., "Most Courts Overvalue Closely-Held Stocks," *Taxes*, March 1973, pp. 144-56, and "Why 25 Percent Discount for Nonmarketability in One Valuation, 100 Percent in Another?" *Taxes*, May 1977, p.320.
    - Maher, J. Michael, "Discounts for Lack of Marketability for Closely-Held

Business Interests," *Taxes*, September 1976, pp. 562-71;

- Trout, Robert R., "Estimation of Discount Associated with the Transfer of Restricted Securities," *Taxes*, June 1977, pp. 381-85;
- "Discounts on Restricted Stock: The Impact of Illiquidity on Stock Prices", W.L. Silber, *Financial Analysts Journal*, July-August, 1991.
- Standard Research Consultants, "Revenue Ruling 77-287 Revisited," *SRC Quarterly Reports*, Spring 1983, pp. 1-3;
- Bruce A. Johnson and James R. Park, "Limited Partnership Discounts - Observations from the Secondary Market," *Business Valuation Review*, June 1997, pp. 59-64;
- Kathryn F. Aschwald, "Restricted Stock Discounts Decline as Result of 1-year Holding Period", *Business Valuation Update*, May 2000, pp. 1-5;
- Robert W. Baird & Company Studies, conducted under the direction of John D. Emory, published in *Business Valuation News* and *Business Valuation Review* during the period September 1985 through March 1997; and
- Willamette Management Associates Studies, conducted under the direction of Shannon P. Pratt, described in *Valuing A Business*, 2nd Edition 1989, pp. 250-255.

I reviewed additional minority interest and marketability discount information, including the following:

Houlihan, Lokey, Howard & Zukin's 1999 Annual Control Premium Study;
Bogdanski, John A., "Discounts and Premiums", Chapter 4, *Federal Tax Valuation*, Warren, Gorham & Lamont 1996, pp. 4-71 to 4-88;
Eric W. Nath, "A Tale of Two Markets," *Business Valuation Review*, September 1994, pp. 107-112;
Mergerstat Review, 1999 Edition, published by Mergerstat, a division of Houlihan, Lokey, Howard & Zukin;
Realty Stock Review, a bi-monthly publication of Charter Financial Publishing Corp.;
"Partnership Re-Sale Discounts Holding Their Own", *Partnership Spectrum*, pp 1-9, (May/June 1999); and
"Liquidations Put Pressure on Re-Sale Discounts", *The Partnership Spectrum*, pp 1-10, May/June 2000 issue.

## SUMMARY DESCRIPTION OF THE COMPANY

DRF is a family controlled Washington corporation, incorporated in 1923. Its purposes are to acquire, own, sell, lease, convey and mortgage real property, personal property and other investments as a personal holding company.

The Company was founded by O.D. Fisher and O.W. Fisher. Prior to January 6, 1987 the

Company had been owned 50/50 by Bennett I. Fisher and his brother George O. Fisher. They each held 1,000 common shares. Bennett died on January 6, 1987, leaving his shares to his wife and widow, Gisele C. Fisher. She subsequently made gifts of 22 shares of stock each to her two sons: George D. Fisher and William O. Fisher. As of March 10, 2000, the Company's ownership was as follows:

| Name | # of Shares | % Interest |
|---|---|---|
| Allie Fisher | 1,000 | 50 |
| Gisele C. Fisher | 956 | 47.8 |
| George D. Fisher | 22 | 1.1 |
| William O. Fisher | 22 | 1.1 |
| Total | 2,000 | 100.0 |

## Review of CAA Appraisal of DRF

Mr. Tony Leung of CAA prepared a report on February 15, 2001 of a minority common stock interest as of March 10, 2000, for gift tax reporting purposes. Based on his valuation, Mrs. Fisher made gifts of DRF stock on that day to various family members.

CAA stated in their Certification that their report was prepared in conformity with the Uniform Standards of Professional Appraisal Practice. These standards require, among others, that an appraiser must include in the analysis, when relevant, data regarding:

- the nature and history of the business;
- financial and economic conditions affecting the business enterprise, its industry, and the general economy;
- past results, current operations, and future prospects of the business enterprise;
- past sales of the capital stock or other ownership interests in the business enterprise being appraised;
- sales of similar business or capital stock of publicly held similar businesses;
- prices, terms and conditions affecting past sales of similar business equity; and
- economic benefit of intangible assets.

CAA did little to conform with these requirements. They did not include an economic analysis section, nor did they consider past transactions involving stock in the Company being gifted by Mrs. Fisher to her children. Also, no mention was made of a search by CAA for comparable sales or comparable publicly traded companies. The only search for public company information

had to do with finding a basis for a minority discount among publicly traded Closed End Investment Funds. In addition, no mention was made of the 1987 appraisal which Mr. Leung prepared when he was a principal of Management Advisory Services, Inc.

Standards Rule 10-2 requires that each written business valuation report must be prepared in accordance with one of the following options and prominently state which option it used: Appraisal Report or Restricted Use Appraisal Report. CAA did not do this.

Standards Rule 10-2 also requires the Appraisal Report to state the identity of the client and intended users, by name or type. This was not done.

Generally, CAA followed the broad requirements of USPAP, but I found that the report did not provide enough detail to provide the reader with adequate information about the analysis performed, as well as about the context in which the valuation was being made. At a minimum, CAA should have listed the documents and information which they reviewed and relied upon in arriving at their opinion.

## Discussion Of CAA Valuation Method

CAA based their appraisal opinion upon one valuation approach: the adjusted net asset (NAV) method.

Under the NAV method, they applied a single discount to the pro-rata fair market value of stockholders' equity, using a discount derived from Price/Net Asset Value ratios among Closed End Investment Companies. They derived their data from *Morningstar Closed-End Funds* as well as *Barrons Weekly* and Standard & Poor's *Stock Guide* - March 2000.

I concur with CAA's choice of appraisal method. It is consistent with the nature of the assets owned by DRF. I also concur with CAA's estimate of DRF's overall Net Asset Value. I spot-checked the accuracy of the pricing and valuation of each security in the portfolio and found them to be accurate.

My major points of disagreement are with their calculation of deferred capital gains taxes without discounting for their non-current, contingent status, and their selection of an overall Price/Net Asset Value ratio of 0.54 times in valuation of a minority common stock interest.

## NET ASSET VALUE DISCUSSION

CAA presented a detailed statement of Adjusted Net Asset Value as of March 10, 2000. Mr. Leung, the report author, also presented a schedule of the market value of each security, and he presented a narrative description of assets as of the valuation date. The total value of assets, which consisted of a portfolio of marketable stocks, cash, money market funds and two parcels of real property, was $46,843,929 as of March 10, 2000. Liabilities listed were accounts payable of $494 and a $46,000 note payable to the Trustees of M.B.F., the identity of which was not disclosed. In addition there was an amount of $283,136 in income tax refunds receivable, which Mr. Leung listed among liabilities, although it was actually an asset.

Mr. Leung deducted $15,859,390 from the Adjusted Book Value of the Company to allow for deferred income taxes on the unrealized holding gain on the Company's assets, calculated at a federal tax rate of 35 percent on a gain of $45,312,542 ($46,843,929-$1,531,387 book value). After making this deduction the Adjusted Net Asset Value was $31,221,181.

I have no disagreement with Mr. Leung's calculation of Adjusted Net Asset Value, although I disagree with deducting the deferred taxes on the gain with no discounting for their contingent and non-current nature.

CAA applied a Price/Net Asset Value discount of 54 percent to the Adjusted Net Asset Value as of March 10, 2000, leaving an indicated aggregate minority interest fair market value of $16,859,438. This discount was a combination of a minority discount based on publicly traded closed end funds, and a marketability discount based on various empirical studies. [1]

I reviewed Mr. Leung's calculations as well as the sources of his data for the Price/Net Asset Value ratio derived from Closed End Funds.

I consider his ratios based on Closed End Funds to be reasonably well supported, although his sample is quite small. In the high technology area he presented only two comparable funds. Among Capital Appreciation and Income and Capital Appreciation Funds, he used a sample which contains at least 65 percent equities, primarily US based companies and which ostensibly

---

[1] Study made by FMV Opinions, Inc., as reported in "Strategies for Obtaining the Largest Valuation Discounts", Hall and Polacek, *Estate Planning*, Jan-Feb. 1994;
"The value of marketability as Illustrated in Initial Public Offerings of Common Stock", John D. Emory, *Business Valuation Review*, various issues since September 1985. In his December 1999 report as of October 13, 1999, Mr. Leung added reference to two more studies: "Discounts of Stocks of Closely Held Corporations", by Steven E. Bolten, in *Trusts & Estates*, December, 1990, and "Discounts on Restricted Stock: The Impact of Illiquidity on Stock Prices," by W.L. Silber, in *Financial Analysts' Journal*, July-August 1991.

excludes non-diversified funds. Mr. Leung did not describe his Price/Net Asset ratios to be a minority discount. Instead, he used these ratios in conjunction with reference to studies on marketability discounts to justify his overall Price/Net Asset Value Ratio of 54 percent.

Normally in an appraisal of a closely held business or investment holding company, one sees a discount for lack of control and a second discount for lack of marketability. Mr. Leung did not do this. He did not make reference to any of the studies which appraisers normally use for identifying discounts for lack of control. Nor did he describe the discount derived from the Closed End Mutual Funds as being a minority discount or discount for lack of control. He simply cited the information.

Assuming Mr. Leung selected a Price/Net Asset Value ratio of approximately 85 percent, his implied minority discount was 15 percent and his implied marketability discount was approximately 36.5 percent. This is consistent with the data he presented on Price/Net Asset Value ratios from Closed End Mutual Funds. The calculation is as follows:

| | |
|---|---|
| Pro-Rata Value | 100.00 % |
| Minority Discount (15.0%) | -15.00 |
| Marketable Minority Interest Value | 85.00 |
| Marketability Discount (36.47%) | -31.00 |
| Fair Market Value | 54.00% |

The implied marketability discount has been calculated in series with the minority discount. In other words, the marketability discount has been applied to the net marketable minority interest value. Thus the discount does not add up in simple summation. The overall Price/Net Asset Value ratio of 54 percent must be calculated serially.

I consider 15 percent to be reasonable for valuation of a minority interest in the Company as of March 10, 2000, given the data from Closed End Funds.

I do not consider a marketability discount of 36.47 percent to be appropriate, however.

The assets held by DRF are for the most part marketable securities. Their historical dividend yield trend in market value supports the hypothesis that DRF was indeed like a Closed End Fund. But for the fact that its shares did not trade on an exchange, it was similar in most other respects to a closed end fund. In his report, Mr. Leung acknowledges that DRF's dividend yield, which averaged 5.36 percent in March 2000, was higher than all of the Closed End Funds which he used as comparables. In fact, the dividend yield of his chosen Closed End Funds ranged from

1 to 2 percent for the diversified stock funds and 2 to 4 percent for those concentrated in the financial sector. Normally a high dividend yield would lend itself to a higher value. It is not clear from Mr. Leung's report that he had drawn that or some other conclusion.

Mr. Leung highlighted the portfolio of DRF as being less diversified and smaller in dollar size than that of his chosen Closed End Funds. While it is true that the portfolio was considerably smaller than the sample of Closed End Funds used by Mr. Leung, the major stocks within the portfolio had all performed with stable profitability for many years prior to the valuation date. In my analysis of the companies in DRF's portfolio, I have concluded that the lack of diversification was offset by the stability and lack of volatility in the three major stocks of the portfolio: Weyerhaeuser, Safeco and Fisher Companies, Inc. The charts below show that all three stocks had experienced a declining trend in their price during 1999, but in March, 2000, the picture was more optimistic. Compared to many companies at that time, these three showed reasonable stability.




**Figure 1** - Safeco Stock Price Trends: Jan-Dec 2000




**Figure 2** - Fisher Communications Stock Price Trends: Jan-Dec 2000




**Figure 3** - Weyerhaeuser Company Stock Price Trends: Jan-Dec 2000

Mr. Leung also highlighted DRF's lack of trading, the high built-in gain of its portfolio and its lack of ready marketability. From his discussion, it appears that the lack of trading is due to the high built-in gains issue, so there are really only two substantive reasons for Mr. Leung's choice of a 0.54 times price-to-value ratio rather than the 0.85 times ratio indicated by his sample of Closed End Funds.

Since Mr. Leung deducted a provision for the built-in gains taxes, he has dealt with that portfolio risk. It is double-counting to use the built-in gain liability as a justification for a high marketability discount. If a buyer is compensated for the future income tax liability associated with the built-in gains, it does not seem reasonable to increase the marketability discount for the future tax liability as well. That risk or cost has already been accounted for.

This leaves only the issue of non-marketability to support Mr. Leung's high discount.

Mr. Leung's sources of authority for his marketability discount include Mr. Lance Hall and Timothy Polacek of FMV Opinions, Inc. The authors of this article, entitled "Strategies for Obtaining the Largest Valuation Discounts", emphasized that discounts must be based on specific facts and circumstances. Among other points made in the article, they concluded that a marketability discount for a closely held entity, based on empirical studies, should take size as well as other factors into consideration. The following paragraphs are taken from that article.

> "**Lack of marketability discounts.** The data that is frequently referred to in determining the discount for lack of marketability begins with the 1971 Institutional Investor Study Report, published by the Securities and Exchange Commission ("SEC Study"). This study

reviewed discounts in connection with transactions involving securities that were restricted from trading on the public exchanges under Rule 144 of the Securities and Exchange Act of 1934. Based on more than 300 transactions, the SEC Study found that restricted stock transactions occurred at prices that were, on average, **24% less** than the prices for similar blocks of unrestricted stock."

According to the SEC Study, three variables influence the size of the discount for lack of marketability: (1) the annual sales of the corporation, (2) the level of earnings, and (3) the stock exchange on which the corporation's stock was bought and sold. The SEC Study indicates that the lack of marketability discount was highest (30%-40%) for companies with less than $5 million in sales, but decreased (10%-20%) for companies with more than $5 million in sales. For companies ranked by earnings, lack of marketability discounts were highest (20%-30%) for companies having less than $1 million in earnings and lowest (10%-20%) for companies with earnings over $1 million. Similarly, lack of marketability discounts were greatest (30%-40%) among corporations whose stock was traded over the counter, but that did not report their financial information on a regular basis. Lower discounts applied to stock traded on the American (20%-30%) and New York (10%-20%) Stock Exchanges. The SEC Study clearly demonstrates that the three variables listed above influence the magnitude of lack of marketability discounts.

In an update to the SEC Study, FMV Opinions, Inc., a business valuation firm in Irvine, California, examined more than 100 restricted stock transactions from1979 through April 1992 ("FMV Study"). The FMV Study corroborates the conclusions of the SEC Study that the size of the discount is often a function of the size of the subject company's revenues, earnings, and the exchange on which the unrestricted stock was traded. Moreover, the mean discount of the SEC Study (24%) was very similar to the overall mean discount of the FMV Study (23%). The FMV Study also reported that for the period May 1991 through April 1992, restricted stock transactions occurred at prices that were 21% less than those for similar blocks of unrestricted stock.

In addition to the three variables examined in the SEC Study, the FMV Study identified three other variables as influencing the size of the discount for lack of marketability: (1) the dollar value of the block of stock, (2) the percentage size of the block of stock being sold, and (3) the market value or capitalization of the corporation whose stock was being bought and sold. According to the FMV Study, the lack of marketability discount was highest (20%-30%) for blocks of stock valued at less than $10 million, but decreased (10%-20%) as the size of the block exceeded $10 million. For blocks of stocks that exceeded 10% ownership, discounts were higher (20%-30%) than for blocks representing

less than 10% ownership. Lack of marketability discounts appear to increase as the capitalization of the corporation decreases below $50 million (30%-40%) compared to corporations with capitalization's in excess of $100 million (10%-20%).

The latest 12-month data (May 1991 to April 1992 and involving 17 restricted stock transactions) of the FMV Study suggests that discounts are shrinking for restricted stock transactions. The reason for the drop in discounts for the latest period may be that more transactions now occur under Rule 144(a), which relaxes some of the restrictions on such transactions, thus making the restricted securities more marketable.

The SEC Study and FMV Study's 13-year and latest 12-month results conclude that the average discount from the publicly traded price was approximately **20% to 25%**. These figures coincide with the mean discounts allowed by the Tax Court during the same period, suggesting that the court may be well informed regarding the empirical data that is available to support its decisions."

In short, at least one study cited by Mr. Leung would appear to support a discount of much less than the 30 to 40 percent range he concluded to in his report.

A more recent article and study by FMV Opinions corroborated their initial findings. [2] A discount of 20 to 25 percent appears to be more in line with the SEC data as well as FMV Opinion's data on investment firms and financial institutions.

Another authoritative source of data cited by Mr. Leung was the series of studies done by John Emory on prices paid for stock in companies before and after an Initial Public Offering (IPO). Mr. Emory has found sizeable discounts in the companies he has tracked - over 46 percent.

According to Messrs. Hall and Robak, and also in my own review of Mr. Emory's data, there is a built-in bias inherent in the Pre-IPO transaction data. This is the fact that "to put it as briefly as possible, many of the transactions in the studies either take place too far from the initial public offering date or are not arm's-length transactions. The problem with transactions taking place too far prior to the IPO is that the typical pre-IPO firm goes through a radical transformation, in terms of products and services offered, customers served, depth and breadth of management, and

[2] "Bringing Sanity to Marketability Discounts: A New Data Source", by Esben Robak and Lance Hall, in *Valuation Strategies*, July/August 2001.

other factors. Furthermore, the pre-IPO studies have a successful IPO bias that drives the presumed average discount up for unregistered shares. The Rule requires a holding period of 1 year currently (under the original version of Rule 144 the holding period was 2 years). After the initial holding period, unregistered securities can be sold only by complying with certain"dribble out," or volume limit, provisions of the Rule. According to these provisions, the total amount of securities sold in any three-month period, to qualify for the exemption, cannot exceed the greater of one percent of the total number of the company's outstanding shares or the average weekly reported trading volume during the four weeks preceding such sale. Furthermore, the issuer has to have filed all reports (financial and other) required by the SEC and the seller of the restricted stock has to comply with the manner of sale and notice requirements of the Rule." [3]

These significant shortcomings cast doubt on the relevance of the pre-IPO studies for determining lack of marketability discounts for private equity.

Finally, there exists a study published annually by Partnership Profiles, Inc. in their magazine, *Partnership Spectrum*, which documents transactions involving minority interests in limited partnerships which trade on an informal market set up by a group of brokers. This study, details of which are highlighted on Table II attached to this report, shows that for equity interests in 27 debt-free partnerships which make regular distributions, the discount from the appraised value of the assets was 25 percent in 1999. Mr. Leung did not make any reference to this study, in spite of it being used by many appraisers.

Regarding the **marketability discount**, I have concerns about the Pre-IPO studies cited by CAA. Mr. Leung suggest that a marketability discount of **30 to 40 percent** was reasonable for DRF, based on a 34.2 percent average of seven restricted stock studies and the Pre-IPO studies of John Emory and Willamette Management Associates, which averaged approximately 45 percent.

As I stated above, there is a built-in bias to the Pre-IPO studies which should be considered before relying too heavily on them. And within the seven restricted stock studies, there is also a bias and a problem, as pointed out by Mr. Robak and Mr. Hall:

> The studies listed above [the same studies cited by CAA] were mostly performed on small samples of restricted stock transactions. Also, most of the studies listed in the table provide little or no detail about how the discount varies around the average. However, the

[3] Robak and Hall , *op. cit.*

most comprehensive of these studies, the Institutional Investor Study, does provide some detail: the discounts in this study tended to be higher for transactions involving companies with lower revenues and net income, and for companies traded in the over-the-counter market. Common for all the restricted stock studies, however, is the fact that since the underlying data has never been made public, it is impossible to verify any of their conclusions. Moreover, the average discounts in most of the older studies are contradicted by studies published in academic journals. [4] Furthermore, even if these studies were not contradicted by more rigorous academic studies, the use of an average provides little insight into what an appropriate discount should be for a specific interest. In other words, it begs the question, "Is the subject asset better or worse than the average?" Without the underlying data, it is literally impossible to know. [5]

Mr. Leung's choice of empirical studies did not apply particularly well to the subject common stock interest, and the studies they cited have been shown to be biased.

Moreover, the marketability discount which Mr. Leung selected in his previous appraisal of DRF in 1987 was only 20 percent. There was no discussion in the current report or comparison to that valuation to justify a higher discount in 2000.

### ALTERNATE VALUE

CAA has suggested that a willing buyer and a willing seller would agree on a price per unit of DRF which is equal to 54 percent of the underlying after-tax net asset value. I consider this to be an excessive discount, given the liquidity of its assets and the recent findings on marketability discounts as described by FMV as well as more recently by Dr. Mukesh Bajaj et al. [6]

In my opinion, based on the factors I reviewed and discussed above, I consider the following values to reasonably represent the range within which *fair market value* of Mrs. Fisher's interests in DRF fell as of March 10, 2000, the valuation date:

---

[4] See, for example, *Equity Ownership Concentration And Firm Value: Evidence From Private Equity Financings*, Wruck, K. H., Journal of Financial Economics 23, 3-28, 1989; and *Market Discounts And Shareholder Gains For Placing Equity Privately*, Hertzel, M. and R. L. Smith, Journal of Finance 48, 459-485, 1993.

[5] Robak and Hall , *op. cit.*

[6] "Firm Value and Marketability Discounts" by Mukesh Bajaj, David J. Denis, Stephen P. Ferris & Atulya Sarin, Journal of Corporation Law, 27 (Fall, 2001): 89-115.

| Description | | Low | | High |
|---|---|---|---|---|
| Net Asset Value | | $47,080,571 | | $47,080,571 |
| Reserve For Deferred Taxes | | (10,793,634) | | (10,793,634) |
| Adjusted Net Asset Value | | 36,286,937 | | 36,286,937 |
| Discount for lack of Control | 15% | (5,443,041) | 15% | (5,443,041) |
| Marketable Minority Interest Value | | 30,843,896 | | 30,843,896 |
| Discount For Lack of Marketability | 25% | (7,710,974) | 20% | (6,168,779) |
| Aggregate Fair Market Value | | $ 23,132,922 | | $ 24,675,117 |
| Value Per Share (2,000 Total Shares) | | **$ 11,566.46** | | **$ 12,337.56** |

CAA's value, by comparison, was $8,430, reflecting a Price/NAV ratio of 0.54

The reserve for deferred taxes has been calculated at a 35 percent federal tax rate, the same as was used by CAA. But I discounted the calculated tax liability of $15,859,390, using a discount rate of 8 percent, over an assumed holding period of five years. This discount, which amounts to approximately 32 percent, provides for what I consider this liability to be: non-current and contingent on future events which might or might not occur. The discount rate of 8 percent is based on rates of return generated by closed end funds and Investment Companies, as tracked by Ibbotson Associates in their Cost of Capital Yearbook, 2001 edition. The holding period is arbitrary, but it reflects the fact that between 1987 and 2000, a span of 13 years, the composition of the portfolio held by DRF had changed very little, particularly with respect to the blocks of stock in Safeco Corporation, Weyerhaeuser Company and Fisher Companies Inc., which showed no change.

My value for a minority common stock interest is derived from applying a **15 percent minority interest discount** and a **20 to 25 percent marketability discount** to the pro-rata net asset value of DRF as of March 10, 2000. In my opinion, this value is one which reflects the reality of DRF as a family controlled holding company in early 2000, and the nature and liquidity of the assets held by DRF. Together the two discounts reflect a Price/NAV ratio range of 0.64 to 0.68.

My calculations are presented on Table I attached to this report, with data for the Closed End Funds on Table II.

Please contact me if you require additional information or assistance.

Very truly yours,

**LEWIS OLDS & ASSOCIATES**

Lewis D. Olds, CPA, ASA

enclosures

# APPENDIX A

# FINANCIAL & VALUATION TABLES

LEWIS OLDS
& ASSOCIATES

# Table I

## D.R. Fisher Company

### Comparison of Stock Valuations - March 10, 2000

| | Per CAS | | Per LO&A | | | |
|---|---|---|---|---|---|---|
| | Discount | Value | Discount | Value | Discount | Value |
| **Net Asset Value Method** | | | | | | |
| Market Value of Assets | | 47,127,065 | | 47,127,065 | | 47,127,065 |
| Less: Book Value of Liabilities | | 46,494 | | 46,494 | | 46,494 |
| Net Asset Value | | 47,080,571 | | 47,080,571 | | 47,080,571 |
| Less Reserve For Deferred Taxes on Gain | | (15,859,390) | | (10,793,634) | | (10,793,634) |
| Adjusted Net Asset Value | | 31,221,181 | | 36,286,937 | | 36,286,937 |
| Discount For Lack of Control | 15.00% | (4,683,177) | 15.00% | (5,443,041) | 15.00% | (5,443,041) |
| Marketable Minority Interest Value | | 26,538,004 | | 30,843,896 | | 30,843,896 |
| Discount For Lack of Marketability | 36.47% | (9,678,567) | 25.00% | (7,710,974) | 20.00% | (6,168,779) |
| Aggregate Non-Marketable Minority Interest Value | | 16,859,437 | | 23,132,922 | | 24,675,117 |
| Fair Market Value Per Share (2,000 Shares O/S) | | **8,430** | | **11,566** | | **12,338** |

# Table II

# D.R. Fisher Company

## Valution Ratios For Selected Closed-End Investment Companies

**As of March 24, 2000**

### CIC's Selected By Corporate Advisory Associates

| | Ticker Symbol | Common Shares (000) | Type | Total Asset Value (Millions) | 3/3/00 Price/ Share Per Stock Guide | Price/NAV Per Stock Guide | Dividend Yield | Built-In Gain As % Of Asset Value | Comments |
|---|---|---|---|---|---|---|---|---|---|
| Adams Express | ADX | 53,204 | ICA | 2,823.8 | $ 37.38 | 0.84 | 1.0% | 49% | Diversified |
| Blue Chip Value Fund | BLU | 16,740 | ICA | 175.8 | $ 8.25 | 0.89 | 10.7% | 10% | Diversified |
| Gabelli Equity Trust | GAB | 106,479 | CA | 1,503.6 | $ 12.13 | 0.95 | 0.0% | 47% | Non-diversified |
| General American Investors | GAM | 26,219 | CA | 1,318.4 | $ 39.38 | 0.88 | 1.2% | 45% | Diversified |
| Liberty All-Star Equity Fund | USA | 94,998 | CA | 1,441.8 | $ 11.19 | 0.77 | 0.0% | 27% | Diversified |
| Morgan Grenfell SmallCap | MGC | 9,802 | CA | 155.9 | $ 16.38 | 0.84 | 0.0% | 30% | Diversified |
| Royce Value Trust | RVT | 35,071 | CA | 552.9 | $ 13.81 | 0.84 | 9.9% | 20% | Diversified |
| Salomon Brothers Fund | SBF | 94,608 | CA | 1,820.0 | $ 19.75 | 0.94 | 8.0% | 32% | Diversified |
| Tri-Continental Corporation | TY | 125,234 | ICA | 3,193.5 | $ 25.50 | 0.77 | 1.4% | 28% | Diversified |
| Zweig Fund | ZF | 60,136 | CA | 733.5 | $ 10.00 | 0.82 | 0.0% | | |
| D.R. Fisher Company | | 2 | | 47.0 | | | 5.4% | 96% | |
| | | | | **Average** | | **0.85** | 3.2% | 32% | |
| | | | | **Median** | | **0.84** | 1.2% | 30% | |

### Other CICs

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ACM Managed Dollar Income | ADF | 22,003 | ICA | 198.0 | $ 9.00 | 0.98 | 13.3% |
| ACM Managed Income Fund | AMF | 22,818 | ICA | 141.2 | $ 6.19 | 1.11 | 13.6% |
| Alliance All-Mkt Adv Fund | AMO | 2,508 | CA | 104.7 | $ 41.75 | 0.74 | 11.1% |
| Bergstrom Capital | BEM | 1,000 | ICA | 269.3 | $ 269.25 | 0.91 | 0.0% |
| Bexil Corp | BXL | 762 | ICA | 7.0 | $ 9.25 | 0.72 | 10.8% |
| Blackrock High Yield Trust | BHY | 6,307 | CA | 78.4 | $ 12.44 | 0.96 | 13.0% |
| Central Securities | CET | 16,851 | CA | 571.9 | $ 33.94 | 0.79 | 0.8% |
| Chartwell Div & Inc. Fund | CWF | 15,537 | CA | 166.1 | $ 10.69 | 0.82 | 11.6% |
| Conseco Strategic Income Fund | CFD | 6,735 | CA | 66.5 | $ 9.88 | 0.81 | 13.2% |
| Debt Strategies Fund | DBS | 31,425 | ICA | 184.6 | $ 5.88 | 0.83 | 13.4% |
| Debt Strategies Fund II | DSU | 62,610 | ICA | 442.2 | $ 7.06 | 0.83 | 13.6% |
| Debt Strategies Fund III | DBU | 11,010 | CA | 95.0 | $ 8.63 | 0.94 | 13.2% |
| DLJ High Yield Bond Fund | DHY | 44,007 | ICA | 349.3 | $ 7.94 | 1.03 | 12.5% |
| Duff/Phelps Util Income Fund | DNP | 205,714 | ICA | 1,812.9 | $ 8.81 | 1.00 | 8.9% |
| Engex Inc | EGX | 977 | CA | 34.2 | $ 35.00 | 1.09 | 0.0% |
| Equus II Inc | EQS | 4,954 | CA | 50.5 | $ 10.19 | 0.63 | 0.4% |
| Global Income Fund | GIF | 4,939 | ICA | 22.2 | $ 4.50 | 0.78 | 13.3% |
| Mass. Mutual Part'n Inv. | MPV | 9,333 | ICA | 91.0 | $ 9.75 | 0.85 | 9.8% |
| MFS Special Value Trust | MFV | 6,354 | ICA | 88.6 | $ 13.94 | 1.00 | 11.8% |
| Pacific American Inc. Shrs | PAI | 9,389 | ICA | 112.1 | $ 11.94 | 0.80 | 8.7% |
| PIMCO Comml Mtg Sec Tr | PCM | 11,010 | ICA | 136.2 | $ 12.38 | 0.96 | 9.6% |
| Petroleum & Resources | PEO | 13,841 | ICA | 445.5 | $ 32.19 | 0.88 | 2.6% |
| TCW Conv Sec Fund | CVT | 41,990 | ICA | 433.0 | $ 10.31 | 0.84 | 8.1% |
| Van Kampen Cv Sec | VXS | 3,242 | | 101.5 | $ 31.31 | 0.81 | 2.7% |
| Zweig Total Return | ZTR | 89,771 | | 555.5 | $ 6.19 | 0.81 | 0.0% |
| | | | | **Average** | | **0.88** | 9.6% |
| | | | | **Median** | | **0.84** | 12.5% |

# APPENDIX B

## REVIEWER'S CERTIFICATION

LEWIS OLDS
& ASSOCIATES

## CERTIFICATION STATEMENT

I certify that, to the best of my knowledge and belief:

- the facts and data reported by the reviewer and used in review process are true and correct.
- the analyses, opinions, and conclusions in this review report are limited only by the assumptions and limiting conditions stated in this review report, and are my personal, impartial and unbiased professional analyses, opinions, and conclusions.
- I have no present or prospective interest in the property interest that is the subject of this report, and I have no personal interest or bias with respect to the parties involved.
- my engagement in this assignment was not contingent upon developing or reporting predetermined results.
- my compensation is not contingent on an action or event resulting from the analyses, opinions, or conclusions, or the use of, this report.
- my analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.
- no one provided significant professional assistance to the person signing this report.

Lewis D. Olds, CPA, ASA
Valuation Consultant

**LEWIS OLDS**
**& ASSOCIATES**

# APPENDIX C

# CONTINGENT & LIMITING CONDITIONS

# CONTINGENT & LIMITING CONDITIONS

This valuation review opinion is subject to the following conditions:

1 Information, estimates, and opinions contained in this report are obtained from sources considered reliable; however, no liability for such sources is assumed by the appraiser.

2 The company and its representatives have confirmed to the appraiser that the information supplied to the appraiser was complete and accurate to the best of the company's employees' knowledge. Information supplied by management has been accepted without further verification as correctly reflecting the company's past results and current condition in accordance with generally accepted accounting principles, unless otherwise noted.

3 Possession of this report, or a copy thereof, does not carry with it the right of publication of all or part of it, nor may it be used for any purpose by anyone but the client without the previous written consent of the appraiser or the client and, in any event, only with proper attribution.

4 The assets, properties and business interests appraised are assumed to be free and clear of any or all liens or encumbrances unless otherwise indicated. Lewis Olds & Associates (LO&A) assumes that there is full compliance of all applicable federal, state, and local regulations and laws unless such non-compliance is stated herein.

5 Appraiser is not required to give testimony in court, or be in attendance during any hearings or depositions, with reference to the company being appraised, unless previous arrangements have been made.

6 This opinion of value may not be used by any other person or for any other purpose other than to whom it is addressed or named in the body of the report and only for the stated purpose of the appraisal, unless prior written consent by LO&A is given.

7 The various estimates of value and opinions presented in this report apply to this appraisal only and may not be used out of the context presented herein. This appraisal is valid only for the appraisal date or dates specified herein and only for the appraisal purpose(s) specified herein.

8 Environmental problems may exist in association with the company being appraised. LO&A's analysis does not give consideration to such problems, except as is disclosed in the appraisal.

LEWIS OLDS
& ASSOCIATES

# APPENDIX D

# REVIEWER'S QUALIFICATIONS

**LEWIS OLDS & ASSOCIATES**
Business Appraisers • Financial Consultants

# LEWIS D. OLDS, CPA, ASA

**Academic and Professional Credentials**

Bachelor of Science, Business Administration, Accounting, University of Minnesota, Minneapolis, 1976
MBA, Finance & Management Information Systems, University of British Columbia, Vancouver, 1978
Canadian Institute of Chartered Accountants, Chartered Accountant, British Columbia, 1979
Canadian Institute of Chartered Business Valuators, Chartered Business Valuator, 1984
American Society of Appraisers, Accredited Senior Appraiser, Business Valuation (Accredited since 1989) Reaccredited 2003
Oregon State Board Of Accountancy, Certified Public Accountant, 1996
Washington State Board Of Accountancy, Certified Public Accountant, 2001

**Position & Experience**

Valuation Consultant & Owner, Lewis Olds & Associates
Valuation Consultant & Member, Arnold & Olds, LLC, 1994-2000
Director, Business Valuation Dept., Lyon Skelte & Speirs, Inc., Lake Oswego, OR, 1992-1994
Director, Business Valuation Dept., Soberman Isenbaum & Colomby, Toronto, Ontario, 1987-1992
Senior Valuation Analyst, Thorne Ernst & Whinney, Toronto, Ontario, 1986-1987
Valuation Consultant, Lewis Olds & Associates, Vancouver, B.C., 1984-1986
Senior Valuation Analyst, Coopers & Lybrand, Vancouver, B.C., 1981-1984

Qualified as an expert witness on financial and valuation issues in District Courts of Oregon and Washington; U.S. District Court; and in Supreme Courts of Ontario and British Columbia; accepted as a business valuation expert by the Internal Revenue Service.

**Professional Affiliations**

American Society of Appraisers (Past President, Portland Chapter)
Washington Society of Certified Public Accountants
Oregon Society of Certified Public Accountants
American Institute of Certified Public Accountants
Canadian Institute of Chartered Business Valuators

**Seminars, Speeches, and Instruction**

Speaker, Oregon State Bar Association, May 1998 Continuing Legal Education Program, Business Law Section, on draftimg buy-sell agreements.
Speaker, Oregon State Bar Association, May 1996 Continuing Legal Education Program, Family and Juvenile Law Section, on the valuation of law practices in divorce litigation.
Speaker, Oregon State Bar Association, November 1993 Continuing Legal Education Program, Family and Juvenile Law Section, on the role of business appraisers in divorce litigation.
Seminar Instructor, November, 1988, Education Consortium of Chartered Accountants, Toronto, Ontario, on The Accountant's Role in Litigation
Seminar Instructor, March, 1983, Provincial Court Registrars' Training Program, Valuation of Business Assets

**Publications**

"Who Took The Market Out Of Fair Market Value?" December 1996, *Family and Juvenile Law Newsletter*, OSBA
"Some Tips For Valuing Small Businesses", April, 1996, *Family and Juvenile Law Newsletter*, OSBA
"IRS Changes Its Mind", August, 1993, *Family and Juvenile Law Newsletter*, OSBA
"Business Valuators - A Valuable Asset for Family Law Attorneys", February, 1993, *Family and Juvenile Law Newsletter*, OSBA
"Should You Buy A Business In A Recession?", *Comments*, December, 1990, Soberman Isenbaum & Colomby, Toronto, Ont.
"No-fault Insurance: Some Things You Should Know", *Comments*, June 1990, Soberman Isenbaum & Colomby, Toronto, Ont.
"Does Your Business Have Goodwill?", *Comments*, March, 1990, Soberman Isenbaum & Colomby, Toronto, Ont.
"Getting The Best Price For Your Practice", November, 1989, *Law Practice Management*, De Boo Publishers, Toronto, Ontario
"Taxes and Support Payments: An Update", May, 1989, *Money & Family Law*, De Boo Publishers, Toronto, Ontario

22922 N.E. 14th Street Sammamish, Washington 98074
Oregon Phone: (503) 646-3667 Oregon Fax: (503) 646-3228
Washington Phone: (425) 898-9863 Washington Fax: (425) 898-9624
E-Mail: lolds@lewisolds.com EIN: 93-1294630