

Shannon Pratt's
BUSINESS VALUATION UPDATE®
A Business Valuation Resources© publication

Timely news, views and resources for better valuations

Vol. 6, No. 5, May 2000

*Editor's Column:*

## USPAP board needs qualified BV members

### Four openings available; Applications by Aug. 1, 2000

If you might ever consider serving on the **Appraisal Standards Board (ASB)** of **The Appraisal Foundation**, now is the time.

### Kramer completing ASB term

**Yale Kramer**, currently the only BV person on the ASB, is not standing for reappointment. Two other incumbents whose terms are expiring are also not standing for reappointment. The Foundation Executive Committee voted to expand the Appraisal Standards Board from six to seven members (subject to approval by the full Board of Trustees). This means that there are four openings for new members on the 7-member ASB.



Yale Kramer

The function of the ASB is to produce the **Uniform Standard of Professional Appraisal Practice (USPAP)**, which is usually issued annually in November. The present plan is to split USPAP into four editions (real estate, personal property, mass appraisal, and business valuation) effective with the 2002 edition.

### New, separate USPAP BV edition

This means that the ASB in 2001 will be responsible for the first separate business valuation edition of USPAP. Obviously, ***it is critical that highly qualified business appraisers be appointed to the ASB for terms starting Jan. 1, 2001, in order to have significant input to this first BV edition of USPAP.***

The **Appraisal Qualifications Board (AQB)** also has two openings, but that is not critical at this time, because there is no agenda in 2001 to address qualifica-

*Continued to next page...*

*Guest Article:*

## Restricted stock discounts decline as result of 1-year holding period

### Studies after 1990 "no longer relevant" for lack of marketability discounts

***by Kathryn F. Aschwald****



Kathryn F. Aschwald

***I can't count the number of times that I've been asked whether there's been a restricted stock discount study since the Rule 144 holding period was reduced from two years to one year in 1997. Well, Columbia Financial Advisors, Inc. conducted the first such study, and we're delighted to be the first to publish the results.–SP***

This article addresses the changes in the marketplace for restricted securities that have occurred since 1990 and the impact that those changes have had on the overall level of discounts for lack of marketability for these securities.

The article addresses the change in restricted stock discounts resulting from two key events relating to restricted securities that have increased the liquidity of these securities over time. The chronology of these events and the evidence pointing to what has happened to discounts on restricted securities provides us with important information regarding how the market reacts to varying levels of liquidity. That is, as liquidity increases, discounts for lack of liquidity decrease. The evidence also leads to the conclusion that, for purposes of determining discounts for lack of marketability of privately held securities, restricted stock studies relying on transaction data after 1990 are no longer relevant.

It should be noted that there are a number of factors specific to the subject security that have been found to influence the magnitude of the discount. These factors include such things as the issuing company's size, the exchange upon which the security may ultimately be traded, profitability, earnings and price stability, etc. This article does not attempt to address those factors.

Restricted stock (or letter stock) is stock issued by a corporation that is either not registered with the Securities and Exchange Commission (SEC) and cannot be sold into the public market or is registered with the SEC but is restricted from sale into the public market. The stock is usually issued when a corporation is

*Continued to next page...*

*Kathryn F. Aschwald, CFA, ASA is a principal and co-founder of Columbia Financial Advisors, Inc. a business appraisal and financial advisory firm headquartered in Portland, Oregon. Ms. Aschwald has been appraising businesses and business interests since 1984. She specializes in the areas of restricted stock and blockage discounts, ESOP- related valuation and financial advisory services, litigation support, and transactions.

## INSIDE...

Jury gives fair value verdict for North Carolina Motor Speedway .......... 5
Special Report: Professional associations class schedules for 2000 .......... 9

**DEPARTMENTS**

Legal & court case update .......... 5
Data & publications update .......... 13
Cost of capital update .......... 14
Reader / Editor exchange .......... 14
Calendar update .......... 15

EXHIBIT 43

## Restricted stock discounts decline

*... continued from front page*

first going public, making an acquisition or raising capital. The main reasons corporations issue unregistered stock rather than tradable stock are to avoid dilution of their stock price with an excessive number of shares available for resale at any one time and to avoid the costs of registering the securities with the SEC.

### Rule 144 stock original restrictions

The registration exemption on restricted stocks is granted under Section 4(2) of the 1933 Securities Act. The intent of Section 4(2) is to allow "small" corporations the ability to raise capital without incurring the costs of a public offering. Regulation D, a safe harbor regulation, which became effective in 1982, falls under Section 4(2) of the code and provides uniformity in federal and state securities laws regarding private placements of securities. Securities bought under Regulation D are subject to restrictions, the most important being that the securities cannot be resold without either registration under the Act, or an exemption[1]. The exemptions for these securities were originally granted under Rule 144. Prior to April 29, 1997, the exemption was as follows:

Rule 144 allows the limited resale of unregistered securities after a minimum holding period of two years. Resale is limited to the higher of 1 percent of outstanding stock or average weekly volume over a four week period prior to the sale, during any three month period. There is no quantity limitation after a three year holding period[2]

Therefore, a holder of restricted stock must either register their securities with the SEC or qualify for a 144 exemption, in order to sell their stock in the public market. A holder of restricted stock can, however, trade the stock in a private transaction.

### Rule 144A relaxes restrictions in 1990

Historically, when traded privately, the restricted stock transaction was usually required to be registered with the SEC. However, in 1990, the SEC adopted rule 144A which relaxed the SEC filing restrictions on private transactions. The rule allows qualified institutional investors to trade unregistered securities among themselves without filing registration statements. A limited market was thus created for restricted securities beginning in 1990.

### Holding period reduced to one year in 1997

On Feb. 20, 1997, the SEC announced that effective April 29, 1997, the holding period requirements contained in Rule 144 would be amended to permit the resale of limited amounts of restricted securities by any person after a one-year, rather than a two-year, holding period. Also, the amendment permits unlimited resales of restricted securities held by non-affiliates of the issuer after a holding period of two years, rather than three years. The limitations on resale after the one-year holding period remain unchanged.

The amendment also applies to SEC Rule 145 which governs the resale of securities received in connection with reclassifications, mergers, consolidations and asset transfers such that the holding period requirements of Rule 145 correspond to the amended holding periods for resales under Rule 144. These two changes have increased the liquidity of restricted securities.

### Restricted stock studies prior to SEC Rule 144 amendment

There exists a body of knowledge regarding discounts for lack of marketability for restricted securities based on data on transactions in letter stocks. Letter stock is identical in all respect to the freely traded stock of the public company except that it is restricted from trading on the open market for a certain period. The duration of the restriction varies from one situation to another but typically lapses within two years. There are eight published independent studies of restricted stock transactions spanning a period of time from the late 1960's through 1988[3]. These studies consistently indicate a discount of

*Continued to next page...*

[1] Kasim L. Alli, Ph.D. and Donald J. Thompson, Ph.D. "The Value of the Resale Limitation on Restricted Stock: An Option Theory Approach," *American Society of Appraisers: Valuation*, March 1991, pp.22-23

[2] *Ibid.*

Shannon Pratt's UPDATE
BUSINESS VALUATION®

Publisher & Editor-in-Chief: Shannon Pratt
Managing Editor: Stacy Ison
Operations Manager: Chad Phillips
Legal and Court Case Editor: Linda Kruschke
Production Manager: Michael David Thomas
Contributing Editor: Doug Twitchell
Marketing Manager: Jenny Tallis-Grow
Copy Editor: Janet Marcley
Staff Writers: Ann Burnum
Customer Service: Pam Pittock

*Shannon Pratt's Business Valuation Update*™ (ISSN 1088-4882) is published monthly by Business Valuation Resources, L.L.C., for $189 a year. Please call or write for multiple-subscription rates.

Periodicals postage paid at Portland, Oregon. POSTMASTER: Send address changes to Business Valuation Resources, L.L.C., 7412 S.W. Beaverton-Hillsdale Hwy., Suite 106, Portland, OR 97225, phone (503) 291-7963 or (888) 287-8258, fax (503) 291-7955, email: *shannonp@transport.com*, Web page: *www.bvupdate.com*. Editorial office and subscription requests should go to the above address.

Copyright 2000, Business Valuation Resources, L.L.C. (BVR). All rights reserved. No part of this newsletter may be reproduced without express written consent from BVR.

## USPAP board needs qualified BV members

*... continued from front page*

tions for business appraisers.

### Fishman urges applications

Candidates for both boards are nominated by the **Appraisal Foundations Standards and Qualifications Board Nominating Committee.** Chairman of that committee this year is **Jay Fishman**, who "urges all qualified applicants to apply for positions... the Appraisal Foundation has taken a leadership role in the appraisal profession. At his critical juncture, it is important for both boards to continue to have the highest caliber of members."



**Jay Fishman**

Applications must in by Aug. 1, 2000. For applications, contact **Paula Douglas** at The Appraisal Foundation, (202) 624-3048 or email at *paula@appraisalfoundation.org.*

### USPAP needs BV leadership

A separate BV edition of USPAP is something that many of us in the profession have been advocating for years. Now it is about to become a reality.

It is important to all of us that the BV profession provides high quality leadership in the creation of this document. I add to Jay's urging that our readers and your colleagues seriously consider this opportunity to be a part of the Appraisal Standards Board for a three-year term, starting in 2001.

Best wishes,

Shannon Pratt

Shannon Pratt

## Restricted stock discounts decline

*... continued*

35% from the freely traded counterpart stock. The average discounts indicated in these eight studies ranged from 26% to 45%.

### Discounts decrease after Rule 144A

In more recent years (subsequent to the years included in the studies discussed above), the market for restricted securities has increased due to the exemptions to Rule 144 allowed with Rule 144A private placements of restricted securities to qualified investors.

To our knowledge, there have only been three studies published which include data on transactions in restricted securities after Rule 144A (1990) and before the reduction in Rule 144 stock holding periods (April 29, 1997). These three studies are a study conducted by **Management Planning, Inc.**[4] titled "Analysis of Private Sales of Restricted Stocks of Public Companies: 1980-1995" (the Management Planning study), a study that appeared in the January-February, 1994 issue of *Estate Planning* [5] by **Lance Hall** with **FMV Opinions, Inc.** and **Timothy Polacek**, a tax lawyer (the FMV study), and a study published in *Shannon Pratt's Business Valuation Update* by **Bruce Johnson**, ASA, of **Munroe, Park & Johnson, Inc.** (the Johnson study)[6]

The Management Planning study included transactions that occurred from 1980 through 1995. The average discount indicated by the 49 transactions in the study was 27.7% and the median was 28.9%. The range of discounts in the Management Planning study was 0% to 58%. The average discount in this study is lower than the discounts in the earlier studies including transactions prior to 1990, which typically indicated average discounts of 35%. The reason for this difference lies, perhaps, in the fact that fully one third of the time frame in which the transactions occurred was after 1990 and the enactment of Rule 144A, which created a limited market for restricted securities. The study, as published, made no attempt to separate the data by date or calculate the discounts before and after 1990. However, based on the data published, we observed that 20 of the 49 transactions (41%) in the study occurred from 1990-1995. These 20 transactions took place at an average discount of 26.7% and the median was 29.1%. The range of discounts for the 1990-1995 period was 2.8% to 49.5%.

> First, the exchange on which the issuing company's non-restricted stock is traded seemed to have an impact on the size of the discount, with the highest discounts generally seen for those issuing companies whose stock was traded on the OTC and Small Market Capitalization markets.

The FMV study, as published in *Estate Planning*[7], revealed limited information. The overall mean discount of the FMV study was 23%, and covered 100 transactions during the years 1979 through 1992. However, the article reported that for the period May 1991 through April 1992, restricted stock transactions occurred at prices that reflected a discount of 21% from similar blocks of unrestricted stock. Again, this study indicates lower discounts after the creation of a limited market (and thus increased liquidity) for restricted securities.

The Johnson study covers transactions that occurred during the years 1991-1995. The average discount for lack of marketability for the 72 transactions observed in the Johnson study was 20%. The range of discounts varied from a premium of 10% to a discount of 60%. Again, this study points to lower discounts after Rule 144A which increased the liquidity of restricted securities. Mr. Johnson noted:

> As can be seen, the discount for lack of marketability was less than the earlier studies. This is primarily due to an increased number of investors who have entered into the market for restricted stocks in the past five years.[8]

### CFAI 1996-97 restricted stock study

**Columbia Financial Advisors, Inc.** (CFAI) conducted a study of the sale of restricted securities in the U.S. We examined only private common equity placements over the period Jan. 1, 1996 through April 30, 1997.

A search of Securities Data Company's *U.S. New Issues* Private Placement database revealed that there were 123 private placements of common stock in the U.S. from January 1, 1996 through April 30, 1997. There were no private placements of restricted common stock in the U.S. from Feb. 15, 1997 through April 30, 1997 for which there was sufficient data available to determine a restricted stock discount. We eliminated from these original 123 transactions those transactions with no offer price or public market price available, leaving 101 transactions. We further eliminated those transactions with non-U.S. issuers and/or securities that were not traded in the U.S., leaving 29 transactions.

For each of these 29 companies, we searched the issuing company's SEC filings using the EDGAR on-line database in an attempt to independently verify that the securities that were privately placed were indeed restricted and/or unregistered. This process resulted in the elimination of an additional six transactions that did not involve restricted securities.

Of the remaining 23 companies, we were able to independently verify, through a review of various SEC filings and telephone interviews with the issuing companies, that eight of the transactions did indeed involve restricted securities. The remaining 15 transactions were listed by Securities Data Company as private placements of common stock with no registration rights, including one Rule 144A private placement (which by definition involves restricted securities). Thus we relied on Securities Data Company's characterization of these transactions, and included them in our analysis.

We obtained various information for these private placements, including the private placement offer price, the offer date, and the issuing company's public market price one day prior to the private placement date.

Our analysis of these transactions led to the following observations. First, the exchange

*Continued to next page...*

[3] SEC Institutional Investor Study, 1971; Milton Gelman study, 1972; Robert Trout study, 1972, Robert E. Moroney study, 1973; the J. Michael Maher study, 1976; Standard Research Consultants study, 1983; Willamette Management Associates, Inc. study, 1984; and William L. Silber study, 1991.

[4] Z. Christopher Mercer, *Quantifying Marketability Discounts*, (Peabody Publishing, LP, 1997), pp. 347-370.

[5] Lance S. Hall and Timothy C. Placek, "Strategies for Obtaining the Largest Valuation Discounts", *Estate Planning*, January-February, 1994 pp. 38-44. The study is also referenced in Z. Christopher Mercer, *Quantifying Marketability Discounts*, (Peabody Publishing, LP, 1997), pp. 67-68.

[6] Bruce Johnson, "Restricted Stock Discounts, 1991-95", *Shannon Pratt's Business Valuation Update* ™, Vol. 5, No. 3, March 1999, pp. 1-3.

[7] Lance S. Hall and Timothy C. Placek, "Strategies for Obtaining the Largest Valuation Discounts", *Estate Planning*, January-February, 1994 pp. 38-44.

[8] Bruce Johnson, "Restricted Stock Discounts, 1991-95", *Shannon Pratt's Business Valuation Update*™, Vol. 5, No. 3, March 1999, p. 2.

## Restricted stock discounts decline

*... continued from previous page*

on which the issuing company's non-restricted stock is traded seemed to have an impact on the size of the discount, with the highest discounts generally seen for those issuing companies whose stock was traded on the OTC and Small Market Capitalization markets. The average discount for all 23 transactions was approximately 21%. The average discount for those eight transactions that we were specifically able to verify to involve restricted and/or unregistered securities was 26%. The average discount for those issuing companies whose stock was traded on the NASDAQ, OTC, and/or Small Market Capitalization markets was 23%. For all 23 transactions, the discounts ranged from 0.8% to 67.5% and the median was 14%.

### Discounts lower than earlier studies

These discounts are generally lower than the discounts recorded in the earlier studies noted above which generally indicated discounts of approximately 35%. The increase in volume of privately placed stock (Rule 144A) in the past several years offers an explanation. As activity in a market increases, more and better information becomes available. In addition, there are now more participants in the market for restricted stocks due to Rule 144A and, therefore, increased liquidity. This would tend to decrease discounts because better information results in less risk and thus a lower required rate of return. The lower discounts in this particular study may also reflect, to some degree, the market's anticipation of the SEC's change in the holding period from two years to one year, although we have no way to verify this. Since June 1995, the SEC proposed amendment to Rule 144 was published for public comment. Therefore, knowledgeable private placement and Rule 144A market participants were most likely aware of the proposed changes.

### Discounts lower after change in holding period requirements

Using the same methodology and sources discussed above, CFAI conducted another restricted stock study in an attempt to identify the impact of the increased liquidity of restricted securities as a result in the reduction in holding period requirements which became effective April 29, 1997. We examined only private common equity placements over the period Jan. 1, 1997 through Dec. 31, 1998.

There were 270 private placements of common stock in the U.S. from Jan. 1, 1997 through Dec. 31, 1998. We eliminated those transactions that did not involve publicly traded companies, leaving 44 transactions. For each of these 44 transactions, we searched the issuing company's SEC filings using the EDGAR on-line database in an attempt to obtain the offer price and details about the placement. Through this process, we eliminated an additional 29 companies for which there were no offer prices reported and/or the placements were not restricted or unregistered. All remaining 15 transactions involved companies whose common stock was traded on the OTC, NASDAQ or Small Cap markets.

As in the earlier study, we obtained the private placement offer price, the offer date, and the issuing company's public market price one day prior to the private placement date.

The average discount indicated by this study was 13%. The range of discounts was 0% to 30% and the median was 9%.

These discounts are generally lower than the discounts recorded in CFAI's earlier study, which indicated an overall average discount of 21%. The lower discounts in this study in all probability reflect the market's reaction to the SEC's change in the holding period from two years to one year. The reduction in the holding period exposes the owner of the restricted security to less investment risk, as it is less likely that the price would fall in a one year period versus a two year period.

**COLUMBIA FINANCIAL ADVISORS, INC. RESTRICTED STOCK STUDY**

| Discounts prior to 1990 | Average Discount |
|---|---|
| SEC Institutional Investor Study | 25.8% |
| Milton Gelman | 33.0% |
| Robert Trout | 33.5% |
| Robert E. Moroney | 35.6% |
| J. Michael Maher | 35.4% |
| Standard Research Consultants | 45.0% *median* |
| Willamette Management Associates | 31.2% *median* |
| William L. Silber | 33.8% |
| ***Overall Range*** | ***25.8% - 45.0%*** |
| **Discounts after 1990 (Rule 144Aamendment), but prior to reduction in required holding periods** | |
| Management Planning Study, 1990-1995 Transactions | 26.7% |
| FMV Study, 1991-1992 Transactions | 21.0% |
| Johnson Study, 1991-1995 | 20.0% |
| CFAI Study, 1996-Feb. 14, 1997 | 21.0% |
| Tetra Tech, Inc. SEC Form 10-K | 16.0% - 28.0% |
| ***Overall Range*** | ***16.0% - 28.0%*** |
| **Discounts after April 29, 1997** | |
| CFAI Study, 1997-1998 | 13.0% |
| Tetra Tech, Inc. SEC Form 10-K | 15.0% |
| **Overall Range** | **13.0% - 15.0%** |

### Other Market Evidence

Another indication of the market's recognition of the increased liquidity of restricted securities (and thus lower marketability discounts) was found in Tetra Tech, Inc.'s SEC Form 10-K for the fiscal year ending September 30, 1999. Tetra Tech, Inc. is a publicly traded environmental engineering firm. Tetra Tech, Inc., active in industry acquisitions, typically uses its stock (restricted) as part or all of the purchase consideration. In determining the value of securities issued in such transactions, Tetra Tech offered the following in the footnotes to its Sept. 30, 1999 financial statements:

> The Company values stock exchanged in acquisitions based on extended restriction periods and economic factors specific to the Company's circumstances. During fiscal 1998 and 1999, stock exchanged in acquisitions was discounted by 15%. During fiscal 1997, the discount on stock exchanged in acquisitions ranged from 16% to 28%.

Tetra Tech, Inc.'s fiscal 1998 and 1998 generally cover the period after the reduction in the holding period requirements under Rule 144. Tetra Tech, Inc.'s fiscal 1997 reflects a period of time (Oct. 1, 1996 through April 29, 1997) prior to the reduction in the holding periods.

### Studies applicable for privately held securities

Appraisers have often quoted the well known studies of restricted stock conducted prior to the Rule 144A amendment in 1990 in determining the appropriate discount for lack of marketability for privately held securities. These studies are still applicable for this purpose today.

Many "rumblings" in the appraisal community have centered around the fact that discounts for restricted stock have been declining, and many appear to be concerned about what this might mean in valuing privately held securities. It makes perfect sense that the discounts for re-

*Continued to next page...*

## Restricted stock discounts decline

*... continued*

stricted securities have generally declined since 1990 as the market (and liquidity) for theses securities has increased due to Rule 144A and the shortening of restricted stock holding periods beginning April 29, 1997. Thus, while the newer studies are specifically relevant for determining the appropriate discounts for restricted securities, the studies conducted after 1990 are not relevant for purposes of determining discounts for lack of marketability for privately held stock, because they reflect the increased liquidity in the market for restricted securities. Such increased liquidity is not present in privately held securities.

***SP Comment:** These results also imply that the **Emory** and **Willamette** pre-IPO studies are relatively more important in estimating discounts for lack of marketability, especially since 1990. It is noteworthy that the discounts evidenced in those studies have **not** declined since 1990.* **BVU**

**BV Videocourse**
**Available at only $99**

The 155-minute ***Business Valuation Videocourse,*** moderated by **Shannon Pratt** and featuring **Jay Fishman, Robert Reilly,** and **Bob Schweihs,** originally published by the AICPA at $129, is now available from **Business Valuation Resources** at only $99, including the 236-page manual updated in 1997.

**To order, call:**

**(888) BUS-VALU [287-8258] or email: *shannonp@transport.com***

# LEGAL & COURT CASE UPDATE

**DISSENTING SHAREHOLDER**

## Jury gives fair value verdict for North Carolina Motor Speedway

***Smith v. North Carolina Motor Speedway,* North Carolina Superior Court, Mecklenberg County Case No. 98-CVS-3766, April 26, 2000.**

A jury verdict in a dissenter's rights appraisal case awarded $23.47 per share, as opposed to the company's offer of $19.61 per share, in the acquisition of North Carolina Motor Speedway by a subsidiary of Penske Motorsports, Inc.

In April 1997, Carrie DeWitt gave Penske the right to buy her shares, representing about 65% of those outstanding, at $18.61 per share. Based on 2,236,731 shares outstanding, this reflected a total value of just under $42,000,000, plus just under $5 million debt assumed by Penske. On Dec. 2, 1997, Penske Motorsports merged with North Carolina Motor Speedway. The stockholders were offered $19.61 in stock or cash.

**Bruton Smith,** chairman of Speedway Motorsports (then the largest auto racing company) and owner of just over 530,000 shares, dissented along with other stockholders totaling about 7,000 shares. Penske offered the dissenters $16.77 per share, based on a fairness opinion by investment bankers **Interstate/Johnson Lane Corporation.** The dissenters claimed a value of $55 per share.

Experts testifying for the plaintiffs during the two-week trial were **T. Randolph Whitt, CPA, ABV,** of **Hitchner Whitt & Co., P.A.,** and **Mark W. Montgomery** of **Rocker Partners,** a private investment fund. Experts testifying for the defendants were **Brent Kulman** of **Wachovia Securities, Inc.** (formerly Interstate/Johnson Lane), **Adam Simmonds**—formerly of **Merrill Lynch** and currently with **Houlihan Lokey Howard & Zukin,** and **Shannon Pratt, CFA, FASA, CBA,** of **Willamette Management Associates.**



**The one-mile oval North Carolina Speedway is nicknamed "The Rock" for its location near Rockingham, N.C., and features a large rock with drivers' names engraved at the entrance.**

**NORTH CAROLINA MOTOR SPEEDWAY**

| | Per share |
|---|---|
| Merger price | $19.61 |
| Dissenters' claim | $55.00 |
| Jury verdict | $23.47 |

At the time of the merger, there were three publicly-traded Motorsports companies featuring NASCAR races, which all of the experts used in one way or another: International Speedway (headed by **Bill France,** also chairman of NASCAR), Penske Motorsports, and Speedway Motorsports. Since then, International acquired Penske, making International the largest motorsports company. Experts for the plaintiffs tended to focus on values per seat, while experts for the defense tended to focus on multiples of EBITDA and EBIT. Both Bruton Smith and Bill Frances testified as fact witnesses at the trial.

In addition to the guideline public companies, there were also several acquisitions that the experts referenced.

**Tim Frost,** of **Frost Motorsports, LLC,** an economic and financial consultant to the motorsports industry, noted that jurors might have had a hard time isolating conditions at the acquisition date because several subsequent events occurred. For one thing, NASCAR rode the boom in equity markets.

*Continued to next page...*

# An Economist Financial Analyst's Approach to Valuing Stock of a Closely Held Company

*By Milton Gelman*

*Journal of Taxation*, June 1972, pp. 353-354

In valuing stocks of closely-held companies for the purpose of determining Federal and local estate and/or gift taxes, the valuation analyst is usually confronted with two measurement problems: (1) determination of the gross, or initial, value of the stock, and (2) the appropriate discount to apply to the gross value for lack of marketability, market pressure and other factors. Mr. Gelman discusses some of the problems in determining the gross value of the stock and suggests a technique for quantifying the discount to be applied to the gross value.

SINCE THE STOCKS of closely-held companies are, by definition, not publicly traded, the analyst's assignment in estate and gift tax matters is to determine their "fair market value" had they been offered publicly for sale on either the date of death or the date of the gift. The classic definition of "fair market value" is the price, in cash or its equivalent, which a willing buyer, under no compulsion to buy, would pay to a willing seller, under no compulsion to sell, and both having reasonable knowledge of the relevant facts.

The first step in the valuation process is to identify the company's principal lines of activity and to secure financial statements (i.e., profit and loss statements and balance sheets) for at least the five years preceding the valuation date. In addition, financial data for the most recent reporting period (i.e., quarterly or semiannually) prior to the valuation date should also be secured. If possible, detailed sales and profits data, by product line, should be obtained from the estate's or company's accountant.

**Comparable public companies.** After identifying the subject company's principal business activities, the next step is to select "comparable" public corporations. The purpose of this exercise is to analyze the relationship between the stock prices of these public companies and various financial indicators, or variables (i.e., to determine how investors are valuing similar companies in the market place), and use such findings as a guide in deriving gross, or initial, values for the closely held stock.

While it is rare to find public companies which are directly comparable in all respects, it may be possible to obtain a representative sample of public companies which are essentially comparable to the company being valued—at least insofar as the investment community is concerned. By "essentially" comparable companies is meant the selection of public companies with product lines and size characteristics reasonably similar to the subject company. The general procedure followed to determine which public companies to use for comparative purposes is as follows: first, a complete list is drawn up of all public companies classified as being in the same or similar businesses as the subject company, according to Standard & Poor's and Moody's classifications of companies. This approach may also be supplemented by referring to trade association listings of companies and then determining which of these companies are publicly owned. This process should yield a list of all the possible "candidate" companies. Second, the total sales, the markets served and the product mix of sales of the candidate companies are analyzed and those public companies which most closely resemble the subject company in terms of these characteristics are selected for inclusion in the final sample.

**Valuation of public companies in same industry.** In the case of operating companies, investors primarily look to earnings (and dividends) and, to a lesser degree, book value, in arriving at what they will pay for a given stock. (In the case of publicly owned real estate and investment companies, book value is probably more relevant as a price determinant.) Thus, price-earnings ratios (market price divided by earnings per share) of the selected public companies represent an important element in arriving at a gross value for the subject company. In addition, the price-cash flow multiple concept (market price divided by cash flow per share, which is the sum of net income plus depreciation) may also be used as a supplement to the determination based on price-earnings ratios. The price-cash flow ratio is particularly relevant when comparing companies, which follow different depreciation write-off policies for tax purposes. Thus, assuming all other things equal, a company, which uses accelerated depreciation, would report lower net income after taxes than another, which does not follow such an accounting policy. The cash flow of the company using accelerated depreciation would, however, tend to be higher than the company which does not.

EXHIBIT 44

GF0719

Book value is usually not a useful indicator in valuing the stocks of closely held operating companies, principally because the book value of private companies tends to be overstated relative to that of public companies. This is so because closely held companies characteristically pay out only a small portion of their earnings in the form of dividends as compared to public companies, with the result that the retained earnings component of book value is inflated relative to that of public companies.

**Application of price determinants to subject company.** The next step is the analysis is to determine the appropriate price determinant (price-earnings ratio, price-cash flow ratio, etc.) to apply to the relevant financial data of the company being valued. In the majority of instances the most recent financial data are reliable indicators of earnings performance. However, in the case of cyclical companies, where there is often considerable variation in earnings from year-to-year, it may be advisable to use an "average" of the earnings of several years for purposes of the valuation.

It is not unusual to find that the price earnings ratios of larger public companies are higher, on average, than those of smaller public companies, even after adjusting for differential growth rates where necessary. This phenomenon is also often apparent in the case of companies whose stock is being offered to the public for the first time. Underwriters frequently price the common stocks of new issues at lower prices relative to earnings than the prices at which stocks of larger, public companies in the same industry are selling. Since closely held companies are, at best, of the same approximate size as the smaller public companies, the appropriate price-earning ratio to use for establishing an initial value for the closely held stock may be considerably lower than the price earnings ratios at which most public companies are selling.

**Discount for lack of marketability**

Perhaps the most difficult aspect in the valuation of closely held stocks is the quantification of the size of the discount to apply to the gross value ascertained for the stock due to the absence of a public market for the stock. The size of the discount established for the lack of marketability feature of closely held stock has been base historically upon the judgment of the valuation analyst, since detailed information on securities transactions involving restrictions as to marketability was not, until recently, a matter of public knowledge. However, financial data, which only recently have become available to the public, may serve as guides in determining the appropriate discount to use. These data relate to the discounts actually received by professional investors who purchase shares in publicly traded companies with restrictions as to their marketability. These transactions are ordinarily made under the restriction of an investment letter, precluding the sale of these shares by the purchaser for periods of up to two years, except under the same restrictions as to marketability.

While for many years major institutions investors (such as insurance companies and banks) have provided capital to companies through the purchase of investment letter stock, the details of these transactions have not been made matter of public knowledge. Since there is a restriction on their transferability, restricted securities are usually purchased at a price substantially below that of the freely marketable securities of the same class as the company. During 1968, however, four large, closed-end investment companies specializing in restricted-securities investments were established via public offering of their shares. A significant portion of their funds is invested in the letter stock of publicly held companies. These restricted stock purchases are made either directly from the company or, in some instances, from selling stockholders, and involve both listed and over-the-counter public companies.

The four specialized closed-end investment companies formed in 1968 for this purpose were the Diebold Venture Capital Corporation, Fund of Letters, Inc. (name changed to New America Fund, Inc. in December 1971), SMC Investment Corporation and the Value Line Development Capital Corporation. At the end of 1970, or the latest fiscal year, these funds had total assets ranging from $16 million to $196 million. Investments are made in both large and small companies. From an analysis of the financial statements issued by these investment companies, the discount from market price paid by these funds can be computed at the time the purchase of the restricted stocks held in their portfolios was made. For example, the 1970 Annual Report of the Diebold Venture Capital Corporation indicates for each of its publicly-traded letter stock investments, the following information: (1) the "market value (if free)," which is the number of shares of stock held in the portfolio multiplied by the closing price at the end of 1970, and (2) the "fair value," which reflects the same discount from actual market value at the time the securities were purchased applied to the closing price at year-end. Therefore, by dividing the "fair value" by the "market value (if free)" and subtracting the result from 100%, the actual discount at the time of purchase can be ascertained. The discounts at which restricted stock purchases were made by the other closed-end funds may be determined in a similar fashion.

At year-end 1970, or the latest fiscal year, these four funds, in aggregate, had letter stock investments in the common stocks of 89 public companies. The size of the discount from market value for these holdings of publicly-traded, restricted common stocks are summarized in the following table:

| Size of Discount | No. of Common Stocks | % of Total |
|---|---|---|
| Less than 15.0% | 5 | 6 |
| 15.0 - 19.9 | 9 | 10 |
| 20.0 - 24.9 | 13 | 15 |
| 25.0 - 29.9 | 9 | 10 |
| 30.0 - 34.9 | 12 | 13 |
| 35.0 - 39.9 | 9 | 10 |
| 40.0 and over | 32 | 36 |
| Total | 89 | 100% |

This table reveals that about 85% of the letter-stock purchases of these funds were made at discounts from market value of 20% or more and, further, that almost 60% of the purchases were made at discounts of 30% and higher. Both the arithmetic average and median (i.e., middle value) discount of all 89 stock purchases was 33%. Depending on size and other factors, these actual discounts obtained by knowledgeable investors may serve as a guide to the valuation analyst in determining the discount to apply to the gross value previously determined for the closely-held stock, in order to arrive at final value for the shares involved.

## NEW DECISIONS

**Sales of real estate lots produced long-term capital gains. (TCM)**
Taxpayer and three others formed a corporation to sell 100 real estate lots. After 80 lots were sold and taxpayer had become the sole shareholder, he liquidated the corporation and claimed long-term capital gains form the sale of four lots in 1965. The Commissioner disallowed the capital gain treatment.

*Held: For the taxpayer.* Taxpayer did not actively attempt to sell the lots. He devoted no time or effort to obtain buyers, incurred no advertising expenses and was not engaged in the real estate business. The sales proceeds are, therefore, properly characterized as long-term capital gains. Furthermore, although taxpayer erroneously deducted special assessments against the four lots as real estate taxes, such expenditures were properly chargeable to the capital account. The adjusted basis of the property is increased to include the special assessments. Frick, TCM 1972-71.

**Amounts received for transfer of know how are capital gains. (TC)**
Taxpayer, an inventor, developed a printer for use with electronic computers. Pursuant to agreements, taxpayer transferred a non-exclusive license with respect to two patents, which related to certain aspects of the printer and the technological know-how necessary for the manufacture of the printer. Taxpayer treated the amounts received as capital gains.

*Held: For taxpayer.* No express allocation of consideration between know how and a license is made by the agreements. Since the agreements are ambiguous, extrinsic evidence is admissible. Based on such evidence, the amounts received were intended to be consideration for the technology rather than for any license, as the patents were meaningless without the technological know how. Accordingly, the amounts received are capital gains. Shepard, Jr., 57 TC No. 62.

**Jury findings on character of gain on land sales are upheld. (CA)**
After considering the evidence, the district court jury held that taxpayer was entitled to capital gains treatment on the sale of real estate during 1958 and the years 1960 through 1963 because, in those years, such property was not held primarily for sale to customers in the ordinary course of business. However, real estate sold in 1959 was considered to have been held primarily for sale to customers in the ordinary course of business and therefore subject to ordinary income treatment.

*Held: Affirmed.* Also taxpayer is allowed to introduce a certified copy of the judgment of an earlier decision in which it was decided that real estate was not held for sale to customers in the ordinary cause of business. Koch, CA-7, 3/13/72.

**Realty owners were in real estate business; sale proceeds were ordinary income. (CA)**
Taxpayers sold real estate and treated the proceeds as capital gains. The Tax Court upheld the Commissioner's classification of all the proceeds as ordinary income. All of the circumstances (the purchase, survey and subdivision of land, authorization to two real estate brokers to sell, spending $120,000 improving the property, amending the partnership's business purpose to allow the sale of real estate and real estate sales being the partnership's largest profit-making activity) indicated that the taxpayers were in the realty business and therefore the proceeds were ordinary income.

*Held: Affirmed.* Hansche, CA-7, 3/16/72.

**Addition of new streets precludes Section1237 treatment. (DC)**
The Government contended taxpayer did not qualify under Section 1237 as to income received from sale of subdivided lots because the addition of new streets in 1963 was a substantial improvement that significantly increased the value of the lots.

*Held: For the Government (in part).* Taxpayer received ordinary income from lots sold after the road improvements that increased in value. Capital gains were realized on the sale of lots sold before the improvements and on lots sold after the improvements that did not increase in value because of the improvements. Revell, DC S. C., 3/3/72.

**Payment to lessor for modification of lease restoration clause is taxable as ordinary income. (TC)**
Taxpayer was a lessor of certain property. It received a payment for modification of the lease to allow use as a television studio and to release the tenant from a requirement to restore the leased premises to their state before alteration into a television studio. Upon execution of the modification of the lease, the tenant would continue to occupy the premises. Taxpayer treated the payment as capital gains.

*Held: Against taxpayer.* It is clear that the parties would have entered into a new lease at the agreed rental without any additional payment if the tenant had not insisted upon the deletion of the restoration clause. The payment for updating the clause is a part of the consideration paid for the terms upon which the tenant continued to occupy the property and as such is ordinary income to taxpayer. Cases involving the taking or destruction of property are not in point. Sirbo Holdings, Inc., 57 TC No. 55.

**Covenant not to compete caused taxable income on corporate liquidation. (TCM)**
Taxpayer sold its broadcasting business pursuant to an agreement, which included covenants not to compete on behalf of taxpayer and certain of its stockholders. Taxpayer contended that the money received under the covenant was really a capital gain from the sale of property subject to non-recognition under the Section 337 corporate liquidation. The Commissioner claimed that the covenant was real and that ordinary income was realized.

*Held: For the Commissioner.* Taxpayer failed to present sufficient proof that the covenant lacked economic substance. It was negotiated as part of the sale agreement. A specific amount was allocated to the covenant and that amount was reallocated among the covenanters. It was not an inseparable part of good will acquired by the purchaser and it had independent economic significance. Therefore, the money paid for the covenant was not a payment in exchange or assets resulting in a tax-free gain under Section 337, but was ordinary income realized by taxpayer. Harvey Radio Laboratories, TCM 1972-85.

**Yearly payments received following sale of radio station do not qualify for capital gain treatment. (CA)**
Taxpayer sold a radio station to an insurance company pursuant to a contract providing for consideration of $1,250,000, plus $30,000 per year for at least 17 years of advisory services. The district court held taxpayer was not entitled to capital gain treatment for the yearly payments even though (in related any pending litigation) the IRS contended no services were rendered and refused to permit the station to deduct the yearly payments as an expense.

*Held: Affirmed. Ward, CA-6, 2/22/72.*

**No capital gains treatment for payment is received on termination of employment contract.** (CA)
Taxpayer had an employment contract with an oil company. Under this agreement, taxpayer received a salary, plus 5% of net profits, including any gain realized by the company from the sale of its assets. Upon termination of his employment, taxpayer received a lump sum payment of $555,000. He reported the payment as capital gain. The Government determined the payment to be ordinary income. The district court held for the Government. Taxpayer was at all times an employee and never owned any interest in the company or its assets. The termination of an employment agreement does not constitute the sale or exchange or a capital asset.

*Held: Affirmed.* The court refused to consider the availability of income averaging since the issue was first raised on appeal. Freese, CA-10, 2/23/72.

**Property was acquired by gift not by inheritance. (TCM)**
Taxpayer sold property for $15,000 claimed a basis of $22,500 and reported a loss, which the Commissioner disallowed.

*Held: For the Commissioner.* The property was owned by taxpayer's parents, on the mother's death the father inherited the other half of the property and filed an affidavit with the Inheritance Tax Division listing the property value at $9,325. Later the father transferred the property to taxpayer. Since taxpayer acquired the property by gift, and not by inheritance, his basis was the same as the donors, $9,325, on the date of the gift, rather than the fair market value on the date of the father's death. Therefore, a capital gain was realized and not a capital loss. Hawkinson, TCM 1972-32.

**Leasehold and improvements thereon are considered Section 1231 assets. (Rev. Rul.)**
Taxpayer leased land and erected.a building thereon. During the course of the lease taxpayer subleased part of the premises. At a point in time, taxpayer sold all his interest in the leasehold and improvements. Since the taxpayer's lease-hold was property used in his trade or business it qualifies as Section 1231 property. The underlying assets will, however, be subject to the provisions of Section 1245 and 1250 where applicable. (Rev. Rul. 60-4 superseded.) Rev. Rul. 72-85, IRB 1972-9.

**Payments for relinquishment of territorial rights is a capital gain. (Rev. Rul.)**
The Service has ruled that the amount received by a professional football team for the relinquishment of its exclusive territorial rights for the presentation of football is treated as a capital gain. Rev. Rul. 71-583, IRB 1971-51.

**Capital gain treatment for sale of insurance company with payment contingent on receipt of premium income. (DC)**
Taxpayer and other shareholders of an insurance company (X) sold their X stock to an insurance company (Y) in exchange for cash plus a promissory note from Y, payment of which was contingent upon receipt of premium income by Y. Taxpayer contended the sale qualified for capital gain treatment.

*Held: For taxpayer.* The transaction remained a sale for tax purposes even though Y was obligated to pay the purchase price solely from income received from the assets of X. Boone, DC Okla., 1/26/72.

**Acquiescence announcement.**
Soil and water conservation expenses. Conservation expenses were deductible under Section 175 when the land was not recently actively farmed even though work was done at the same time to water it by irrigation. [Prior full acquiescence withdrawn and acquiescence in result only substituted.—Ed.] Behring, 32 TC 1256, acq., IRB 1972-14.

**Applicability of Sections 267 and 1031 to an exchange of farm property for rental property between a sole shareholder and his corporation is discussed. (Rev. Rul.)**
A sole stockholder owned certain rental property. Taxpayer exchanged his rental property for farmland and machinery owned by his corporation. Because of the machinery, the property exchanged is not of a like-kind and accordingly the non-recognition provisions of Section 1031 are not entirely applicable. If the taxpayer partially recognizes a loss on the transaction it shall not be deductible in accordance with the provisions of Sections 267. Rev. Rul. 72-151, IRB 1972-14.

**Advance certification of WIN employees is not needed. (News Release)**
Employers may hire additional workers whose compensation will qualify for the Work Incentive credit now and obtain certification from the Labor Department later when the appropriate forms are available. IRS News Release 1210. 2/7/72.

**Certiorari announcements.**
Earnings of physician's retirement fund. The Ninth Circuit held that a partnership's contributions to a retirement trust on behalf of its general partners was not current income to them. The eventual enjoyment was subject to too many contingencies. Bayse, cert. Granted, 4/3/72.

*Interest deduction.* The Ninth Circuit held that a deduction for prepaid interest was not allowable. The lender did not perform its obligation and the indebtedness never existed. Kovtun, cert. den. 3/27/72.

*Cost of stock bought to borrow money.* The Eighth Circuit held that a cooperative could not deduct the cost of bank stock it was required to buy to borrow money. The payments were for capital assets and while necessary, were not ordinary. [The Supreme Court recently reached a similar conclusion, see 36 JTAX 273 (May, 1972)—Ed.] M.F.A. Central Cooperative, cert. den., 4/3/72.

**Section 1341 applied to public utility refund to consumers. (Rev. Rul.)**
The Service explains the application of Section 1341 to refunds made by a public utility to consumers. The public utility was under a binding agreement wherein price increases in gas purchased by the company were passed on to consumers and also added to cost of goods sold. In the year in question the public utility received refunds from its suppliers, which was included in gross income. Corresponding equivalent amounts were refunded to consumers in the same year. Rev. Rul. 72-28, IRB 1972-4.

## DEPRECIATION

**Investment credit is allowable for floating docks. (CA)**
Taxpayer was a member of a partnership, which leased docking facilities. The partnership built floating docks that were held in place by guide pilings driven into the harbor bottom. Taxpayer claimed an investment credit for the docks and pilings. The Tax Court held for taxpayer in part. The floating docks are not inherently permanent structures because they can be easily transferred to new locations, as they are portable. The docks are, therefore, qualifying property. The guide pilings are inherently permanent structures since they are driven into the harbor bottom and, therefore they do not qualify for the investment credit.
*Held: Affirmed.* Estate of Morgan, CA-9, 10/21/71.

**Taxpayer is allowed to depreciate facilities constructed with Federal funds. (Ct. Cls.)**
Taxpayer, a railroad, was disallowed deductions for depreciation on facilities, which had been constructed with Federal funds as the Commissioner maintained that taxpayer had not paid for such facilities.

*Held: For taxpayer.* Taxpayer is found to be the party responsible for replacing, at its own expense, such facilities and, therefore, the economic loss accompanying wear and tear of such facilities is deemed to fall on taxpayer. The court also cites the Supreme Court's Brown Shoe decision (339 U.S. 583, 1950) in which it was held that certain donated property could be added to the depreciable base. In a related area, it is determined that certain modification projects qualify as repairs. Other issues decided are: taxpayer improperly changed its method of estimating accrued vacation pay liability; taxpayer is entitled to a foreign tax credit for Mexican income taxes on car rentals even though taxpayer was later granted a subsidy by the Mexican government in the amount of such taxes. Chicago, Burlington & Quincy Railroad Co., Ct. Cls., 2/18/72.

**Depletion deductions are disallowed where asset was not being exhausted. (TCM)**
Taxpayer claimed cost depletion deductions for the loss of ground water under his farm. The Commissioner disallowed the deductions.

*Held: For the Commissioner.* Although a geological survey showed a decline in the water level in the general area of taxpayer's farm, most wells located nearby did not show any significant decline in water levels. Therefore, the underground water supply was not exhausted to any significant extent. Nesmith, TCM 1972-34.