Table XIV-45
DISCOUNTS ON PURCHASE PRICE OF RESTRICTED COMMON STOCK
CLASSIFIED BY TRADING MARKET

January 1, 1966 to June 30, 1969

| | -15.0% to 0.0% | | 0.1% to 10.0% | | 10.1% to 20.0% | | 20.1% to 30.0% | | 30.1% to 40.0% | | 10.1% to 50.0% | | 50.1% to 80.0% | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Trading Markers | No. of Transactions | Value of Purchases (Dollars) | No. of Transactions | Value of Purchases (Dollars) | No. of Transactions | Value of Purchases (Dollars) | No. of Transactions | Value of Purchases (Dollars) | No. of Transactions | Value of Purchases (Dollars) | No. of Transactions | Value of Purchases (Dollars) | No. of Transactions | Value of Purchases (Dollars) | No. of Transactions | Value of Purchases (Dollars) |
| Unknown | 1 | 1,500,000 | 2 | 2,496,383 | 1 | 205,000 | 0 | --- | 2 | 3.332,000 | 0 | --- | 1 | 1,259,995 | 7 | 8,793,378 |
| New York Stock Exchange | 7 | 3,760,663 | 13 | 15,111,798 | 13 | 24,503,988 | 10 | 17,954,085 | 3 | 11,102,501 | 1 | 1,400,000 | 4 | 5,005,068 | 51 | 78,838,103 |
| American Stock Exchange | 2 | 7,263,606 | 4 | 15,850,000 | 11 | 14,548,750 | 20 | 46,200,677 | 7 | 21,074,298 | 1 | 11,250 | 4 | 4,802,404 | 49 | 109,783,439 |
| Over-the-Counter (Reporting Co.) | 11 | 13.828,757 | 39 | 13,613,676 | 35 | 38,585,239 | 30 | 35,479,946 | 30 | 58,689,328 | 13 | 9,284,047 | 21 | 8,996,404 | 179 | 178,477,419 |
| Over-the-Counter (Non-Reporting Co.) | 5 | 8,329,369 | 9 | 5,245,925 | 18 | 25,122,024 | 17 | 11,229,153 | 25 | 29,423,584 | 20 | 11,377,431 | 18 | 13,505,545 | 112 | 104,253,033 |
| TOTAL | 26 | 34,681,849 | 67 | 52,337,982 | 78 | 102,965,021 | 77 | 110.863,863 | 67 | 123,621,711 | 35 | 22,105,728 | 48 | 33,569,418 | 398 | 480,145,572 |

Table XIV-46
DISCOUNTS ON PURCHASE PRICE OF RESTRICTED COMMON STOCK
BY CLASS OF INSTITUTION MARKET

January 1, 1966 to June 30, 1969

| | -15.0% to 0.0% | | 0.1% to 10.0% | | 10.1% to 20.0% | | 20.1% to 30.0% | | 30.1% to 40.0% | | 10.1% to 50.0% | | 50.1% to 80.0% | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Class of Institution | No. of Transactions | Value of Purchases (Dollars) | No. of Transactions | Value of Purchases (Dollars) | No. of Transactions | Value of Purchases (Dollars) | No. of Transactions | Value of Purchases (Dollars) | No. of Transactions | Value of Purchases (Dollars) | No. of Transactions | Value of Purchases (Dollars) | No. of Transactions | Value of Purchases (Dollars) | No. of Transactions | Value of Purchases (Dollars) |
| Banks | 6 | 10,803,050 | 17 | 15,021,358 | 31 | 35,624,259 | 26 | 44,586,199 | 18 | 44,581,008 | 9 | 3,838,055 | 12 | 3,047,068 | 119 | 157,500,997 |
| Investment Advisors | 7 | 6,012,188 | 13 | 24,429,493 | 27 | 50,390,544 | 26 | 37,654,718 | 32 | 60,149,780 | 16 | 13,630,681 | 16 | 20,695,041 | 137 | 212,962,445 |
| Property and Liability Insurance Companies | 1 | 1,500,000 | 2 | 1,438,375 | 3 | 2,418,279 | 3 | 7,342,061 | 0 | --- | 3 | 1,850,000 | 2 | 1,659,995 | 14 | 16,208,710 |
| Life Insurance Companies | 5 | 6,909,369 | 2 | 2,079,500 | 8 | 7,735,412 | 13 | 9,720,627 | 8 | 10,174,527 | 2 | 999,993 | 5 | 3,631,414 | 43 | 41,200,842 |
| Self-Administered Employee Benefits | 4 | 3,109,932 | 29 | 3,733,256 | 2 | 3,653,133 | 3 | 1,748,856 | 0 | --- | 0 | --- | 2 | 2,000,000 | 40 | 14,245,177 |
| Foundations | 0 | --- | 2 | 3,140,000 | 1 | 429,000 | 0 | --- | 0 | --- | 0 | --- | 0 | --- | 3 | 3,569,000 |
| Educational Endowments | 1 | 284,250 | 1 | 2,500,000 | 2 | 600,000 | 1 | 1,300,000 | 0 | --- | 2 | 1,000000 | 1 | 207,000 | 8 | 5,891,250 |
| Venture Capital | 2 | 6,043,060 | 1 | 46,000 | 4 | 2,144,394 | 5 | 8,511,402 | 9 | 8,714,396 | 3 | 786,999 | 10 | 2,378,900 | 34 | 28,567,151 |
| TOTAL | 24 | 34,681,849 | 47 | 52,337,982 | 78 | 102,965,021 | 77 | 110,863,863 | 67 | 123,621,711 | 35 | 22,105,728 | 48 | 33,569,418 | 398 | 480,145,572 |

GF0745

Tables XIV-47 and XIV-48 show discounts classified by sales and earnings of issuer, respectively. Whereas companies with sales of under $5 million accounted for 66.4 percent of all transactions involving discounts in excess of 50.0 percent and for 68.4 percent of all transactions involving discounts of between 40.1 percent and 50.0 percent, they accounted for only 23.8 percent and 24.8 percent, respectively, of transactions involving discounts of less than 10.0 percent and of between 10.1 percent and 20.0 percent. Whereas companies with sales of $100 million or more accounted for only 6.1 percent of transactions involving discounts of more than 40.0 percent, they accounted for 21.1 percent of transactions involving discounts of not more than 20 percent.

Issuers' earnings are far more related to size of discount than are issuers' sales. For example, there were no transactions in publicly traded common stock of companies with earnings deficits in the fiscal years preceding the dates of the transactions. Whereas transactions in shares of companies with earnings of less than $1 million accounted for 93.9 percent of all transactions involving discounts of more than 40.0 percent, they accounted for only 49.4 percent of transactions involving discounts of 20.0 percent or less. The greater influence on the size of the discounts of earnings than of sales is probably due to the more proximate relationship of earnings than of sales to the riskiness of the investment.

Tables XIV-49 and XIV-50 show the average[103] discounts, in each of the years in the sample period, classified by sales and earnings of issuers, respectively. Average discounts rose over the period January 1, 1966 through June 30, 1969. They were 15.3 percent in 1966, 17.7 percent in 1967, 24.5 percent in 1968, and 27.9 percent in the first half of 1969. The average were generally higher for the smaller companies; however, the small number of transactions in the shares of these companies makes the averages sensitive to extreme points. Table XIV-59 shows a monotonic decline from 25.6 percent for companies with earnings between 0 and $99,000 to 15.8 percent for companies with earnings of $10 million or more.

To capture the simultaneous influence on the size of the discount of some of the variables described above, and certain other variables, the Study regressed the discount in each transaction on dummy variables describing some of the institutional purchasers, the trading market for the publicly-held shares, the S&P index, and the size of the purchase. The estimated coefficients attached to each of the variables and the t-values are shown in table XIV-51.

TABLE XIV-5I. ESTIMATES OF COEFFICIENTS OF REGRESSION OF DISCOUNTS OBTAINED IN PURCHASES OF RESTRICTED COMMON STOCK ON SELECTED EXPLANATORY VARIABLES, 338 TRANSACTIONS BETWEEN JAN. I, 1966, AND JUNE 3RD, 1969

| Variable | Regression Coefficient | t-Value |
|---|---|---|
| Intercept | -0.512 | 3.22 |
| Banks (DV) | .096 | 3.50 |
| Investments advisers (DV) | .124 | 4.41 |
| Life insurance companies (DV) | .107 | 3.07 |
| Venture capital companies (DV) | .233 | 6.05 |
| N.Y.S.E. (DV) | -.085 | -2.65 |
| A.S.E. (DV) | -.046 | -1.43 |
| O.T.C. reporting companies (DV) | -.063 | -2.93 |
| S& P composite index | .007 | 4.53 |
| Size of purchase | .018 | -2.66 |

Note: The adjusted R2 of the regression is 0.202. "DV" means dummy variable.

[103] The averages are weighted by the number of transactions in each sales (or earnings) range. The averages for each range are themselves simple averages of the discounts on the individual transactions within each range.

All variables except for the dummy variable associated with the ASE are statistically significant. The regression is read in two parts—(1) the intercept and dummy variables and (2) the last two variables. To obtain the influence on the discount of bank purchases of restricted stock of a company with securities listed on the NYSE, one sums the intercept, the coefficient for the bank dummy variable, and the coefficient for the NYSE dummy variable (-.512 + .096 -.085). To obtain the effect on discounts of purchases by venture capital companies of NYSE securities one substitutes the coefficient attached to the latter dummy variable for the coefficient attached to the bank dummy variable (-.512 + .233 -.085). Substituting the venture capital company coefficient for the bank coefficient adds 13.7 percent points to the discount (.233 -.096). Similarly, substituting the OTC coefficient for the NYSE coefficient adds 2.2 percentage points to the discount [- 0.63 -(-.085)]. In effect, the dummy variables modify the intercept of the regression for each combination of independent dummy variables, in this case one institution variable and one market variable. The second part of the regression involves ordinary variables—the S&P index (coeval with the month in which the given transaction took place) and the size of the purchase. The size of the discount is positively related to the S&P index rising 0.7 percentage points for each one point change in the S&P index.[104] The discount is lower for larger purchases because larger purchases are associated with larger issuers.

Table XIV-52 summarizes the regression assuming the transaction size and the S&P index are at their mean values. The numbers in the cells were calculated in the manner described in the text above. The discounts in each cell would increase by 0.7 percentage points for each unit change in the S&P index. For example, if instead of its mean value, 98.20, the S&P index were at 100.0, the numbers in each cell would increase by 1.3 (i.e., 0.7 (100.0 -98.2)). The average discount for the 338 transactions was 24.0 percent.

TABLE XIV-52 AVERAGE DISCOUNTS ON PURCHASES OF RESTRICTED COMMON STOCK CLASSIFIED BY INSTITUTION4L PURCHASER AND TRADING MARKETS. JAN. 1. 1966-JUNE 30, 1969

| | Market | | | |
|---|---|---|---|---|
| Class of institution | N.Y.S.E. | A.S.E. | OTC – RPG | OTC – Non RPG |
| Banks | 18.7 | 22.5 | 25.6 | 31.9 |
| Investment advisers | 21.6 | 25.4 | 28.5 | 34.8 |
| Life insurance companies | 19.9 | 23.7 | 26.8 | 33.1 |
| Venture capital companies | 32.5 | 36.3 | 39.4 | 45.7 |
| Other institutions | 9.2 | 13.0 | 16.1 | 22.4 |

Note: This table is based on the regression coefficients reported in Table XIV-51. The discounts are calculated on the basis of the mean value of the S&P index and the mean transactions size. The discounts would decrease by 1.8 percentage points for each $1,000,000 increase in the size of the transaction.

[104] This result may indicate that Investors are skeptical about the permanence of rises in stock prices and, therefore, revise upward their estimate of the risk of the restricted security when stock prices are high.

Table XIV-47
DISCOUNTS ON PURCHASE PRICE OF RESTRICTED COMMON STOCK
CLASSIFIED BY SIZE OF TRANSACTION AND SALES OF ISSUER
January 1, 1966 to June 30, 1969
(Publicly Held Companies Only)

| | 50.1% or More | | 40.1% to 50% | | 30.1% to 40.0% | | 20.1% to 30.0% | | 10.1% to 20.0% | | 0.1% to 10.0% | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sales of Issuer (Thousand of Dollars) | No. of Transactior | Size of Transactior (Dollars) | No. of Transactior | Size of Transactior (Dollars) | No. of Transactior | Size of Transactior (Dollars) | No. of Transactior | Size of Transactior (Dollars) | No. of Transactior | Size of Transactior (Dollars) | No. of Transactior | Size of Transactior (Dollars) | No. of Transactior | Size of Transactior (Dollars) |
| Less than 100 | 11 | 2,894,999 | 7 | 2,554,000 | 17 | 19,642,364 | 16 | 12,197,394 | 62 | 12,267,292 | 9 | 12,566,000 | 66 | 62,122,049 |
| 100 – 999 | 7 | 474,040 | 2 | 1,221,000 | 0 | — | 1 | 500,000 | 1 | 1,018,500 | 2 | 3,877,500 | 13 | 7,091,040 |
| 1,000 – 4,999 | 8 | 4,605,505 | 13 | 8,170,747 | 12 | 10,675,150 | 15 | 9,865,951 | 10 | 9,351,738 | 3 | 2,295,200 | 61 | 44,964,291 |
| 5,000 – 19,999 | 6 | 1,620,015 | 4 | 1,147,305 | 13 | 25,986,008 | 25 | 27,238,210 | 24 | 21,441,347 | 47 | 12,750,481 | 119 | 90,183,366 |
| 20,000 – 99,999 | 3 | 605,689 | 3 | 4,372,676 | 6 | 11,499,250 | 8 | 11,187,954 | 18 | 22,231,737 | 17 | 36,481,954 | 55 | 87,009,260 |
| 100,000 or More | 2 | 1,805,068 | 0 | — | 2 | 2,049,998 | 3 | 7,903,586 | 10 | 24,959,483 | 7 | 10,832,925 | 24 | 47,551,060 |
| Tot | 37 | 12,005,316 | 29 | 17,465,728 | 50 | 69,852,770 | 68 | 69,523,095 | 69 | 91,270,097 | 85 | 78,804,060 | 338 | 338,921,06 |

Table XIV-48
DISCOUNTS ON PURCHASE PRICE OF RESTRICTED COMMON STOCK
CLASSIFIED BY SIZE OF TRANSACTION AND EARNINGS OF ISSUER
January 1, 1966 to June 30, 1969
(Publicly Held Companies Only)

| | 50.1% or More | | 40.1% to 50% | | 30.1% to 40.0% | | 20.1% to 30.0% | | 10.1% to 20.0% | | 0.1% to 10.0% | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Eamings of Issuer (Thousands ( Dollars) | No. of Transactior | Size of Transactior (Dollars) | No. of Transactior | Size of Transactior (Dollars) | No. of Transactior | Size of Transactior (Dollars) | No. of Transactior | Size of Transactior (Dollars) | No. of Transactior | Size of Transactior (Dollars) | No. of Transactior | Size of Transactior (Dollars) | No. of Transactior | Size of Transactior (Dollars) |
| Deficit | 0 | — | 0 | — | 0 | — | 0 | — | 0 | — | 0 | — | 0 | — |
| 0 – 99 | 27 | 6,901,243 | 19 | 11,003,559 | 28 | 37,681,014 | 31 | 32,796,968 | 19 | 29,553,418 | 46 | 25,122,042 | 170 | 143,058,24 |
| 100 – 999 | 8 | 3,229,005 | 10 | 6,462,169 | 19 | 26,121,758 | 24 | 20,344,492 | 25 | 12,480,144 | 16 | 16,790,565 | 102 | 85,498,133 |
| 1,000 – 9,99 | 0 | — | 0 | — | 3 | 6,049,998 | 12 | 16,313,549 | 17 | 16,955,530 | 15 | 27,948,007 | 47 | 67,267,084 |
| 10,000or Mo | 2 | 1,805,068 | 0 | — | 0 | — | 1 | 68,086 | 8 | 19,814,968 | 8 | 21,409,483 | 19 | 43,097,605 |
| TOTA | 37 | 12,005,316 | 29 | 17,465,72 | 50 | 69,852,770 | 68 | 69,523,095 | 69 | 69,523,095 | 85 | 78,804,060 | 338 | 338,921,06 |

Table XIV-49
AVERAGE DISCOUNTS ON PURCHASE PRICE OF RESTRICTED COMMON STOCK
CLASSIFIED BY SALES OF ISSUER AND AVERAGE PERCENTAGE DISCOUNT, OVER TIME
(PUBLICLY HELD COMPANIES ONLY)

SALES OF ISSUER
(Thousands of Dollars)

| | Less than 100 | | 100 – 999 | | 1,000 – 4,999 | | 5,000 – 19,999 | | 20,000 – 99,999 | | 100,000 or more | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | No. of Transactior | Average Discount (Percentag | No. of Transactior | Average Discount (Percentag | No. of Transactior | Average Discount (Percentag | No. of Transactior | Average Discount (Percentag | No. of Transactior | Average Discount (Percentag | No. of Transactior | Average Discount (Percentag | No. of Transactior | Average Discount (Percentag |
| 1966 | 0 | — | 0 | — | 1 | 61.4 | 7 | 23.8 | 10 | 9.3 | 3 | .2 | 21 | 15.3 |
| 1967 | 1 | 17.2 | 3 | 79.4 | 11 | 37.4 | 36 | 9.5 | 6 | 6.2 | 6 | 11.2 | 63 | 17.7 |
| 1968 | 2 | 25.6 | 5 | 30.0 | 36 | 32.6 | 47 | 18.7 | 26 | 73.9 | 11 | 21.1 | 127 | 24.5 |
| 1969 | 3 | 41.4 | 5 | 45.5 | 13 | 26.9 | 29 | 27.1 | 13 | 21.4 | 4 | 25.8 | 67 | 27.9 |
| TOTA | 6 | 32.1 | 13 | 47.4 | 61 | 32.7 | 119 | 18.3 | 55 | 18.7 | 24 | 16.8 | 278 | 23.1 |

Note:
Averages of discounts are weighted by the number of transactions in each range of sales

Table XIV-50
AVERAGE DISCOUNTS ON PURCHASE PRICE OF RESTRICTED COMMON STOCK
CLASSIFIED BY EARNINGS OF ISSUER AND AVERAGE PERCENTAGE DISCOUNT, OVER TIME
(PUBLICLY HELD COMPANIES ONLY)

SALES OF ISSUER
(Thousands of Dollars)

| | Deficit | | 0 – 99 | | 100 – 999 | | 1,000 – 9,999 | | 10,000 or More | | Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | No. of Transaction: | Average Discount (Percentage | No. of Transaction: | Average Discount (Percentag | No. of Transaction: | Average Discount (Percentage | No. of Transaction: | Average Discount (Percentage) | No. of Transaction: | Average Discount (Percentage) | No. of Transaction: | Average Discount (Percentage |
| 1966 | 0 | — | 8 | 14.7 | 5 | 25.6 | 4 | 10.7 | 4 | 8.4 | 21 | 15.3 |
| 1967 | 0 | — | 35 | 21.8 | 12 | 19.2 | 12 | 8.1 | 4 | 4.9 | 63 | 17.7 |
| 1968 | 0 | — | 48 | 27.1 | 49 | 26.0 | 21 | 15.5 | 9 | 23.2 | 127 | 24.5 |
| 1969 | 0 | — | 19 | 33.3 | 36 | 26.6 | 10 | 23.8 | 2 | 19.3 | 67 | 27.9 |
| TOTAL | 0 | — | 110 | 25.6 | 102 | 23.4 | 47 | 15.0 | 19 | 15.8 | 278 | 29.1 |

Note:
Averages of discounts are weighted by the number of transactions in each range of earnings

*Facts, ideas, opinions on matters of importance to businessmen and their professional advisors.*

# SRC® Quarterly Reports

Standard Research Consultants 26 Broadway, New York, NY 10004 (212) 558-6660

VOLUME 10. NO. 1 SPRING 1983

## REVENUE RULING 77-287 REVISITED

*William F. Pittock, Financial Analysts, and*
*Charles H. Stryker, C.F.A., Senior Consultant*
*Standard Research Consultants*

Valuators are often retained to determine for estate tax, gift tax, and other purposes the fair market value of corporate stock that cannot be readily sold in the public market (securities whose transferability is limited under the Federal securities laws). In determining the fair market value of corporate securities subject to resale limitations, valuators typically discount the freely traded value of the securities to reflect their lack of marketability. Such a discount is appropriate in light of the additional risk assumed in owning a security whose transferability is restricted. The holder of restricted securities may sustain losses or forego profits because of his or her inability to sell them. Specifically, such a holder assumes additional business risk (i.e., changes in the issuer's business or operations which would have caused the holder to sell absent the resale restrictions), financial risk (i.e., changes in the issuer's financial condition, e.g., leverage, which would have caused the holder to sell absent the resale restrictions), and market risk (i.e., changes in the supply and demand for the issuer's securities which might not allow the contemplated means of legally disposing of the stock to materialize).

In 1977 the IRS issued Revenue Ruling 77-287 ("RR77-287"), "Valuation of Securities Restricted from Immediate Resale," to provide IRS personnel and taxpayers with information and guidance in valuing securities that are restricted under the Federal securities laws. In determining the difference between the fair market value of registered, actively traded common stock and equivalent stock that cannot be publicly traded, RR77-287 indicated that: (1) no automatic formulas could be used to determine discounts for lack of marketability; (2) generally such discounts were related to both the sales and the earnings of the issuing corporation; (3) such discounts generally were a function of the trading market for the equivalent actively traded stock (e.g., discounts for restricted securities issued by NYSE companies are generally lower than discounts for those issued by ASE companies); and (4) such discounts generally were a function of the resale constraints applicable to the restricted security (e.g., the existence of demand and/or piggyback registration rights; the issue of who bears the cost of registration). These conclusions were based upon the SEC's Institutional Investor Study ("the SEC Study"), which analyzed discounts associated with restricted common stock sold during the period January 1, 1966 – June 30, 1969.

There have been many institutional and environmental changes since the SEC Study was performed which may impact upon the current applicability of RR77-287 (e.g., the adoption and revision of Rule 144, which governs the public sale of restricted stock; and the development of NASDAQ, the national O-T-C trading market). Therefore we believe it is important to analyze recent private placements of common stock to test the current applicability of both RR77-287 and the SEC Study.

*Empirical Evidence and Findings*

In order to assess the magnitude of discounts for lack of marketability, private placements of restricted common stock were studied. The placements were of securities identical in every way but marketability to securities traded on recognized exchanges or in the over-the-counter market. Comparing the placement prices of such restricted securities to the market price, on the placement date, of the same issuer's unrestricted shares provided a good indication of the magnitude of negotiated discounts for lack of marketability.

Twenty-eight private placements of restricted common stock from October 1978 through June 1982 were selected for study. To be eligible for inclusion in our study, the private placement had to involve the common stock (or the

EXHIBIT 48



REV 04/16/03

GF0750

common stock with purchase warrants) of a United States corporation and had to occur as an arm's-length transaction between unrelated parties which did not affect control of the corporation. In addition, the corporation could not be in a state of bankruptcy; nor could it be a financial, insurance, or real estate company. Finally, the corporation's unrestricted common stock had to be quoted in the *National Monthly Stock Summary*, the placement price could not be less than $1.00 per share, and adequate information about the placement and the corporation had to be available. Discounts range from 7% to 91% with a median of 45%.

We pursued an empirical study of the twenty-eight placements to test the four determinants of discounts (earnings, sales, trading market, and resale agreement provisions) outlined in RR77-287. Approximately sixty percent of the placements in the study were by companies reporting deficits in the fiscal year prior to the placement date (no such deficits were reported in the SEC Study). Profitability in the fiscal year preceding the placement did not seem to influence the discount; the 22 companies showing a profit in that year had a median discount of 45%, while the 17 that were unprofitable had a median of 46%. Rather, it was the *earnings pattern* of the issuer that seemed to matter. On the average, companies that were profitable in each of the five years prior to the date of placement appeared to sell restricted stock at substantially smaller discounts from market than did those with two, three, or four unprofitable years during the five-year period:

| Profitable Years of Latest Five | Number of Placements | Median Discount % |
|---|---|---|
| Five | 2 | 34 |
| Two to Four | 12 | 39 |
| Zero or One | 14 | 46 |
| All Companies | 28 | 45 |

The size of the issuing company, in terms of revenues for the year preceding the placement, also appeared to influence discount levels. Revenues of all issuing companies were ranked from high to low and grouped by quartile as follows:

| Issuer Size | Revenue Range ($000) | Discount % |
|---|---|---|
| Highest Quartile | 29,700-275,000 | 36 |
| Second Quartile | 9,500-29,699 | 45 |
| Third Quartile | 1,650-9,499 | 34 |
| Lowest Quartile | 500-1,649 | 48 |

The largest issuers of restricted stock tended to be associated with lower discounts. The median discount of the lowest quartile was above the median for all companies. It should be noted that four of the seven third-quartile placements were by natural resource companies with reserves valued significantly in excess of book value. As none of the other quartiles possessed as many natural resource companies, this factor may explain the relatively low median discount of this quartile.

Four of the twenty-eight companies studied had unrestricted common shares that were traded on either the ASE or NYSE. Discounts associated with the four placements ranged from 25% to 58%, with a median of 47%, not significantly different from the 45% median of the remaining (unlisted) companies. The fact that there did not seem to be a relationship between the issuer's trading market and discount might be attributable to the development, since 1969, of the NASDAQ trading system. However, the relative absence of exchange-listed companies from the study (it included only one NYSE company, which had a discount of 36%) leaves room for further speculation on this point.

Ten of the twenty-eight private placements involved various resale agreement (registration) provisions such as trigger or piggyback rights. The former permits the holder of restricted securities to request and presumably obtain registration of his or her shares while the latter enables such a shareholder to participate in a registration requested by the issuer. The median discount for the ten placements involving resale agreement provisions was 53%, versus a median discount for all twenty-eight placements of 45%, a result that appears to be at odds with the implications of RR77-287. It should be noted that the promulgation of Rule 144 in 1972, plus subsequent relaxations of this rule, have enhanced the marketability of restricted stock and thus made registration rights less important. However, these changes have *not* enhanced the marketability of restricted stock issued by closely held or private companies.

In assessing these findings, it is important to note that the number of placements under study is comparatively small due to the difficulty in identifying such transactions and the decline in the absolute number of equity placements since the SEC Study.

*Other Considerations*
While the focus of this article is those discount-for-lack-of-marketability factors discussed in RR77-287, we believe that a summary of other relevant factors is appropriate.

1. *The length of time the stock was held by the owner*: Rule 144, which governs the orderly public sale of restricted stock, requires a minimum holding period of at least two years before unregistered, restricted stock can be sold, within specified limitations, in the public market. Also, for nonaffiliates of the issuer, a holding period of three or more years allows the holder of restricted stock to sell his or her entire holdings to the general public.

2. *The length of time it would take to dispose of the restricted stock*: The longer the time needed to dispose of the restricted stock, the greater the discount, *ceteris parabis*. The length of time may be affected by Rule 144, a registration by the issuer (note: restricted stock cannot be sold during a registration period), sales by related parties that may inhibit Rule 144 sales, etc.

3. *The financial fundamentals of the issuer*: The sounder the capitalization of an issuer, the lower the discount tends to be.

4. *Investors' appraisals of the unrestricted stock being traded in the marketplace*: Specifically, one would analyze the issuer's relative price: earnings multiples, dividend yields, and ratios of market price to tangible book value as compared with those of comparable companies (rational investors require higher discounts from an issuer whose stock they believe is overpriced).

5. *Trading volume and volatility of the unrestricted stock*: The greater the company's trading volume, the greater the likelihood that upon expiration of the resale restrictions, the restricted stock can be sold publicly without disrupting the market for the issuer's unrestricted stock. A purchase of restricted stock assumes less additional risk when the market for the issuer's unrestricted stock is stable.

*Conclusion*
In conclusion, RR77-287 is helpful as a guide to the valuation of restricted securities. Its appropriateness, however, depends upon the degree to which its observations can be supported by current empirical evidence. The findings of our ongoing private placement study indicate that certain elements of the ruling (i.e., those pertaining to the trading market and resale agreement provisions) may no longer have relevance in the determination of discounts for lack of marketability. In addition, we believe that the ruling does not address many of the valuation factors that currently affect discounts for lack of marketability.

This article has attempted to isolate and examine the factors that bear upon the magnitude of discounts for lack of marketability. In addition to being probative of discounts in cases involving noncontrolling restricted common stock interests issued in private placements, these factors are equally important in the valuation of noncontrolling closely held common stock, qualified option stock (discussed in the Winter 1983 issue of *SRC Quarterly Reports*), and other forms of restricted ownership interest.

*Estimation of the Discount Associated with the Transfer of Restricted Securities*

*Robert R. Trout*

*Taxes*, June 1977, pp. 381-384

*The author sets up an economic model that can be used to estimate the discount that should be accorded a transfer of restricted securities.*

Often it is the case in the valuation of an estate, a gift, or a charitable donation that the property being transferred is common stock in a closely held corporation or unregistered shares ("investment letter stock") in a company whose securities are publicly traded. In both cases the valuation expert must include in the valuation a discount for the lack of marketability of the shares.

As a means of estimating this discount a financial model was constructed that will provide an estimate of the discount that should be accorded investment letter of privately offered common stock. The data used in the development of this model consisted of purchases of investment letter stock by six mutual funds during the period 1968-1972. The six mutual funds are: The New America Fund, Inc., Source Capital, Inc., Diebold Venture Capital Corp., Highland Capital Corp., The Value Line Development Capital Corp., and Value Line Special Situations Fund. Some purchases by these mutual funds during the study period were excluded due to errors in reporting or due to a lack of information concerning one or more of the financial variables. Only those securities that were purchased as common stock were included in the study. Common shares acquired by the conversion of convertible bonds or warrants were excluded due to the problem of incorporating the premium paid for these instruments into the financial model. The final database consisted of 60 purchases during the five-year time period.

The variables included in the analysis appear below, and a description of each variable follows:

(1) Exchange listing;
(2) Number of shared outstanding;
(3) Shares purchased/shares outstanding—% control;
(4) Indicator variable for purchases of less than 1%; and
(5) Value of purchase.

The variable representing exchange listing is an indicator variable that takes on a value of one if the security is listed on either the New York or the American Stock Exchange, and a value of zero otherwise. Since major exchange listing generally enhances marketability, one would expect this variable to be negatively related to the discount.

The number of shares outstanding is a proxy for the marketability of the shares purchased. The more shares outstanding, presumably, the larger will be the market for these shares. One would expect this variable to be negatively related to the discount since the marketability of a security should be inversely related to the discount.

The number of shares purchased as a % of the shares outstanding is included since it may measure either one or both of two effects: control or the ease with which the purchaser can dispose of the unrestricted shares. The control effect should act to reduce the discount since a purchaser should be willing to pay a premium for control; thus, if the variable measures this effect, the result would be a negative relationship between % and control and the discount. It is also possible that this variable could measure the lack of marketability of the purchase. A large number of shares would be more difficult to dispose of than a small number of shares. This effect is usually referred to as the "lockage effect" and would be positively related to the discount. To sort out this problem, two additional variables were included in the model.

First, an indicator variable was included that takes on a value of one if a purchase amounted to less than 1% of the shares outstanding, or a value of zero otherwise. The indicator variable reflects the reduced discount necessary for a purchase of a small number of shares of a restricted security that could easily be sold. One would expect the indicator variable to be negatively related to the level of the discount, since very small purchases should have small discounts.

EXHIBIT 49

Second, a value-of-purchase variable was included to measure the effect of the level of the investment on the discount. This value is not the price actually paid for the security; rather, it is the value the shares purchased would have if they were registered, or unrestricted. This variable can also be considered a proxy for the blockage effect, and should be positively related to the discount to measure the difficulty a seller usually has in disposing of a large block of stock.

The relationship between observed discounts on sales of restricted securities and the factors presented above may be explored with the use of multiple regression analysis. This relationship can be expressed in the following way:

$$D_i = B_o + B_i X_{if} + B_2 X_{i2} + \ldots + B_j X_{if} + E_i$$

Where:

$D_i$ = the discount observed for the *i*th transaction
$B_o$ = the intercept term
$B_j$ = coefficients relating financial variables to discounts
$X_{if}$ = financial characteristics of the *i*th transaction
$E_i$ = random error term for the *i*th transaction

The individual units of observation are the purchases of unregistered shares of common stock, while the financial characteristics are exchange listing, shares outstanding, % control and value of the purchase.

**Empirical Results**

The results of the multiple regressions appear in Table 1. The column in this table headed "Regression Coefficient" (column 3) describes the parameters of the function, which will be referred to as "Model 1." Each of these parameters indicates the percentage point change in the discount resulting from a one-unit change in the variable specified, holding each of the other variables in the equation constant.

Associated with each of these regression coefficients is a standard error that measures the degree of uncertainty with which each coefficient was measured. The column headed "T-Statistic" (column 4) describes, for each regression coefficient, the ratio of the regression coefficient to its standard error. The larger the t-statistic, the more reliable is the estimate. T-statistics of 1.67 or higher indicate that if the true effect of the variable were zero, the observed coefficient would occur less than one time in ten. For t-statistics of 2.70 or higher, this likelihood is less than one in a hundred. All of the five variables have significance levels of less than 5%, which means that one is 95% confident that the true value of each parameter is not zero.

TABLE 1
Regression Coefficients Relating Discounts for Purchases of Restricted Shares with Selected Financial Variables

| Variable | Unit of Variable (1) | Mean Value (2) | Regression Coefficient (3) | T-Statistic (4) | Level of Significance (5) |
|---|---|---|---|---|---|
| Intercept | — | — | 43.53 | 12.40 | <1% |
| Exchange listing | Indicator | 0.17 | -8.39 | 2.00 | 5% |
| Shares outstanding | Millions | 1.51 | -4.08 | 2.71 | 1% |
| Percent control | % | 7.41 | -0.87 | 2.59 | 1% |
| Control less than 1% | Indicator | 0.10 | -12.11 | 2.15 | 3% |
| Value | $ million | 1.08 | 4.15 | 2.38 | 2% |
| Discount | % | 33.45 | — | — | — |
| Number of observations | | 60 | | | |
| Standard error of estimate | | 11.70 | | | |
| R | | 0.49 | | | |
| F (5, 54 df) | | 4.78 | | | |

Table 2
Regression Coefficients Relating Discounts for Purchases of Restricted Shares with Selected Financial Variables

| Variable | Unit of Variable (1) | Mean Value (2) | Regression Coefficient (3) | T-Statistic (4) | Level of Significance (5) |
|---|---|---|---|---|---|
| Intercept | — | — | 47.37 | 11.29 | <1% |
| Exchange listing | Indicator | 0.17 | -8.19 | 1.92 | 1% |
| Shares outstanding | Millions | 1.51 | -3.90 | 2.51 | 6% |
| Percent control | Percent | 7.41 | -1.06 | 2.38 | 1% |
| Control less than 1% | Indicator | 0.10 | -14.27 | 2.50 | 2% |
| Value* Control (Blockage) | Million—% | 11.10 | 0.24 | 1.87 | 1% |
| Discount | % | 33.45 | — | — | 6% |
| Number of observations | | 60 | | | — |
| Standard error of estimate | | 11.92 | | | |
| R | | 0.46 | | | <1% |
| F (5, 54 df) | | 4.19 | | | <1% |

As expected, the coefficient for exchange listing is negative and has a value of –8.39, indicating an 8.39 percentage point lower discount accorded exchange-listed securities when controlling for the other variables in the model. The coefficient for the indicator variable has a value of –12.11, which indicates that small purchases of stock have a 12.11 percentage point lower discount than purchases that amount to more than 1% of the outstanding shares, other variables held constant.

The coefficient of the control variable is –0.87, which means that the discount should decline by a little less than 1 percentage point for each additional 1% of control involved in the purchase.

The coefficient for shares outstanding is –4.08, which indicates that the discount will be about four percentage points smaller for each additional million shares of common stock of the issue which are outstanding.

The value of purchase, or blockage, variable has a coefficient of 4.75, which indicates that the discount will increase by 4.75 percentage points for each additional million dollars of stock purchased.

It should be apparent that the effects of the value of purchase and percent control variables on the discount are in opposite directions. For larger purchases of stock, the % control will be larger and the discount smaller; however, the value of the purchase will be larger, which will increase the discount. Thus, the effects of the two variables tend to offset one another.

It is also possible that the effect of the value of purchase on the discount may vary according to the level of the control. To examine this possibility an interaction term, defined as the product of the value of purchase and control, was included in the model in place of the value-of-purchase variable. The results of this regression are in Table 2, and this equation will be referred to as "Model 2."

The coefficients of the variables that represent exchange listing, shares outstanding and control of less than 1% are very similar to those found in Table 1, and are about as statistically significant.

The coefficient of the control variable in this model is negative; however, this variable must be examined in conjunction with the interaction term. To properly analyze the effect of this variable, one must find the partial derivative of the dependent variable (discount) with respect to control, as indicated below:

$$\frac{\partial D}{\partial C} = -1/06 + (.24 \text{ X Value})$$

Thus, the effect of control depends on the value of the purchase. As the value increases, the negative effect of control on the discount diminishes. For example, each additional % of control will decrease the discount by 1.08 percentage points on a purchase valued at $1 million.

The effect of the value of purchase on the discount in turn depends on the level of control. As was the case in examining the effect of value on the discount requires use of partial derivatives:

$$\frac{\partial D}{\partial C} = -0.24 * \text{Control}$$

The partial derivative indicates that for any given level of control, the discount will increase as the value of the unrestricted securities purchased increases. For example, each additional $1 million of value will increase the discount by 2.4 percentage points in a purchase of 10% of the outstanding shares.

This interaction effect can be termed the blockage effect: the larger the size of the block, the larger the discount. Notice that the effect of the value on the discount is greater for purchases that involve larger amounts of control than smaller amounts of control. However, this is offset somewhat by the fact that the control variable itself acts to reduce the discount, and the larger the percent control, the smaller will be the discount.

The adjusted coefficient of multiple correlations (called R) for Model 1 has a value of .49, which indicates a moderate ability of this model to account for variations in the observed discounts. Most purchases of restricted stocks are negotiated between buyer and seller and these agreements have specified characteristics that are not constant among all such transactions. These characteristics, such as the exact agreement on registration responsibility, may differ widely among these transactions, and this fact would lead one not to expect any model to be extremely accurate in predicting discounts. However, the variables in the model are all significant, both singularly and when taken in concert (as measured by the F-statistic).

Another factor that may explain the "unexplained variation" in the discounts in the relative bargaining power of sellers of restricted securities. This strength may vary considerably among sellers and significantly influence the size of the discount that they must accept in order to sell unregistered securities. One must remember that the market for unregistered shares is not a continuous auction market as are the markets for most registered securities, so that buyers and sellers or both are faced with a situation where one or the other, or both sides, may be lacking relevant information about the market.

Model 2, which contains the interaction term, is slightly inferior to Model 1 in that it has a lower coefficient of multiple correlation (.46 versus .49), smaller F-statistic (4.19 versus 4.78) and some of the individual t-statistics are smaller than the corresponding t-statistics in Model 1.

Actual prediction using each model will be fairly similar, except for instances where the value of the securities purchases is large, and where large is, say above $5 million. This is due to the fact that none of the purchases in the data set involved blocks of stock with unrestricted market values of this size. In fact, the value of the largest purchase was $4.4 million.

For an example of how to use the models to predict the discount, consider a hypothetical situation consisting of a transfer of 100,000 shares of investment letter stock. Assume the issuing company has 1 million listed common shares outstanding and that the average of the high-low price on the date of transfer is $25 per share. Inserting these values into Model 1 results in a predicted discount of 34.2%, while use of Model 2 results in a predicted discount of 30.7%.

**Conclusion**

Each of the two models presented in this report accounts for a significant portion of the variation in discounts given mutual funds in purchases of investment letter stock; however, a significant part of this variation remains unexplained by these models. The fact that much of this variation remains unexplained is not surprising given the nature of the purchase agreements and the lack of an auction market for restricted securities.

The models are useful in predicting the discount which should be accorded a transfer of restricted shares given information about the variables included in the models. Other relevant information, if any, should be used to adjust this predicted discount accordingly before it is applied to any transfer in a valuation case.

*Robert R. Trout is a member of the faculty of the Graduate School of Administration at the University of California, Irvine, and a principal in Trout, Shulman & Associates, Los Angles.*

## Willamette Management Associates Study

Willamette Management Associates, Inc. analyzed private placements of restricted stocks for the period of January 1, 1981, through May 31, 1984. The early part of this unpublished study overlapped the last part of the SRC study, but very few transactions took place during the period of overlap. Most of the transactions in the Willamette study occurred in 1983.

Willamette identified 33 transactions during that period that could reasonably be classified as arm's length and for which the price of the restricted shares could be compared directly with the price of trades in identical but unrestricted shares of the same company at the same time. The median discount for the 33 restricted stock transactions compared to the prices of their freely tradable counterparts was 31.2 percent.

The slightly lower average percentage discounts for private placements during this time may be attributable to the somewhat depressed pricing in the public stock market, which in turn reflected the recessionary economic conditions prevalent during most of the period of the study. I believe this study basically supports the long-term average discount of 35 percent for transactions in restricted stock compared with the prices of their freely tradable counterparts.

## Summary of Studies on Restricted Stock Transactions

The seven independent studies of restricted stock transactions reported above cover several hundred transactions spanning the late 1960s through 1984. Considering the number of independent researchers and the very long time span encompassing a wide variety of market conditions, the results are remarkably consistent, as summarized in Table 10–2.

In many of the cases of restricted stock transactions tabulated in Table 10–2, the purchaser of the stock had the right to register the stock for sale in the existing public market. Sometimes investors get a commitment from the issuer to register the securities at a certain future date, sometimes investors have "demand" rights, where they can force the issuer to register the securities at a time of their choosing. Sometimes they get "piggyback" rights where there is no obligation other than to include the securities on any future registration that the issuer undertakes. And sometimes the purchaser has to rely on Rule 144, where they can sell after two years if other parts of the rule are followed. In any case, they generally expect to be able to resell the stock in the public market in the foreseeable future.

## Revenue Ruling 77-287

EXHIBIT 50

In 1977, the Internal Revenue Service specifically recognized the relevance of the data discussed in the foregoing sections in Revenue Ruling 77-287. The purpose of the ruling is "to provide information and

TABLE 10-2

**Summary of Restricted Stock Studies**

| Study | Years Covered in Study | Average Discount % |
|---|---|---|
| SEC, Overall Average[a] | 1966-1969 | 25.8 |
| SEC, Nonreporting OTC Companies[a] | 1966-1969 | 32.6 |
| Gelman[b] | 1968-1970 | 33.0 |
| Trout[c] | 1968-1972 | 33.5[i] |
| Moroney[d] | h | 35.6 |
| Maher[e] | 1969-1973 | 35.4 |
| Standard Research Consultants[f] | 1978-1982 | 45.0[i] |
| Willamette Management Associates, Inc.[g] | 1981-1984 | 31.2[i] |

[a] From "Discounts Involved in Purchases of Common Stock (1966-1969)," *Institutional Investor Study Report of the Securities and Exchange Commission*, H.R. Doc. No. 64, Part 5, 92d Cong., 1st Sess. 1971, pp. 2444-2456.

[b] From Milton Gelman, "An Economist-Financial Analyst's Approach to Valuing Stock of a Closely Held Company," *Journal of Taxation*, June 1972, pp. 353-354.

[c] From Robert R. Trout, "Estimation of the Discount Associated with the Transfer of Restricted Securities," *Taxes*, June 1977, pp. 381-385.

[d] From Robert E. Moroney, "Most Courts Overvalue Closely Held Stocks," *Taxes*, March 1973, pp. 144-154.

[e] From J. Michael Maher, "Discounts for Lack of Marketability for Closely-Held Business Interests," *Taxes*, September 1976, pp. 562-571.

[f] From "Revenue Ruling 77-287 Revisited," *SRC Quarterly Reports*, Spring 1983, pp. 1-3.

[g] From Willamette Management Associates study (unpublished).

[h] Although the years covered in this study are likely to be 1969-1972, no specific years were given in the published account.

[i] Median discounts

guidance to taxpayers, Internal Revenue Service personnel, and others concerned with the valuation, for Federal tax purposes, of securities that cannot be immediately resold because they are restricted from resale pursuant to Federal security laws."[14]

The ruling specifically references the SEC *Institutional Investor Study* and the values of restricted securities purchased by investment companies as part of the "relevant facts and circumstances that bear upon the worth of restricted stock." The complete text of Revenue Ruling 77-287 is shown as Exhibit 19–4 in Chapter 19, "Estate Planning and Tax Valuations."

## Studies of Private Transactions Prior to Public Offerings

Before the 1980s, virtually all the empirical research directed at quantifying the value of ready marketability, or the discount for lack of it, focused on comparisons between the prices of freely tradable shares of stock and restricted but otherwise identical shares of stock.

[14]Revenue Ruling 77-287 (1977-2 C.B. 319), Section 1.