# ATTACHMENT H

Later, in 1977, the Internal Revenue Service issued Revenue Ruling 77-287 which deals with the valuation of restricted stocks. In the ruling, the Internal Revenue Service indicated factors that, along with the factors in Revenue Ruling 59-60, should be considered when valuing restricted stock. The factors listed in the ruling are:

- Any declaration of trust, trust agreement, and any other agreements relating to the shares of restricted stock
- Any document showing any offers to buy or sell or indications of interest in buying or selling the restricted shares
- The latest prospectus of the company
- Annual reports of the company for three to five years preceding the valuation date
- The trading prices and trading volume of the related class of traded securities one month preceding the valuation date, if they are traded on a stock exchange
- The relationship of the parties to the agreements concerning the restricted stock, such as whether they are members of the immediate family or perhaps whether they are officers or directors of the company
- Whether the interest being valued represents a majority or minority ownership

There are a number of studies and empirical evidence supporting lack of marketability discounts. Some of the studies bearing on the extent of lack of marketability discounts (restricted versus freely traded shares), their dates and their findings are as follows:

Summary of Restricted Stock Studies:

| Study | Period of Study | Mean Discount for Lack of Marketability | Median Discount for Lack of Marketability |
|---|---|---|---|
| Securities and Exchange Commission | 1966 to 1969 | 25.8% | n/a |
| Hall and Polacek | 1979 to 1992 | 23% | n/a |
| Silber | 1981 to 1988 | 33.75% | n/a |
| Stryker and Pittock | 1978 to 1982 | n/a | 45% |
| Maher | 1969 to 1973 | 35% | n/a |
| Gelman | 1968 to 1970 | 33% | 33% |
| Moroney | 1969 to 1973 | 35.6% | 33% |
| Trout | 1968 to 1972 | 33.45% | n/a |
| Arneson | Referred to Maher and Moroney studies | 50% or greater | n/a |
| Willamette Management Associates Study | 1981 to 1984 | n/a | 31.2% |
| Management Planning Inc., Restricted Stock Study | 1980 to 1995 | 27.7% | 28.8% |
| FMV Opinions, Inc. | 1980 to 1997 | 22.1% | 20.1% |
| Johnson Study | 1991 to 1995 | 20% | n/a |
| Columbia Financial Advisors, Inc. | 1996 to 1997 | 21% | 14% |
| Columbia Financial Advisors, Inc. (SEC Rule 144 change from 2-year to 1-year waiting period) | 1997 to 1998 | 13% | 9% |

The results of the Management Planning, Inc., Restricted Stock Study indicated that some factors had a clear correlation to the restricted stock discount while others had some or no correlation. Factors with a clear correlation include:

3. The market could have been anticipating the SEC's change in the holding period from two years to one year. This cannot be verified, but it is likely that the market participants knew of the proposed changes.

The second Columbia study was after the Rule 144 holding period was shortened to one year. This study analyzed 15 transactions and found an average discount of 13 percent and a median discount of 9 percent. Columbia's explanation for the lower discounts was directed at the SEC holding period requirement change from two years to one year.

The Columbia study concluded that the studies conducted after 1990 are not relevant for arriving at discounts for lack of marketability on privately-held businesses because the studies are on restricted securities which are traded in a market for restricted securities, which is more liquid than the private securities market. Thus, this increased liquidity is not available in privately-held securities.

Initial Public Offering Studies:
Another important group of studies is based on transactions in privately-held companies shortly before initial public offerings. Both Shannon Pratt's firm, Willamette Management, Inc., and John Emory of Robert W. Baird & Co., Incorporated, have conducted extensive analysis of this subject. Dr. Pratt, in his book Valuing a Business concludes: "The evidence from the Emory and Willamette Management Associate studies taken together is compelling. The studies covered hundreds of transactions over more than 20 years. Average differentials between private transaction prices and public market prices varied under different market conditions, ranging from about 40 percent to 63 percent, after eliminating the outliers."

Emory Studies, January 1980 through March 2000:
The eight studies conducted by John D. Emory from January 1980 through April 1997 eliminated development-stage companies, companies with losses, and companies with an IPO price of less than $5 per share. All of the transactions took place within a five-month period prior to the initial public offering.

Mr. Emory says of these studies: "... the companies were promising in nature, and their securities had good potential for becoming readily marketable. ...The final question to be answered is that if the kinds of discounts ... are appropriate for promising situations where marketability is probable, but not a certainty, how much greater should discounts be for the more typical company's stock that has no marketability, little if any chance of ever becoming marketable, and is in a neutral or unpromising situation?"

Emory conducted further studies from May 1997 through March 2000, including Dot.Com companies in his study. Further, from May 1997 through December 2000, Emory prepared two more studies based on his review of 1,847 IPO prospectuses over this period.

The average of the means and the average of the medians in the eleven successive studies (593 transactions) conducted by Emory covering about 21 years in segments of about eighteen months to three years in duration were 47% for the mean and 48% for the median.

Willamette Management Associates Studies, 1975 through 1997:
The eighteen studies conducted by Willamette Management Associates analyze IPO transactions from 1975 to 1997. The window of transactions in this study was from 1 to 36 months prior to the IPO. Willamette used registration statements in gathering its information, and made adjustments to reflect differences in market conditions between the dates.

The median discounts in the eighteen studies conducted by Willamette covering about 23 years in segments of one to three years in duration ranged from 31.8% in 1991 to 73.1% in 1984.

Hitchner Studies No. 1:
James R. Hitchner, CPA/ABV, ASA, took the Emory studies and broke them down by analyzing the fifth, fourth, and third months prior to the date of the IPO to see if the discounts were higher for those transactions farthest from the IPO date. He conducted this analysis on pre-IPO transactions and stock option transactions occurring between January 1980 and June 1995 and between January 1994 and June 1995.

The following summarizes the mean and median discounts for the fifth, fourth and third months prior to the date of the IPO in Hitchner's first study of pre-IPO transactions:

| Transactions between: | Transaction taking place in the fifth/fourth/third month | | Per Emory Study (within five/four/three months of IPO) | |
|---|---|---|---|---|
| | Mean | Median | Mean | Median |
| January 1980 and June 1995 | | | | |
| Fifth month – 47 and 219 transactions, respectively | 54% | 50% | 45% | 43% |
| Fourth month – 43 and 172 transactions, respectively | 51% | 51% | 43% | 42% |
| Third month – 56 and 129 transactions, respectively | 43% | 42% | 40% | 39% |
| | | | | |
| January 1994 and June 1995 | | | | |
| Fifth Month – 10 and 46 transactions, respectively | 50% | 46% | 45% | 45% |
| Fourth month – 17 and 36 transactions, respectively | 48% | 50% | 43% | 45% |
| Third month – 11 and 19 transactions, respectively | 44% | 43% | 39% | 38% |

The results of this study support the movement of discounts downward as the transactions moved toward the initial public offering or towards marketability and liquidity.

Hitchner Studies No. 2:
Hitchner also performed an analysis of pre-IPO transactions and the related prospectuses of guideline companies from February 1995 to June 1996 in the consulting industry. He found 23 transactions among 14 companies within 15 months of their IPO.

The following table summarizes the result of this study:

| Discounts | Mean | Median |
|---|---|---|
| Overall | 51% | 52% |
| At Five Months | 49% | 53% |
| Five Months or Less | 44% | 36% |
| At Four Months | 56% | 57% |
| Four Months or Less | 41% | 36% |
| At Three Months | 31% | 31% |
| Three Months or Less | 31% | 35% |

Again, the results of this study support the movement of discounts downward as the transactions moved toward the initial public offering, or towards marketability and liquidity.

# ATTACHMENT I

Publicly traded companies frequently issue restricted, or "letter," stock in making acquisitions or raising capital, because the time and cost of registering the new stock with the SEC would make a registration at the time of the transaction impractical. Also, founders or other insiders may own portions of a publicly traded company's stock that has never been registered for public trading. Even though such stock cannot be sold to the public on the open market, it may be sold in private transactions under certain circumstances. Until 1995, such transactions had to be reported to the SEC and thus became a matter of public record. Since then, analysts have collected such transaction data from private sources. Therefore, there is available a body of data on the prices of private transactions in restricted securities that can be used for comparison with prices of the same but unrestricted securities eligible for trading on the open market.

SEC *Accounting Release No. 113* specifically points out that the discount for lack of marketability frequently is substantial:

> Restricted securities are often purchased at a discount, frequently substantial, from the market price of outstanding unrestricted securities of the same class. This reflects the fact that securities which cannot be readily sold in the public market are less valuable than securities which can be sold, and also the fact that by the direct sale of restricted securities, sellers avoid the expense, time and public disclosure which registration entails.[7]

It is exceedingly important to keep in mind that restrictions on the transfer of restricted stock eventually lapse, usually within 12 months.[8] At that point, investors can sell the shares into the existing market, subject to whatever volume and other restrictions may be imposed by SEC Rule 144.[9] Consequently, all other things being equal, shares of closely held stock, which may never have the benefit of a public market, would be expected to require higher discounts for lack of marketability than those applicable to restricted stock of a public company. The market does, indeed, impose a higher discount on closely held stock than on restricted stock of a public company, as will be shown below.

<u>SEC Institutional Investor Study</u>

In a major SEC study of institutional investor actions, one of the topics was the amount of discount at which transactions in restricted stock took place compared to the prices of identical but unrestricted stock on the open market.[10]

The SEC study found an average discount of 24 percent for all transactions of restricted stock compared to their unrestricted counterpart stock. In addition, the study found generally higher discounts for

---

[7] Securities and Exchange Commission, *Accounting Series Release No. 113: Statement Regarding Restricted Securities* (Chicago: Commerce Clearing House, Federal Securities Law Reports, 1977), pp. 62, 285.

[8] On February 18, 1997, the SEC adopted amendments to reduce the holding period requirements under Rule 144 of the Securities Act from two years to one year for the resale of limited amounts of restricted securities. Most of the studies cited in this report, which are the most current studies available, were conducted prior to this amendment.

[9] 17 CFR 230.144 (revised April 1, 1990).

[10] "Discounts Involved in Purchases of Common Stock," in U.S. 92nd Congress, 1st Session, House, *Institutional Investor Study Report of the Securities and Exchange Commission*, (Washington: Government Printing Office, March 10, 1971, 5:2444–2456, Document No. 92–64, Part 5).

restricted stocks that would trade on the over-the-counter market (OTC) once the restrictions expired, as opposed to stocks that would trade on the New York Stock Exchange (NYSE) or the American Stock Exchange (ASE). The average discount for stocks that would trade on the OTC when their restrictions expired was approximately 35 percent.

The Internal Revenue Service (the "Service"), in Revenue Ruling 77–287, specifically acknowledges the conclusions of the SEC *Institutional Investor Study* and the values of restricted securities purchased by investment companies as part of the "relevant facts and circumstances that bear upon the worth of restricted stock." The Service states the purpose of Revenue Ruling 77–287 as: "to provide information and guidance to taxpayers, [Service], and others concerned with the valuation, for Federal tax purposes, of securities that cannot be immediately resold because they are restricted from resale pursuant to Federal security laws."[11]

One of the outgrowths of the SEC *Institutional Investor Study* was SEC *Accounting Series Releases, No. 113*, dated October 13, 1969, and *No. 118*, dated December 23, 1970, which require investment companies registered under the Investment Company Act of 1940 to disclose their policies for the cost and valuation of their restricted securities. The result was that an ongoing body of data became available on the relationship between restricted stock prices and their freely tradable counterparts, which can provide empirical benchmarks for quantifying marketability discounts.

## Gelman Study

In 1972, Milton Gelman published the results of his study of prices paid for restricted securities by four closed-end investment companies specializing in restricted securities investments.[12] From 89 transactions between 1968 and 1970, Gelman found that both the arithmetic average and median discounts were 33 percent and that almost 60 percent of the purchases were at discounts of 30 percent and higher.

## Trout Study

In a study of restricted stocks purchased by mutual funds from 1968 to 1972, Robert Trout attempted to construct a financial model that would provide an estimate of the discount appropriate for a private company's stock.[13] His multiple regression model included 60 purchases and found an average discount of approximately 33.5 percent for restricted stock compared to its freely traded counterpart stock.

As the SEC study showed, he also found that companies with stocks listed on national exchanges had lower discounts on their restricted stock transactions than did stocks traded over-the-counter.

[11] Revenue Ruling 77–287, 1977–2 C.B. 319, Section I.
[12] Milton Gelman, "An Economist-Financial Analyst's Approach to Valuing Stock of a Closely Held Company," *Journal of Taxation*, June 1972, pp. 353–4.
[13] Robert R. Trout, "Estimation of the Discount Associated with the Transfer of Restricted Securities," *Taxes*, June 1977, pp. 381–5.

Moroney Study

In an article published in the March 1973 issue of *Taxes*, Robert E. Moroney presented the results of his study of the prices paid for restricted securities by 10 registered investment companies.[14] The study reflected 146 purchases. The average discount was approximately 35.6 percent and the median discount was 33.0 percent.

Moroney points out:

> It goes without saying that each cash purchase of a block of restricted equity securities fully satisfied the requirement that the purchase price be one, "at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Reg. Sec. 20.2031–1(b)[15]

Moroney contrasts the evidence of the actual cash transactions with the lower average discounts for lack of marketability adjudicated in most prior court decisions on gift and estate tax matters. He points out, however, that the evidence on the prices of restricted stocks was not available as a benchmark for quantifying lack of marketability discounts at the times of the prior cases, and he suggests that higher discounts for lack of marketability be allowed in the future now that the relevant data are available. As Moroney puts it:

> Obviously the courts in the past have overvalued minority interests in closely held companies for federal tax purposes. But most (probably all) of those decisions were handed down without benefit of the facts of life recently made available for all to see.
>
> Some appraisers have for years had a strong gut feeling that they should use far greater discounts for nonmarketability than the courts had allowed. From now on those appraisers need not stop at 35 percent merely because it's perhaps the largest discount clearly approved in a court decision. Appraisers can now cite a number of known arm's-length transactions in which the discount ranged up to 90 percent.[16]

Maher Study

Another well-documented study on discounts for lack of marketability for closely held companies was done by J. Michael Maher and published in the September 1976 issue of *Taxes*.[17] Maher's approach was similar to Moroney's in that it compared prices paid for restricted stocks with the market prices of their unrestricted counterparts. He found that mutual funds were not purchasing restricted securities during 1974 and 1975, which were very depressed years for the stock market. Therefore, the data actually used covered the five-year period from 1969 through 1973. The study showed that "the mean discount for lack of marketability for the years 1969–73 amounted to 35.43 percent."[18] He further eliminated the top and

---

[14] Robert E. Moroney, "Most Courts Overvalue Closely-Held Stocks," *Taxes*, March 1973, pp. 144–56.
[15] Ibid., p. 151.
[16] Ibid., p. 154.
[17] J. Michael Maher, "Discounts for Lack of Marketability for Closely-Held Business Interests," *Taxes*, September 1976, pp. 562–71.
[18] Ibid., p. 571.

bottom 10 percent of purchases in an effort to remove especially high- and low-risk situations. The result was almost identical with the "outliers" removed, with a mean discount of 34.73 percent.

Maher concludes:

> The result I have reached is that most appraisers underestimate the proper discount for lack of marketability. The results seem to indicate that this discount should be about 35 percent. Perhaps this makes sense because by committing funds to restricted common stock, the willing buyer (a) would be denied the opportunity to take advantage of other investments, and (b) would continue to have his investment at the risk of the business until the shares could be offered to the public or another buyer is found.
>
> The 35 percent discount would not contain elements of a discount for a minority interest because it is measured against the current fair market value of securities actively traded (other minority interests). Consequently, appraisers should also consider a discount for a minority interest in those closely held corporations where a discount is applicable.[19]

## Standard Research Consultants Study

In 1983, Standard Research Consultants (SRC) analyzed private placements of common stock to test the current applicability of the SEC study.[20] SRC studied 28 private placements of restricted common stock from October 1978 through June 1982. Discounts ranged from 7 percent to 91 percent with a median of 45 percent.

## Willamette Management Associates Study

Willamette Management Associates analyzed private placements of restricted stocks for the period of January 1, 1981, through May 31, 1984. The early part of this unpublished study overlapped the last part of the SRC study, but very few transactions took place during the period of overlap. Most of the transactions in the Willamette Management Associates study occurred in 1983.

Willamette Management Associates identified 33 transactions during that period that could reasonably be classified as arm's-length and for which the price of the restricted shares could be compared directly with the price of trades in identical but unrestricted shares of the same company at the same time. The median discount for the 33 restricted stock transactions compared to the prices of their freely tradable counterparts was 31.2 percent.

The slightly lower average percentage discounts for private placements during this time may be attributable to the somewhat depressed prices in the public stock market, which in turn reflected the recessionary economic conditions prevalent during most of the period of the study.

[19] Ibid., p. 571.
[20] "Revenue Ruling 77–287 Revisited," *SRC Quarterly Reports*, Spring 1983, pp. 1–3.

Silber Study

In a 1991 article in the *Financial Analysts Journal*, William L. Silber presented the results of analysis of 69 private placements of common stock of publicly traded companies between 1981 and 1988.[21] He found that the average discount was 33.75 percent, very consistent with earlier studies.

He also found that the size of the discount tended to be higher for private placements that were larger as a percentage of the shares outstanding. He found a small effect on the discount on the basis of the size of the company as measured by revenues. "Tripling the revenues from the sample mean of $40 million to $120 million increases the relative price of the restricted shares by only 2.9 points (from 71.7 to 74.6)."[22]

FMV Study

FMV Opinions, Inc., examined restricted stock transactions from 1980 through 1997.[23] This analysis of 243 transactions resulted in a mean discount of approximately 22.1 percent and a median discount of 20.1 percent.

The FMV study also examined the relationship between the discount and several factors including: the industry, trading market (exchange traded or over-the-counter), the percentage size of the block, and the total market value of the subject corporation. According to the study, the discount for lack of marketability was higher for over-the-counter traded securities.

Management Planning Study

Management Planning, Inc., performed a study titled "Analysis of Restricted Stocks of Public Companies: 1980–1996," which covered a total of 53 transactions after elimination of transactions for various factors. The elimination factors included: (1) companies that suffered a loss in the fiscal year preceding the private transaction; (2) companies defined as "start-up" companies (i.e., companies having revenues of less than $3 million); and (3) transactions that were known to have registration rights. Their study found an average price discount of 27 percent.

Columbia Financial Advisors, Inc., Studies

Columbia Financial Advisors, Inc. (CFAI) conducted a study of the sale of restricted securities over the period January 1, 1996, through April 30, 1997. The transactions were pulled from Securities Data Corporation's *U.S. New Issues* private placement database. A total of 123 private placements were included in this database for the period of time chosen. A total of 100 transactions were eliminated for various reasons, leaving 23 transactions for the study. The discounts ranged from 0.8 to 67.5 percent for all 23 transactions with an average of approximately 21 percent and a median of 14 percent.

---

[21] William L. Silber, "Discounts on Restricted Stock: The Impact of Illiquidity on Stock Prices," *Financial Analysts Journal*, July–August 1991, pp. 60–64.
[22] Ibid., p. 64.
[23] Espen Robak, "FMV Introduces Detailed Restricted Stock Study," *Shannon Pratt's Business Valuation Update*, November 2001, pp. 1–3.

These discounts are generally lower than the discounts recorded in the earlier studies discussed above. One explanation for this is the increase in volume of privately placed stock (Rule 144(a)) in the past several years. Also, it was known at that time that a change in the holding period required by the SEC from two years to one year was scheduled to take place as of April 29, 1997.

Using the same methodology and sources discussed above, CFAI conducted another study in an attempt to identify the impact of the increased liquidity resulting from the change in the holding period required by the SEC. They examined private common equity placements during the period January 1, 1997, through December 31, 1998. There were a total of 270 private placements of common stocks during that time. A total of 255 transactions were eliminated for various reasons, leaving 15 transactions for the study. The discounts ranged from 0 to 30 percent for the 15 transactions, with an average of approximately 13 percent and a median of 9 percent.

These discounts are generally lower than those indicated in the earlier CFAI study. This is most likely due to the change in the holding period required by the SEC from two years to one year.

## Summary of Restricted Stock Studies

The 13 independent studies of restricted stock transactions reported above cover several hundred transactions spanning the late 1960s through 1998. The results of these studies are summarized below:

| Study | Years Covered in Study | Average Discount |
|---|---|---|
| SEC Overall Average | 1966–69 | 25.8% |
| SEC Nonreporting OTC Companies | 1966–69 | 32.6% |
| Milton Gelman | 1968–70 | 33.0% |
| Robert R. Trout | 1968–72 | 33.5% |
| Robert E. Moroney | 1969–72 | 35.6% |
| J. Michael Maher | 1968–73 | 35.4% |
| Standard Research Consultants | 1978–82 | 45.0% |
| Willamette Management Associates | 1981–84 | 31.2% |
| William L. Silber | 1981–88 | 33.8% |
| Management Planning, Inc. | 1980–96 | 27.0% |
| Columbia Financial Advisors, Inc. | 1996–97 | 21.0% |
| Columbia Financial Advisors, Inc. | 1997–98 | 13.0% |
| FMV Opinions, Inc. | 1980–97 | 22.1% |

In many of the cases of restricted stock transactions as presented above, the purchaser of the stock had the right to register the stock for sale in the existing public market. Sometimes investors get a commitment from the issuer to register the securities at a certain future date. Sometimes investors have "demand" rights, where they can force the issuer to register the securities at a time of their choosing. Sometimes they get "piggyback" rights where there is no obligation other than to include the securities on any future registration that the issuer undertakes. And sometimes the purchaser has to rely on Rule 144, where they can sell after one year (previously two years) if other parts of the rule are followed. In recent years, more transactions have occurred under Rule 144(a), which relaxes some of the restrictions on such transactions, thus making the restricted securities more marketable. In any case, they generally expect to be able to resell the stock in the public market in the foreseeable future. As one would expect, as the holding period

has decreased and as activity in the private placement market has increased, the discounts indicated from these studies have decreased.

## Private Transactions Prior to Public Offerings

Before the 1980s, virtually all the empirical research directed at quantifying the value of ready marketability, or the discount for lack of it, focused on comparisons between the prices of freely tradable shares of stock and restricted but otherwise identical shares of stock. Observers agreed that discounts for lack of marketability for shares of closely held companies were greater than those for restricted shares of publicly held companies, since the closely held shares had no established market in which they could eventually sell following the removal of certain trading restrictions. However, data for quantifying how much greater this discount should be had not yet been developed and analyzed.

During the 1980s, an investment banking firm, Robert W. Baird & Co., and a business valuation firm, Willamette Management Associates, independently undertook development of data with which to address this question. The research proceeded along basically parallel lines, although each firm was unaware of the other's efforts until their respective research was far along and each had enough data to reach some conclusions.

### Emory Studies

A number of studies were conducted under the direction of John D. Emory, president of Emory Business Valuation, LLC, in Milwaukee, Wisconsin.[24] The studies covered various time periods from 1980 through 2000.[25]

The basic methodology for the studies was identical. The population of companies in each study consisted entirely of initial public offerings during the respective period in which Baird & Company either participated in or received prospectuses. The prospectuses of these 4,088 offerings were analyzed to determine the relationship between the price at which the stock was initially offered to the public and the

---

[24] Mr. Emory was formerly with Robert W. Baird & Co. where the studies through April 1997 were conducted.

[25] John D. Emory, "The Value of Marketability as Illustrated in Initial Public Offerings of Common Stock—January 1980 through June 1981," *Business Valuation News*, September 1985, pp. 21–24, also in *ASA Valuation*, June 1986, pp. 62–66; "The Value of Marketability as Illustrated in Initial Public Offerings of Common Stock, January 1985 through June 1986," *Business Valuation Review*, December 1986, pp.12–15; "The Value of Marketability as Illustrated in Initial Public Offerings of Common Stock (August 1987–January 1989)," *Business Valuation Review*, June 1989, pp. 55–57; "The Value of Marketability as Illustrated in Initial Public Offerings of Common Stock, February 1989–July 1990," *Business Valuation Review*, December 1990, pp. 114–16; "The Value of Marketability as Illustrated in Initial Public Offerings of Common Stock, August 1990 through January 1992," *Business Valuation Review*, December 1992, pp. 208–212; "The Value of Marketability as Illustrated in Initial Public Offerings of Common Stock, February 1992 through July 1993," *Business Valuation Review*, March 1994, pp. 3–5; "The Value of Marketability as Illustrated in Initial Public Offerings of Common Stock, January 1994 through June 1995," *Business Valuation Review*, December 1995, pp. 155–160; "The Value of Marketability as Illustrated in Initial Public Offerings of Common Stock, November 1995 through April 1997," *Business Valuation Review*, September 1997, pp. 123–131; John D. Emory Sr., F.R. Dengel III, and John D. Emory Jr., "The Value of Marketability as Illustrated in Initial Public Offerings of Common Stock, May 1997 through December 2000, *Business Valuation Review*, September 2001, pp. 15–19.

price at which the latest private transaction took place up to five months prior to the initial public offering. Emory gives the following explanatory statements regarding the studies:

> In order to provide a reasonable comparison of prices before and at the IPO, we felt it necessary both for the company to have been reasonably sound and for the private transaction to have occurred within a period of five months prior to the offering date. . . . In most cases, the transactions were stated to have been, or could reasonably be expected to have been, at fair market value. All ultimately would have had to be able to withstand SEC, IRS or judicial review, particularly in light of the subsequent public offering.[26]

Following the above guidelines, and after eliminating development-stage companies, companies with a history of operating losses, companies with an IPO price under $5 per share, and companies with no transactions within five months prior to the initial public offering, 346 qualifying transactions were included in the studies.

Excluding the results of the 1980–81 study, which were uncharacteristically high, the mean price discount was in the range of 42 to 48 percent and the median price discount was in the range of 40 to 45 percent. The fact that these averages are a little more than 10 percentage points greater than those indicated by most of the above-mentioned restricted stock studies is about what one might reasonably expect, since the transactions occurred when there was not yet any established secondary market for the subject stock. A summary of the results of each of the Baird initial public offering studies is presented below.

| | Prospectuses | Qualifying | Indicated Discount | |
|---|---|---|---|---|
| Study | Reviewed | Transactions | Mean | Median |
| 1980–1981 | 97 | 13 | 60% | 66% |
| 1985–1986 | 130 | 21 | 43% | 43% |
| 1987–1989 | 98 | 27 | 45% | 45% |
| 1989–1990 | 157 | 23 | 45% | 40% |
| 1990–1991 | 266 | 35 | 42% | 40% |
| 1992–1993 | 443 | 54 | 45% | 44% |
| 1994–1995 | 318 | 46 | 45% | 45% |
| 1995–1997 | 732 | 91 | 43% | 42% |
| 1997–2000 | 1,847 | 36 | 48% | 44% |

Emory makes the following observations:

> Since an initial public offering often takes four or five months from conception to completion, the transactions mentioned in the prospectuses in the study would almost certainly have reflected the likelihood of marketability and any other value adjustment associated with being a public company. . . . The final question to be answered is that if the kinds of discounts found in this study occur where marketability is probable, but not a certainty, how much greater should discounts be for the more typical company's stock that has no marketability, little if any chance of ever becoming marketable, and is in a neutral to unpromising situation? . . . it is apparent that the lack of marketability is one of

[26] John D. Emory Sr., F.R. Dengel III, and John D. Emory Jr., "The Value of Marketability as Illustrated in Initial Public Offerings of Common Stock, May 1997 through December 2000, *Business Valuation Review*, September 2001, pp. 15–19.

> the more important components of value, and the public marketplace emphasizes this point.[27]

In September 2000, Mr. Emory and his associates published a similar study that dealt with dot-com companies only.[28] This study covered the period from May 1997 through March 2000. They used a total of 53 sales transactions, 42 of which were convertible preferred stock transactions and 11 of which were common stock transactions. For the 53 transactions, they arrived at a mean discount of 54 percent and a median discount of 54 percent. For the 42 convertible preferred stock transactions, they arrived at a 54 percent mean discount and a 53 percent median discount. For the 11 common stock transactions, the mean discount was 54 percent while the median was 59 percent.

Willamette Management Associates Studies

Over several years, Willamette Management Associates has conducted a series of 18 studies of the prices of private stock transactions relative to those of subsequent public offerings of stock of the same companies. The 18 studies covered the years 1975 through 1997. The results of this series of studies were most recently published in 2001.[29]

The Willamette Management Associates studies differed from the Baird studies in several respects. One important difference was that the source documents for the Willamette Management Associates studies were complete SEC registration statements primarily on Form S–1 and Form S–18, whereas the source documents for the Baird studies were prospectuses. Although the prospectus constitutes a portion of the registration statement, it is required to disclose only transactions with affiliated parties. Form S–1 and S–18 registration statements require disclosure of *all* private transactions in the stock within the three years prior to the public offering, in a section of the registration statement separate from the prospectus portion.

The Willamette Management Associates studies attempted to include only transactions that were on an arm's-length basis. The data analyzed included sales of stock in private placements and repurchases of treasury stock by the companies. Transactions involving the granting of stock options were eliminated. Transactions with corporate insiders or related parties were eliminated unless it was verified (by telephone) that the transactions were bona fide, arm's-length transactions. Therefore, although there was considerable overlap in the public offerings studied by Baird and those studied by Willamette Management Associates, the actual transactions included in the two sets of studies were quite different.

For the years 1975 through 1996, the Willamette Management Associates study considered all public offerings in the files of the *IPO Reporter*.[30] Through 1996, the *IPO Reporter* annually published information on all completed initial public offerings excluding closed-end funds. For the year 1997, the list of public offerings to be considered in our study was obtained from the Corporate New Issues database provided by Thomson Financial Securities Data. Eliminated from our analyses were financial institutions, real estate investment trusts (REITs), natural resource companies, offerings priced at $1 or

---

[27] Ibid.
[28] John D. Emory Sr., F.R. Dengel III, and John D. Emory Jr., "The Value of Marketability as Illustrated in Initial Public Offerings of Dot-Com Companies, May 1997 through March 2000," *Business Valuation Review*, September 2000, pp. 111–121.
[29] Shannon P. Pratt, *Business Valuation Discounts and Premiums* (New York: John Wiley & Sons, 2001), pp. 84–86.
[30] *Going Public: The IPO Reporter* (New York: Investment Dealers' Digest, Inc., annual).

less per share, and offerings on units or warrants, since such offerings might be thought to have unique characteristics. The private transactions analyzed took place during the 36 months prior to the initial public offering. If a company had more than one transaction that met the study's criteria, all such transactions were included. Beginning with 1994, multiple transactions within 12 months at the same price were treated as a single transaction.

For each transaction for which meaningful earnings data were available in the registration statement as of both the private transaction and public offering dates, the price/earnings multiple of each private transaction was compared with the subsequent public offering price/earnings multiple. Companies that had no meaningful earnings as of the private transaction date and/or the public offering date were eliminated.

Because the private transactions occurred over a period of up to three years prior to the public offering, Willamette Management Associates made adjustments to reflect differences in market conditions for stocks of the respective industries between the time of each private transaction and the time of each subsequent public offering. Price/earnings multiples were adjusted for differences in the industry average price/earnings multiple between the time of the private transaction and that of the public offering.

The formula used to derive the discount for the private transaction price from the public offering price was as follows:

$$\frac{P/E_o - P/E_p\left(\dfrac{IP/E_o}{IP/E_p}\right)}{P/E_o}$$

where:

$P/E_o$ = Price/earnings multiple of the public offering
$P/E_p$ = Price/earnings multiple of the private transaction
$IP/E_o$ = Industry price/earnings multiple at time of offering
$IP/E_p$ = Industry price/earnings multiple at time of private transaction

The results of the Willamette Management Associates studies described above are presented in the following table. As shown, the average discounts varied from period to period, but, in most cases, were higher than the average discounts shown in the studies for restricted stocks of companies that already had an established public trading market—which is the result one would expect.

**Summary of Discounts for Private Transaction P/E Multiples Compared to Public Offering P/E Multiples Adjusted for Changes in Industry P/E Multiples**

| Time Period | Number of Companies Analyzed | Number of Transactions Analyzed | Standard Mean Discount | Trimmed Mean Discount* | Median Discount | Standard Deviation |
|---|---|---|---|---|---|---|
| 1975–78 | 17 | 31 | 34.0% | 43.4% | 52.5% | 58.6% |
| 1979 | 9 | 17 | 55.6% | 56.8% | 62.7% | 30.2% |
| 1980–82 | 58 | 113 | 48.0% | 51.9% | 56.5% | 29.8% |
| 1983 | 85 | 214 | 50.1% | 55.2% | 60.7% | 34.7% |
| 1984 | 20 | 33 | 43.2% | 52.9% | 73.1% | 63.9% |
| 1985 | 18 | 25 | 41.3% | 47.3% | 42.6% | 43.5% |
| 1986 | 47 | 74 | 38.5% | 44.7% | 47.4% | 44.2% |
| 1987 | 25 | 40 | 36.9% | 44.9% | 43.8% | 49.9% |
| 1988 | 13 | 19 | 41.5% | 42.5% | 51.8% | 29.5% |
| 1989 | 9 | 19 | 47.3% | 46.9% | 50.3% | 18.6% |
| 1990 | 17 | 23 | 30.5% | 33.0% | 48.5% | 42.7% |
| 1991 | 27 | 34 | 24.2% | 28.9% | 31.8% | 37.7% |
| 1992 | 36 | 75 | 41.9% | 47.0% | 51.7% | 42.6% |
| 1993 | 51 | 110 | 46.9% | 49.9% | 53.3% | 33.9% |
| 1994 | 31 | 48 | 31.9% | 38.4% | 42.0% | 49.6% |
| 1995 | 42 | 66 | 32.2% | 47.4% | 58.7% | 76.4% |
| 1996 | 17 | 22 | 31.5% | 34.5% | 44.3% | 45.4% |
| 1997 | 34 | 44 | 28.4% | 30.5% | 35.2% | 46.7% |

* Excludes the highest and lowest deciles of indicated discounts.

Source: Shannon P. Pratt, *Business Valuation Discounts and Premiums* (New York: John Wiley & Sons, 2001), p. 85.

## Summary of Private Transaction Studies

The evidence from the Baird and Willamette Management Associates studies taken together seems quite compelling. The studies covered hundreds of transactions during a span of over 20 years. Median differentials between private transaction prices and public market prices varied under different market conditions, ranging from about 35 to 63 percent, after eliminating the "outliers." This is very strong support for the hypothesis that the fair market values of minority interests in privately held companies are greatly discounted from their publicly traded counterparts.

# ATTACHMENT J

# FEDERAL RESERVE statistical release

These data are released each Monday. The availability of the release is announced on (202) 452-3206.

H.15 (519)

## SELECTED INTEREST RATES

Yields in percent per annum

For immediate release
March 13, 2000

| Instruments | 2000 Mar 6 | 2000 Mar 7 | 2000 Mar 8 | 2000 Mar 9 | 2000 Mar 10 | Week Ending Mar 10 | Week Ending Mar 3 | 2000 Feb |
|---|---|---|---|---|---|---|---|---|
| Federal funds (effective) [1 2 3] | 5.73 | 5.68 | 5.77 | 5.79 | 5.75 | 5.73 | 5.77 | 5.73 |
| Commercial paper [3 4 5 6] | | | | | | | | |
| Nonfinancial | | | | | | | | |
| 1-month | 5.82 | 5.81 | 5.83 | 5.82 | 5.86 | 5.83 | 5.78 | 5.76 |
| 2-month | 5.85 | 5.86 | 5.87 | 5.89 | 5.89 | 5.87 | 5.85 | 5.81 |
| 3-month | 5.88 | 5.90 | 5.90 | 5.92 | 5.94 | 5.91 | 5.89 | 5.87 |
| Financial | | | | | | | | |
| 1-month | 5.84 | 5.84 | 5.84 | 5.86 | 5.86 | 5.85 | 5.79 | 5.78 |
| 2-month | 5.89 | 5.90 | 5.89 | 5.90 | 5.91 | 5.90 | 5.88 | 5.84 |
| 3-month | 5.93 | 5.94 | 5.95 | 5.95 | 5.97 | 5.95 | 5.93 | 5.90 |
| Bankers acceptances (top rated) [3 4 7] | | | | | | | | |
| 3-month | 5.98 | 5.98 | 5.98 | 6.00 | 6.03 | 5.99 | 5.97 | 5.94 |
| 6-month | 6.15 | 6.15 | 6.15 | 6.16 | 6.16 | 6.15 | 6.15 | 6.11 |
| CDs (secondary market) [3 8] | | | | | | | | |
| 1-month | 5.90 | 5.92 | 5.91 | 5.96 | 5.95 | 5.93 | 5.87 | 5.83 |
| 3-month | 6.05 | 6.07 | 6.06 | 6.08 | 6.10 | 6.07 | 6.04 | 6.01 |
| 6-month | 6.27 | 6.29 | 6.28 | 6.29 | 6.30 | 6.29 | 6.26 | 6.26 |
| Eurodollar deposits (London) [3 9] | | | | | | | | |
| 1-month | 5.81 | 5.88 | 5.88 | 5.94 | 5.78 | 5.86 | 5.82 | 5.80 |
| 3-month | 6.00 | 6.03 | 6.06 | 6.09 | 6.06 | 6.05 | 6.06 | 6.02 |
| 6-month | 6.22 | 6.25 | 6.28 | 6.28 | 6.28 | 6.26 | 6.27 | 6.26 |
| Bank prime loan [2 3 10] | 8.75 | 8.75 | 8.75 | 8.75 | 8.75 | 8.75 | 8.75 | 8.73 |
| Discount window borrowing [2 11] | 5.25 | 5.25 | 5.25 | 5.25 | 5.25 | 5.25 | 5.25 | 5.24 |
| U.S. government securities | | | | | | | | |
| Treasury bills | | | | | | | | |
| Auction high [3 4 12] | | | | | | | | |
| 3-month | 5.69 | | | | | 5.69 | 5.67 | 5.57 |
| 6-month | 5.83 | | | | | 5.83 | 5.77 | 5.75 |
| 1-year | | | | | | | 5.84 | 5.91 |
| Secondary market [3 4] | | | | | | | | |
| 3-month | 5.66 | 5.67 | 5.67 | 5.66 | 5.70 | 5.67 | 5.62 | 5.55 |
| 6-month | 5.79 | 5.81 | 5.83 | 5.80 | 5.85 | 5.82 | 5.76 | 5.72 |
| 1-year | 5.84 | 5.82 | 5.82 | 5.80 | 5.85 | 5.83 | 5.83 | 5.84 |
| Treasury constant maturities [13] | | | | | | | | |
| 3-month | 5.85 | 5.83 | 5.83 | 5.82 | 5.87 | 5.84 | 5.78 | 5.73 |
| 6-month | 6.08 | 6.07 | 6.09 | 6.06 | 6.11 | 6.08 | 6.02 | 6.00 |
| 1-year | 6.20 | 6.17 | 6.17 | 6.15 | 6.21 | 6.18 | 6.18 | 6.22 |
| 2-year | 6.55 | 6.48 | 6.50 | 6.48 | 6.55 | 6.51 | 6.51 | 6.61 |
| 3-year | 6.62 | 6.55 | 6.54 | 6.52 | 6.58 | 6.56 | 6.55 | 6.65 |
| 5-year | 6.64 | 6.60 | 6.59 | 6.56 | 6.61 | 6.60 | 6.58 | 6.68 |
| 7-year | 6.65 | 6.62 | 6.61 | 6.59 | 6.63 | 6.62 | 6.64 | 6.72 |
| 10-year | 6.42 | 6.39 | 6.38 | 6.35 | 6.39 | 6.39 | 6.39 | 6.52 |
| 20-year | 6.46 | 6.46 | 6.48 | 6.47 | 6.52 | 6.48 | 6.45 | 6.54 |
| 30-year | 6.16 | 6.16 | 6.17 | 6.16 | 6.19 | 6.17 | 6.15 | 6.23 |
| Composite | | | | | | | | |
| Over 10 years (long-term) [14] | 6.41 | 6.41 | 6.43 | 6.42 | 6.47 | 6.43 | 6.41 | 6.49 |
| Corporate bonds | | | | | | | | |
| Moody's seasoned | | | | | | | | |
| Aaa | 7.69 | 7.70 | 7.71 | 7.74 | 7.81 | 7.73 | 7.71 | 7.68 |
| Baa | 8.33 | 8.34 | 8.36 | 8.40 | 8.48 | 8.38 | 8.35 | 8.29 |
| State & local bonds [15] | | | | 5.89 | | 5.89 | 5.94 | 6.00 |
| Conventional mortgages [16] | | | | | 8.23 | 8.23 | 8.27 | 8.33 |

See overleaf for footnotes

EXHIBIT 37